**15-10322**

_____
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**GORDON LEROY HALL,**

**Defendant-Appellant.**
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA (CR-14-00184-NVW-1)
_____

**DEFENDANT - APPELLANT'S EXCERPTS OF RECORD**
**Volume 4: pp. 607-906**
_____

JON M. SANDS
Federal Public Defender
District of Arizona

DANIEL L. KAPLAN
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007-2730
(602) 382-2767

_____
_____

# TABLE OF CONTENTS

**PAGE**

## Volume 1

Reporter's Transcript Excerpt
January 7, 2015 Motion Hearing ............................................................................. 1

Reporter's Transcript Excerpt
January 22, 2015 Jury Trial ................................................................................. 2-4

Reporter's Transcript Excerpt
June 16, 2015 Sentencing Hearing......................................................................... 5-6

## Volume 2

Indictment ....................................................................................................... 7-10

Reporter's Transcript
May 19, 2014 Initial Appearance/Arraignment................................................. 11-37

Government's Motion for a *Faretta* Hearing ................................................... 38-87

Defendant's Pro Se Petition for Judicial Notice ............................................... 88-91

Reporter's Transcript
June 11, 2014 *Faretta* Hearing ..................................................................... 92-129

Reporter's Transcript
June 13, 2014 Appointment/Detention Hearing .......................................... 130-136

Defendant's Motion to Waive Defendant's Presence at
   Status Conference ...................................................................................... 137-139

Defendant's Motion to Determine Competency.......................................... 140-144

Defense Counsel's Motion to Withdraw as Counsel ................................... 145-148

Reporter's Transcript
January 7, 2015 Motion Hearing ................................................................... 149-173

Reporter's Transcript
January 15, 2015 Final Pretrial Conference.................................................. 174-217

Reporter's Transcript Excerpt
January 20, 2015 Jury Trial – Day 1............................................................. 218-306

## Volume 3

Reporter's Transcript Excerpt (continued)
January 20, 2015 Jury Trial – Day 1............................................................. 307-371

Reporter's Transcript
January 21, 2015 Jury Trial – Day 2............................................................. 372-606

## Volume 4

Reporter's Transcript (continued)
January 21, 2015 Jury Trial – Day 2............................................................. 607-690

Reporter's Transcript Excerpt
January 22, 2015 Jury Trial – Day 3............................................................. 691-860

Jury Verdict Form ....................................................................................... 861-862

Trial Exhibit 1 ............................................................................................. 863-867

Trial Exhibit 2 ............................................................................................. 868-872

Trial Exhibit 3 ............................................................................................. 873-875

Trial Exhibit 4 ............................................................................................. 876-878

Trial Exhibit 5 ............................................................................................. 879-881

Trial Exhibit 6 ............................................................................................. 882-906

## Volume 5

Trial Exhibit 6 (continued)..............................................................907-942

Trial Exhibit 7 ...........................................................................943-953

Trial Exhibit 8 ...........................................................................954-958

Trial Exhibit 9 ...........................................................................959-967

Trial Exhibit 10 .........................................................................968-975

Trial Exhibit 11 .........................................................................976-995

Trial Exhibit 12 .........................................................................996-998

Trial Exhibit 19 ........................................................................999-1010

Trial Exhibit 20 .......................................................................1011-1014

Trial Exhibit 29 ............................................................................1015

Trial Exhibit 105 .....................................................................1016-1019

Order Denying Pro Se Motions to Dismiss ....................................1020

Defendant's Pro Se Correspondence to Court ..........................1021-1023

Defendant's Motion to Continue Sentencing............................1024-1028

Defense Counsel's Motion to Withdraw as Counsel ................1029-1034

Reporter's Transcript
June 16, 2015 Sentencing .......................................................1035-1087

Judgment .................................................................................1088-1091

Defendant's Pro Se Notice.......................................................1092-1098

iii

Notice of Appeal ........................................................................ 1099-1100

District Court Docket Sheet ...................................................... 1101-1116

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1   A   To help notarize documents.  I mean, it was a job.

2   Q   Okay.  But specifically, as to going out and becoming a

3   notary, did you have to do certain things to make that happen?

4   A   Just the paperwork that everybody else does.

5   Q   Okay.  And you did that after Benton Hall asked you to

6   become a notary, correct?

7   A   Correct.

8   Q   So what did you do after you did become a notary?

9   A   I would notarize signatures from -- if it had gotten in

10  the mail or not.  But it was only -- I mean, I primarily

11  didn't do that.  Primarily, Niki -- or Nicole Perry notarized

12  the documents.

13  Q   She was also a notary in the office?

14  A   Yes.

15  Q   Okay.  With respect to your duties as a notary, did you

16  ever use that outside of the office?

17  A   I think maybe twice.

18  Q   Primarily, you used it for your work at the office; is

19  that right?

20  A   Yes.

21  Q   Okay.  Did Gordon Hall's company submit documents to the

22  IRS on behalf of clients?

23  A   Yes.

24  Q   And what type of documents did the business use when you

25  first started working for the company in November 2012?

CR14-00184-PHX-NVW     JURY TRIAL - DAY 2   1-21-15

1    A    The surety and indemnity bond.

2    Q    Are you familiar with the phrase "Privately Registered

3    Setoff Bond"?

4    A    Yes.

5    Q    Okay.  What is that document?

6    A    It was -- it was a document and I believe if it's the

7    document that I'm thinking about, it was filed with the UCC

8    Code.

9    Q    That was a notation listed on the document?

10   A    Yes.

11   Q    Was this a type of document that the company sent to the

12   IRS?

13   A    Yes.

14   Q    Okay.  And that was when you began working there; is that

15   correct?

16   A    Yes.

17   Q    Are you familiar with a document called a Notice of Claim?

18   A    Yes.

19   Q    What is that document?

20   A    It was the first document that went out in the series of

21   mailings, basically trying to settle whatever had been

22   existing claim was.

23   Q    So in the series of documents that the company would send

24   out on behalf of clients, generally a Notice of Claim was the

25   first?

ER 608

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1   A    Yes.

2   Q    Okay.  Now, are you familiar with the document called an

3   Affidavit of Service?

4   A    Yes.

5   Q    What is an Affidavit of Service?

6   A    Basically, showing at the end of every mailing there would

7   be an Affidavit of Service with a jurat on it.  I mean,

8   basically stating that the person that had mailed it out being

9   that presenter had deposited it to the Post Office and then

10  that was what would be notarized.

11  Q    So it was a document used with mailings?

12  A    Yes.

13  Q    Every mailing?

14  A    Yes.

15  Q    Okay.  Now, these documents you've just described, were

16  these the type of documents that the business generated?

17  A    Yes.

18  Q    Okay.  Now, you talked about data entry before when you

19  were describing the roles of the different employees.

20         How does that data entry relate to these documents

21  you just described?

22         If you were asked to enter information and create a

23  promissory -- or a setoff bond, what was your job to do to

24  create that document?

25  A    Input the names and the social security numbers and the

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2    1-21-15

1    addresses.

2    Q    All right.  And did you do that?

3    A    Yes.

4    Q    Did other office staff do that as well?

5    A    Yes.

6    Q    And where did the office staff get the individual client's

7    names, social security numbers, other information?

8    A    From the clients.

9    Q    Okay.  Did you have to say you were going to create -- you

10   were going to enter that information in the document.  Would

11   you get it from the client every time you created a document?

12   A    Yes.

13   Q    Okay.  So you would call a client up every time for a

14   social security number?

15            MR. KUNKLE:  Objection, Your Honor.  Leading.

16            THE WITNESS:  You kept a record --

17            THE COURT:  Overruled.  You can answer -- you may

18   answer.

19            THE WITNESS:  You kept a record of it once you had

20   it, but it was all at the discretion -- it was at the

21   discretion of the client.

22   BY MS. EDELSTEIN:

23   Q    Okay.

24   A    I couldn't just grab a computer and start typing stuff up

25   because it's not for me.

1  Q    Okay.  So did you ever create a document that you weren't

2  told to create?

3  A    No.

4  Q    Okay.  Who told you to make the document?

5  A    The client requested it and then we expedited it as a

6  company.

7  Q    So who would the -- would the client call you and request

8  the document?

9  A    Sometimes.

10  Q    Okay.  Now, going back to the --

11        Well, let's just take, for an example, a Notice of

12  Claim document.  You said it was the first in a series; is

13  that right?

14  A    Yes.

15  Q    Now, you just described that a client might call up and

16  say that they wanted to -- what would they say to start the

17  process?

18  A    They would talk to -- I didn't talk to new people, so I

19  can't exactly answer your question.

20  Q    You never spoke to a client about starting a new process?

21  A    No, because it didn't go through me.

22  Q    Who did it go through?

23  A    Gordon Hall or Benton Hall -- or I'm saying Gordon Hall

24  or -- I don't know.

25  Q    Explain if you would, would Gordon Hall type up these

1    notices of claim?

2    A    No.  We did.

3    Q    When you say "we," who are you talking about?

4    A    Office staff.

5    Q    Okay.  How would an office staff member such as yourself

6    create this document once they were told to create it in the

7    steps?

8    A    Input the data.  Have the information.  And if need be, go

9    on PACER and look up the docket sheet.  Figure out what

10   exactly is going on.  Input the data and then that was pretty

11   much it.

12   Q    Was it a form that you entered the information into?

13   A    They were templates where documents with verbiage in

14   there.

15   Q    Okay.  Now, describe for the jury what these templates

16   were.

17   A    They were basically the same document.  The verbiage was

18   changed depending on what was needed by the client and then it

19   was sent off.  I mean, it had different parts to it.  It had

20   what the issue was and it had --

21   Q    Well, let me ask you.  Was there a template for a

22   Privately Registered Setoff Bond?

23   A    There were different -- yes.  There were different

24   documents throughout it.  But I mean it was different parts.

25   Q    Okay.  Listen to the question.

1           Was there a template for a Privately Setoff --

2     Privately Registered Setoff Bond?

3     A    Yes.

4     Q    Okay.  Was there a template for a Notice of Claim?

5     A    Yes.

6     Q    Was there a template for an Affidavit of Service?

7     A    Yes.

8     Q    Did you create those templates?

9     A    No.

10    Q    Who created those templates?

11    A    I know that they came from Brandon Adams and Gordon Hall.

12          But with my experience and the dance of where it was

13    coming where, I would say -- and we went over it one night at

14    the house, it was all coming from Brandon's new idea, so --

15    Q    Are you talking about with respect to the money orders?

16    A    The whole thing.

17    Q    Okay.  So let's go back just to be clear.

18          The templates for the documents that I just

19    mentioned, the Privately Registered Setoff Bond, the Notice of

20    Claims, the Affidavit of Service, where did those three

21    templates come from as far as you know?

22    A    As far as I know, they were in the office and I would get

23    them sent to me.  And once I had them, I had them.

24    Q    Were they in paper form in the office?

25    A    The printed versions already were.  But there were Word

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    documents that were editable on the computer.

2    Q    So there were Word documents on the computer?

3    A    Yes.

4    Q    Okay.  And when you got to the office in November 2012,

5    were the template already on the computers?

6    A    Yes.

7    Q    Once the templates were printed out with the client

8    information, what happened next?

9    A    A set got mailed out and then a set remained in the

10   office.

11   Q    Were the documents printed on standard paper?

12   A    Most of them -- the bonds were printed on thicker paper.

13   Q    Bond paper?

14   A    Yes.

15   Q    How much bond paper did the business go through when you

16   were working there?

17   A    Like a box every two weeks maybe.

18   Q    Do you know how many pages are in a box?

19   A    No.

20   Q    Can you guess?

21          THE COURT:  Don't guess.

22   BY MS. EDELSTEIN:

23   Q    Can you estimate?

24   A    I don't know.  The box was about this big (indicating) so

25   whatever that may be.

UNITED STATES DISTRICT COURT

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    Q    Okay.  Were these -- once the client's information had

2    been entered into these templates and templates had been

3    printed, did the clients sign these documents?

4    A    Yes.

5    Q    Every time?

6    A    Yes.

7    Q    Did you see the client sign the documents?

8    A    No.

9    Q    Who would have taken the documents to the client to sign?

10   A    They were mailed.

11   Q    Okay.  Did employees at the business have authorization to

12   sign for clients in certain circumstances?

13   A    Yes.

14   Q    Did you ever have authority to sign on behalf of a client?

15   A    Maybe once or twice.

16   Q    And you got that authorization from the client?

17   A    Yes.

18   Q    Okay.  Now, you described these bonds, is that right, that

19   were printed using the template?

20          Do you recall from your time working on these

21   particular templates how much was entered on these bonds, the

22   average figure listed on these bonds?

23   A    From what I can recall, it's about a hundred thousand

24   maybe.  I don't --

25   Q    Did they vary, the figures?

UNITED STATES DISTRICT COURT

CR14-00184-PHX-NVW     JURY TRIAL - DAY 2   1-21-15

1    A    Yes.

2    Q    Were they as high as 4.5 million at times?

3    A    I would guess if that's what was trying to be set off, if

4    that was the amount of debt in exchange.

5    Q    So if the -- where did the company get the information

6    about how much debt was owed by a client?

7    A    I don't recall.

8    Q    Now, you described that the documents were mailed; is that

9    correct?

10   A    Yes.

11   Q    Okay.  Was there a certain way they were mailed?

12   A    Certified and Registered Mail.

13   Q    Okay.  Was a specific Post Office used by the business?

14   A    There was a Post Office down the street one way.  And if

15   it was really late, there's a Post Office off of Van Buren

16   that stays open pretty late.

17   Q    And that Post Office on Van Buren was also utilized?

18   A    I believe so.

19   Q    And you said -- were all of the packets from the business,

20   were they always mailed Registered or Certified Mail?

21   A    I believe so.

22   Q    Okay.  And how many did you see mailed out daily on a

23   daily basis?

24   A    It depends on the day.  I mean, there is days when there

25   would be like four or five.

1   Q   A day?

2   A   Yeah.  But then there were days when there was a lot more.

3   It just depended on what needed to go out.

4   Q   Now, in these packets it just wouldn't be a single

5   document; is that correct?

6   A   Well, it was a packet.  It was one document -- well, it

7   was one package and it had different documents that were all

8   on the Affidavit of Service.

9   Q   Okay.  So there would be -- the Affidavit of Service would

10  list the contents of the packet?

11  A   Correct.

12  Q   And some examples of things that could be in there are,

13  for example, the Notice of Claim you described; is that right?

14       How about the setoff bonds?

15  A   Yes.

16  Q   Okay.  Now, the Registered Mail slips, were those kept in

17  the office?  Were extras of those kept in the office?

18  A   Like ones that have already been filled out or ones that

19  are blank?

20  Q   Both.  Were plain Registered Mail slips kept in the

21  office?

22  A   Yes.

23  Q   Were filled out Registered Mail slips kept in the office?

24  A   Yes.

25  Q   Okay.  Now, why were filled-out Registered Mail slips kept

1    in the office?

2    A    Well, the receipt that comes back with -- or the receipt

3    that comes back with Certified Mail you keep it with the

4    mailing.

5    Q    Okay.  So to be clear, when some package was mailed out

6    and a receipt was obtained, that would be stored in the

7    office?

8    A    Correct.

9    Q    Now, with respect to a mailing that had not been done yet,

10   was Post Office Registered Mail labels, blank ones kept in the

11   office for use at a later mailing?

12   A    Yes.

13   Q    And you had access to those in the office to use?

14        Did the person that filled out the Registered Mail

15   labels that were used by the business, was that always the

16   person that mailed the actual package at the Post Office?

17   A    For the most part, yes.

18   Q    Were there times where the person that filled out the

19   label was not the person that actually mailed it?

20   A    Yes.

21   Q    Now, you described earlier that several members of the

22   office staff worked as presenters; is that correct, or were

23   presenters?

24   A    Yes.

25   Q    Will you describe for the jury what that means,

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    "presenter"?

2    A    The third-party person to mail the documents.

3    Q    So the presenter is the person that mailed the documents?

4    A    Yes.

5    Q    Would they have to sign any specific document?

6    A    The Affidavit of Service.

7    Q    So a presenter was responsible for signing an Affidavit of

8    Service?  And you actually acted as a presenter from time to

9    time?

10         Is that a "yes"?

11   A    Yes.  Sorry.

12   Q    Was an Affidavit of Service always filled out for every

13   mailing?

14   A    Yes.

15   Q    Each and every one?

16   A    If it was mailed out.

17   Q    Okay.  So if a document or something that was printed in

18   the office was not actually mailed out, you wouldn't expect to

19   see an Affidavit of Service; is that right?

20   A    Yes.

21   Q    Now, the Affidavit of Service that was put in the mailing

22   packet, was that filled out at the time it was mailed?

23   A    No.

24   Q    Why not?

25   A    Because it shows proof that it was taken to the Post

1    Office and it's already sealed by the time it gets there.  So

2    it would be in the following mailing as an copy.

3    Q   So the actual Affidavit of Service in the mailing packet

4    would not be filled out?

5    A   Yes.

6    Q   It would not be signed; is that right?

7    A   Correct.

8    Q   When was the Affidavit of Service signed after something

9    was mailed?

10   A   The following morning.

11   Q   Okay.  And was that filled-out Affidavit of Service filed

12   in the office?

13   A   Yes.

14   Q   Now, you described that there were multiple steps in terms

15   of these mailings; is that right?

16   A   Yes.

17   Q   So for one client who needed a debt setoff, it wouldn't be

18   just one package; is that right?

19   A   Correct.

20   Q   How many packets were mailed out usually -- how many steps

21   in the process when you started?

22   A   I don't recall.  Multiple steps.

23   Q   More than one?

24   A   Yes.

25   Q   And with each time a mailing was done or a step was done,

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1   would there be an Affidavit of Service?

2   A   Yes.

3   Q   Okay.  How many clients do you believe Gordon Hall's

4   company had?

5   A   I don't know.  Over a hundred, maybe.  I don't really

6   know.  I mean, I can tell you there was a filing cabinet full.

7   Q   Well, would you describe for the jury that filing cabinet?

8   A   It was a standard-wide filing cabinet with --

9         MS. EDELSTEIN:  May the record reflect the witness is

10   holding out her arms about arm length?

11         THE COURT:  The record will so reflect.

12         THE WITNESS:  But three or four drawers, just a

13   filing cabinet.

14   BY MS. EDELSTEIN:

15   Q   And did each of the files in there represent a client's

16   paperwork?

17   A   Yes.

18   Q   And was it full?

19   A   Yes.

20   Q   Were there files that didn't fit in the filing cabinet?

21   A   Yes.  I moved the files to a different filing area in

22   order to alphabetize them.

23   Q   And there were a lot of files?

24   A   Yes.

25   Q   How did the clients pay for the services provided?

1   A   By check or money order payment.

2   Q   Did you see those checks?

3   A   Maybe in passing, but I did not examine them.

4   Q   Were you responsible for collecting those checks?

5   A   At one point if I was going to the house, I would see if

6   there was any mail and I would take it back to the office.

7   But not just checks, just mail in general.  So if there was

8   checks involved, it was part of the mail.

9   Q   So if a check did arrive in the mail, by virtue of you

10  picking up the mail, you would have delivered a check; is that

11  right?

12  A   Correct.

13  Q   So you wouldn't actually call a client and say "You need

14  to pay X amount"; is that right?

15  A   I sent out e-mails and I called on Benton's behalf when he

16  requested it.  But other than that, I didn't.

17  Q   Did you -- now, you said you did it on Benton's behalf.

18  Did Benton tell you how much the client owed?

19  A   It was noted on his iPad.

20  Q   So he would somehow communicate with you what to send in

21  the e-mail?

22  A   Well, yeah.  I would see the iPad and see the amount on

23  there.

24  Q   Were the clients charged for each document that was

25  prepared as far as you know?

1    A    Yes.

2    Q    Were the clients charged for the mailing?

3    A    It was just a -- yes.  Yes.

4    Q    And who do you believe negotiated with the clients as to

5    the fees?

6    A    Gordon Hall or Benton Hall.

7    Q    Okay.  Now, Gordon Hall or Benton Hall.

8         Okay.  And how do you know that?

9    A    I -- I know that they talked about the money, so I would

10   assume -- not necessarily assume, I guess that's not a good

11   word.

12        THE COURT:  Try to speak up a little bit.  All right?

13        THE WITNESS:  I would say it was communicated before

14   the mailings went out, so.

15   BY MS. EDELSTEIN:

16   Q    Did you ever overhear conversations about fees?

17   A    Yes, in passing.

18   Q    But you were not part of those conversations; is that

19   right?

20   A    I don't believe so.

21   Q    At some point did the business start using money orders?

22   A    Yes.

23   Q    Okay.  Now, do you recall when that was?

24   A    January, maybe.  January.

25   Q    Of what year?

```
 1   A   Or December of 2012 or January -- I don't recall an exact

 2   date.

 3   Q   So maybe the end of 2012 into 2013?

 4           Now, how did you become aware that the business was

 5   going to start using money orders?

 6   A   We had a -- we were instructed that that's what was going

 7   to happen.  We had a Webinar with Brandon Adams.

 8   Q   You had a Webinar with Brandon Adams.

 9           Okay.  And where did you watch this Webinar?

10   A   At the office.

11   Q   Okay.  And it was conducted by Brandon Adams?

12   A   Yes.

13   Q   Did all the employees watch this Webinar?

14   A   Yes.

15   Q   Now, who instructed you that the change was going to be to

16   money orders?

17   A   It was just a topic that -- I can't recall who exactly

18   said it first.

19   Q   Okay.  Were you trained on how to prepare these money

20   orders?

21   A   Yes.

22   Q   Who trained you?

23   A   Brandon Adams.

24   Q   And when did he train you?

25   A   When he trained everybody else.
```

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    Q    Where was that?

2    A    I believe at the office.

3    Q    Was there a specific training session held?

4    A    There was one in the office and one at the house.

5    Q    Do you remember when the one at the house would have

6    occurred?

7    A    Around the same time.

8    Q    And are we talking about --

9    A    They first came out.

10   Q    The Presidio Circle house?

11   A    Yes.

12   Q    Gordon Hall's residence?

13   A    Yes.

14   Q    Okay.  And who conducted that training?

15   A    Brandon.

16   Q    Just Brandon Adams?

17   A    Mostly Brandon, yes.

18   Q    Who else?

19   A    Actually, it was Brandon, so.

20   Q    Nobody else spoke at that training?

21   A    I mean, we all speak, but not in a leadership manner.

22   Q    Okay.  Was Gordon Hall present at that training?

23   A    Yes.

24   Q    Okay.  Who were these money orders going to be sent to by

25   the business?

 1    A   I don't recall who exactly it got sent to.  The original

 2    and all that stuff.  But it got sent out just like every other

 3    mailing.

 4    Q   Okay.  Was it sent to the -- were money orders sent to the

 5    IRS?

 6    A   Yes.

 7    Q   And why were the money orders sent to the IRS?  What was

 8    the purpose as far as you understood?

 9    A   Setting off the debt they had with the IRS.

10    Q   Is it setting off the debt who had with the IRS?

11    A   The client.

12    Q   Were you ever told why the business was going to use money

13    orders?

14    A   Because it would -- I mean, it was just a new thing.  I

15    mean, I wouldn't say that there was an exact reason.

16          Changing to something else means something else that

17    somebody knew maybe better or maybe worked better.

18    Q   Do you know whose idea it was to switch over to using

19    money orders?

20    A   I believe it was Brandon Adams.

21    Q   And what makes you say that?

22    A   Because the checks came from him.

23    Q   Okay.  And by "checks," you mean the money orders?

24    A   Yes.

25    Q   So if the money orders came from him, would you describe

1   for the jury how these money orders came from him?  What was

2   the process to get a money order from Brandon Adams?

3   A   There was a spreadsheet that was filled out with a

4   client's name and social and it was printed in New Mexico and

5   sent here in the mail.

6   Q   Okay.  So you said quite a bit there.  So let's kind of

7   break it down step-by-step.

8           Would you take a look at Exhibit 12.  It should be in

9   front of you.  There should be a folder in front of you that

10  says Exhibit 12.

11          A brief indulgence, Your Honor.

12  A   No.  But 9, 10, 19, 20, and 30.

13  Q   It's coming to you right now.

14          If you would turn to page 2 of this exhibit, is that

15  the spreadsheet you just described?

16          Nick, may we go to the computer system, please?

17  A   Yes.

18  Q   Okay.  Now, this is the spreadsheet information that would

19  be sent to Brandon Adams?

20  A   Yes.

21  Q   Who compiled this spreadsheet?

22  A   I mean I might have touched it once, but I don't really

23  remember it.  But I knew that Niki -- or not Niki but Mary

24  Mota and Chris.

25  Q   Office staff members?

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    A    Yes.

2    Q    Okay.  Now, as far as you can recall, the first money

3    orders that the business used, who were they for?

4    A    Gordon Hall.

5    Q    Gordon Hall and.  Who were they going to be sent to?

6    A    The IRS.

7    Q    Now, does this spreadsheet pertain specifically to Gordon

8    Hall?

9    A    Yes.

10   Q    Okay.  And this was the type of information -- this was

11   the information that was sent to Brandon Adams as far as you

12   know?

13   A    Yes.

14   Q    Now, was anything else sent to Brandon Adams besides the

15   information that's listed on this spreadsheet?

16   A    No.

17   Q    And then what would happen after Brandon Adams received

18   this information?

19   A    It would be printed onto a piece of paper and it became a

20   money order.

21   Q    And is it your testimony that Brandon Adams printed the

22   money orders?

23   A    Yes.

24   Q    How do you know that?

25   A    Well, he would say that he sent them.

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1           And in other cases he would talk about having to get
2    some printed out, so.
3    Q   Okay.  Turn, if you would, to Exhibit 1 that also should
4    be in front of you.  And if you would turn to the -- in that
5    package, if you would turn to the actual money order in
6    Exhibit 1.
7    A   Yes.
8    Q   Do you recognize this?
9    A   Yes.
10   Q   Is there a signature on this money order?
11   A   Yes.
12   Q   Do you recognize that signature?
13   A   It's Gordon Hall's signature.
14   Q   Did you see him sign this document?
15   A   Yes.
16   Q   And what were the circumstances of Mr. Hall signing this
17   money order?
18   A   Like --
19   Q   Did you hand him this money order to sign?
20   A   Maybe.  It was two years ago.
21   Q   You did see him sign this document?
22   A   I believe so, yes.
23   Q   Okay.  Now, if you can see, there appears to be on the
24   date there appears --
25   A   The correction on the date?

1  Q   I'm sorry?

2  A   The correction on the date?

3  Q   Yes.

4          Why is there a correction on the date?

5  A   Because it was printed incorrectly.

6  Q   Okay.  Who -- whose initials appear by that correction?

7  A   Gordon Hall's.

8  Q   Did you see Gordon Hall put his initials next to that

9  correction?

10 A   Yes.

11 Q   And down at the bottom it looks like there appears to be

12 another correction, correct, under Record of Payment?

13 A   Uh-huh.

14 Q   Are those Gordon Hall's initials?

15 A   Yes.

16 Q   Did you see him put his initials on that correction?

17 A   Yes.

18 Q   Now, if you're looking at the face of this money order,

19 what information from this would the office have provided to

20 Brandon Adams to print this?

21 A   The name, the address.

22 Q   The name and address of the drawer?

23 A   Yes.  The name and address of the drawer.

24 Q   Okay.  What else?

25 A   The "for the benefit of," the information of what needs to

1    be down there, the tax period and the social.

2    Q    So you are talking about the "memo" line?

3    A    Yes.

4    Q    Now, in your experience, is the social security number

5    that's entered on this memo line, is it the actual social

6    security for the person listed there?

7    A    To my knowledge.

8    Q    Okay.  And does this appear to be Gordon Hall's social

9    security number?

10   A    Yes.

11   Q    Have you ever -- were you aware of any circumstances where

12   the social security number that was listed on the money order

13   did not correspond to the person listed?

14   A    Only in error, so, no.

15   Q    It was supposed to be the accurate social security number?

16   A    Yes.

17   Q    Okay.  Do you know where the amount that's listed on this

18   money order came from?

19   A    I'm guessing the amount was on the spreadsheet as well.

20   Q    So the office staff would have been responsible for

21   entering that information?

22   A    Yes.

23   Q    And, generally, where did the amounts come from that were

24   listed?

25   A    I don't recall.

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    Q    Could they have come from the client?

2    A    Well, yes.

3    Q    Or the individual whose money order it was?

4    A    Yes.

5    Q    Okay.  Would you take a look at page 4.

6         Do you know what this document is?

7    A    Yes.

8    Q    What is it?

9    A    It's a tax document.

10   Q    Do you know who created it?

11   A    I believe I did.

12   Q    I'm sorry?

13   A    I said I believe I may have filled it out.

14   Q    Okay.  And was this one of the documents that you had on

15   the computer that you could fill out?

16   A    Yes.

17   Q    Okay.  And where did you get the information that was

18   listed on this document?

19   A    From the information sheet for -- depending on the client.

20   Q    So the specific spreadsheet.  Turn to page 5, please.

21        Do you recognize this?

22   A    Yes.

23   Q    What is this?

24   A    An Affidavit of Service.

25   Q    Now, do you see your name listed on this Affidavit of

1    Service?

2    A    Yes.

3    Q    And why are you listed on this document?

4    A    Because I was the presenter.

5    Q    Okay.  So you were the person that witnessed the

6    signatures placed on this document; is that what this means?

7    A    Yes.

8    Q    Okay.  And would you have, in fact, filled out this

9    Affidavit of Service that went into the packet?

10   A    I'm sorry.  What was that?

11   Q    Would you have filled out this Affidavit of Service before

12   it went into the packet?

13   A    No -- well, what's listed in the mailing would be on

14   there, yes; but, no, it would not have been signed.

15   Q    It wouldn't have been signed, but the other information we

16   see -- can you go to the broader document.

17         So you would have entered the information on top of

18   where it was going to be mailed to:  T.W. Lyons.  Is that

19   right?

20   A    Yes.

21   Q    Would you have entered the contents of the package?

22   A    Yes.

23   Q    Would you have also entered that "payment for tax period

24   1996" on the "regarding" line?

25   A    Yes.

```
 1    Q    And the total number of pages?

 2    A    Yes.

 3    Q    Okay.  Now, would you please turn your attention to

 4    Exhibit 2.  That should also be in front of you.

 5              Do you see a money order contained in this package?

 6    A    Yes.

 7    Q    And is it signed?

 8    A    Yes.

 9    Q    Do you recognize that signature?

10    A    Yes.

11    Q    Whose is it?

12    A    Gordon Hall's.

13    Q    Did you see him sign this?

14    A    Yes.

15    Q    Now, there appears to also be two corrections on this

16    money order; is that right?

17    A    Yes.

18    Q    Were the -- when you said you saw Gordon Hall sign the

19    money order in Exhibit 1, and now you have just said you saw

20    him sign the money order in Exhibit 2, were these done at the

21    same time?

22    A    Yes.

23    Q    And were the corrections made at the same time?

24    A    Yes.

25    Q    And in this package that you're looking at, does that also
```

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1  contain the Affidavit of Service and the IRS Form 1040-V that

2  you filled out?

3  A   Yes.

4  Q   Turn your attention to Exhibit 9, please.

5        Do you see the envelope?

6  A   Yes.

7  Q   Okay.  Now, is Exhibit 9 a package of documents?

8  A   It was the copy that was in the office.

9  Q   So this is an example of a copy that would be maintained

10 for the mailing that was sent out; is that right?

11       Do you recognize the handwriting on the front of this

12 envelope?

13 A   It's my handwriting.

14 Q   And did you put a date on it?

15 A   Yes.

16 Q   Does this correspond to the money order in Exhibit 1?

17 A   I would believe so.  I don't have a --

18 Q   You can open the packet.

19 A   Yes.

20 Q   Now, I want to just turn to the last page of Exhibit 9.

21 It's an Affidavit of Service.

22 A   Yes.

23 Q   Now, in this copy that's kept in the office, the Affidavit

24 of Service appears to be signed; is that right?

25 A   Correct.

```
 1    Q    Do you see your signature on this document?

 2    A    Yes.

 3    Q    Is that your fingerprint next to it?

 4    A    Yes.

 5    Q    Why does the office maintain a signed and fingerprinted

 6    copy of this?

 7    A    I don't know.

 8    Q    Were you instructed that this was the procedure to follow?

 9    A    Yes.

10    Q    Did you follow the procedure when you were asked to?

11    A    Yes.

12    Q    Okay.  Now, it appears that this document is also

13    notarized.  Do you see that there?

14    A    Yes.

15    Q    Do you recognize the signature of the notary?

16    A    Niki Perry.

17    Q    For -- this all corresponds to the money order that you

18    previously looked at in Exhibit 1; is that right?

19    A    Yes.

20    Q    And there appears -- the top portion of it where T.W.

21    Lyons' name is it appears that a Registered Mail number is

22    placed there, right?

23    A    Yes.

24    Q    How would you have known to put that particular mail

25    number on there?
```

1   A    Because it was all logged as soon as it got put into the

2   Post Office -- like when it got taken to the Post Office, the

3   Registered Mailing numbers were listed and then it gets put

4   onto the document.

5   Q    So you would have used the receipt you got from the

6   Registered Mail from the Post Office to enter this document.

7          Was this Affidavit of Service stored in the files of

8   the business?

9   A    Yes.

10  Q    Please turn to Exhibit 10.

11         Does this appear to be the package that would

12  correspond to the money order in Exhibit 2?

13  A    Yes.

14  Q    And did you fill out the documentation including Affidavit

15  of Service in this packet as you did with Exhibit 9?

16  A    Yes.

17  Q    And turning to the last page, do you recognize your

18  signature on that document?

19  A    On the Affidavit of Service?

20  Q    On the Affidavit of Service, yes.

21         Let me give you a page number.  Page 4.

22  A    Yes.

23  Q    And that is your signature and fingerprint?

24  A    Yes.

25  Q    Now, Ms. Jorgensen, did you ever see the money orders

1  being printed, the documents themselves?

2  A    Once in New Mexico.

3  Q    In New Mexico.  And do you recall when that was?

4  A    Early in the year in 2013 when we went out to New

5  Mexico -- "We" meaning Benton Hall and myself -- to move

6  Brandon Adams and his family to Arizona.

7  Q    So at some point in 2013 Mr. Adams was going to move to

8  Arizona?

9  A    Yes.

10  Q    Okay.  And you and Benton Hall went to assist him with

11  that?

12  A    Yes.

13  Q    Where did you see the money orders being printed?

14  A    In his office space in his own home.

15  Q    And who was actually doing the printing?

16  A    Brandon Adams.

17  Q    And did you see the printer that was being used?

18  A    Yes.

19  Q    Okay.  I'll direct your attention to this side of the

20  courtroom.  There's a printer sitting on this desk over here.

21  Do you see that?

22  A    Yes.

23  Q    Do you recognize that printer?

24  A    Yes.

25  Q    What is that printer?

CR14-00184-PHX-NVW     JURY TRIAL - DAY 2   1-21-15

1   A    It's Micro ink printer.

2   Q    I'm sorry.  I didn't hear you.

3   A    It's a Micro ink printer.

4   Q    What do you mean by a Micro ink printer?

5   A    It's the printer that was used to print the money orders.

6   Q    Now, you said that that was in Brandon Adams' house that

7   you saw the printer printing off the money orders; is that

8   right?

9   A    Yes.

10  Q    Okay.  Were any of these money orders ever printed at the

11  office location on Greenfield Street?

12  A    I believe so.

13  Q    Did you ever witness that?

14  A    I can't recall to say "yes" or "no" because I don't

15  remember clearly.

16  Q    Do you ever recall seeing anyone other than Brandon Adams

17  printing money orders?

18  A    No.

19  Q    Now, you said that you were in New Mexico to help

20  Mr. Adams move; is that right?

21  A    Correct.

22  Q    Would you turn to Exhibit 20.  Do you see that?

23       Do you recognize this residence in Exhibit 20?

24  A    That is the house that Brandon Adams moved into.

25  Q    Okay.  Did he own this house as far as you knew?

 1    A    No.

 2    Q    Who owned this house?

 3    A    It was rented.

 4    Q    Who rented it?

 5    A    Brandon Hall.

 6    Q    For Mr. Adams to live in?

 7    A    Yes.

 8    Q    Okay.  Now, would you turn to the second page of this

 9    exhibit.  Do you see this?

10    A    Yes.

11    Q    Do you recognize where this is?

12    A    It is the office space that is within that home that

13    Brandon Alexander Adams rented.

14    Q    Okay.  And when you were in the home, you said you

15    assisted him to move.  Did you see the money orders being

16    printed on this printer in this office?

17    A    Yes.

18    Q    Okay.  During the -- your time working for Gordon Hall's

19    business, how many money orders do you think the company

20    mailed out for clients?

21    A    I don't recall.  I know we got an envelope from Brandon

22    like once a week, maybe twice, and it had -- I don't know,

23    like three or four in it.  Sometimes more.  Sometimes less.

24    Q    So there would be three or four money orders in a package

25    that was received once or twice a week; is that right?

```
 1   A   Oh, actually, no.  I take -- take that back.

 2           Maybe closer to nine.

 3   Q   Nine money orders?

 4   A   Money orders.

 5   Q   A week?

 6   A   Yes.

 7   Q   Did that number change after he moved down to Arizona?

 8   A   Yes.  He was not -- he was no longer mailing them.

 9   Q   How many -- did the number of money orders weekly change

10   from nine -- was it more or less after he moved here?

11   A   It was less, simply because everything stopped then, so.

12   Q   And what do you mean everything stopped then?

13   A   The search warrant and the arrests and that all started

14   pretty much as soon as we got Brandon out here, so.

15   Q   So shortly after Mr. Adams moved to Arizona, the search

16   warrants were executed?

17   A   Yes.

18   Q   Okay.  Would you turn to Exhibit 8.

19           Do you recognize the individual in this picture?

20   A   Yes.  It's Benton Hall.

21   Q   How certain are you?

22   A   A hundred percent certain.

23   Q   Okay.  Would you take a look at Defense Exhibit 103.  It

24   should be up there.  It may not be.  So I don't know that I

25   requested it, so it will be brought up to you in just one
```

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

```
 1   second.  I'm sorry.  101.  Sorry.
 2   A   Am I to keep both of them open at the same time?
 3   Q   You can.  Let me just briefly switch to the document
 4   camera.
 5           Now, this is Defense Exhibit 101.  Do you see some
 6   handwriting on this mailing receipt?
 7   A   Yes.
 8   Q   Do you recognize the handwriting?
 9   A   Yes.
10   Q   Whose handwriting is this?
11   A   That is Benton Hall's handwriting.
12   Q   So you did not fill out this lower portion of this
13   document; is that correct?
14   A   Correct.
15   Q   Okay.  When you were working for Gordon Hall's company,
16   how often were you paid?
17   A   Weekly.
18   Q   And how were you paid?
19   A   Cash.
20   Q   Who paid you?
21   A   Benton paid everybody, but the money came from Gordon
22   Hall.
23   Q   How do you know that?
24   A   Because they would go to the bank together and he would
25   get the money from his father and then pay the employees.
```

1    Q    In cash?

2    A    In cash.

3    Q    Were the other employees also paid in cash as far as you

4    know?

5    A    Yes.

6    Q    Ms. Jorgensen, are you still owed money for work you did

7    while working for the company?

8            MR. KUNKLE:  Objection, Your Honor.  Relevance.

9            THE COURT:  Overruled.

10            THE WITNESS:  Yes.

11   BY MS. EDELSTEIN:

12   Q    Would you accept one of Gordon Hall's money orders as

13   payment for the amount you are owed?

14   A    No.

15   Q    Why?

16   A    I would prefer it cash because I know that it's going to

17   be a payment.

18   Q    Okay.  Would you have accepted one of those money orders

19   as payment while you were working for the business?

20   A    No.

21   Q    Why?

22   A    Because I was getting paid cash.

23   Q    I'm sorry?

24   A    I wasn't going to change the way I was being paid.  And

25   the money orders were drawn off the Treasury -- or they had

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    something with the Treasury and my relation was with them as

2    an employer and nothing else.

3    Q    Would you have accepted a money order in lieu of cash in a

4    week that you were not there?

5    A    No.

6    Q    You wouldn't have accepted that as payment?

7    A    No.

8    Q    You would have insisted on being paid in cash?

9    A    Correct.

10   Q    During the entire time you were working for Gordon Hall's

11   business, how often was a client's debt settled?

12   A    None.  Never.

13   Q    None that you're aware of?

14   A    None that I'm aware of.

15        MS. EDELSTEIN:  Brief indulgence, Your Honor.

16   BY MS. EDELSTEIN:

17   Q    Now, with the setoff bonds that you described before, you

18   said that there was a multiple-step process in the mailing; is

19   that right?

20   A    Yes.

21   Q    Was there a multiple-step process for the money orders?

22   A    Yes.

23   Q    Okay.  How many steps were involved in the money orders?

24   A    I don't recall.

25   Q    Was it as many steps as the setoff bond?

1   A   I would think so, yes.

2   Q   So there would be multiple mailings of the money orders as

3   there was with the setoff bond?

4   A   Yes.

5   Q   And did you ever -- were you ever involved in these

6   multiple mailings for the money orders?

7   A   By what -- in what way are you asking?

8   Q   With respect to the setoff bonds, you said that there were

9   a series of mailings; is that right?

10  A   Yes.

11  Q   For the money orders, was there also a series of mailings?

12  A   Yes.

13  Q   Okay.  Were you ever involved in the series of mailings

14  for the money orders?

15  A   As in the later mailings for the initial money order sent?

16  Q   Yes.

17  A   Yes.

18  Q   What was contained in the later mailings for the money

19  orders?

20  A   I don't recall.

21  Q   Okay.  Was it an additional money order?

22  A   I don't recall.

23          MS. EDELSTEIN:  No additional questions, Your Honor.

24          THE COURT:  All right.  You may cross examine.

25                      **CROSS EXAMINATION**

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1    BY MR. KUNKLE:

2    Q   Good afternoon, Ms. Jorgensen.  How are you?

3    A   I'm here.

4    Q   You're shrugging your shoulders and saying you're here.

5             You don't want to be here, do you?

6    A   No.

7    Q   Why not?

8    A   Because I would rather be at work.

9    Q   Okay.  Fair enough.

10            Did you want to testify against Mr. Hall?

11   A   No.

12   Q   When you met with the agents, did that ever come up in any

13   discussions about your involvement in this?

14   A   By what exactly are you asking?

15   Q   Well, what I'm asking you is did they ever discuss with

16   you that you could be charged with a crime?

17   A   Asking if I would be charged with a crime?

18   Q   Yes.

19   A   No.

20   Q   That never came up in any discussions?

21   A   I mean, I have asked to know what's going on.  But my --

22   from my understanding is purely a witness.

23   Q   And you are not going to be charged with anything,

24   correct, as far as you know?

25   A   As far as I know, no.

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1   Q    When you met with the agents, Agent Neri and Agent Nixon,

2   your mother was with you, correct?

3   A    Correct.

4   Q    And she's here in the audience today, right?  She's in the

5   front row over there?

6   A    Yes.

7   Q    You met Gordon Hall after your mother -- and I think it

8   was your step-father attended a seminar, correct, of Brandon

9   Adams?

10  A    I don't recall when they met.  I recall when I met them.

11  Q    Okay.

12  A    So I can't say if it was before or after anything.

13  Q    Let's start backwards.

14       You were asked if you would take one of these money

15  orders and you said "no."

16  A    Correct?  No.

17  Q    You wouldn't.

18       It's drawn or the Treasury, right?

19  A    Yes.  Yes.

20  Q    Did you understand these things to work?

21  A    No.

22  Q    Why not?

23  A    Because I'm a person of proof.

24  Q    Well, what does that mean you are a person of proof?

25  A    I wouldn't say that I knew something worked unless I tried

UNITED STATES DISTRICT COURT

ER 647

1    it and it worked.

2    Q   Okay.  I'm having a hard time hearing you.

3            Okay.  Let me just ask you something just real quick.

4            You looked at those money orders, correct?

5    A   Correct.

6    Q   You read through them?

7    A   Yes.

8    Q   And just to back up one more moment, you used a phrase

9    about those money orders being mailed to the IRS.  You said it

10   was "to set off a debt."

11           Do you recall using that phrase in your testimony?

12   A   Yes.

13   Q   What did you mean by that?

14   A   It was the phrase that I received when I asked questions.

15           I mean it was the same response that I got.

16           To elaborate that?

17   Q   Yea.  Please elaborate.  What does that mean to you to set

18   off a debt?

19   A   Well, there's a debt.  In this instance there is money

20   that's owed in taxes.

21           I don't know how the monetary amount equals out to

22   setoff whatever it does, but to settle an agreement of

23   disagreements.  I mean there's a debt that needs to be paid.

24   Some action needs to be taken.  And that action was to set off

25   that debt.

1   Q   Using what to set off that debt?

2   A   That money order.

3   Q   Okay.  And how would that work as you understood it?

4   A   I was doing a job that I was asked to do.  I was working

5   and I was doing what I was told.

6   Q   Okay.  So you never had it fully explained to you?

7   A   It's been two years and I do my best to forget everything,

8   so I'm trying to pull it back into my brain.

9   Q   Did you understand that that setoff would come from an

10  account at the Treasury connected to someone's social security

11  number?

12          Does that sound familiar to you?

13  A   Yes.  I had heard that.

14  Q   Who had you heard that from?

15  A   Brandon Adams.

16  Q   And Brandon Adams, I believe at one point you told the

17  agents he was in it just for the money, right?

18  A   Unless --

19          MS. EDELSTEIN:  Objection.  Calls for speculation,

20  Your Honor.

21          THE COURT:  Well, I'll allow the question.  I'm

22  wondering if we need more foundation for it.

23          Overruled.  You can answer the question if you know.

24          THE WITNESS:  Will you repeat the question, please?

25  BY MR. KUNKLE:

```
1   Q    My question to you is:  Do you recall telling the agents

2   that you believed Brandon Adams was involved in this just for

3   the money.

4   A    Yes.

5   Q    And that Jack Smith, he believed in it, the process,

6   correct?

7   A    Yes.

8   Q    And that Gordon Hall and Benton Hall believed in the

9   process, correct?

10  A    Correct.

11  Q    And this process was this idea that you could set off a

12  debt based on this secret account that you had with the United

13  States Treasury, correct?

14  A    Correct.

15  Q    And that secret account was the government held that in

16  someone's name connected to their social security number.

17           Does that sound familiar?

18  A    Yes.

19  Q    I know you want to forget this and it's two years ago but

20  that all sounds about what you heard, correct?

21  A    Correct.

22  Q    And you mentioned a Webinar that you watched.

23  A    It was like a conference.

24           Do I need to elaborate a Webinar?

25  Q    No.  I think everybody knows what a Webinar is.  But I
```

1    mean what do you remember at the Webinar that you heard?  It

2    was just a presentation about how this would work, right?

3    A   Yes.  It was a different flow of things because Brandon

4    Adams was changing up the process, adding different steps with

5    different instruments such as the money order, I believe.

6    Q   Prior to that, the process, you had mentioned, involved a

7    Notice of Claim and an offer to settle the debt, correct, and

8    maybe even a Privately Registered Setoff Bond?

9         Does that also sound familiar?

10   A   Yes.

11   Q   And to your knowledge, that never worked, right?

12   A   I'm not going to say that it never worked, but I'm not

13   going to say that it did, because I can't testify with a

14   hundred percent to anything.

15        Because maybe in 300 years from now maybe it will

16   work, but I don't know.

17   Q   Well, the idea that the process changed was because they

18   were perhaps fumbling around to find a new way to make this

19   work.  Would that sound fair?

20   A   Yeah.  It was a different approach, I would take it, just

21   like the A1-A process that was original before the Notice of

22   Claim and the different mailings and that.

23   Q   So A1-A was different from A1-B in terms of processes?

24   A   Yes.  I mean, I would -- whatever the different things

25   were, I knew there was something called A1-A and it was a

1    different process before I started because I was moving the

2    files.  So I'm like, "What's this?  It's different."  And then

3    filed it.

4    Q   And to your knowledge, the idea that this had to keep

5    changing was because none of this was really working for many

6    of these people, correct?

7    A   Correct.

8    Q   And this company, just so we're all clear, was called

9    Creditor in Commerce.

10          Does that sound familiar?

11   A   Yes.  There were different names.

12          Benton went by Air Avas Consulting and then there was

13   the Commerce Coach.  That was on the e-mails.  I don't know if

14   that was an association through a business name.  There were

15   just multiple, so I couldn't discern a certain one.

16   Q   Master in Commerce, does that ring a bell?

17          You are shaking your head "yes"?

18   A   Yes.

19   Q   And was that Mr. Adams' outfit connected with the --

20   A   Yes.  Master in Commerce, MIC, that is Brandon Adams.

21   Q   And did he promote that through the -- was it the Center

22   for New Leadership?  Was that one you mentioned in New Mexico?

23   A   Yes.

24   Q   And who was involved in that Center For New Leadership in

25   New Mexico?  CNFLM or something like that?

1    A    Yea.  CLFNM.  That was Celestina's -- Celestina Adams.  I

2    don't know if she has his last name or hers -- Garcia maybe is

3    her last name.  I'm not sure.  Brandon's wife.

4           It was her -- it had a different meaning for the both

5    of them, I would say.  She was in it for self-progress and the

6    actual CLFNM itself -- I went to it.  I attended the first

7    one.

8           And like I said, that's where I met Brandon Adams.

9    And it wasn't about bonds or money orders or any of that.  It

10   was about personal growth.

11   Q    From there though, when you later -- did you later attend

12   anything with Master in Commerce or Credit in Commerce?

13   A    No.

14   Q    Did you ever see any of the materials or teaching

15   materials?

16   A    Unless those terms were incorporated into where I worked,

17   I don't know if I touched them or not.

18   Q    And when you say you worked there, did you ever

19   participate in any of the conference calls on Monday nights or

20   anything like that?

21   A    I listened to them.

22   Q    You listened to them.  How many times?

23   A    Maybe -- I mean, I heard it a lot at my home because my

24   parents listened to it.

25           But aside from that, going out of my way to sit on

1    the phone for quite a while, unless I was at the Halls' home

2    residence or that -- I mean I wouldn't listen to it.

3         So I -- I mean maybe three, four times, aside, like

4    in my own choosing, maybe once.

5    Q   And when you listened to those calls, that material, did

6    it make sense to you?

7    A   Well, of course it makes sense.

8    Q   Tell us why it made sense to you.

9    A   I would say that no matter what, if I stood here and I

10   said that, you know, flowers grow in pots, but they grow in

11   pots because I tell them to.  I mean, you don't know why

12   flowers grow in pots.  They just grow in pots.

13        But if I say that and it makes sense because I can

14   explain this, that, and the other to give proof to what I'm

15   saying, then you would believe what I'm saying.

16        I don't know if that's making sense.

17        It gives rise when it's rolled so sweetly off the

18   tongue.  If you're a good talker, people listen.  If you are a

19   good salesperson, people buy your cars.

20   Q   You said you heard it at home too, correct?

21   A   Correct.

22   Q   Your mother and step-father, did they engage in this

23   process as well?

24   A   Possibly.  I don't remember if it was a "yes" or "no" on

25   that one.  Maybe -- yes.  Yes.

1   Q   They did?  Did they go through the Notice of Claim and the

2   tender of settlement and all these --

3   A   It was the A1-A process maybe.

4   Q   Okay.  I say you looking at your mom.

5         If you don't remember, that's fine.

6   A   I don't know what exactly it was.  I know that the

7   interest of that was around so -- I mean, I don't recall what

8   exactly happened.  I know that they were family friends and I

9   enjoyed spending time with them and they are genuinely nice

10  people.  I that's what I can testify on that point.

11        I hung out with them to hang out with them as people.

12  I chose to spend my time with them to hang out with them as

13  people and family friends.

14        THE COURT:  Mr. Kunkle, about how long do you have?

15        MR. KUNKLE:  Just a few more minutes.  I know the

16  jury is looking at the clock.

17        THE COURT:  May I impose on the jury to stay a little

18  late so that we can finish with the witness and she will not

19  have to come back tomorrow.

20        All right.  Go ahead, Mr. Kunkle.

21  BY MR. KUNKLE:

22  Q   And just so it's clear, Ms. Jorgensen, when you learned

23  this, you learned this after you started working there or did

24  you learn some of it before you started working with Mr. Hall?

25  A   After I started working there.

1   Q   And as you look back on it now, does it make any sense to

2   you?

3   A   I suppose in its own way.  I don't know how else to convey

4   my point to you.

5   Q   Well, try.

6        Please explain to these folks over here to my left.

7   Tell them why it makes sense.  Why it stills makes sense to

8   you in some way.

9   A   You didn't know that two plus two equaled four until

10  somebody told you but that is a fact.  Now everybody else

11  knows that.  But if somebody hauled off and said this crazy

12  number, plus this, subtract that, multiply it by this, and

13  divide it by that, then add, you know, variables in there,

14  there's a mathematical way to deduct what that number may be.

15       But in logic, you have to find reasoning from

16  somebody else and have trust; and I trusted them.  So I didn't

17  see why I should not trust them.  But I didn't necessarily

18  fully believe.  It was a job to me.

19  Q   By the way, you mentioned you wouldn't take those money

20  orders.  Have you ever taken out a money orders at a Western

21  Union or Safeway or anything like that yourself?

22  A   Yes.  I used to pay my rent with it.

23  Q   When you do that, do you sign your own money order as the

24  person who can pay the money order?

25  A   Yes.

```
 1   Q    Okay.  You sign as the person who's taking it out.

 2              You're not saying "sign it" and saying Timothy

 3   Geithner will pay my rent, right?

 4   A    No.

 5   Q    You're laughing because you know that's somewhat of a

 6   preposterous notion, correct?

 7              Is that "yes"?

 8   A    Yes.

 9              MR. KUNKLE:  All right.  I have nothing further, Your

10   Honor.

11              THE COURT:  All right.  Any redirect?

12              MS. EDELSTEIN:  Very briefly, Your Honor.

13                        REDIRECT EXAMINATION

14   BY MS. EDELSTEIN:

15   Q    Ms. Jorgensen, as far as you are aware, were any of the

16   office staff in this case charged with a crime?

17   A    I don't believe so.

18   Q    Was it your understanding that the money orders would pay

19   a client's tax debt?  Was that their purpose?

20   A    Yes.

21   Q    Was it your understanding that the money orders in

22   Exhibits 1 and 2 that you looked at were meant to pay off

23   Gordon Hall's tax debt?

24   A    Yes.

25   Q    You stated today that even though looking back, it's hard
```

1    to conceive of, but even today, some part of this makes sense;

2    is that correct?  Some part of the process makes sense; is

3    that what you just testified to?

4    A   Yes.

5    Q   Even knowing that, would you accept -- would you accept

6    one of these money orders in payment?

7    A   No.

8              MS. EDELSTEIN:  No further questions, Your Honor.

9              THE COURT:  All right, counsel.  May Ms. Jorgensen be

10   excused permanently?

11             MS. EDELSTEIN:  Yes, Your Honor.

12             MR. KUNKLE:  Yes, Your Honor.

13             THE COURT:  All right.  Ms. Jorgensen, I instruct you

14   not to discuss your testimony with anyone except the lawyers

15   in this case until the trial is over.  With that you are

16   excused.

17             Thank you.  You may step down.

18             Now, we will be in recess till nine o'clock in the

19   morning.  And, again, I remind the jury of the admonitions.

20             Do not discuss the case with anyone.  Do not allow

21   anyone to discuss it with you.  Do not do any independent

22   research or investigation and keep your minds open.

23             With that we will be in recess until nine o'clock.

24             All rise for the jury.

25        (Open court, no jury present at 5:00 p.m.)

1    **INSTRUCTION CONFERENCE**

2            THE COURT:  All right.  Please be seated.

3            The record will show the absence of the jury.

4            Counsel, I want to take a short break and then

5    discuss the jury instructions but first let me discuss our

6    discussion.

7            Before we finalize the jury instructions, I will

8    remind you all you will have your opportunity to make

9    objections to any instructions or failure to give

10   instructions.  That will be your opportunity to do that and

11   that will be the time in which you must do it in order to

12   preserve any objection for appellate review.

13           The discussion I want to have about instructions is

14   not that.  I don't view anything we say in this discussion as

15   preserving the record for anything.

16           And the reason is I want an open discussion to

17   understand the instructions, see what we can do to improve

18   them, but I will remind you to make your formal objections if

19   you have any before we finalize them tomorrow.

20           Now, with that we're running late.  I don't really

21   view it as necessary to keep the court reporter here for this

22   discussion because it's not going to preserve any record or

23   anything unless somebody would like to of it.

24           Do either of you want to have the court reporter here

25   for the discussion I want to have on the instructions?

1        MS. EDELSTEIN:  No, Your Honor.

2        MR. KUNKLE:  Your Honor, I think under the

3   circumstances, I hate to impose on the court reporter.

4        THE COURT:  Actually, I think I understand why you're

5   saying that and so we'll do that.

6        So I'm going to ask.  We'll take a break so

7   everybody, especially the court reporter, can take a little

8   rest, and then we will come back in ten minutes and have this

9   discussion.

10        Also, Cullen, do you have that page?  I have done a

11  replacement page 10 where I have taken a crack at that

12  instruction as I indicated about accomplices and agreements

13  not to prosecute.

14        So take a look at that and we'll be in recess for ten

15  minutes.

16     (Recess taken at 5:03 p.m.; resumed at 5:15 p.m.)

17     (Open court, no jury present.)

18        THE COURT:  Please be seated.  Have you all had a

19  chance to look at this?  Are we ready to talk about it?

20        MS. EDELSTEIN:  Yes, Your Honor.

21        MR. KUNKLE:  Yes, sir.

22        THE COURT:  Well, I'll tell you what.  Why don't we

23  just take it from the beginning.

24        The things that are of interest to me are the

25  substantive instructions.  I think the rest are pretty cut and

1    dried.  They are things you already agreed to.

2         Let's just -- let's see.  Well, looking at the bottom

3    of page 2, it ends with a question mark.  It should be a

4    period.  We'll date it tomorrow.

5         So any comments or questions on page 2?

6         MS. EDELSTEIN:  Just what you already saw, Your

7    Honor.

8         THE COURT:  All right.  Then now page 3, I think the

9    only thing -- well; first of all, I think you all generally

10   did a good job on writing this instruction from scratch.  I

11   have bolded the language Mr. Kunkle has requested that is in

12   dispute.

13        And frankly, you know, we need to have language here

14   that correctly comports with the *Howick* case but is

15   understandable to real people.

16        I mean, that's a great opinion for lawyers to read

17   because the court did a great job of exploring the issue, but

18   we can't write a jury instruction that has five or six

19   restatements of the same idea from different perspectives.

20        So the first sentence which is the government's

21   sentence looks fine to me.  So, Mr. Kunkle, tell me why we

22   need and what we need from your bolded second sentence in the

23   middle of page 3.

24        And by the way, you can see I actually edited your

25   language.  In the second sentence you had the "document must

1    hold itself out."

2          And I added "credibly" just for purposes of

3    discussion.  I'm not sure that's right or a good idea, but.

4          MR. KUNKLE:  Your Honor, just -- I'm trying to

5    recollect what I had sent to Ms. Edelstein last evening by

6    e-mail, but the point is, that sentence in bold in this -- and

7    I would ask that, you know, for purposes of the record in the

8    event that the Court does not give this instruction, that this

9    be marked.  Obviously, we'll talk about it on the record.

10          THE COURT:  Can you speak into the microphone?

11          MR. KUNKLE:  Oh, I'm sorry.  I thought I was.

12          Your Honor, I would ask that this document be marked

13    as an exhibit, you know, obviously for today for purposes of

14    appeal in the event I'm overruled.

15          But that sentence, Your Honor -- that actually is two

16    sentences.  I'm sorry to interrupt you, sir.

17          THE COURT:  I can file something with the Clerk's

18    Office so that will have that convenient record.

19          MR. KUNKLE:  All right.  The two sentences there in

20    bold, Your Honor, comes straight from the opinion in *Howick*.

21          And why I believe they are important is because, one,

22    without that, it becomes too subjective of what a document

23    purports to be.

24          And the law is that this has to have some objective

25    component and fashioned to the document itself.  And that's

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    what *Howick* says.  I mean, the line is right there in the

2    opinion I'm reading:  "To trigger liability, the document need

3    only credibly hold itself out as a negotiable instrument."

4             MS. EDELSTEIN:  Mr. Kunkle, where are you reading

5    from?

6             MR. KUNKLE:  I'm sorry, Ms. Edelstein.  It's in the

7    *Howick* opinion.  I believe it's page 1068 near the bottom of

8    the page.

9             THE COURT:  What headnote is it?  What headnote

10   number?

11            MR. KUNKLE:  Your Honor, my opinion doesn't have

12   headnotes printed in it.  I think it's page 1068.

13            THE COURT:  I'm reading a Lexis version, so I don't

14   have the same pagination.

15            MR. KUNKLE:  There's the one paragraph that starts,

16   "The standard we announce today" and the next paragraph says

17   "Thus, those who regard fictitious obligations in general when

18   they discuss people of a rather credulous nature."

19            THE COURT:  Yea.

20            MR. KUNKLE:  And the being able to detect bogus

21   obligation by noticing variations between the phony document

22   and the real McCoy.

23            And at the end of that paragraph the Ninth Circuit

24   writes, "To trigger liability, the document need only credibly

25   hold itself out as a negotiable instrument."

1          And I just -- and that's where that language comes

2    from.

3          THE COURT:  Well, let me tell you.  Here's the

4    problem is all this language is good, but the matter is having

5    it not misleadingly incomplete.

6          If I look at the last page of the opinion, about five

7    paragraphs up, there's a passage that struck me as getting to

8    the gist of it.  Well, it's -- it says:

9          Accordingly, Congress provided protection from fraud

10   to a particularly vulnerable class of victims.  In keeping

11   with that objective, we conclude that the statute criminalizes

12   even bogus obligations that a prudent person might, upon

13   consideration, be unlikely to accept as genuine, so long as

14   those documents bear a family resemblance to actual financial

15   obligations.  To trigger liability, in other words, the

16   document need only credibly hold itself out as a negotiable

17   instrument.

18         Now, let me tell you for better or for worse, having

19   labored through this opinion, I have this sense of an

20   epiphany.  I think I understand what they're saying here.

21         And that is -- so you're all in trouble.  But they're

22   talking here about it -- on its face this document, it looks

23   like the stuff we see as a money order; and in form, it looks

24   like it.

25         If you have even a modest amount of sophistication,

1    you might wonder about an order drawn on the Secretary of

2    Treasury.  But on the other hand, the Secretary -- the

3    Treasury Department issues paper all the time.

4         So when I look at the fact of the evidence of this

5    case, I don't have any difficulty concluding that these two

6    checks, these money orders, fall within jury submissible scope

7    of this statute.

8         The question is we want to instruct them so they can

9    apply this statute; understand it correctly and apply it.

10        So the fact that I think it's sufficient, you know,

11   doesn't end the inquiry.  And, in fact, in some ways this --

12   and, again, we've heard a lot of evidence about all the other

13   paper, the ancillary paper that went with this program.

14        That's not the corpus delicti of this crime.  It's

15   only these two money orders.  That information is relevant and

16   admissible to put context and shed light for what these two

17   were and whether they are proof of intent to deceive is met.

18   But it's only these two documents that need to satisfy that

19   requirement.

20        So I'm not -- I'm not saying no.  I'm just sort of

21   emoting with you all about this and let's figure out how to

22   make it work.

23        MR. KUNKLE:  The other -- and not to further

24   complicate matters, Your Honor, and I just wanted to point

25   this out, I also believe that we need to give a definition

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1    from this Court of what a "negotiable instrument" means.

2           Because, you know, we all have belief we know what it

3    means, but "negotiable" means it can be used in commerce.  It

4    can be deposited.  It can be relied upon, much like a check or

5    a real money order.

6           And so I think for the jury's sake, and because I

7    think the document has to stand on its own, we have to also

8    define what "negotiable" means in commerce.

9           THE COURT:  Well, under the Uniform Commercial Code,

10   "negotiable" means that it's transferable -- could be

11   transferred to a holder in due course, I think.  I'm going way

12   back, but that's not what we're talking about here.

13          MS. EDELSTEIN:  You Honor, I think that adds a great

14   deal of confusion.  The government does not have to prove that

15   this was a negotiable instrument, only look it looks like a

16   financial instrument.

17          THE COURT:  He wants a definition.  But, you know, my

18   sense of it is that "negotiable instrument," in common

19   parlance, means anything that you can transfer.  The Uniform

20   Commercial Code has a different definition which I think

21   clearly is not what we're talking about here.

22          And I also think this document unquestionably meets

23   any statutory understanding of what this statute means.

24          I think trying to define "negotiable instrument"

25   beyond the common sense understanding is "something that

1   people can sign off on to someone else who may or may not take

2   it" would only make things considerably worse.

3         And I think we can -- this clearly was, on its face,

4   purports to be negotiable.  That's the whole point of it.  So,

5   again, I apologize for not being very articulate, but we have

6   to be very careful to have a definition here that does not --

7   that captures the gist of this without going to confusion.

8         Now, maybe let me -- I understand your point.  Maybe

9   I should ask Ms. Edelstein to tell us what's wrong with this

10  language.

11        MS. EDELSTEIN:  Your Honor, well, one, that sentiment

12  of what he's asking to be added is essentially already laid

13  out in the preceding sentence, and then further down in the

14  last line starting at 23 of the following paragraph.

15        The item need only credibly appear to be in a class

16  of or bear a family resemblance to financial instruments.

17  That's drawn directly from the *Howick* opinion, the case

18  itself, Your Honor.  That's literally the way that the court

19  lays it out in terms of the liability here.

20        On top of that, the first line:

21        A fictitious financial instrument and the fact of the

22  instrument's nonexistence is presumably unknown and not

23  revealed to the intended recipient.

24        If you look at the previous line, starting line 15:

25        A fictitious instrument is a bogus document created

1    to --

2            THE COURT:  Slow down.

3            MS. EDELSTEIN:  Sorry.

4            A fictitious instrument is a bogus document created

5    to appear to be a financial instrument although no such

6    genuine financial instrument exists.  And the fact of the

7    instrument -- it should actually be possessive, Your Honor.

8    An apostrophe needs to be inserted there -- nonexistence is

9    unknown to the intended recipient.

10            So it's essentially duplicating the exact same

11   statements in the portion of the instruction starting at 15,

12   and then again at 23, both of which were drawn directly from

13   the *Howick* opinion.

14            THE COURT:  And that's where I added the word

15   "credibly."  I think it's not spelled right, but --

16            MS. EDELSTEIN:  "Credibly."  Yes, it would be a "Y."

17            THE COURT:  Got it.

18            MS. EDELSTEIN:  So the government's position is it's

19   redundant, Your Honor, and not exactly easy to understand

20   phrased in that way.

21            THE COURT:  And to the extent it's not redundant it's

22   too narrow.  I don't think it has to hold itself out as a

23   negotiable instrument in the UCC sense.  It has to credibly

24   appear to be in a class of documents.

25            MS. EDELSTEIN:  That's right.  And the filing that I

1    have submitted to Your Honor this morning, that was part of

2    the government's objection is it's slightly off in the sense

3    that this case doesn't hold that the statute or -- sorry --

4    I'm tired as well -- that the financial instrument must hold

5    itself out.  It just has to have a credible appearance to

6    resemble, not that it must be credible.

7         THE COURT:  And there's also a passage here -- where

8    is it?  There's other language that we cannot incorporate at

9    all, but it really gives me an understanding.  They talk about

10   whether the document is, quote, free of disqualifying marks.

11        If you have a picture of dog smoking a cigarette,

12   it's probably not currency or a bond or something.  And they

13   say the standard is not a stringent one.

14        MR. KUNKLE:  Your Honor, I'm sorry.  I think I can

15   head this off in the pass right now, Your Honor.

16        THE COURT:  Go ahead.

17        MR. KUNKLE:  I'm rereading the *Salman* opinion while

18   we're sitting here, not to suggest I'm not listening to Your

19   Honor or Ms. Edelstein, because I know this is important.

20        And, again, I apologize for not having a headnote

21   available to copy and reading from is not one.

22        But the language in *Salman* -- and that's S-A-L-M-A-N.

23   It's 531 F.3d, Your Honor, 1007.

24        THE COURT:  Which case is that?

25        MR. KUNKLE:  *United States v. Albert Salman*.  It's a

 1    later case.  531 F.3d, 1007.  It's 2008.

 2              THE COURT:  Is that a Ninth Circuit case?

 3              MR. KUNKLE:  Yes, sir.  Yes, sir.

 4              MS. EDELSTEIN:  Could you restate that, please?

 5              MR. KUNKLE:  I'm sorry.  I have a copy here if

 6    counsel needs it from the government.  It's 531 F.3d, 1007.

 7              And I just point that out because in that case it

 8    appears Mr. Salman used a sight draft.

 9              THE COURT:  A what?

10              MR. KUNKLE:  A sight draft in order to pay someone

11    else, Your Honor.  I'm sorry.

12              THE COURT:  I'm not familiar with that term.  Is that

13    like a bearer instrument or --

14              MR. KUNKLE:  I'm trying to find the language in here

15    where it discusses what a sight draft is.

16              I think there's a footnote at the end.  There's --

17    it's:

18              "A draft is simply an order to pay, and by putting

19    the word 'sight' in front of it just implies that you are to

20    pay the item on sight."

21              This is the language that the expert used in that

22    case, a gentleman named Mr. Reusser.

23              THE COURT:  To me that sounds like a bearer document.

24              MR. KUNKLE:  And he says:  They're usually

25    nonnegotiable sight drafts but, "They're prearranged

1   situations where two parties - two or more parties have agreed

2   to make payment between themselves, and it could have

3   conditions attached to it, or it could have other items which

4   would not meet the terms of negotiability."

5           But aside from that, they kind of talk about the

6   *Howick* case in this *Salman* case.  And the expert there, a

7   former bank examiner with the Office of the Comptroller of the

8   Currency of the Department of the Treasury testified at the

9   Salman trial that sight drafts are commonly nonnegotiable and

10  that labeling a sight draft nonnegotiable does not render it

11  invalid.

12          Okay.  And what the circuit court goes on to say is

13  that:  A sight draft, unlike a Federal Reserve note, is not

14  necessarily a member of a negotiable class of financial

15  instruments, and a fictitious sight draft cannot be

16  disqualified from being an unlawful fictitious obligation

17  under 514 merely on the basis that it is a nonnegotiable

18  instrument.

19          And what they are saying in *Howick* is they analyzed

20  the Federal Reserve notes in *Howick* to be sufficiently

21  credible to constitute fictitious obligations.  They use that

22  term "credible" and I think that's one of the terms we need to

23  consider.

24          But then they do go on to say they discuss that

25  negotiable requirement in *Howick* because that reflected the

1    type of fictitious instrument in *Howick*.

2         And I realize I kind of was looking at this after we

3    started discussing "negotiability," but -- well, I'll share

4    the case.

5         THE COURT:  Well, thank you for -- and I have not

6    read that case, but it sounds like it's confirming my

7    intuition that technical negotiability as opposed to the

8    practicality of people transferring and accepting it is not

9    the criterion here.  So I'm disposed to, based on that, to

10   decline the second of your two sentences.

11        Now, let's talk about the other one.

12        MS. EDELSTEIN:  Your Honor --

13        THE COURT:  I have an idea.  You know, we have the

14   language here.  This is the government's language that I

15   tweaked that the item need only credibly appear to be in a

16   class of or bear a family resemblance to financial

17   instruments.

18        And, of course, as the court said in *Howick*, the

19   requirement of intent to defraud is another limitation that

20   cuts in here in an important way.

21        In light of that, I mean, I'm thinking perhaps the

22   language without the additions is more than adequate to

23   capture what we're looking at here.  It's going to exclude

24   the -- what the court describes as documents that have

25   disqualifying marks.  It's no Monopoly money.  And counsel

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1    will be able to argue -- well, I don't --

2          Mr. Kunkle, I need to hear you pitch your argument to

3    the extent you have one.

4          MR. KUNKLE:  I was just sharing with -- Your Honor, k

5    I'm sorry.  I was just sharing with Ms. Edelstein the fact

6    that in *the* Salman opinion the holding is that they held that

7    the plain language of (a)(2) -- 514(a)(2) prohibits the

8    passing -- and it says right there in English -- whether

9    negotiable or nonnegotiable.

10          You see, and again, because it is Mr. Salman's

11   argument was that I put "nonnegotiable" right on it.  You

12   know, but it was a sight draft.  So it's --

13          And I will be honest with you, at this time of the

14   afternoon, things are a little scrambled for me too.  But it

15   doesn't appear to be from the statute.  And I understand the

16   Court's statements earlier to mean this too.

17          "Negotiability" is maybe one factor that the jury can

18   consider, but it's not required, if I'm understanding this

19   correctly from *Salman* and *Howick*, because the guidance that's

20   given from these two opinions is kind of seemingly

21   contradictory when you read each opinion separately.

22          THE COURT:  All right.  We're talking anything

23   further, Ms. Edelstein, about his first sentence?  I am sort

24   of inclined to agree that the other language here does cover

25   the points --

1          MS. EDELSTEIN:  Your Honor --

2          THE COURT:  -- that Mr. Kunkle is articulating.

3          MS. EDELSTEIN:  Other than just the modification to

4    make it possessory and the fact of the instrument's

5    nonexistence.

6          THE COURT:  I saw that where was that?

7          MS. EDELSTEIN:  Line 17, the first word.

8          THE COURT:  Yes.  I saw that.

9          MS. EDELSTEIN:  Other than that, and also, Your

10   Honor, we noted as we were reading through that this portion,

11   this 15 through what is now 20, but I understand that the

12   Court is going to cut it down, we believe that that

13   instruction, "a fictitious instrument is a bogus document,"

14   that line should also be included for the second substantive

15   count for Count 4.

16          THE COURT:  I wondered why you didn't have exactly

17   the same language.

18          MS. EDELSTEIN:  I think I omitted it by mistake, Your

19   Honor.  It should be there.

20          MR. KUNKLE:  Ms. Edelstein was talking rather

21   quickly.

22          THE COURT:  There's a sentence or two that's in the

23   first one that's not in the second one.  And she's saying

24   let's repeat them in the second instruction as well.

25          MR. KUNKLE:  Okay.  I know what she's talking about.

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1          THE COURT:  I had the same question.

2          So I think we'll -- whatever we say we needed, we

3  will say it the same for both instructions.

4          MR. KUNKLE:  Your Honor, I think based on the defense

5  theory of the case, as much as we can distill this, is that --

6  and why I wanted that language in there about negotiability is

7  because this does on its face appear to be what could be a

8  negotiable instrument.

9          So the language of the document has to kind of

10  purport to be a negotiable instrument in this instance, not

11  with the sight drafts of Mr. Salman's but in this instance.

12          If he had sent them a million dollar bill that had a

13  dog smoking in the portrait, we would all say ha-ha, and, you

14  know, this is what *Howick* spoke to.

15          But where it looks real but it's a ten million dollar

16  bill or whatever it may be or a million -- and in this case it

17  could have been, you know, an $868,000 bill, you know, to pay

18  off the exact number of the debt.

19          I think that that's why this is vital to our theory

20  is that because there's language on the face of these two

21  documents it says right there, you know, get Timothy Geithner

22  to pay himself, you know, anybody looking at that would say

23  this doesn't make any sense.

24          THE COURT:  But not -- I thought about that too

25  and --

1          MR. KUNKLE:  And our argument is that this is just

2    designed to impede and -- for lack of a better word -- screw

3    with the IRS.

4          THE COURT:  I think you can make that argument, but I

5    was wondering -- I think this is what you're saying.  I was

6    wondering, does that on the face of it, is Timothy Geithner

7    sort of paying Timothy Geithner.  But it actually doesn't say

8    paying Timothy Geithner.  It says pay the IRS.

9          And, in fact, there are numerous federal instruments

10   that can be used to pay a federal debt.  So I thought, you

11   know, you can make that argument.  It's a jury trial.  You

12   have a right to it.  But I don't think that's really coming

13   within the statute.  That's not a disqualification and so --

14         MS. EDELSTEIN:  I mean to the extent --

15         THE COURT:  You're not stopped from making that

16   argument.

17         MS. EDELSTEIN:  And, Your Honor, to the extent that

18   the Court when it gives its examples, it gives the classic

19   example of the dog smoking a cigarette which is clearly not.

20         But if you would read next example the Court cites,

21   which the Court finds falls within it, it is simply something

22   that has an official-sounding title to it.

23         If I can quote it exactly, which is the United States

24   Bank Certificate but it has a portrait of President Monroe,

25   the case finds that that would fall into the body of documents

1    we're talking about here.  It need not be so authentic looking

2    that nobody could have a doubt.  It just needs to have some

3    indicia.

4         THE COURT:  I understand and that's part of the

5    reason why I have no difficulty concluding that these

6    documents satisfy -- or are jury submissible under this

7    statute.

8         The question is do we say more?  I'm not -- I guess

9    I'm arguing the case for economy on the theory that what we

10   have here is right.  And the question is:  Is it incomplete?

11   Does it lack some general guidance?  And, as you all may know,

12   I don't believe in jury instructions that get very complicated

13   with a lot of minutia.

14        The Ninth Circuit model instructions are written in

15   an abstract form and I think they are great and that's the way

16   to instruct the jury.

17        But now that said, are you suggesting something,

18   Ms. Edelstein?

19        MS. EDELSTEIN:  Your Honor, I would give the

20   instruction as written without the addition by Mr. Kunkle.

21        THE COURT:  Yeah.  Mr. Kunkle, any last word on that?

22        MR. KUNKLE:  Your Honor, I think at this point,

23   because a money order is a negotiable instrument, I think that

24   without that language saying -- you know, and it's different

25   from the *Salman* case where they are talking about

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1   nonnegotiable instruments.

2          THE COURT:  What language?

3          MR. KUNKLE:  The language that's in this -- on page 3

4   I'm looking at that's in bold on lines 18, 19, and 20, where

5   it reads:  "A fictitious instrument, and the fact of the

6   instrument's nonexistence, is presumably unknown, and not

7   revealed to, the intended recipient."

8          And that it must -- and that the document must

9   credibly hold itself out to be a negotiable instrument.

10          And I think that's right out of the *Howick* case, that

11   language, and I think that language needs to be in there in

12   this case because we're talking about negotiable instruments

13   and it's also, you know, because of who is being allegedly the

14   recipient of this is the IRS.

15          I mean, the reel problem with this case, Judge, is

16   this is a statute, like Mr. Salman argued, that is designed to

17   protect the credulous person.  This is a government agency

18   we're talking about.  And I mean I'll raise this tomorrow in a

19   Rule 29 motion, but I believe that because this is the

20   government that's allegedly being defrauded by its own paper,

21   there needs to be a little bit something more in terms of

22   materiality here to show some sort of reliance on that form

23   paper.  I believe that there has to be something more than

24   just "you intend to do this and that."  There has to be some

25   kind of result.

1            THE COURT:  You know, but actually when we look at

2    the language of the statute, it doesn't say "negotiable."  It

3    says the actual language is, quote, you know, "a fictitious

4    instrument, document, or other item appearing, representing,

5    purporting or contriving through scheme or artifice to be an

6    actual security or other financial instrument issued on the

7    authority of any number of things.

8            It just says "security or financial instrument."  It

9    doesn't say "negotiable" in any sense that the lawyers talk

10   about.

11           Now, I think there is a nonuniform commercial code

12   sense of "negotiable" that doesn't mean anything.  It just

13   means anything.  You could purport to transfer.  You can

14   transfer anything.  That sense of "negotiable" seems to me to

15   be satisfied by anything.

16           And I'm just worried about -- no.  I'm worried about

17   confusion.

18           Also, Mr. Kunkle, I'm disposed to put language in

19   here that you request out of caution provided it doesn't look

20   confusing.  So --

21           MR. KUNKLE:  If it helps the Court, Your Honor, I'm

22   not confused.  I think that, you know --

23           THE COURT:  I'm worried about them.

24           MR. KUNKLE:  Well, but -- and I think that sentence

25   makes sense because it's-- the fact of it is presumably

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1    unknown and not revealed to them.  And right on the face of

2    this document is --

3             THE COURT:  Let me come back to the language that is

4    not in dispute that everybody is accepting says -- as we have

5    edited it -- "must appear to be a financial instrument and the

6    item need only credibly appear to be of a class."

7             Now, that word "credibly," I think, covers the dog

8    smoking a cigarette, the Monopoly money.  It amply enables you

9    to argue against those ridiculous cases.

10            This is not a ridiculous case.  This document -- this

11   is not, in my view, not a borderline document under the scope

12   of the statute.

13            But I'm thinking that that word "credibly" appears

14   enables all the argument you want to make, Mr. Kunkle.  And

15   once I say -- it certainly would encompass that there is a

16   situation where you pass something to somebody and you reveal

17   it's a joke, that's not credibly an instrument.

18            And presumably -- this comes back to another issue,

19   Mr. Kunkle.  The way I'm reading this case, this is an

20   objective standard.  It's an objective standard of credible

21   appearance.  It's --

22            I don't read it as a subjective standard that this

23   particular person has a level of sophistication they spot it

24   immediately.  That's how I'm reading that statute.

25            MR. KUNKLE:  Well, Your Honor --

CR14-00184-PHX-NVW    **JURY TRIAL - DAY 2  1-21-15**

1              THE COURT:  Am I wrong about that, Ms. Edelstein?

2              MS. EDELSTEIN:  Your Honor, the way I read the case

3     and the statutes, Your Honor, it doesn't even -- it doesn't

4     require any type of understanding by the recipient.  The

5     "intent" element goes to the intent in passing it or making it

6     versus the intent to convince the person receiving it that it

7     is what it purports to be.

8              THE COURT:  Otherwise, it could be a crime when you

9     pass it to nine people but not a crime when you pass it to the

10    tenth person who has particular knowledge.

11             MS. EDELSTEIN:  That's correct, Your Honor.

12             THE COURT:  Well, I tell you what.  Here's is what --

13             MR. KUNKLE:  Your Honor, if I may, if there's not an

14    objective element to this -- and that is why I wanted the

15    wanted the language about "the document must credibly hold

16    itself out to be a negotiable instrument" because that's what

17    we're talking about; in this case a money order would be a

18    negotiable instrument.

19             If there wasn't anything else, you could have a

20    parade of people come in from the IRS and say, yeah, we were

21    going to process that.

22             To someone else they would look at this and say it's

23    completely bogus.  I'm not taking this because I know that a

24    money order doesn't look like this.  It doesn't have the

25    person telling, you know, someone else to pay it.  This is

1    what's missing.

2         And so without that objective standard, I don't think

3    the law is ever set out to penalize anybody because a victim

4    said, well, this harmed me and you better believe me.  I'm

5    harmed.  Self-defense has an objective standard.  We don't

6    tell a jury in a self-defense case that you acted in

7    self-defense because you believed that person had it coming to

8    him when you reacted in self-defense.

9         We employ an objective, reasonable, prudent standard

10   for assessing when someone acts under law.

11        Otherwise, you can imagine the situations where any

12   particular case somebody could come in and say, well, I

13   thought that was fraud and it could be the Monopoly money.

14        Under the government's theory, then you could be

15   penalized for passing Monopoly money and that's not the way

16   the law is supposed to work.  There has to be an objective

17   standard.  It has to fasten itself back to the document.

18        THE COURT:  All right.  I don't think I'm disagreeing

19   with that.  I think it is an objective standard but --

20        By the way, you know, I'm going back 42 years, but

21   when I took a course in Uniform Commercial Code, my

22   recollection isn't -- I don't know if this is instruments in

23   general or checks, but a check made by the maker to the maker

24   is a bearer instrument.  Anybody can cash it.  And now my

25   memory could be wrong, but that's what seems to come back from

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1    42 years ago.

2            This sort of isn't -- it isn't the maker endorsing.

3    It's the maker -- well, the maker making it to the Internal

4    Revenue Service which is a federal agency different from --

5    well, all the more reason not to go there.

6            Here is what I think I will do.  I'm going to reread

7    this case and look at that *Salman* case which I had not read.

8    But it sounds from the way you summarize it it's not going to

9    change things.

10           I'm disposed for now -- and I will let this ruin my

11   evening -- to go with the government's language deleting your

12   additional language.

13           But I will reread this.  And I think I am comfortable

14   saying it doesn't have to be a negotiable instrument in a

15   technical sense.  And then in a layman's sense of a negotiable

16   anything that can be signed, even though it doesn't carry the

17   special legal consequences of what's an uniform -- negotiable

18   instrument under the Uniform Commercial Code -- it doesn't

19   help you to say that.

20           Let me -- I will think it through and I'm inclined to

21   be cautious.  For now I'm going to -- I'm going to go the

22   government's way on the grounds that everything you're arguing

23   for, Mr. Kunkle, I think is encompassed by this language.  And

24   it doesn't prevent you from making the arguments you want to

25   make to the jury.

1        Let's -- and then we will conform the second one.

2        Now, the aiding and abetting, you can see I took what

3   you did and I rendered it abstract.  And I don't know if you

4   all had a chance to look at it, but your language was cast in

5   the terms of the facts of this case and I have tried to make

6   it abstract.

7        Have you all -- what do you think, Ms. Edelstein?

8        MS. EDELSTEIN:  Your Honor, I think it actually reads

9   much cleaner.  It makes it -- with the bulkiness of the

10  statutes put in there and the definitions each time,

11  especially in light of the fact it will be given after the

12  substantive instructions, I think that this rewriting of it is

13  adequate and certainly addresses the aiding and abetting

14  statute itself.

15        THE COURT:  Mr. Kunkle, what do you think?

16        MR. KUNKLE:  I'm just looking through it again, Your

17  Honor.

18        THE COURT:  Take your time and look at it.

19        And did we give them new, complete drafts of

20  everything?  The instructions through page 12?  All right.

21        MR. KUNKLE:  Actually, Your Honor, the aiding and

22  abetting instruction, as you rewrote it, is almost exactly --

23  well, it is pretty much close to 5.1 Aiding and Abetting from

24  the Model 9 and it cleans up the language we submitted earlier

25  in the Joint Proposed which was filed by the government on.

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

 1          And I understand the Court.  You're not ruling yet on

 2    the two other substantive instructions.

 3          THE COURT:  No.  I'm leaning against you, but I want

 4    to reread the cases and think if I can craft something that

 5    may be -- like I said, I think the language, the way it is

 6    now, the government's language, although it is concise, it

 7    captures everything.  I don't think it excludes anything that

 8    you have been trying to present and will argue, Mr. Kunkle,

 9    but I will look at it some more and then I will let you know

10    first thing in the morning -- well, let you know in the

11    morning if I have any different thought.

12          So, all right.  And I'm hearing, at least for now,

13    satisfaction with the rewrite on the Aiding and Abetting on

14    page 5.

15          I guess the next thing I note is on page 7 on "What

16    Is Not Evidence."  The language about limited purpose

17    admissions.  I don't recall any limited purpose admissions we

18    have had yet.

19          MR. KUNKLE:  I don't think anything.

20          THE COURT:  If we don't, then I'm inclined to take

21    that sentence out.  It's an abstract and doesn't help with

22    this case.

23          And then on -- you know, my -- oh, one other thing.

24          Mr. Kunkle, the defendant doesn't have to decide

25    whether he is going to testify until the government rests its

 1    case but, you know, I trust you are conferring with him and

 2    he'll have to make his decision at that time.

 3            And we will wrap this up very shortly.  And,

 4    Mr. Hall, if you do think you might want to testify or make

 5    that decision, I strongly urge you to talk with Mr. Kunkle

 6    about what it is you want to cover so he can prepare what

 7    questions to ask you.

 8            Now, the other changes I made to the top of page 10,

 9    I have relabeled this.  "Testimony of certain witnesses" where

10    I have made this -- stated these principles of heightened

11    scrutiny without purporting to instruct the jury that they fit

12    the facts of this case.  And both size can argue that they do

13    or do not fit the testimony of witnesses in this case.

14            So what do you think of that, Ms. Edelstein?

15            MS. EDELSTEIN:  Your Honor, the modification the

16    government would suggest is to eliminate the portion of line 7

17    onto line 8 where it says "or if a witness's testimony was

18    given in exchange for a promise by the government that was

19    the -- that the witness will not be prosecuted."

20            I think the state of the record is at this point

21    there is no evidence that any such promise was given.  No

22    witness has testified that there was a statement by anybody in

23    the government that said:  You will not be prosecuted.

24            THE COURT:  All right.

25            MS. EDELSTEIN:  And I think the gist of it would come

1    through by rewriting it to say:  If a witness admits or was

2    alleged to be an accomplice to the crime charged, in

3    evaluating the testimony of such a witness, you should

4    consider the extent to which the testimony may have been

5    influenced by this factor.

6         THE COURT:  All right.  And your response,

7    Mr. Kunkle?

8         His response is that the promise was in body

9    language.

10        MR. KUNKLE:  Are you taking that from my body

11   language and signs?

12        Actually, I personally disagree with the government

13   what the record reflects and what was maybe promised or not

14   promised to a witness.

15        I think when someone looks at the transcript down the

16   road and the instruction under 4.9, Your Honor, the Model

17   Instruction of the Ninth Circuit, it speaks of testimony given

18   in exchange for a promise.

19        Well, what's a promise, you know?

20        THE COURT:  Do you want this language in?

21        MR. KUNKLE:  Yes, I do.

22        THE COURT:  Here is my thought.

23        Ms. Edelstein, on the one hand I think you're right.

24   I don't think we had evidence of a promise.  However, it's a

25   criminal case.  The defendant has wide range to argue.  And I

1    am not seeing any prejudice to the government in including

2    this language.

3            I don't think -- it's not persuasive to me, but

4    Mr. Kunkle would then be free to argue that.  You can get up

5    and say, hey, she just -- she had her hopes and expectations

6    and there was nobody -- she never said they ever told her

7    that.

8            If we don't have this language and the Court of

9    Appeals looks and says, well, you know, maybe you could see it

10   that way, I might have to try this case again.

11           If I put this language in here, I'm not seeing how it

12   prejudices the government in this trial.  So I'm inclined to

13   leave it in for that.

14           If I thought that this language would be -- would

15   harm the government in any way, I would think twice about

16   putting it in.  So, all right, with the defendant wanting that

17   language, I'm disposed now to leave it in.

18           And I think that's the last thing that I thought to

19   talk about.

20           Anything else either of you would like to talk about?

21   And I think we need to hurry, because I'm keeping -- I assume

22   I'm keeping the bus waiting.

23           So anything else?

24           MS. EDELSTEIN:  Nothing further, Your Honor.

25           THE COURT:  All right.  Mr. Kunkle?

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2   1-21-15

1          MR. KUNKLE:  Nothing further.

2          THE COURT:  All right.  Thank you all.  And thank you

3    for your patience.  We will be adjourned until -- be here a

4    little before nine o'clock in the morning.

5       (Proceedings adjourned at 5:58 p.m.)

6                              * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

ER 689

CR14-00184-PHX-NVW    JURY TRIAL - DAY 2  1-21-15

1

2                    C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8          I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13         DATED at Phoenix, Arizona, this 9th day of September,

14   2015.

15

16

17

18

19                    s/Elizabeth A. Lemke
                      ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25

UNITED STATES DISTRICT COURT

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| United States of America, | ) |
| | ) **SEALED** |
| Plaintiff, | ) **APPEAL** |
| | ) **CR14-00184-01-PHX-NVW(MHB)** |
| vs. | ) Phoenix, Arizona |
| | ) January 22, 2015 |
| Gordon Leroy Hall, | ) 9:09 a.m. |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #3**
**(Pages 590 through 764, Inclusive.)**


**APPEARANCES:**

**For the Government:**

          U.S. ATTORNEY'S OFFICE
          By:  **Lisa E. Jennis, Esq.**
               **Monica Edelstein, Esq.**
          40 North Central Avenue, Suite 1200
          Phoenix, AZ  85004

**For the Defendant Gordon Leroy Hall:**
          STEPHEN C. KUNKLE, PLLC
          By: **Stephen C. Kunkle, Esq.**
          5150 North 16th Street, Suite A-222
          Phoenix, AZ  85020

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1                                **INDEX**

2

   **SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**
3
   GOVERNMENT RESTS                                    Page 645
4  DEFENSE RESTS                                       Page 660
   INSTRUCTION CONFERENCE                              Page 661
5  DEFENDANT'S RULE 29 MOTION                          Page 697
   FINAL INSTRUCTIONS TO THE JURY                      Page 703
6  CLOSING ARGUMENT:  GOVERNMENT                       Page 717
   CLOSING ARGUMENT:  DEFENDANT                        Page 732
7  REBUTTAL CLOSING ARGUMENT:  GOVERNMENT              Page 754

8
                       **INDEX OF WITNESSES**
9
   **WILLIAM C. KERR**:
10
   Direct examination by Ms. Edelstein                 Page 593
11 Cross examination by Mr. Kunkle                      Page 622
   Redirect examination by Ms. Edelstein               Page 643
12

13

14                     **INDEX OF EXHIBITS**

15 **EXHIBIT NO.:**          **DESCRIPTION:**              **RECEIVED:**

16 Exhibit No. 105    Money order images              Page 622

17

18

19

20

21

22

23

24

25

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

```
 1                      P R O C E E D I N G S
 2       (Called to the order of court at 9:09 a.m.)
 3       (Open court, no jury present.)
 4            THE COURT:  All right.  Please be seated.  We'll have
 5  to talk about the new instruction when we finish with this
 6  witness.
 7       (Open court, jury present.)
 8            THE COURT:  Please be seated.  The record will show
 9  the presence of counsel, the defendant, and the jury.
10            The government may call its next witness.
11            MS. EDELSTEIN:  Thank you, Your Honor.  The United
12  States calls Mr. William Kerr.
13            Your Honor, it appears our witness stepped out
14  briefly.  He should be back in a second.
15            THE COURT:  All right.
16            Ms. Edelstein, should we take a short recess so you
17  can see if he has some indisposition.
18            MS. EDELSTEIN:  Yes, Your Honor.
19            THE COURT:  All right.  We'll recess and return when
20  the witness is available.
21       (Recess taken at 9:13 a.m.; resumed at 9:14 a.m.)
22            THE COURT:  All right.  Again, please be seated and,
23  Ms. Edelstein, you may call your next witness.
24            MS. EDELSTEIN:  Thank you, Your Honor.  The United
25  States calls Mr. William Kerr.
```

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1          THE COURT:  All right.  Please come up to the front

2    here and the clerk will swear you in.

3          THE CLERK:  State your full name for the record and

4    spell your last name.

5          THE WITNESS:  William C. Kerr.  K-E-R-R.

6    **(Witness duly sworn)**

7          THE COURT:  All right.  You may proceed.

8          MS. EDELSTEIN:  Thank you, Your Honor.

9               **WILLIAM C. KERR, WITNESS, SWORN**

10                   **DIRECT EXAMINATION**

11   BY MS. EDELSTEIN:

12   Q   Good morning, Mr. Kerr.

13   A   Good morning.

14   Q   Did you travel to Phoenix to be here today?

15   A   I'm sorry?

16   Q   Did you travel to Phoenix to be here today?

17   A   Yes.

18   Q   Where did you come from?

19   A   I came from Pittsburgh, Pennsylvania, actually.

20   Q   Are you from Alexandria, Virginia?

21   A   I'm from Alexandria, Virginia.  We're in the process of

22   moving to Ohio.  We'll be there -- the closest airport in

23   Pittsburgh.

24   Q   What you do in Virginia?

25   A   I'm retired.  And I also have my own consulting and

 1    investigation called William C. Kerr & Associates.

 2    Q    Do you have a consulting business?

 3    A    Yes.

 4    Q    And would you repeat the name of it?

 5    A    William C. Kerr & Associates, LLC.

 6    Q    And what type of services does William C. Kerr &

 7    Associates provide?

 8    A    I will do primarily consulting and testimony on matters

 9    relating to banking, financial investigations.  I've worked on

10    bankruptcy cases, basically, anything that I feel is within my

11    realm of knowledge in finance.

12    Q    So the focus of your practice is finance; is that right?

13    A    That is correct, yes.

14    Q    Do you have a background in this type of work aside from

15    your consulting company?

16    A    Yes.  I was originally employed by the Office of the

17    Comptroller of the Currency, otherwise known as the National

18    Bank Examiners.

19    Q    Before we get do that, can you describe for the grand jury

20    what your education is beginning with college.

21    A    I'm a graduate of Miami University, Oxford, Ohio.  I have

22    a bachelor's degree in Business, a major in Accounting.  I

23    subsequently took some paralegal classes in Washington, D.C.

24    at the graduate school.

25    Q    Now, you were describing that you were working -- you

1    worked for the Comptroller of Currency; is that right?

2    A    That is correct, yes.

3    Q    What is the Comptroller of Currency?

4    A    The Comptroller of Currency is the federal agency that

5    issues licenses to and is responsible for examining banks that

6    have a national charter.

7         Bank of America, any bank with a "national" title or

8    "NA," that's a national bank.  It would have been chartered.

9    A charter would have been issued by the OCC -- excuse me --

10   with the Office of the Comptroller of the Currency.  And we

11   are also responsible for examining that institution to ensure

12   compliance with the laws, rules, regulations, and the quality

13   of its assets.

14   Q    And you described it goes by the acronym OCC; is that

15   right?

16   A    Yes.  OCC.

17   Q    They're pretty fond of acronyms in DC, aren't they?

18   A    Yes.

19   Q    As a Comptroller of Currency, what branch of the

20   government does it fall under?

21   A    The office -- the OCC is a part of the United States

22   Treasury.

23   Q    And you described your job there as a bank examiner; is

24   that correct?

25   A    That's correct, yes.

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1            As a bank examiner I would actually go into financial

2    institutions.  Originally, I worked out of Cleveland and

3    examined all their books and records.  I did that for a number

4    of years; about 15.

5            I left and went into banking for a while.  I came

6    bank with the OCC in Washington, D.C. where I was involved in

7    Policy and Examination Procedure and also teaching.  And then

8    in 1995 I became involved with Financial Fraud.

9            And from 1995 until the time I retired in 2007, I

10   dealt exclusively with financial fraud, both internal within

11   the bank, and external.

12   Q   So the latter part of the time you were with the OCC you

13   concentrated on financial fraud; is that right?

14   A   That's correct, yes.

15   Q   What training did you have for your job at the OCC?

16   A   At the OCC I have a substantial amount of on-the-job

17   training.  There are numerous courses in credit, audit, fraud,

18   finance that you take over your career with the OCC.

19           As you advance, you go from assistant to a

20   commissioned national bank examiner, and you are responsible

21   for examining the banks.  So along with that is you are also

22   studying various portions of the law that deal with the

23   banking industry.

24   Q   Were you called upon to testify as an expert in your role

25   as a bank examiner with OCC?

1    A    Yes, I was.

2    Q    How often?

3    A    I was called, I believe, four times; and actually

4    testified, twice.

5    Q    Okay.  And in which courts were those.  Is it federal or

6    state?

7    A    Both of those were federal courts.  I believe one was in

8    Connecticut and the other one was in California.

9    Q    And do you have experience --

10         And what type of cases?  Were they criminal or civil?

11   A    Those would have been civil cases, yes.

12   Q    Okay.  And you said you testified probably a total of four

13   times while you were with OCC?

14   A    I was called four times.  I only testified twice.

15   Q    Okay.  Now, do you provide training or teaching to

16   others -- did you provide while you were at the OCC?

17   A    Yes.  I was involved in extensive training both in

18   lending, anti-fraud activities.  We also ran courses for

19   agents such as the FBI, DEA, so forth.  I was extensively

20   involved in that and also participated in developing and

21   running with some private individuals a seminar on

22   white-collar crime, high-yield investment fraud.

23   Q    Now, you described something called "I-fraud."  Would you

24   explain that to the jury?

25   A    I'm sorry?

1    Q    You described something called I-fraud.  Would you

2    describe to the jury?

3    A    High-yield fraud?

4    Q    I'm sorry.  I must have misunderstood you.

5         Yes.  High-yield fraud.

6    A    Yes.  High-yield fraud is one where the scenario is you

7    give me a hundred dollars today and at the end of the week

8    I'll give you back two hundred.

9         If you recall the Ponzi schemes where you are paying

10   out money and you have to have additional investors coming in

11   to pay out high yields.  And that's known as a high-yield

12   investment fraud.  So basically, you're guaranteeing someone

13   at normal payment out in a short period of time.

14   Q    And you do training on that particular type of fraud as

15   well as the others you described; is that right?

16   A    I did training and I eventually began teaching on that and

17   we ran public seminars around the world, actually, on this.

18   Q    Now, how does your work at your current business, William

19   C. Kerr & Associates, differ from the work you did as a bank

20   examiner?

21   A    Primarily, I do not examine banks.  However, several of

22   the cases I have worked on involved banking in cases of

23   capital adequacy and also one with a Bankruptcy Trustee,

24   assisting them in understanding the banking and so forth.  So

25   those are the types in banking in particular.

1    Q    Do you still provide expert testimony services with your

2    new business?

3    A    Yes.

4    Q    Okay.  And do you continue to teach in your capacity in

5    your new business?

6    A    No, not any formal teaching.  I do some teaching when I'm

7    talking with people, but, no.

8    Q    Along those lines, I'm going to ask you a series of, if

9    you would, in your line of work, definitions for certain terms

10   that are frequently brought up in your line of work.

11          Starting with "financial instruments."  Would you

12   describe what a financial instrument is?

13   A    Well, a financial instrument is any instrument that's

14   going to transmit a financial transaction.  The most common is

15   a check which you write every day.  Or you go to like Circle K

16   and purchase a money order, that is a financial instrument.  A

17   bond that you might purchase or security stock, those are

18   types of financial instruments.

19   Q    During the course of your career, have you been called

20   upon to determine whether certain financial instruments are

21   false or genuine?

22   A    Yes.  That was a large portion of the work that we did in

23   the -- my last ten, fifteen years with the OCC.

24   Q    With the OCC itself?

25   A    Yes, and subsequent now on my own.

1  Q   In the context of your work, what does the work

2  "fictitious" mean?

3  A   Fictitious is an item that does not exist in the

4  legitimate financial world, if we're talking about financial

5  items.  In other words, a counterfeit item is one like a

6  dollar bill.  Someone might wash it out and raise it up to a

7  $20 bill and reprint it and make it look like a twenty.

8  That's a counterfeit.

9         "Fictitious" is you would sit down and take a piece

10 of paper and draw some dollar signs and maybe a picture of

11 George Washington onto it and write "$10" in the corner and

12 put "U.S. Treasury."  That's a fictitious instrument.

13 Q   Is it safe to characterize something that's counterfeit as

14 an alteration of a financial instrument?

15 A   Yes.  It's an attempt to create an identical item and pass

16 that off as genuine.

17 Q   Whereas, a fictitious item is essentially created from

18 whole cloth?

19 A   That's correct.  It does not exist -- in the form you're

20 looking at, it does not extent in the legitimate financial

21 world.

22 Q   Can you estimate how often you have been asked to make the

23 determination whether a financial instrument was fictitious?

24 A   I have testified in 31 cases, I believe, and a total

25 number of times I have actually been asked to review would

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1   have to be in the hundreds.

2   Q    So is this testimony that you have provided after you left

3   the office of the Comptroller of Currency?

4   A    That would be during and after.

5   Q    During and after.  So it was a total of 31 times you've

6   testified?

7   A    Yes.  Yes.

8   Q    Okay.  And you have been asked to make this inquiry

9   independent of testimony how many times?

10  A    Hum.  I would guess maybe ten or twelve.

11  Q    I'm sorry?

12  A    Ten or twelve.

13  Q    Okay.  Were you asked to examine certain financial

14  instruments for this case today?

15  A    Yes, I was.

16  Q    Okay.  Would you please take a look at Exhibits 1 and 2.

17  They should be in front of you in the envelope -- or in the

18  folder, excuse me.  Thank you.

19          And if you would look at page 2 or the money order --

20  or the document labeled "money order" in each of those.

21  A    Yes.

22  Q    Okay.  And would you look at them side-by-side, please.

23  A    I have them both.

24  Q    Are these the instruments you were asked to review for

25  your testimony today?

UNITED STATES DISTRICT COURT

1    A    Yes, they are.

2    Q    And you can feel free to remove them from the covering.

3         Would you take a minute and compare these two items

4    labeled "money order" side-by-side.

5         When you have had a chance to review them both, we

6    can go from there.

7    A    Yes.

8    Q    Do they appear substantially the same, aside from the

9    amounts listed and the tax years listed on the "memo" line?

10   A    Yes.  The two items are identical except for the amount

11   and the tax years as far as the instruments themselves.

12   Q    And the tax year information, are you pulling that from

13   the "memo" line on each of these documents?

14   A    Yes.  At the bottom it says -- on Exhibit 1 says:

15        For benefit:  Gordon L. Hall; and a number; and a tax

16   period 12/31/96.

17        And the second, Exhibit 2, says:

18        For the benefit of Gordon L. Hall; a number; and a

19   tax period 12/31/1997.

20   Q    And to be clear, you did review copies of these documents

21   prior to your testimony today?

22   A    Yes, I did.

23   Q    Okay.  For ease of your testimony, why don't we just focus

24   for now on Exhibit 1.  And should the need arise to

25   specifically refer to Exhibit 2, we can go back in and discuss

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    that at the end of your testimony.

2            What type of instrument appears in Exhibit 1?

3    A    This exhibit represents itself as a money order.

4    Q    Okay.  And what type -- what is a traditional money order?

5    A    A traditional money order is -- let's say, you wish to

6    send $50 to a grandchild or whatever in Cleveland.

7            You can go down to the local Circle K, walk in, and

8    have your, say, $50, and purchase a money order from Circle K

9    for $50, and they will charge you $2.50.

10           You have to pay them $52.50 and they issue you a

11   money order for $50 and then you make it payable to whoever

12   you want.  And then that you can send off.

13           The person who receives it can take that money to a

14   Circle K or a bank and cash it without any problem because

15   they're not depending on you to pay, as you would with a

16   check.  They're depending on the issuer of the money order

17   which, in this case, would be, as an example, Circle K.

18   Q    Okay.  So when you obtain a money order, you prepay for

19   it?

20   A    Yes.  A money order is a prepaid item.  In other words,

21   you have to purchase it, whether you purchase from Circle K, a

22   bank, or someone else.

23   Q    Are money orders readily available to purchase?

24   A    Absolutely.

25   Q    Looking at Exhibit 1, in your expert opinion, is the

UNITED STATES DISTRICT COURT

1    financial instrument labeled "money order" in Exhibit 1 a

2    legitimate or a fictitious instrument?

3    A    It gives the appearance of being a legitimate item.  It

4    has the requirements for a financial instrument.  It also

5    presents itself very well in that it has various security

6    features.  It's in a format that you would normally see for a

7    money order if you purchased it.

8              However, when you look at it and see where it is

9    payable from, no, it is not.  It is fictitious.

10   Q    It is your opinion that this is a fictitious financial

11   instrument?

12   A    It is my opinion that this item is a fictitious U.S.

13   government instrument, yes.

14   Q    Do you need to know anything about how a financial

15   instrument was actually created or printed in order to make

16   your determination?

17   A    How this one was printed?

18   Q    Any instrument you're examining, do you need to know how

19   it was created in order to make your assessment of it?

20   A    Not particularly, no.

21   Q    All right.  And you can make your assessment solely from

22   the document presented to you?

23   A    That is correct, yes.

24   Q    Aside from your conclusion that this money order is

25   fictitious, is there anything about it -- and you were

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1   describing a few things previously that make it seem

2   legitimate to say the average Joe or Jane?

3   A    If we look at the top left, it says "Drawer," which is

4   Mr. Hall.

5         It's titled "money order," which is an instrument

6   that we normally see that would be recognizable by most

7   people.

8         It has like a normal check or a money order "pay to

9   the order of."

10        It is dated.  It has an amount.  And it is signed.

11        So looking at the face of it, it presents itself

12   well.  It has all the criteria necessary for a financial

13   instrument that you can process.

14   Q    Would it be common for a money order to have this "memo"

15   line or "for the benefit" line on it?

16   A    Yes.  Because, like I said, you want it payable to --

17   let's say a grandchild for their birthday, you put the

18   person's name up on the "pay to" order line and down in the

19   "benefit" you say as a birthday present.

20   Q    Okay.  Now, can you describe the paper that you're holding

21   this money order on?

22   A    Can I what?

23   Q    Would you describe the paper, the actual document itself

24   to the jury?

25   A    This paper is known as "security paper" in the industry

1    because, as indicated at the top, it says "for security

2    purposes."

3         The face of this document contains a colored

4    background and microprinting in the border.  And it does have

5    a light-green border.  And if we had a magnifying glass and

6    looked at the line around the bottom edge, like underneath the

7    signature, you would actually see that that is what's known as

8    "microprinting."

9         It's not a solid line.  It's actually the words

10   printed in microscopic print that if you took a magnifying

11   glass, you would be able to read that.  That is a security

12   feature.

13        This document, if we turn it over onto the back,

14   describes on the lower portion --

15        THE COURT:  I'm sorry.  Which line are you talking

16   about there?

17        THE WITNESS:  Oh.  On the document underneath the

18   signature, you see the dark line?

19        THE COURT:  Could you turn the screen?  Yes.

20        THE WITNESS:  Under the signature there is a dark

21   line under that line would be the outline of the item.

22   BY MS. EDELSTEIN:

23   Q   Is this the line you're referring to?

24   A   Yes.

25   Q   Okay.  So --

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1          THE COURT:  You're not talking about the microprint?

2          THE WITNESS:  No.  I'm not talking about the

3     microprint.  It's the solid -- what appears to be a solid

4     black line above the MICR encoding.  That is actually

5     microprinting.

6          THE COURT:  And what is that again?

7          THE WITNESS:  That is minute printing.  In other

8     words, if you take a magnifying glass and blow that up, it

9     might say "security" or "money order" or some words.  It's not

10    a solid line.

11         THE COURT:  You mean that the straight line

12    underneath the --

13         THE WITNESS:  Yes.

14         THE COURT:  -- the signature?

15         THE WITNESS:  Yes.

16         THE COURT:  And that's not a straight line?

17         THE WITNESS:  That is not a straight line.

18         THE COURT:  What is it?

19         THE WITNESS:  It is actually printing.  It's words

20    printed across there.

21         THE COURT:  All right.  Please continue.

22    BY MS. EDELSTEIN:

23    Q    Thank you, Your Honor.

24         And if you would zoom out and if you were referring

25    to the line that says "security" on the bottom portion of the

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

```
 1   check, it appears to be written into the border of the check.
 2           It says "security locks will disappear when copied or
 3   with normal body heat."
 4           Do you see that there?
 5   A   Yes, I do.
 6   Q   What does that indicate to you?
 7   A   That is another type of security feature that there are
 8   parts of this on here that if you heat them up, on the back,
 9   again, if we go to the back, I can show you what we're talking
10   about in that security lock.
11   Q   Okay.  We'll go to the second page of that.  The jury is
12   also looking at the --
13   A   And down at the bottom there's --
14   Q   Okay.
15   A   And you see at the top left?
16   Q   Yes.
17   A   There's actually a lock.  And if you heat that, it will
18   disappear.
19   Q   Okay.  So is this a security feature that financial
20   institutions or banks or consumer places such as Circle K
21   would have on their money orders?
22   A   This is correct.  These items listed on the back of here,
23   are all, as I said, standard security features that would be
24   available, some or all, in any financial instrument in
25   modern-day processing, yes.
```

UNITED STATES DISTRICT COURT

1   Q    Now, turning back to the front, I want to discuss a little

2   bit about the routing numbers or the numbers that you see

3   listed on the bottom of this check here.  Do you see those?

4   A    Yes, I do.

5   Q    Okay.  Do you -- are these type of -- is this type of

6   information commonly included on a check or a money order?

7   A    Yes, it is.  This is the standard -- it's what's known as

8   MICR encoding, M-I-C-R.  And that is the font or print style

9   that's used to print this.

10       And this is something that whenever you pick up a

11  financial instrument that can be processed like a check or a

12  money order, it will have this line of MICR encoded print

13  across the bottom.  That's so that a machine can read this

14  rather than an individual and that is the style of font.

15       And then if you look at the first set of numbers in

16  front of the first "06" you'll see a solid bar followed by two

17  dots, that is an indication that that is the routing number

18  for the financial institution that's going to pay they item.

19       And this is --

20  Q    Do you --

21  A    I'm sorry.

22  Q    Do you recognize this routing number?

23  A    This routing number is actually a routing number for the

24  Federal Reserve Bank of Atlanta and is also the account used

25  for an IRS collection account.

1    Q    So this particular routing number is a legitimate routing

2    number tied to the Treasury?

3    A    Absolutely.

4    Q    The Federal Reserve, I'm sorry.

5    A    Yes.

6    Q    Okay.  And that is the little bar and dots that you just

7    described would indicate to someone looking at this document

8    that that was a routing number?

9    A    That's correct.  That's the symbol that indicates to the

10   machine or anybody looking at it that that's the routing

11   number.

12   Q    Okay.  Now, you said something about IRS collections.

13             Can you describe what you mean by that?

14   A    This is an account at the Federal Reserve Bank of Atlanta

15   for the use of the IRS to accept payments from taxpayers,

16   businesses, I assume, whoever.

17             It's not something -- it's not a normal checking

18   account where you can write checks against it.  It's only an

19   account used to collect funds, not to go out.

20   Q    And how would an individual find out this particular

21   routing number?

22   A    You can go to the Internet, look up Federal Reserve Bank

23   of Atlanta, and you come up with the routing number for that

24   institution.

25   Q    Okay.  Moving to the next number there, do you see the

1    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?

2    A    Yes, I do.

3    Q    What does that indicate?

4    A    Okay.  That is the -- if you look at the last item there

5    after the "59," you'll see, again, two thin vertical lines

6    followed by a black square.  That's the indicator to the

7    machine that that is the account number upon which this item

8    is to be drawn.

9           So now we have two items.  First one is the routing

10   number.  Tells where the check is to go; and the second number

11   is the account number, supposedly, that tells them where to

12   collect the funds from.

13   Q    Now, you said "supposedly."  What made you say

14   "supposedly"?

15   A    Well, in this case, this is Mr. Hall's social security

16   number.

17   Q    Okay.  And so you see that same number repeated above on

18   the "benefit" line; is that correct?

19   A    That is correct, yes.

20   Q    Okay.  Now did you have a chance to examine the third

21   number in this sequence?

22   A    Yes.  The third number, again, if you look at the top

23   right of it, you'll see the account -- the money order number.

24   And you'll see, again, down here at the bottom that is exactly

25   the same number, and that is in the correct position.

1          First comes the routing number; second, the account

2     number; and third, the item number.

3     Q    Generally, when you see a money order, does it have these

4     four separate numbers listed at the bottom?

5     A    Yes, it can.

6     Q    It can.  Okay.  And the last number there, there appears

7     to be a marking preceding the number.  Would you describe what

8     that means?

9     A    Again, preceding that number you'll see a thick line, a

10    thin line, and another thick line staggered.  And following

11    that, if you check those numbers and compare that to the

12    amount of the item, you'll see that it's $868,397.60.

13         So that is the amount.  And that symbol preceding

14    that and following that indicates, again, to someone looking

15    at it on the machine indicates that that's the amount.

16         So, again, what we have represented here is a very

17    good quality item.  It's on security paper.  It has all of the

18    routing numbers, the account number, the item number, and the

19    amount all encoded at the bottom.

20         So if you look at this, it looks good.

21    Q    Okay.  Now, is there a phrase or term that you use in your

22    line of work to describe these types of things that we've just

23    reviewed, these indicators that you've talked about, the

24    security features, the routing numbers, and these type of

25    things?

1   A   Yeah.  This -- if you ask me how I would describe this in

2   general, I would say it's a high-quality item that is

3   attempting to represent itself as a legitimate financial

4   instrument.

5   Q   And in your opinion, why would these types of high-quality

6   items be included on a money order -- on a document like this?

7   A   To make it appear that it is legitimate.

8          In other words, if you looked at an item, it didn't

9   have the routing number, it didn't have the security --

10  because, you know, you can write a check to someone just on a

11  blank piece of paper.  It's not required to have the MICR

12  encoding on the bottom.

13         As long as you have the account number and so forth,

14  that's fine.  But in this case, this looks like a legitimate

15  financial instrument.

16  Q   Despite these different high quality items that you just

17  described that make this money order appear legitimate, what

18  is it about your review of this document that led you to the

19  conclusion that it was, in fact, fictitious?

20  A   Well, the first thing I looked at, I saw "paid to the

21  United States Treasury," which is not unusual because this was

22  going to be in payment of taxes.

23         But then when I saw that the "drawee" on the

24  left-hand side, right under the typed number, was

25  Mr. Geithner, Secretary of the Treasury.

1          And then I looked immediately down and saw the

2    routing number.  And from my past experience I knew

3    immediately that this was not legitimate.

4    Q    Okay.  And what do you mean by your past experience?

5    A    My past experience in reviewing these items, and

6    basically, other people in financial institutions looking at

7    these, that's what you look at.  Who is paying it?  And you

8    look at the account routing numbers and so forth to see if

9    this appears to be legitimate.

10   Q    Okay.  Now, can Mr. Geithner pay a debt for Mr. Hall as

11   listed on this document?

12   A    Not to my knowledge.

13   Q    Is there an account at Treasury that could be in

14   Mr. Hall's name that could be accessed through this document?

15   A    No.  There are no accounts at Treasury upon which an

16   individual, Mr. Hall or anybody else, can actually draw money

17   from, nor -- there are no accounts there that you can write a

18   check against, money order, or any other type of wire transfer

19   or anything.

20          The Treasury does not maintain accounts for

21   individuals.

22   Q    Despite the fact that Treasury doesn't maintain these

23   accounts and Mr. Geithner cannot pay these tax debts, from the

24   face of this money order would you describe for the jury what

25   it's purporting to do or have happen?

1    A    This money order is basically, if you look at it at face

2    value, it's saying "pay to the United States Treasury

3    $868,397.60."

4         And it is drawn against an account at the United

5    States Treasury Department which does not exist.  And the

6    payor is going to be the United States Department of Treasury.

7    Q    Okay.  Now, in your line of work, have you ever seen a

8    legitimate money order of this nature where the drawee was the

9    Secretary of the Treasury?

10   A    No.  Number one, the United States Treasury Department

11   does not issue money orders; and secondly, I have not seen any

12   instrument with Mr. Geithner's signature on it, because like

13   any other business, the Treasury has accounts which they have

14   authorized signers on.

15        I don't think Mr. Geithner actually has authority to

16   sign on some accounts.

17   Q    Would Mr. Hall have authority to sign on any of those

18   accounts?

19   A    No.  Mr. Hall has no authority to sign or obligate the

20   U.S. Treasury for those amounts.

21   Q    And yet his signature does appear on this document?

22   A    His signature, to the best of my knowledge, appears on the

23   document as the maker or the drawer of the item.

24   Q    Okay.  Now, taking a look, you see that there is a

25   paragraph, a blocked paragraph, to the right of the drawee.

1    Do you see that there?

2    A   Yes, I do.

3    Q   What does this language purport to come from?

4    A   I'm sorry.  Would you repeat that, please?

5    Q   Does this language appear to be a citation from something

6    in particular?

7    A   It's language that I have seen at different places in

8    various forms, but I can't cite a source for that.  But it is

9    very similar to what I have seen on many other fictitious

10   instruments, and my in my estimation, has no meaning

11   whatsoever.

12   Q   Is it customary for a legitimate money order to include

13   this type of language on it?

14   A   It would be unusual for that to be on there.

15   Q   So despite the indicators or characteristics of legitimacy

16   that you described that may make this appear genuine as a

17   whole, is it a real money order?

18   A   It has the criteria for a real money order, yes.

19   Q   Could this money order be processed for the amount listed

20   on it?

21   A   It could be processed, yes, but it would -- it would go to

22   the institution and then immediately be rejected.  Because if

23   you took this apart where it's perforated and ran it through

24   in the banking system, the system would accept it because it

25   has the routing number for the bank.

1          It would process it, send it off to the Federal

2     Reserve Bank of Atlanta, and there it would be rejected

3     because they couldn't find the account number.

4     Q   So because of these indicators on it, because of this

5     routing number information, it could actually be through a

6     computer processed, so to speak?

7     A   Yes.  In other words, if the person at the IRS who

8     received this as a payment -- a staff person received this and

9     their process would be -- because, again, it would be

10    separated -- it would just be the top portion of the money

11    order coming in.

12         They would take it and process it normal unless there

13    was some suspicion.  And looking at it -- and not everybody is

14    an expert in financial instruments -- but someone who is

15    handling these quite often might know enough to look further.

16    Q   In your opinion what is this money order worth?

17    A   It has -- it has no value whatsoever.

18    Q   In your line of work, what does it mean to say something

19    is "issued under the authority of the United States"?

20    A   "Issued under the authority of the United States" would be

21    U.S. currency or U.S. government bond, an E Bond that's issued

22    under the authority of the United States government, and

23    payment, a check coming from the government, or a wire

24    transfer or ACH payment, they are authorized payments by the

25    U.S. government.

1    Q    Does this money order purport to be issued under the

2    authority of the United States?

3    A    Yes, it does.

4    Q    Why do you say that?

5    A    Because it is saying that Mr. Geithner is the drawee, the

6    one who is going to pay.  It's attempting to process it

7    against a U.S. government account at the Federal Reserve Bank

8    of Atlanta.  It has a signature, although the signature of

9    that person is not authorized to obligate the Treasury.

10   Q    In your line of work, have you seen this type of financial

11   document in which an individual is attempting to get the

12   Treasury to pay off a certain amount of debts?

13   A    Yes, regularly.

14   Q    Would you please turn to page 3 of Exhibit 1 -- and

15   actually, it's your -- your copies are not numbered, but it's

16   the 1996 Form 1040-V?

17   A    Yes.

18   Q    Do you recognize this type of document?

19   A    Yes, I do.

20   Q    Do you know what a 1040-V is used for?

21   A    It is to process a payment -- in other words, let's say

22   you have to do estimated taxes or you want to pay taxes to the

23   government, you would use a 1040-V along with your financial

24   instrument to pay the government whatever you owe them.

25   Q    In your examination of fictitious financial instruments

1    submitted, have you done cases where the payment was submitted

2    to the IRS?

3    A    Absolutely.

4    Q    In your line of work, have you seen payments submitted to

5    the IRS, fictitious payments submitted to the IRS, that

6    included a copy of this Form 1040-V?

7    A    Quite regularly, yes.

8    Q    Now, would you please turn to Exhibit 2.  That's the

9    second money order.

10   A    Yes.

11   Q    Is this the other financial instrument you were asked to

12   examine in this case?

13   A    Yes, it is.

14   Q    In your expert opinion, is the financial instrument

15   labeled "money order" in Exhibit 2 legitimate or fictitious?

16   A    It is fictitious.

17   Q    And did you reach your conclusions in the same way as your

18   examination of Exhibit 1?

19   A    Yes, I did, because except for, as we stated before, the

20   amount and the date and the tax year, it's an identical item.

21   Q    And the markings are substantially the same as in Exhibit

22   1?

23   A    Yes.  All the security features, all the indicators, the

24   MICR encoding, they're all identical.

25   Q    And does this document labeled "money order" in Exhibit 2

1    also purport to be issued under the authority of the United

2    States?

3    A   Yes, it does, because it's saying the drawee is

4    Mr. Geithner, Secretary of the Treasury, and it has the

5    account and Federal Reserve Bank of Atlanta upon which it is

6    to be drawn.

7    Q   Now, I would like to ask you a hypothetical, Mr. Kerr, if

8    you would so indulge me.

9         Say, for example, instead of this financial

10   instrument that we're looking at here that's on this special

11   paper and with these indications, if you would say, for

12   example, Mr. Hall simply wrote the amount he owed to the IRS,

13   he added routing numbers, his signature, and say some water

14   marks or security marks to a side of a banana and mailed that

15   banana into the IRS, would that banana be considered a

16   fictitious financial instrument?

17   A   I would say yes because it's obviously fictitious.

18   Q   Okay.  Does sending something in that's clearly fictitious

19   but that bears indicia or characteristics of being legitimate

20   such as routing numbers, security, water marks, those type of

21   things, is something of that nature -- would that be something

22   you generally were required to examine to determine if it was

23   fictitious?

24   A   Generally, no.

25   Q   Why not?

1    A    Because it's obviously fictitious.

2    Q    Okay.  What about the two money orders that you have

3    examined in this case?  Draw it into the realm where you would

4    have to be called on to make that determination.

5    A    These look likely legitimate financial instruments.

6    Everything about them presents themselves as a legitimate

7    financial instrument; a money order.  It's in the format.  It

8    has all the dates, the amounts, the signatures, everything you

9    expect to see if you went to Circle K or some other place and

10   purchased one.  This is what you would receive.

11   Q    And in your -- is it your expert legal opinion that both

12   money orders in Exhibit 1 and Exhibit 2 are, in fact,

13   fictitious financial instruments?

14   A    Yes, I am.

15            MS. EDELSTEIN:  No further questions at this time,

16   Your Honor.

17            THE COURT:  All right.  Mr. Kunkle, you may

18   cross-examine.

19            MR. KUNKLE:  Your Honor, I believe we have a

20   stipulation to admit Defendant's No. 5.  And if we could have

21   that just remain up on the screen, that would be fine.

22            THE COURT:  Is that your stipulation, Ms. Edelstein?

23            MS. EDELSTEIN:  Yes, Your Honor.

24            THE COURT:  All right.  Exhibit 5 is admitted.

25            MR. KUNKLE:  I'm sorry. it should be 105.  I

1    misspoke.

2            THE COURT:  Exhibit 105 is admitted.

3        (Exhibit No. 105 admitted in evidence.)

4            MR. KUNKLE:  Mr. Kerr should have it.

5                        **CROSS EXAMINATION**

6    BY MR. KUNKLE:

7    Q   Mr. Kerr, in front of you is a folder.  It's marked

8    Defendant No. 105.  If you could open that and take a look at

9    that for a second?

10   A   Yes.

11   Q   Okay.  In there -- and I apologize for the photocopy

12   quality of those -- are some different images of money orders.

13           Do you see those?

14   A   Yes.

15   Q   Okay.  Now, you have been looking at money orders and

16   checks and documents pretty much your whole life, right,

17   Mr. Kerr?

18   A   Right.

19   Q   Okay.  And you don't work for the government any longer,

20   right.  You do this as a --

21   A   No.

22   Q   This is a business of yours to come in and testify for the

23   government?

24   A   I do this and other financial consulting, yes.

25   Q   I'm going to show you this postal money order.  This is,

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1   again, I apologize.  May we have the Elmo, Mr. Sommers.

2           I apologize for the bad quality of the photocopy

3   printed off the Internet, but you see what we're looking at

4   there?  That's a postal money order?

5   A   Yes.

6   Q   In your experience, how many institutions can issue a

7   money order?

8   A   How many?

9   Q   Yes.  Any bank?

10  A   Any bank?  Actually, any business that would be set up, as

11  long as they would comply with both state and/or federal

12  regulations that comply, you can have -- set up like a title

13  lending, you know, that type of thing, sure.

14  Q   So if you met the requirements of being a financial

15  institution authorized to issue money orders, Mr. Kerr could

16  issue a money order, right?

17  A   That's correct.

18  Q   I mean, you have to go through some regulations to say

19  "this is how we do a money order," right?

20  A   Right.

21  Q   The Comptroller of Currency or the Federal Reserve Bank

22  regulates banks and financial institutions and says "these are

23  regulations you have to have" to issue something like a money

24  order?

25  A   That would be correct.

1    Q    Mr. Hall is not a bank, right?

2    A    That's correct, to the best of my knowledge, yes.

3    Q    Yeah.  He's not a bank.

4         Here's a postal money order.  Now, just so the jury

5    understands the history of money orders, the British postal

6    system was one of the first to start with money orders,

7    correct?

8    A    I believe that's correct.

9    Q    And they realized they could make money off of issuing

10   money orders and then they kind of made it more institutional,

11   right?

12   A    Yes.

13   Q    I mean, a money order is not free?

14   A    No.

15   Q    Because the Postal Service charges you a fee, right?

16   A    That is correct.

17   Q    And what's the max denomination for a postal money order?

18   A    I do not have that information at hand.

19   Q    I believe it's a thousand dollars, correct?

20   A    Okay.

21   Q    So if you went into the Post Office and paid them a couple

22   dollars, rather cheap to get a money order?

23   A    Uh-huh, yes.

24   Q    Here's a postal money order.  The money order says I have

25   already given the thousand dollars to the Postal Service,

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1  right?  In essence, a money order says that, right?

2  A   Yes.  It says give them $15 in this case.

3  Q   This one says $15.  So I've already given $15 to.

4        -- do you need some water, Mr. Kerr?

5  A   I'm okay.

6  Q   Okay.  So basically how it works is you've already given

7  the money to Circle K or Safeway or Western Union, right?

8  A   That's correct.

9  Q   And then on the face of the money order the individual

10  pays where it is get a receipt to show they paid for the money

11  order?

12  A   Yes.

13  Q   That would be the top part there to tear off, correct, up

14  here above the line?

15  A   Yes.

16  Q   This part up here would be the receipt, correct?

17  A   Correct.

18  Q   Down below then, it indicates who it is going to be paid

19  to, right?  I mean, this is a very bad photocopy.

20  A   That's okay.  I recognize it.

21  Q   You know what they say, right?  So the next line down

22  would say who that money order is going to be payable to,

23  right?

24  A   Right.

25  Q   In essence, who it has been given to, right?

1    A    That's who you are going to give it to.

2    Q    And then John Doe can take that money order back to the

3    postal office or even put it in the bank and get paid?

4    A    Right.

5    Q    And the routing numbers go to the Postal Service; is that

6    correct?

7    A    That would be to an account that they have, yes.

8    Q    And that's the institution where it goes to and then they

9    can refuse payment if that money didn't show up there?

10   A    Right.

11   Q    And in a bad world, the Postal Service doesn't pay, but

12   that doesn't happen, right?

13         THE COURT:  Well, let me back up for a minute.  I

14   think we are all familiar with the fact that a personal

15   check -- you can write a check and then issue a stop-payment

16   order and the bank cannot pay it, right?

17         THE WITNESS:  That's correct, yes.  If you issue a

18   stop-payment order, then that would stop payment on a check.

19         THE COURT:  How does a money order differ from that

20   or is it different from that?

21         THE WITNESS:  A money order, to the best of my

22   knowledge, you bought it, you send it, and that's it.

23         THE COURT:  It's drawn on -- well, typically drawn on

24   a financial institution.

25         Can the financial institution stop payment?

1           THE WITNESS:  I don't know the answer to that.

2           THE COURT:  All right.  Go ahead.  I don't know if

3    this matters.  I just write checks.

4    BY MR. KUNKLE:

5    Q   That's all right.  But the point is is a money order is

6    probably more secure from a check because it's already been

7    prepaid, correct?

8    A   Yes, because the person receiving it is not relying on the

9    person sending it to them.  Like an personal check, it depends

10   on their credit.

11          In this case you're relying on the credit of the

12   issuer of the money order.  And in this case you're saying the

13   United States Postal Service will pay me.  I could care less

14   who sent it to me.

15   Q   Right.  It's what it is.

16          You can go to page 2 now and I think it's the Safeway

17   one.  I believe these are in alphabetical order.  And I

18   apologize for the size of that.  This is a Safeway money

19   order, correct?

20   A   Yes.

21   Q   And on there -- and, again, this is a very bad photocopy,

22   but what you see here, these are all -- this is little red

23   dots like a heat mark or water mark, something like that?

24   A   Yes.

25   Q   And that's basically if I get that money order -- and in

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1   this case I think it's Jean Warren who printed this off the

2   Internet -- gets that money order.  She can look at that.

3   That looks legitimate, right?

4   A   It has the appearance of being legitimate, yes.

5   Q   On there it says Money Gram Money Order at the top, right?

6           Same thing.  This tells Safeway or Safeway's bank, if

7   you will, they're going to pay this money order for $971 to

8   Jean Warren of --

9           THE COURT:  You know, if you are going to be reading

10  the substance of these, we need to move their admission.

11          MR. KUNKLE:  They are in.  We stipulated them in,

12  Your Honor.

13          THE COURT:  All right.  Okay.

14  BY MR. KUNKLE:

15  Q   Okay.  So this basically is Jean Warren's money order now?

16  A   That's correct.

17  Q   If Jean Warren wanted to, she could sign the back and even

18  give that to Mr. Kerr, right?

19  A   That is correct.

20  Q   And you could take that to your bank and it's good for

21  $971?

22  A   Right.

23  Q   Now, if we go back then -- and this is a Walmart money

24  order -- this is a better image.  It's also in your packet up

25  there at page 4.  It's the last one.

1          Looks like they ripped off the Safeway money order

2     format.  Same thing, right?

3     A    Yes.

4     Q    And right up there on top it says "Walmart" or as in the

5     other one it said "Safeway" or it says "Postal Service,"

6     right?

7     A    Right.

8     Q    Now, if we go back to this one -- and this is Exhibit No.

9     1, this purports to be a money order because it says "money

10    order"?

11    A    That's right.

12    Q    And on the other money orders there is no line for a

13    drawer, correct, on the Walmart one or --

14          Let me just go back to the Walmart one for a second.

15    A    Okay.

16    Q    There's no line for a drawer of the money order, correct?

17    We don't care who the drawer is.

18    A    No.  There is a line on there where the purchaser could

19    sign, yes, where it says -- the second line down there says

20    "pay to the order of" where you would put who you want it to

21    go to.

22          And the second line on there, if you want it known,

23    then you would put your name in there so you are the drawer.

24    Q    Okay.  So you're saying there is a line in there for the

25    drawer?

1   A    Yeah.  Purchaser.  Signer.  Drawer.  Yes.

2   Q    The drawee is who pays it, right?

3   A    That's correct.

4   Q    The drawer is who makes it or creates it initially?

5   A    Right.

6   Q    So on this one there's no stamp or anything and up at the

7   top it purports on this money order to say where it came from

8   like United States Treasury, right?

9   A    There it says it came from Walmart.

10  Q    I'm sorry.  I'm holding up a different one on the screen,

11  Mr. Kerr.  I apologize.

12  A    Oh, you are looking at -- you're back to that one?

13  Q    Yeah.  Yeah, we're back to that one.

14  A    I'm sorry.

15  Q    Yes.  I didn't mean to play flippery-roo with you there,

16  but I'm sorry.  I kind of jumped ahead of you.

17  A    And would you repeat your question, please?

18  Q    Yeah.  My question is:  Where it says money order here,

19  there's nothing that says "Walmart" or "U.S. Treasury" or

20  "money order," anything like that?  Just the two words "money

21  order," right?

22  A    Right.  Down on the lower right-hand side it says

23  "drawee."

24  Q    Right.  But the drawee would be the guy who is going to

25  pay, correct, like Postal Service or Walmart?

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    A    Yes.

2    Q    Now, you can write a check to yourself, right?

3    A    Yes.

4    Q    And what does that become?  Just as good as cash, right?

5    A    If I have money in the bank, yes.

6    Q    So if you wrote a check to Mr. Kerr from Mr. Kerr, why

7    would anybody do that?

8    A    Well, you do that if you are going to the counter and

9    getting cash.

10   Q    Okay.

11   A    Or you can write it out to cash.

12   Q    And then the bank can take that and process it?

13   A    That's righty, yeah.

14   Q    And so a few moments ago you testified with Ms. Edelstein

15   that everything on this money order, everything, makes it

16   appear to be a legitimate financial instrument, correct?

17   A    I didn't say "everything."

18   Q    I'm sorry?

19   A    I said all the indicators we're looking at, it presented

20   itself as a legitimate financial instrument.  It had all the

21   criteria.  Whether the criteria are correct or not is a

22   different story.

23   Q    Well, let me ask you about this paragraph in particular,

24   this little paragraph right here.

25        Do you see which one I'm looking at with the pen?

1    A    Yes.

2    Q    You know which one I'm talking about?  "The draft is an

3    unconditional" -- what does that language mean?

4            On that money order that's on the screen now it says,

5    "This draft is an unconditional order by the drawer."

6            Do you see that paragraph on there?

7    A    Yes.  Let me get it back out.

8    Q    If you want to get the original out, that's fine.

9    A    That's what I'm doing.  Hold on a second.

10   Q    Okay.  These photocopies on the screens don't work very

11   well.

12   A    You're looking at Exhibit 1?

13   Q    I believe this is Exhibit 2.  We can put one up.

14   A    That's all right.  It doesn't make a difference.  Let me

15   get the right one here.  Yes.

16   Q    That paragraph there, this draft is an unconditional order

17   by Mr. Hall for Mr. Geithner to pay on demand to

18   Mr. Geithner's department, the Secretary of Treasury, that

19   money, the fixed amount of money therein, right?

20           Do you see that language?

21   A    Yes.  So to be paid to the United States Treasury.

22   Q    That's more like -- what's a sight draft?  Is that more

23   language common a sight draft than a money order?

24   A    I wouldn't say it's more common, no.

25   Q    What is a sight draft?

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1   A   A sight draft is an item that's payable upon sight, such

2   as a check.   In other words, you write a check to an

3   individual.   It's also -- it's also a sight draft, because

4   when you receive it, you deposit it in the bank and it's

5   payable.

6          So same idea.   And the same thing with a money order.

7   It is, in fact, a sight draft.

8   Q   Okay.   But a money order is prepaid; sight draft isn't

9   prepaid?

10  A   That's correct.

11  Q   So if it's not -- and I'm not suggesting this is a real

12  document.   Let's just get that straight.   I'm not --

13  A   Uh-huh -- all right.

14  Q   But in this instance it's saying to Mr. Geithner:   Pay

15  your self, correct?

16  A   Well, it's saying Mr. Geithner is going to pay the United

17  States Treasury for the benefit of Mr. Hall for his income

18  tax.

19  Q   And you see there that "private offset account number"?

20  A   Yes.

21  Q   Or a social security number?

22  A   Yes.

23  Q   Have you ever heard of that?

24  A   Yes.

25  Q   How many times have you heard of that?

```
1    A    Hundreds.

2    Q    And in the context of looking at similar documents like

3    this?

4    A    Yes.

5    Q    So I know you have testified previously before about all

6    of this concept "accepted for value, return for value."

7            You know what that is, correct?

8    A    I'm familiar with it, yes.

9    Q    And where does that come from, that kind of language?

10   A    I do not know the source.  I have never proclaimed to be

11   an expert in this area.

12   Q    I'm not asking if you are an expert, but you know what I'm

13   talking about, don't you?

14   A    I know the subject matter and I know it's used with quite

15   regularity.  As to its actual source, I don't know.

16   Q    We don't know where that kind of idea starts from, but you

17   have heard of this idea that there's an account based on a

18   social security number at the Treasury for people, right?

19   A    If you were paying into social security, you do have a

20   social security account, yes.

21   Q    Okay.  Well, what about this idea that there is a secret

22   bank account tied to your social security number to pay your

23   debts?

24           You've heard of that, correct?

25   A    I have heard of it, yes.
```

```
 1   Q    And that's something unique or common theme amongst
 2   sovereigns or people who believe that they have some secret
 3   account that the government doesn't tell them about that they
 4   use their body or their person as collateral to tie to the
 5   debt.
 6             You've heard of that?
 7   A    I have seen that, yes.
 8   Q    So that's something that you are familiar with, right?
 9   A    Yes.
10   Q    And this language about a private offset account and
11   ledgering it off, you have seen that before, right?
12   A    I have, yes.
13   Q    And that's common to people who protest their tax debt, if
14   you will?
15   A    Yes.
16   Q    They don't want to pay.
17   A    Right.
18   Q    The net effect of something like this document, you
19   mentioned it's a financial instrument, correct?
20   A    Yes.
21   Q    All right.  You could take off that top piece of that
22   money order and -- just to back up a minute.
23             Do you know of any banks that issue money orders in
24   that kind of denomination for that kind of amount?
25   A    I have never seen one, but I can't say that they wouldn't.
```

UNITED STATES DISTRICT COURT

CR14-00184-PHX-NVW    JURY TRIAL - DAY 3   1-22-15

1    Q    So if I walked into Okey-Dokey Bank in Nebraska and said,
2    "Here's my $800,000.  I want a money order."  You could
3    presumably get a money order for that amount?
4    A    I would assume that if you had the cash in hand or the
5    cash on deposit that they would issue you a money order or the
6    financial instrument that you desire such as a cashier's
7    check, certified check, for whatever amount you want.
8          Now, they may have their own internal limits that
9    they wouldn't issue a money order, but they would issue a
10   similar instrument, yes.
11   Q    Maybe a cashier's check?
12   A    Cashier's check, sure.
13   Q    If you opened an account with them or something like that?
14   A    Right.
15   Q    And that's basically just to -- well, a cashier's check
16   has already been presented, correct?  The money is taken out
17   of your account before that check is issued, right?
18   A    Yes.
19   Q    And that's what's backward -- well, I shouldn't say
20   "backward," but that's what's different from a regular check
21   as to a cashier's check, right?
22   A    Yeah.  Cashier's check.  Certified check.  Money is
23   already out of your account into a bank's account and the item
24   is drawn against the bank's account, not your checking
25   account.

UNITED STATES DISTRICT COURT

1   Q   Now, in your experience as a bank examiner working for

2   Comptroller of Currency, these instruments go into the system,

3   right?

4        Ms. Edelstein asked you about would it be processed,

5   correct?

6   A   Yes.

7   Q   And those routing numbers would maybe direct us to the

8   Federal Reserve Bank, and ultimately, this would not be paid,

9   correct?

10  A   That is correct.

11  Q   And so what happens with this?  Do they issue then an

12  insufficient funds or account not found?

13  A   If this was actually processed, it would come back

14  probably stamped "account not found."

15  Q   "No such account"?

16  A   "No such account," correct.

17  Q   Right.  And so this is not going to pay any debt

18  whatsoever.  It's useless.  This isn't going to pay any debt,

19  correct?

20  A   It's fictitious.  No.

21  Q   It's just going to --

22  A   There is no account upon which to draw the funds.

23  Q   And so it's just going to gum up the works for the IRS,

24  correct?

25  A   It would.

1  Q   So they are going to think -- well, maybe you mentioned on

2  your direct exam someone could put this in the bank, correct?

3  A   Yes.

4  Q   And they could send it off to Atlanta to the Federal

5  Reserve Bank and say "try to pay that"?

6  A   Yes.

7  Q   If someone didn't look at this closely?

8  A   That is correct.

9  Q   If someone who didn't know Mr. Hall, wasn't aware of his

10 history, just put this in the Bank of America down the street

11 in Mesa, Arizona, it would go back to Atlanta and they would

12 say "no account"?

13 A   That is correct.

14 Q   And the ultimate net result is zero, right?

15 A   Yes.

16 Q   And other than the complete, well, pain in the neck,

17 exercise of putting that in the banking system and having it

18 come back, nothing really happens, right?

19 A   I don't agree.

20 Q   You don't agree?

21 A   I don't agree with that, no.

22 Q   I mean other than what happens then, which is generates

23 more work and more paper?

24 A   Someone drawing this instrument, attempting to pay money

25 that's not there, so to me that is a fictitious instrument and

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    it is not legitimate.

2    Q   I agree.  But what happens in the end?  The IRS has to go

3    back and start trying to collect the tax again, right?

4    A   Yes.

5    Q   And so in the history of trying to collect from this

6    person, they're just not going to get their money based on

7    this?

8    A   That's correct.

9    Q   And so what happens?  It just obstructs the IRS or just

10   makes their job difficult, right?

11   A   It would create some difficulty, yes.

12   Q   Other than -- well, just the processing the paperwork and

13   so forth, right?

14   A   Yeah.  Except it's an attempt to pass an instrument that's

15   worthless against -- it would be like paying you with a

16   worthless check.  It's going to cause me problems, because if

17   I'm owed money and you pay me with a worthless check, I

18   apparently have lost something.

19   Q   Right.

20   A   Otherwise, you wouldn't be paying me in the first place

21   because you're going to rip me off.

22   Q   I have to go and try to collect again, right?

23        Now, you say this is an attempt to really pay it.  Is

24   that what you just said?

25   A   It's an attempt to process this item against to pay the

1    taxes with a worthless, fictitious financial instrument.

2    Q   So what you're saying is in your view, Mr. Hall could

3    really believe this would pay his taxes?  Is that what you're

4    saying?

5    A   I have no idea what was in his mind.

6    Q   Well, you're saying it's an attempt to collect.  That

7    would be his specific idea to go make them pay it.

8    A   I have never seen a legitimate use for an item like this.

9    Q   Because it's tied to the social security number account

10   that doesn't exist, right?

11   A   Tied to an account that does not exist at the U.S.

12   Treasury.

13   Q   Based on a social security number.  That's what purports

14   to be the account number, right?

15   A   This item indicates social security number, yes.

16   Q   For the account number?

17   A   Yes.

18   Q   Okay.  So two questions then.

19          One, you said it's an attempt to pay it if somebody

20   really believed this worked, right?

21   A   This was an attempt to pay, yes.

22   Q   It could also be an attempt to just really impede the IRS,

23   right?

24   A   I have no idea what was in his mind.

25   Q   Well, but you just said -- well, wait.  You don't --

1    A    I don't know what was in his mind when he issued the item.

2    Q    No.  No.  No.

3              See, Mr. Kerr, I know you want to tell this jury that

4    in your mind this is an attempt to collect.  The attempt to

5    have the IRS collect that and, you know, he really believes

6    this is going to pay his account.  That's what you want to

7    tell this jury, right?

8    A    No.  I'm here to tell them that this is a worthless

9    instrument.  That's all.

10   Q    Well, you just used the word, "It's an attempt to pay."

11             I'm asking you that's what you want to tell this

12   jury, right?  You want to tell them this is a real, true

13   attempt to have this account paid.

14             That's what you said Mr. Hall would be trying to do?

15   A    He issued the item and that would be the case, yes.

16   Q    Okay.  The alternative -- and I know as an expert you can

17   answer a hypothetical question -- the alternative is this is

18   just an attempt to maybe put the banana into the system, if

19   you will, and impede the IRS, make their job difficult.  Isn't

20   that the alternative?

21   A    It could be, yes.

22   Q    Okay.  So that's a fair assessment of it as well.

23             Because when Ms. Edelstein asked you about a banana,

24   you had no problem answering that question, right?

25   A    That's right.

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    Q    So if I print these numbers on the side of a banana, you

2    can't put a banana in the computer, right?

3    A    You cannot process a banana, no.

4    Q    So a banana is maybe a bad example.  I don't mean to try

5    to age you, Mr. Kerr.  I feel older every day, but you might

6    have heard of Abbott and Costello, right?

7    A    Yes.

8    Q    And they do a routine called "Who's on First," right?

9    A    Absolutely.

10   Q    You have heard it before, right?

11   A    About two weeks ago.

12   Q    Yeah.  You can't help but laugh every time, right?

13   A    Yes.

14   Q    I mean this isn't a laughing matter because we're messing

15   with the IRS.  But one of the lines they use in there is who's

16   on first.  And when he gets paid, who signs the checks.

17        And he just keeps saying "who," correct?

18   A    Yes.

19   Q    So this is really just a worthless document that basically

20   goes to the IRS and just makes their life difficult, right?

21   A    It does do that.

22        MR. KUNKLE:  I have nothing further, Your Honor.

23        THE COURT:  All right.  Any redirect?

24        MS. EDELSTEIN:  Yes, Your Honor.

25   ////

1                       **REDIRECT EXAMINATION**

2    BY MS. EDELSTEIN:

3    Q   Mr. Kerr, you described on -- we'll just say, for example,

4    Exhibit 1 that there were multiple indicia that lend this some

5    reliability; is that right?

6    A   That is correct.

7    Q   Would it have needed all of those for you to draw the

8    conclusion that it appeared reliable?  Would it have needed

9    all of the water marks and the check stock paper and all that?

10            Or would something even a little bit less -- with

11   fewer indicia have appeared to be legitimate?

12   A   Yes, it would, because it could be printed on plain paper,

13   have the routing number encoded at the bottom.

14            Again, if it's dated, has the amount, signed by an

15   individual, who it's paid to, with the processing information,

16   sure.

17   Q   But you did testify on direct that this particular money

18   order in Exhibits 1 and 2 had high quality markers of

19   legitimacy?

20   A   Yes.  This is a high quality instrument that you would

21   expect to see in a modern-day financial instrument, yes.

22   Q   Now, Mr. Kunkle asked you about the -- he asked you about

23   the purpose, the intended purpose of this document.

24            I want to ask you, going from the face of this

25   document alone, based on where the information is listed on

1    this money order and based on your knowledge of how money

2    orders and financial instruments works, what is the face of

3    this document purporting to do?

4    A   It is attempting to pay an amount to the United States

5    Treasury drawn upon account at the Federal Reserve Bank of

6    Atlanta that is actually an Internal Revenue Service account.

7    Q   Is that what you mean by you say this is an attempt to pay

8    Mr. Hall's debt based on the face of the document rather than

9    any knowledge you might have of what he intended to do?

10   A   Right, because it states down there it is for Mr. Hall and

11   his tax period.

12           Again, it's an item.  It has a legitimate look.  It

13   has the criteria for a financial instrument, and, yes.

14           MS. EDELSTEIN:  Thank you.  No further questions.

15           THE COURT:  All right.  May Mr. Kerr be excused

16   permanently, counsel?

17           MS. EDELSTEIN:  Yes, Your Honor.

18           MR. KUNKLE:   Yes, sir.

19           THE COURT:  All right.  Mr. Kerr, I instruct you not

20   to discuss your testimony with anyone except the lawyers in

21   this case until the trial is over.

22           And with that you are excused.

23           THE WITNESS:  Thank you, sir.

24           THE COURT:  Thank you.  Does the government have

25   further evidence?

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1          MS. JENNIS:  No, Your Honor.  The government rests.

2   **GOVERNMENT RESTS**

3          THE COURT:  All right.  Does the defendant wish to

4   present any evidence?

5          All right.  I tell you what.  This is probably a

6   little bit earlier than I would take a break, but there are

7   some things I do have to take up with counsel.  So let us take

8   a break.  This is a little bit -- I can't predict for sure

9   exactly what we're going to need to do, but I think there is a

10  decent chance that we will be ready for you in 20 minutes, so

11  let us take a 20-minute break.

12         All rise for the jury.

13     (Open court, no jury present at 10:14 a.m.)

14         THE COURT:  All right.  Please be seated.  And the

15  record will show the absence of the jury.

16         All right.  Mr. Kunkle, you may proceed.

17         MR. KUNKLE:  Your Honor, thank you, and thank you,

18  Mr. Sommers.

19         I even mentioned to Ms. Jennis and I think this is

20  important we do this this way and I know Your Honor hopefully

21  understands my approach.

22         We are at that point, Your Honor, and I have been

23  following Your Honor's instructions about my documenting and

24  note taking.  However, because this is a little different, I

25  felt that it would be necessary to take this break.

1        And because, again -- and I think out of an abundance

2  of caution to Mr. Hall's rights under the Sixth Amendment --

3  and I know it's probably very unusual during a trial, but I

4  would ask that you, I, staff, the room be sealed.  We do

5  this -- part of this ex parte with Mr. Hall without the

6  government being here, because I'm intending to basically -- I

7  just want to have on the clear to be record --

8        THE COURT:  You want an ex parte record that it has

9  been communicated to him about his choices?

10        MR. KUNKLE:  Exactly.

11        THE COURT:  And that's fine.

12        MR. KUNKLE:  And we're going to get into issues that

13  implicate, you know, ethical responsibilities of myself and

14  attorney-client privilege and so forth.

15        And I believe out of an abundance of fairness to

16  Mr. Hall -- and I know it's unusual, but I would ask the

17  government be excused, the courtroom be cleared and sealed,

18  and that these proceedings proceed under seal at this point.

19        But, I mean, obviously everything else we will do on

20  the record after that point.  But I think it's incumbent upon

21  me to make that request.

22        THE COURT:  So I'm clear, I'm understanding this

23  request to deal with making a clear record with Mr. Hall that

24  he does understand his choices?

25        MR. KUNKLE:  That's exactly right.

1    bring the jury out that before about our ex parte discussion,

2    I find the only reasonable way to interpret it is that the

3    defendant declines to testify.  And rather than put on

4    something in front of the jury that could be prejudicial to

5    the defendant and making him state that again in front of the

6    jury, based on that discussion Mr. Kunkle will rest his case

7    without presenting any evidence.

8         Correct, Mr. Kunkle?

9         MR. KUNKLE:  That's absolutely correct, Your Honor.

10   Yes.

11        THE COURT:  All right.  So I wanted to tell the

12   government that before we bring the jury out so you know

13   what's happening.

14        MS. JENNIS:  But we still need to do jury

15   instructions.

16        THE COURT:  Oh, yes.  We need to bring the jury in,

17   have the defendant rest his case.  I will then excuse the

18   jury.  We have two or three things to talk about in the jury

19   instructions.  But I want to have the case rested and have

20   them gone.

21        So let's -- I think about another half hour after

22   should be enough for us -- more than enough for us to deal

23   with.

24        MS. JENNIS:  Can we send them to an early lunch and

25   that way we won't have a break between --

1          THE COURT:  Well, I kind of hate to send them to

2    lunch at a quarter to 11:00 which is where we are right now.

3          If we have them back at 11:15, we can get -- I can at

4    least read the instructions and then break for lunch.

5          I don't want to interrupt anybody's closing

6    arguments.

7          MS. JENNIS:  So you will read the instructions, then

8    we will have a break, and then we will do closings.

9          THE COURT:  Yes.  That will be the plan.

10          MS. JENNIS:  All right.  Thank you.

11          THE COURT:  All right.  Let's bring the jury in.

12      (Open court, jury present at 10:46 a.m.)

13          THE COURT:  Please be seated.

14          The record will show the presence of counsel, the

15    defendant, and the jury.

16          Mr. Kunkle, does the defense wish to present any

17    evidence?

18          MR. KUNKLE:  No, Your Honor.  The defense rests.

19    **DEFENDANT RESTS**

20          THE COURT:  All right.  Members of the jury, I need

21    to take a little time to discuss a few final things about the

22    jury instructions and I'm going to take a recess to do that.

23          Then we will have you come back.  I will read you the

24    final instructions.  That take about half an hour, a little

25    less than a half-hour, and then we will take make -- what will

1  probably be a slightly early lunch.  And then after we return

2  from lunch, we'll hear the closing arguments of counsel, after

3  which you will retire to deliberate on your verdict.

4       Now, I think it's hard to say exactly.  I think I

5  would like to take a recess until 11:15.  That will allow us,

6  if I'm predicting right, to finish the instructions, have you

7  off to lunch about 15, 20 minutes before noon, which probably

8  isn't too bad, so we'll be in recess until 11:15.

9       All rise for the jury.

10  (Open court, no jury present at 10:47 a.m.)

11  **INSTRUCTION CONFERENCE**

12       THE COURT:  All right.  Please be seated.  The record

13  will show the absence of the jury.

14       I have got this new request from Mr. Kunkle.  But

15  before we get to that -- oh, where did I put it?

16       MR. KUNKLE:  And, Your Honor, I also forwarded to

17  your chambers and the government the copy of the instructions

18  from that *Salman* case I found on PACER.

19       THE COURT:  I just saw the e-mail a minute ago.  I'm

20  having it printed.  I haven't been able to look at it.

21       MR. KUNKLE:  I just put that out there because I

22  thought it may be helpful for the parties and the Court to

23  take a look at it.

24       THE COURT:  In fact, Cullen, will you go back and get

25  that copy for me so I'll have a copy when we discuss this.

1          And subject to looking at -- Ms. Jennis, have you
2    looked at that instruction from the *Salman* case?
3          MS. EDELSTEIN:  Your Honor, I printed it as I was
4    running to court this morning.  I haven't had a chance to
5    review it.  I believe as I looked at it that it was the entire
6    body of instructions from that case.
7          THE COURT:  Yes.
8          MS. EDELSTEIN:  So I haven't pulled out the specific.
9          THE COURT:  It's 32 pages.  I tell you what.  Here is
10   what I think I want to do.  I want to address things on my
11   mind and then we can go look at that and see if we can get any
12   improvement from that.
13         Maybe the two will be interconnected.  But let me
14   tell you the first thing is something that frankly I meant to
15   discuss yesterday and I forgot.  And that is, if you will look
16   on the most current draft on page 3 at line 16, there's some
17   language here that I don't think is -- I don't -- we need to
18   talk about it because it doesn't make sense to me.  And maybe
19   there's something to be said there.  But if so, I think we
20   need to improve it.
21         The language here says on line 15:
22         A fictitious instrument is a bogus document created
23   to appear to be a financial instrument although no such
24   genuine financial instrument exists.
25         I could put a period right there, but you all have --

1    continuing:

2         And the fact that the instrument's nonexistence is

3    unknown to the intended recipient.

4         I don't understand what that means.  And whatever it

5    is, we need to say it clearly and make sure it's also correct.

6         MS. EDELSTEIN:  Unfortunately, Your Honor, that last

7    part, which is a bit unclear, is a direct quote.

8         But I do agree that it's much more clear if you were

9    to put a period after "exists," because it almost appears that

10   they are different thoughts.

11        THE COURT:  They are completely different domain.

12        MS. EDELSTEIN:  Right.  So to the extent that a

13   period would be well served being placed after "financial

14   instrument exists," period.

15        THE COURT:  But I don't even know what that clause

16   means.  I know what's in the opinion, but that doesn't mean it

17   makes sense.

18        MS. EDELSTEIN:  Right.  I think it -- essentially --

19   I mean, it's hard to fully understand it, Your Honor, but I

20   take it to mean to the extent that the fact that it is --

21   that -- the fact that it is not a real document is unknown to

22   the person who receives that.

23        THE COURT:  See, the problem is this word

24   "instrument."  Does it mean this piece of paper?  Or does it

25   mean the class of documents it's a part of?

1          MS. EDELSTEIN:  Right.  I don't think -- you're

2     right, Your Honor, that it's not clear.  And that's not even

3     clear from the opinion itself.

4          MR. KUNKLE:  Your Honor, may I --

5          THE COURT:  And actually, the *Salman* opinion, I think

6     it validates some of the things I was saying yesterday without

7     the benefit of having read it yesterday about we have to take

8     this language from the *Howick* case and some of it is talking

9     about the circumstances of that case but not stating general

10    principles that we would put in an instruction.

11         Things like the reference to negotiability.  I also

12    realize some of the comments I made yesterday about

13    "negotiability" were incorrect but it doesn't matter.  So --

14         MR. KUNKLE:  May I have a moment, Your Honor?

15         THE COURT:  You may.  Because my one sense is that we

16    didn't need this language at all; that this is adequately

17    covered by the rest of the instruction.

18         But anyway, take a minute and confer.

19         MS. EDELSTEIN:  Your Honor, looking at page 22 of the

20    *Salman* instructions that Mr. Kunkle graciously provided me a

21    copy of just now, it does follow the language in the *Howick*

22    case.

23         It states that line and it puts the clauses together

24    as I had done in the prior proposed instruction.  But to the

25    extent that it maybe more fully outlines the parameters of

1    that case and sheds some light on some of the definitional

2    things, perhaps if we were to incorporate jury instruction 22

3    from that case --

4         THE COURT:  Well, let's look at that, because the

5    second sentence there is something that I also thought about

6    in reading the opinion as to whether we might put something

7    like that -- I'll want to hear from Mr. Kunkle about that.

8         However, this language "the genuine instrument's

9    nonexistence," you know, I don't feel obligated to perpetuate

10   my own mistakes, much less the mistakes of other judges.  I

11   try to make a mistake once.

12        MR. KUNKLE:  Your Honor, if I may, in just discussing

13   this with Ms. Edelstein in terms of instruction No. 22 in

14   fleshing out the language, I know we're relying -- and I'm not

15   suggesting that -- I think it's Judge Hicks up in Nevada.  I

16   think there's only like one district in Nevada.  I don't know

17   Judge Hicks.

18        THE COURT:  I don't mean to disparage the judge, so.

19        MR. KUNKLE:  But what it appears that they did in the

20   *Salman* case -- and I will tell you from reading the opinion in

21   *Salman* -- it didn't seem that that was an issue on appeal.

22        And after discussing with Ms. Edelstein this

23   instruction No. 22 which is page 22 of the 33-page document

24   from the *Salman* instructions I pulled off PACER last night,

25   they have that language directly from the *Howick* opinion that

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1     they instructed the jury in *Salman*.

2          And notably, they also, when you mentioned about the

3     fictitious instrument, the court also went further and

4     described -- gave definitions for "utter" and "instruments"

5     and so forth.

6          I mean, almost parroting what Mr. Kerr just testified

7     to.  It's a legal written document that defines rights and

8     duties.  That's instruction 21.

9          And, again, I'm not suggesting Judge Hicks has the

10    tiger by the tail, but I would like to have the language at a

11    minimum from the instruction --

12          THE COURT:  We're talking about page 22, right?

13          MR. KUNKLE:  In *Salman*.

14          THE COURT:  That's all we're talking about?

15          MR. KUNKLE:  That instruction there about "presumably

16    unknown" and "not revealed to."  And I think the "not revealed

17    to" language is important, Your Honor, because --

18          THE COURT:  Wait.  I don't want to talk about this

19    language.  I want to talk about real meaning.  And I want to

20    talk about a way to say it that is clear.  Not like this.

21    This is not clear.

22          So let's assume I agree with the idea.  Let's come up

23    with better language that -- I think this is -- you know, the

24    problem is, like I said, the juries take this stuff very

25    carefully.  And I don't -- it is a lot more trouble to fix a

UNITED STATES DISTRICT COURT

 1   bad instruction than it is to get it right in the first time

 2   around.

 3            So what are you trying to say here?  What do you want

 4   to say?

 5            MR. KUNKLE:  I take the Court's point that the Ninth

 6   Circuit language is a little convoluted.  I will be honest

 7   with Your Honor.  I haven't given it much thought beyond using

 8   that language.  Perhaps counsel and I may have a moment or

 9   two; Ms. Edelstein and I can figure something.

10            THE COURT:  Are you okay with the second sentence

11   here of instruction 22?  That would be an addition for us.

12            MR. KUNKLE:  At line 4?

13            THE COURT:  Correct.

14            MR. KUNKLE:  I'm okay with that.  I would like the

15   whole instruction given as it is written right there on page

16   22.  I know it is somewhat convoluted language but I think --

17       (Discussion had off the record.)

18            MR. KUNKLE:  I think, Your Honor -- I know Your Honor

19   may be somewhat discomforted about the language, but the

20   government and I are willing to stipulate that you give

21   instruction 22 as part of our instructions.

22            THE COURT:  I understand.  But, you know, I've got a

23   case up on appeal right now where everybody stipulated not to

24   answer a question from the jury because both sides saw

25   strategic benefit in that confusion and I decided it was

1    morally wrong to take people in here, make them make this

2    terribly important decision, and not answer their question.

3         So I answered the question.  I'll find out from the

4    Court of Appeals whether I was right or wrong to answer their

5    questions.

6         So the fact that the lawyers see mutual benefit in

7    confusion doesn't carry the day with me.  So I know you don't

8    see it that way, but let's --

9         MR. KUNKLE:  I don't think it's a mutual benefit for

10   confusion on my part.  I think it's more like, hey, this is

11   what the Ninth Circuit said.  How can we go wrong?

12        THE COURT:  You know, but writing opinions is

13   different from writing jury instructions.  So it's our job to

14   write the jury instruction that captures the substance of the

15   opinion but writes it for real people, so.

16        MS. EDELSTEIN:  Your Honor, the government is sort

17   of -- the two of us have conferred.  And essentially in

18   interpreting that second clause -- that phrase -- "and the

19   fact of the instrument's nonexistence is unknown to the

20   intended recipient," what it sounds like that means to us is

21   the fact that it's bogus, this document is bogus, is unknown

22   to the person who gets it in their hands.

23        THE COURT:  You know what, you can day this different

24   ways.  One meaning that I thought might be here is that the

25   recipient doesn't know that this type of document doesn't

1   exist, which goes to the family of documents, not to this

2   specific document.

3           And the way this is written could easily be taken as

4   referring to this specific document.

5           MS. EDELSTEIN:  Right.  Right.

6           THE COURT:  So I think that's probably -- I think

7   that's probably a correct -- what I tried to articulate now is

8   probably correct.

9           So if we could say something like that, I would be

10  more comfortable.  And, you know, "the nonexistence is

11  unknown."  We've got to get better words than that.

12          I'm taking a crack at this.  How about this --

13          MS. EDELSTEIN:  Your Honor?

14          THE COURT:  Go ahead.

15          MS. EDELSTEIN:  I'm looking at the direct quote and

16  there is a -- where the fact of the genuine instrument's

17  nonexistence is presumably unknown, because they're talking

18  about -- I think that takes it out of specifically referring

19  to the document that we're looking at here versus a family.

20          THE COURT:  But the whole premise is there is no

21  genuine interest, not specifically and not generally, so why

22  do we want to use the word "genuine instrument"?

23          MS. EDELSTEIN:  Just in terms of what they are

24  referring to in terms of what we are looking at in the

25  instruction versus this specific instrument versus the family

 1    or body of documents that could.

 2         THE COURT:  Let me -- let me take a crack at this.

 3         Again, I feel no obligation to work off what is good

 4    opinion writing but not good instruction writing.

 5         MS. EDELSTEIN:  Right.

 6         THE COURT:  So perhaps something like this:

 7         A fictitious obligation is a bogus document contrived

 8    to appear to be a financial instrument where there is, in

 9    fact, no such genuine instrument.

10         And then say:

11         Even if the intended recipient of the document is

12    unaware whether the type of instrument exists --

13         I'm not wedded to those words, but I'm trying to

14    state it in an affirmative way.  Do you want me to give it to

15    you again?

16         MR. KUNKLE:  No.  If I may, Your Honor, when you said

17    "aware," that's why I raised my hand because that goes back to

18    that subject issue.  May I suggest the following?

19         THE COURT:  Go ahead.

20         MR. KUNKLE:  A fictitious instrument is a bogus

21    document contrived to appear to be a financial instrument.

22         Period.

23         The existence of the genuine instrument, which the

24    fictitious instrument appears to be, is unknown and not

25    revealed to the intended recipient of the fictitious document.

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1          THE COURT:  Here's the problem.  This phrase "genuine

2     instrument" is fraught with problems because there is no

3     "genuine instrument."

4          MR. KUNKLE:  Well, okay.  And we could call it the

5     existence of the genuine instrument that the fictitious

6     instrument purports to be.

7          THE COURT:  It doesn't really have to purport to be

8     any.  It just has to be a -- quote -- it has to appear to be a

9     financial instrument.

10          MR. KUNKLE:  Issued by a subdivision.

11          THE COURT:  Right.

12          MR. KUNKLE:  But it's the -- the idea is that it's --

13     I know what you're saying, because then you get back into the

14     counterfeit statute, but maybe leave out the word "genuine,"

15     but the existence of the instrument which the fictitious

16     instrument appears to be is unknown and not revealed to the

17     intended recipient.

18          THE COURT:  You know, this issue of "unknown to" and

19     "not revealed to," that is redundant.  If it's unknown to you,

20     then by hypothesis, it has not been revealed to you.  Why

21     should we say things twice when we can say it once?

22          MR. KUNKLE:  But, Your Honor, it's not redundant,

23     because the "not revealed to," again, goes to the idea that

24     there is a dog on a fictitious instrument smoking a cigar.

25     That's the revealing type.

1      You may not know that this money order comes from the

2   Treasury or doesn't come from the Treasury.  That's your lack

3   of knowledge as the recipient.  But there's also that check on

4   the subjective intent of the recipient that objectively the

5   document doesn't indicate it's not real.

6      *Salman* appealed and said, look, it said

7   "nonnegotiable" right on there.  And they said that doesn't

8   defeat because negotiability isn't the issue.  It's what's on

9   the document that the person looking at that document would

10  either not know because it's bogus and contrived to appear to

11  look genuine; and, B, it's not revealed.

12     Where like if it had said across the document, "This

13  is a banana joke on the IRS, ha, ha, ha."

14     That's revealing it.  So I think that's why it takes

15  it back to the objective standard.  It's not revealed.  It's

16  the dog smoking in the picture with the cigar.

17     THE COURT:  How about -- again, I'm troubled that

18  this phrase "genuine instrument" is perfectly ambiguous as to

19  whether or not we're talking about just this piece of paper or

20  the type of document.  So let's see if we can be clear about

21  that.

22     How about:

23     Where there is, in fact, no such genuine instrument

24  or where there is, in fact, no such genuine type of

25  interest -- type of instrument.

1    This issue about the boundary between a counterfeit
2 and this is not intuitive and it is elusive and I don't want
3 to have language here that slips it back toward a counterfeit.
4    MS. EDELSTEIN:  And the language that we're
5 struggling with, as Ms. Jennis pointed out, is actually in
6 part of the opinion which is looking at the comparison between
7 the two.
8    So it's an attempt to kind of, you know, decipher
9 between "counterfeit" and -- what's the -- "fictitious."  So
10 it's essentially at that point of the opinion the language
11 that is used.  And what's here in the instruction is to make a
12 clarification between "counterfeit" and "fictitious."
13 Whereas, perhaps later, there is better language that
14 clarifies the --
15    THE COURT:  But, you know, the other thing is how
16 this case is going to be argued to the jury.
17    And I think I understand both sides' pitch here and
18 we don't need to draft for hypothetical nuances that don't
19 actually relate to either the government or the defendant is
20 going to argue this.
21    Does it help to add the words I'm suggesting to say
22 "no such genuine type of interest -- "type of instrument"?
23    MS. EDELSTEIN:  I'm sorry, Your Honor, in which
24 portion?
25    THE COURT:  This is the second line where there is,

 1    in fact, no such -- I'm working off the instruction No. 22

 2    from the *Salman* case.

 3            MR. KUNKLE:  The best I could come up with would be

 4    to keep the first sentence and read it this way:

 5            A fictitious obligation -- I'm sorry -- fictitious

 6    obligation is a bogus document contrived to appear to be a

 7    financial instrument.  Period.  The existence of a genuine

 8    instrument -- of a genuine financial instrument -- I'm

 9    sorry -- which the fictitious instrument is contrived and

10    appears to be, is unknown and not recognized --

11            THE COURT:  Okay.  Go back.  I'm trying to write this

12    down.  The existence of what?

13            MR. KUNKLE:  "A."  I was using an indefinite article

14    "a genuine financial instrument" because it doesn't lead them

15    to believe there is a genuine one.  That's the way I took it.

16            The existence of a genuine financial instrument which

17    the fictitious instrument is contrived to and appears to be,

18    is unknown not revealed to the intended recipient of the

19    alleged fictitious instrument.

20            THE COURT:  You know, that just doesn't make sense to

21    me.  Maybe it's because I'm getting old, but it is such an

22    abstraction and it doesn't make sense.

23            So what are we getting at here?  This language, I

24    don't feel any obligation to write instructions that track

25    this court opinion.  I need to write instructions that are

1   understandable and correct.

2           And, you know, that's a great opinion.  I like that

3   opinion.  But it's sort of like a Wagnarian music.  The waves

4   keep coming again and again and give you a sense.  That's fine

5   for Wagner and it's find for hallowed opinions, but it's not

6   fine for jury instructions.

7           So what are we getting at here?  This issue about

8   "presumably unknown" and "not disclosed" -- "revealed" -- what

9   are we getting at?

10          I suppose one thing that that might be getting at,

11  which has no bearing on this case, is if you had facts where

12  the person who circulated this document -- someone says, hey,

13  by the way this is a joke -- I'm sure Judge Berzon in trying

14  to map out this statute was thinking about that.

15          We don't need to talk about that in this case.

16  There's no evidence of that in this case.  So we don't have to

17  write for hypotheticals that don't apply to the facts of this

18  case.

19          The other thing that is presumably unknown, that is

20  if what she may be getting at here is that -- it sounds to me

21  like it's just another perspective on its obviously "can't be

22  real."

23          Again, the facts of this case don't even come

24  remotely close to that.  This document was sent with the IRS

25  payment notice.  It says right on its face it's there for

 1    payment.  So this isn't a joke.  We don't need to write

 2    instructions for jokes.

 3           Well, let's put it this way.  The defendant can argue

 4    that and I don't want to cut that off, but --

 5           "Presumably unknown by."

 6           Unknown for what?

 7           Does the Secretary of the Interior know this stuff?

 8    Well, probably he does.  But this stuff wasn't sent -- well,

 9    it was sent to the IRS agent.

10           MS. EDELSTEIN:  Perhaps, Your Honor, an approach that

11    would simply streamline it to include those points that we are

12    in agreement on and to include, starting at line 15, "a

13    fictitious instrument is a bogus document created to appear to

14    be a financial instrument although no such genuine financial

15    instrument exists."  Period.

16           Picking up again --

17           THE COURT:  Hold on a minute.  You're reading from

18    the other draft.  All right.  Go ahead.

19           MS. EDELSTEIN:  So starting with line 15, putting a

20    period at the end of "exists" on line 16.

21           THE COURT:  All right.

22           MS. EDELSTEIN:  Beginning then, picking up directly

23    in that paragraph:

24           "The government is not required to prove that the

25    false or fictitious instrument, document, or other item

1    appeared to be similar to an actual financial obligation in

2    particular.  The item need only credibly appear to be in a

3    class of or bear a family resemblance to a financial

4    instrument."

5         So essentially, Your Honor, the nonexistence, what

6    that means and what it relates to and the "presumably unknown"

7    and the "revealed to" language is eliminated.  And yet the

8    salient points of the -- what the obligation has to bear

9    resemblance to what it has to credibly hold itself out to be.

10        And that the fact that no genuine such -- no such

11   genuine financial instrument exists is still contained within

12   the instruction.

13        THE COURT:  Well, this comes back to the discussion

14   we had -- or at least what I said yesterday -- where this

15   phrase that we tweaked to say "need only credibly appear to be

16   in a class."

17        That seems to me to cover, certainly to allow the

18   defendant's argument to the jury, that the recipient didn't

19   know there's no such document.

20        That gives us the objective standard that allows all

21   the argument you want to make, Mr. Kunkle, without convoluted,

22   abstract, to my mind, highly-confusing, if not unintelligible

23   language.  This lets you argue what you want.

24        MR. KUNKLE:  Your Honor, one moment, if I may.

25        Your Honor, Mr. Hall's endeavored and decided to

1   excuse himself during this discussion.  He was having

2   difficulty.  As you know, he has been going back and forth to

3   Florence nightly on the bus and early in the morning.  They

4   wake him up in the middle of the night.

5           His head was down.  I don't think he was sleeping

6   through this, but he may have been.  Again, we're just arguing

7   legal issues.

8           THE COURT:  I would be happy to take a break for him

9   if he wants to take a little rest.

10          MR. KUNKLE:  He has just indicated to me in a first

11  that he's chosen to go in the back.  He didn't need to be here

12  for this.

13          THE COURT:  Actually, no, I cannot allow that.

14          MR. KUNKLE:  You can't have him excused?

15          THE COURT:  No, I can't allow that.

16          Sorry, Mr. Hall, I do have to have you present for

17  every aspect of your trial.

18          MR. KUNKLE:  He can choose to waive his presence for

19  this part, Your Honor, the jury instructions, if he wishes.

20          THE COURT:  And in my judgment -- well, I judge that

21  to be unwise, even if I have the power to do it.

22          MR. KUNKLE:  Okay.

23          THE COURT:  So, Mr. Hall, thank you for your

24  patience.  I do wish to have you here for everything.

25          MR. KUNKLE:  Your Honor, I would just ask -- I think

1   because of the theory of the defendant's case, the defense

2   case as it is now, this issue about what's revealed on the

3   face of the document, what's on the face of the document,

4   unknown to the recipient but revealed there, it has to be in

5   there, some language to that effect.

6          Because on the face of this document, which takes it

7   out of being arguably the definition of a financial

8   instrument, is that it's-- well, actually, I take that back.

9          THE COURT:  Actually, I mean -- again, I want to --

10  why isn't this adequately covered by the next sentence that I

11  have been talking about?

12         Secondly, we only have to give instructions that

13  arguably apply to the evidence of this case.  And in this case

14  there's nothing on the face of that instrument that says it's

15  fake and phony and a joke.

16         You can argue that the recipient would figure that

17  out, but --

18         MR. KUNKLE:  But, Your Honor, the Court's making a

19  ruling already.  You're presupposing.  There is language on

20  this document Exhibit 1 and 2 that talks about private offset

21  accounts with social security numbers.

22         That -- you may believe it's only an argument but --

23         THE COURT:  All right.  All right.  Fine.  Fine.

24         MR. KUNKLE:  But to the recipient this is bogus.

25         I mean, you know, presumably our IRS people would

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1    know that someone sitting in a private offset account, what's

2    that, with the same social security number?

3           THE COURT:  I guess I'm going in circles.  I'm not

4    opposed to saying this.  I just want to say it in an

5    understandable way and this is not an understandable way.

6           MS. EDELSTEIN:  Your Honor, the government would

7    object to the extent -- to Mr. Kunkle's argument in the last

8    time in the sense that it is not an element of this charge

9    what the recipient believed.  That has nothing to do with this

10   particular statute.

11          What the IRS decided to do or not do with it, the

12   recipient in this case, is irrelevant.

13          THE COURT:  I tell you what.  I think maybe the

14   *Salman* case gives us -- sheds light here because it's a nice

15   discussion where they go through some of the language in

16   *Howick* -- *Howick* -- and say that language, some language

17   doesn't constrain the crime here.

18          It helps understand -- it talks about circumstances

19   of that case, but -- so we don't have to worry about

20   everything in that opinion meaning the crime.  And, in fact,

21   they were very clear in *Salman*, hey, we're going back to the

22   statute.  What does the statute say?  And for that case it

23   doesn't say anything about "negotiability," so it's not an

24   element of the offense.

25          So in this case it has to appear, represent, purport,

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

 1   or contrive through scheme or artifice to be an actual

 2   security or other financial instrument.  That's all it says.

 3          I am -- Mr. Kunkle, on the one hand I am -- I'm

 4   not -- I am not cutting off the argument you want to make.

 5          The question is whether it is adequately covered by

 6   what I'm comfortable with so far and whether the additional

 7   language you want is either erroneous or confusing.

 8          I don't think it's necessary for you to make your

 9   argument because "credibly appear," it cannot credibly appear.

10          Well, let me ask the government.  What's your -- I

11   mean, obviously, everything that we do here, if there's a

12   conviction, would be picked over by our more learned brethren

13   on the Court of Appeals, but we don't want to make their work

14   unnecessarily hard.

15          So what do you think, Ms. Edelstein?

16          MS. EDELSTEIN:  The government is comfortable with

17   ending that first sentence "the exists."  Period.  Picking up

18   again with line 21.  "The government is not required."

19          Essentially, eliminating the second clause of the

20   first line starting at 15 and omitting entirely Mr. Kunkle's

21   suggested language.

22          THE COURT:  And one last round, Mr. Kunkle.  I mean,

23   I am persuaded that -- but, if you can give me some language

24   that sort of emphasizes this without being confusing, I'm open

25   to it.

1    So I'm kind of putting you on the spot -- by the way,

2    I'm going to make an exception right now to my rule about you

3    have to make your objections later.  This discussion, I think,

4    is focused enough and I don't want to make you repeat it, so

5    I'm going to take this as your formal objection, assuming I --

6    as to this omission of this clause.

7    But tell me -- I'm giving you the opportunity.  I'm

8    also not -- I am asking you, Mr. Kunkle, what other language

9    would you give me?

10   Because if there's a conviction and it goes up on

11   appeal, you have to stand on the language you're going to give

12   me.  So I want to have a clear record here as to what specific

13   language would you be asking for?

14   MS. EDELSTEIN:  And, Your Honor, just to be clear,

15   the language that the government just suggested, is that what

16   Your Honor intends to give as the instruction?

17   THE COURT:  Subject to Mr. Kunkle changing my mind

18   with the language I'm inviting him to submit to me right now.

19   Take a minute.  Collect your thoughts.  We have all

20   day to finish this so -- to finish this trial, so --

21   MR. KUNKLE:  Okay.  I thought you meant all day to

22   finish this part.

23   THE COURT:  By the way, the second sentence from page

24   22 in the *Salman*, I think you are both in agreement and I'm in

25   agreement.  We will insert that.  So we're just talking about

1    this other clause.

2         MR. KUNKLE:  You are referring to page 22 of *Salman*

3    on line 4?

4         THE COURT:  Four through 6, yes.  We will add that in

5    both instructions.

6         MS. EDELSTEIN:  I'm sorry, Your Honor.  I didn't hear

7    that.

8         THE COURT:  This is the language I think you had

9    agreed on and is fine with me.  On the *Salman* instruction,

10   page 22, lines 4 through 6 that we would insert that as well.

11        MS. EDELSTEIN:  Which one is that?

12        THE COURT:  I tell you what.  I guessed wrong about

13   the time.  I'm thinking maybe we should bring the jury back,

14   tell them to go to lunch and come back at what, 12:30, 12:45?

15   What do you all think?  Because we need to type this up and

16   copy it.

17        MS. EDELSTEIN:  Yes, Your Honor.  And given that the

18   lunch break will be at the time we would be -- Ms. Jennis will

19   be finalizing closings as well as Mr. Kunkle, maybe a slightly

20   longer lunch break to allow us to accommodate that?

21        THE COURT:  Sure.  How long do you want?

22        MS. JENNIS:  I was just wondering.  We have some

23   other issues with the jury instructions to take up.

24        THE COURT:  Oh, do we?  Oh.  That's right.

25   Mr. Kunkle's other instruction.

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1           MS. JENNIS:  Yes.

2           THE COURT:  Why don't we tell them to come back at

3    one o'clock then?

4           Nick, just go out and tell them that we are going to

5    take the lunch break at this time and tell them to return at

6    one o'clock.

7           MR. KUNKLE:  Would the Court be inclined to have

8    Mr. Sommers instruct them that this isn't anything to do with

9    us, like something else came up, so they don't think there is

10   this meshugana going on in here.  So, you know, maybe

11   something else --

12          THE COURT:  What's that word mean?

13          MR. KUNKLE:  Meshugana.  It just means "crazy."

14          MS. JENNIS:  Crazy, Your Honor.

15          MR. KUNKLE:  Crazy.

16          THE COURT:  Oh, okay.

17          Just tell them that Judge Wake has asked me to tell

18   you that he guessed wrong on the time and that we will need a

19   little more time.  So please take a lunch break and come back

20   at one and we will give the instructions then.

21          Yes.  You're right.  We have another issue.

22          Take a deep breath and give me the language because

23   whatever language you give me is what you or your successor

24   will have to stand on if this goes up on appeal.

25          And maybe it's this.  Maybe you don't want to approve

1     on this.  That's fine.  I just want you to give me the

2     language I choose between.

3            MR. KUNKLE:  Your Honor, if I may --

4            THE COURT:  Go ahead.

5            MR. KUNKLE:  I'm taking my best stab.  And just so

6     the record is clear, my first position is I would ask the

7     Court to just adopt wholesale --

8            THE COURT:  Well, and let me say for the reasons that

9     we have discussed at length I'm declining that as unnecessary

10    and confusing.

11           But if you can come up with something else, I want to

12    hear it.

13           MR. KUNKLE:  And the record is pretty clear.  I'm

14    kind of going backwards because we did have a stipulation to

15    do that and that seems to have been evaporated, but that's

16    okay.

17           THE COURT:  And the reason I'm rejecting what I have

18    said is because it is confusing, so.

19           MR. KUNKLE:  I think though -- and I'm trying to be

20    constructive here, Your Honor -- and I think because we say a

21    fictitious instrument -- and this is just line 15 from our

22    draft so we are all on the same page -- "a fictitious

23    instrument is a bogus document."

24           Then we have a period.

25           It exists.  When there is no such financial

1    instruments exists.

2         And then what I would add there is that that is --

3    and that can be unknown to the recipient.  And I'll stand

4    by --

5         THE COURT:  So read it to me again.

6         MR. KUNKLE:  And, again, I didn't rewrite this part

7    yet, but:

8         A fictitious instrument is a bogus document created

9    to appear to be a financial instrument although no such

10   genuine instrument exists whether that is known or unknown to

11   the intended -- whether that is unknown to the intended

12   recipient.

13        And then the last sentence I would add, in my

14   opinion, because -- and I'll go on why I think we need this --

15   this is the sentence I would ask the Court and this is the

16   best I can do under these circumstances in a few minutes to

17   consider rewriting this is:

18        As taken as a whole, the fictitious instrument's

19   nature is one that does not reveal it is not genuine to the

20   intended recipient.

21        And, again, I'm just scratching this out here in a

22   few minutes while we're doing this.

23        THE COURT:  I understand.  But I guess my sense is

24   that this phrase we have of "must credibly appear," I think,

25   covers that.  But, Ms. Edelstein --

1          MR. KUNKLE:  And Your Honor --

2          THE COURT:  Yes?

3          MR. KUNKLE:  The reason I think that language is in

4     Judge Berzon's opinion, because when they're first looking at

5     the statute, that was a case of first impression and they talk

6     about vulnerable class of victims.

7          If you just say it can resemble a family of financial

8     instruments or documents, whatever it may be, regardless of

9     what the recipient thinks, because the government seems to

10    think that the recipient's knowledge and so forth isn't

11    relevant, but it is because the jury has heard about that

12    obviously and in this case it is the IRS.

13         But if there is something stamped on that document

14    which you believe that I can cure by just arguing, I think we

15    need an instruction.  Because if there is something on that

16    document that says "this is bullshit" -- excuse my French.

17         THE COURT:  That's the technical legal term, I know.

18         MR. KUNKLE:  But I'm just saying, it's like if there

19    was something to understand, you know, zero value --

20         THE COURT:  To be helpful I need language.

21         MR. KUNKLE:  Okay.

22         THE COURT:  And I'm not trying to --

23         MR. KUNKLE:  And that's why I'm struggling with this.

24         THE COURT:  And the language is what you will have to

25    stand on.  You won't be able to appeal this staying, well,

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1   there should have been something different.

2        You have to give me the language and that's the only

3   thing you can appeal on.

4        MR. KUNKLE:  Well, just so the record is clear, I'm

5   not -- my position would be that the language in that opinion

6   is reflected in the *Salman* instruction 22 that I had asked you

7   to give.  So if you don't give that, that's my objection.

8        THE COURT:  You have made a fine record on this

9   language I'm going to delete that says:

10       The fact that the instrument --

11       MR. KUNKLE:  How about if I put it this way then:

12       Taken as a whole, the fictitious instrument's

13   credibility does not reveal its non-- that it is not genuine

14   to the intended recipient.

15       THE COURT:  All right.  Let me hear from the

16   government on that.

17       MS. EDELSTEIN:  Your Honor, anything related to the

18   "intended recipient" is not an element of this crime.  And so,

19   therefore, any clarification with respect to what the intended

20   recipient may or may not have thought is irrelevant to this

21   charge.

22       THE COURT:  And the *Salman* case tells us not to worry

23   about that "vulnerable victim" language.

24       The Secretary of the Treasury was the victim in that

25   case and they said:  Don't worry about the fact he is not

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    vulnerable.

2         MR. KUNKLE:  But, Your Honor, without that language

3    it becomes too subjective.  You know, the person who is

4    passing the Monopoly money to the IRS and the IRS stupidly

5    tries to process it.

6         THE COURT:  No.  No.  Monopoly money is very

7    objective.

8         MR. KUNKLE:  But that's the point about having that

9    language about revealing on the document itself that it is not

10   real, because there are indicia on this document that indicate

11   it is not real.  Obviously --

12        THE COURT:  What is that?

13        MR. KUNKLE:  That it's to pay off on my social

14   security number on a private offset account that, despite what

15   Mr. Lyons may say, they know darn well what that means.  And,

16   you know, that goes to our defense theory as well.

17        THE COURT:  Okay.  I'm disposed to reject that.  But

18   the government has got to be clear with me.  I mean, I'm not a

19   good sport when the government confesses error.

20        You have to decide what you want.  And if you think

21   I'm wrong about what I'm saying, you need to tell me.  And the

22   government has actually never confessed error on me yet but --

23        MR. KUNKLE:  So the best I could write it and just

24   taken as a whole, the fictitious instrument's -- you know,

25   credibility or credible nature -- is such that it does not

UNITED STATES DISTRICT COURT

1    reveal it is not genuine to the intended recipient.

2             If just they don't want about the "intended

3    recipient," just "is not genuine."

4             We can take out the "intended recipient" language if

5    they object to that.  But I think you have to have some

6    language in there to put this into some objective basis that

7    when they look at it, it's not just that it resembles other

8    things and you can find him guilty, but, no, it's -- you know,

9    yeah, somebody may have overlooked that language, but they do

10   so at their peril because we're dealing with the IRS and

11   Mr. Hall here.

12            THE COURT:  Okay.  Let me hear from the government on

13   this last proposed language.

14            MS. EDELSTEIN:  Your Honor, the government would

15   object to that -- Mr. Kunkle's proposed language -- for the

16   reasons stated previously.

17            THE COURT:  All right.  I'm going to decline that

18   language.

19            MR. KUNKLE:  And, Your Honor, that's over my

20   objection.  I'm asking you to include about 15 words here.

21            THE COURT:  No.  I have read it and the language is

22   confusing.  It is unnecessary in light of the language we

23   already have about "it must credibly appear." And I think it

24   is both unnecessary and confusing.

25            And it doesn't -- it's also not grounded in the

1    language of the statute.  And I think this language -- again,

2    I have said this before and I'm going to say it one more time

3    and we need to move on.

4           I'm open to clarifications if they add understanding

5    and don't add confusion.  And I think this doesn't meet those

6    criteria and you are fully able to argue everything you want

7    from the language we have.

8           So I'm going to -- now, Mr. Kunkle, let me be clear

9    on this thing we have just discussed.  I treat that as your

10   formal objection and I'm overruling it.  And so you don't have

11   to repeat that.  You've made your record on that language.

12          Now, let's go on to anything else.  The only thing

13   I'm recalling is your requested instruction about the

14   uncharged offense.

15          Is there anything else we need to talk about?

16          MR. KUNKLE:  You know, Your Honor, and, again, I'm

17   pointing to my right to Mr. Hall, I did move the Court for a

18   Rule 29 after the close of the government's case.

19          THE COURT:  Well I'll hear that.  I'll treat that as

20   a Rule 29.

21          MR. KUNKLE:  Well --

22          THE COURT:  And I will accept that.  But let's finish

23   the instructions and then I'll come -- I'm treating that as a

24   timely Rule 29 motion.

25          MR. KUNKLE:  All right.  I would like to be heard

```
 1   further on it, Your Honor, but in any event --

 2            THE COURT:  But let's finish these instructions

 3   first.

 4            Is there anything other than this new request that I

 5   don't think I had anything else I wanted to discuss with you

 6   all.

 7            MS. EDELSTEIN:  Nothing from the government.

 8            THE COURT:  Let me be clear now.  We will insert this

 9   sentence from 22 of the Salman opinion, lines 4 and 5.  We

10   will insert it twice; on page 3, after line 17; and on page 4,

11   after line 16.

12            And then we're going to delete the language after

13   "exists" on line 15, and again, on the next page.

14            So the only other thing instruction-wise is

15   Mr. Kunkle's new request for the instruction of the crime not

16   charged.  Give me your best shot on that.

17            MR. KUNKLE:  Well, Your Honor, I know it came in late

18   last night about eleven o'clock on the electronic filing.

19            I think I have tried to -- I mean, I think Your Honor

20   is aware of the fact that our position is this was just really

21   designed to impede the IRS.

22            THE COURT:  But congratulations.  You didn't get

23   indicted for that.

24            MR. KUNKLE:  Well, hey, you know, be careful what you

25   ask for.
```

1    But the point is, I think -- and I want that
2    instruction given so that the jury understands that I didn't
3    use the words "elements" because I don't want there to be
4    confusion that they think that's a crime.
5         THE COURT:  How is that a defense and how does that
6    relate to what they have to prove -- I'm lost.
7         MR. KUNKLE:  I want it instructed, Your Honor,
8    because I want the jury to understand that that comes from
9    7212.  That's what it means to impede the IRS.  That that's
10   what you're doing because they heard other evidence about
11   other money orders, this promoter business, if you will.
12        And I brought it up a few times with different
13   witnesses including Mr. Kerr this morning.
14        THE COURT:  But that other evidence was primarily
15   admitted because of its relevance to the intent to defraud and
16   not to prove some other crime not charged.
17        MR. KUNKLE:  Well, and that being said, the jury
18   should probably be instructed that that other evidence is not
19   to be considered only for its limited purpose to the intent.
20        I think that's 4.10 or 2.9 in the Model Jury
21   Instructions.  But beyond that, I would ask the Court to
22   charge that instruction on what "impeding the IRS" is.
23        I believe there was testimony elicited from the
24   witness of, you know, that was another option that the IRS or
25   the government has in terms of charging someone.

1          And I'm asking for the instruction.  It fits with my

2    theory of the case as I have tried to put it out there in

3    front of the jury strategically, tactically, or whatever you

4    want to call it, and I think it's error not to give that

5    instruction.

6          THE COURT:  Where -- it's not requested though that

7    we could give the standard instruction that says:

8          The defendant is on trial for the matters charged and

9    nothing else.

10         That's not in your request, but where is that?

11         MR. KUNKLE:  I think its 2.9 or 4.10, Your Honor.

12    Other Crimes, Wrongs, or Acts.  4.10 maybe.

13         MS. JENNIS:  3.10, I believe.

14         3.10.  Activities Not Charged.

15         You are only here to determine whether the defendant

16    is guilty or not guilty of the charges in the Indictment.

17         The United States is fine.  That's a good instruction

18    to give, Your Honor.

19         THE COURT:  All right.  I don't really think this is

20    a problem, but I'm -- if there is a problem, this will dispel

21    it.  So we will add 3.1.  Let's find the right place to add

22    it.  How about, I think, on page 6 before "What is Evidence"

23    after we finished at 3.10.  Anybody uncomfortable with that

24    location.

25         MR. KUNKLE:  At the end of page 6 after "reasonable

1    doubt," Your Honor?

2              THE COURT:  Yes.

3              MR. KUNKLE:  That's fine.

4              MS. JENNIS:  That's fine.

5              THE COURT:  All right.  Now, I will hear the

6    government on the uncharged count.

7              MS. JENNIS:  You mean the one that he suggested?

8              THE COURT:  Right.

9              MS. JENNIS:  Well, the United States is opposed to

10   that, Your Honor.  It's not a lesser-included offense.  It's a

11   felony.  It has no relation.  And the fact is, he is only

12   charged with what is listed in the Indictment.

13             THE COURT:  And it is not a defense, so I'm going to

14   overrule that requested instruction.

15             MR. KUNKLE:  Okay, Your Honor, and that's with my

16   exception, I guess, and note my objection.

17             Okay.  And that is just so it's clear that was our

18   theory of the case.  We're saying:  He did this and not this.

19   It goes to an alternative intent.

20             THE COURT:  Again, I'm sorry for repeating myself.

21             It's not a defense that you committed some other

22   crime.  And we are dispelling any prejudice by giving 3.10.

23             So anything else on instructions, counsel?

24             MS. EDELSTEIN:  Nothing, Your Honor.

25             THE COURT:  All right.

1          Cullen, are you on top of this?  Can you have Vickie

2     make those changes and we'll start.

3          LAW CLERK CULLEN MACBETH:  One question about

4     "fictitious" definition.

5          Do you want the second sentence of *Salman* added after

6     the sentence that ends in "exists" or after the sentence about

7     the government is not required to prove?

8          THE COURT:  No.  After "instrument exists."

9          Should we put it in the same paragraph?

10         MS. EDELSTEIN:  I think that's fine, Your Honor.

11         THE COURT:  All right.  Let's put it in the same

12    paragraph.

13         LAW CLERK CULLEN MACBETH:  And a new paragraph.

14         "The government is not --"

15         THE COURT:  Correct.  And that occurs twice in both

16    the instructions.

17         LAW CLERK CULLEN MACBETH:  Do you want the

18    document -- do you want document "created" or "contrived"?

19         MS. EDELSTEIN:  Your Honor, the government would

20    suggest "created."  It's just much more easy to understand.

21         THE COURT:  It's a more down-to-earth word.

22         MS. EDELSTEIN:  That's right.

23         THE COURT:  Any problem with that, Mr. Kunkle?

24         MR. KUNKLE:  I'm sorry, Your Honor?

25         THE COURT:  The word "created."

1              It's the language we have here and Mr. Macbeth has
2     raised the question whether we want to use the word
3     "contrived," which I think is from the opinion.
4              I think "create" is a better word.
5              MS. JENNIS:  Yes, Your Honor.  "Create."
6              THE COURT:  We will leave it as is.  It's a word
7     people can get their hands around.
8              MR. KUNKLE:  I'm not seeing any big semantic
9     difference right now and "contrived," I think, is a little
10    less used in the lexicon than "created."
11             THE COURT:  All right.  We'll stand with that then.
12             All right.  If there's nothing else then, Cullen,
13    have Vickie proceed with that.
14             Now, I think the only other thing is your Rule 29
15    motion.  I will hear that.
16             There's nothing else other than that, correct,
17    counsel?
18             MS. JENNIS:  Yes, Your Honor.
19             MS. EDELSTEIN:  Yes, Your Honor.
20             THE COURT:  All right.  Go ahead.
21    **DEFENDANT'S RULE 29 MOTION**
22             MR. KUNKLE:  I thank you for having that time.  I was
23    rather distracted with what we were dealing with before.
24             THE COURT:  Right.
25             MR. KUNKLE:  And had the government rested, I would

1    have probably said "motion" and we would come up to the

2    sidebar.  But I'll keep this brief.

3          Your Honor, I would honestly submit that why I think

4    we all struggle with this statute is because it's a statute

5    that really is almost imposing a strict liability defense in

6    terms of while there may be language of intent to defraud with

7    no result necessary for the government to prove.

8          It's a crime of a unique nature.  And I believe it's

9    *California v. Lambert*.  You know, back in the '50s the Supreme

10   Court said:

11         Beware of statutes that impose crimes for strict

12   liability without revealing more.

13         And that's why I believe the language "on revealing

14   on the document's nature" that it is not genuinely needed to

15   be included, because otherwise, this just falls into a

16   subjective standard.

17         Does this look like something that could be a

18   financial instrument?  You're guilty, without more.

19         Obviously, there's the words of "intent to defraud,"

20   but I would also submit the government hasn't submitted

21   sufficient evidence on every element of the charge before the

22   jury.

23         THE COURT:  All right.  Does the government want to

24   make any argument on that?

25         MS. JENNIS:  I don't believe we need to elaborate,

 1    Your Honor.

 2            THE COURT:  All right.  Now -- and I actually touched

 3    on this on some earlier remarks.  I conclude without

 4    difficulty that the evidence construed -- well, in favor of

 5    the government -- amply satisfies the requirements of this

 6    statute.  And, indeed, the -- right on the face of it it says

 7    this is to pay the taxes.  And I think there is the IRS form

 8    sent with it that says this is to pay the taxes.

 9            We have the background of him assisting other people

10    to do the same.  And on -- plainly, on its face, it has many

11    of the appearances of a money order.  You really have to read

12    it to figure out there is a problem.

13            And so it looks to me like this really goes right to

14    the heartland of what the statute is about.

15            So the Rule 29 motion is denied on the merits.

16            MR. KUNKLE:  Your Honor, last, and Agent Nixon, I

17    believe, has approached the government and wanted to sit in on

18    closing arguments.

19            And after giving it some thought overnight, I don't

20    really have an objection if he wants to be here.  His role in

21    this case was of limited nature.  He's not going to learn

22    anything from hearing Ms. Jennis' or my arguments in this case

23    to the jury.  And I want that to be clear.

24            So if he comes in unobtrusively, I had asked him to

25    sit in the back.  I told him last night, you know, if you come

 1    in, it's fine with me and I have no objection to that.

 2         THE COURT:  All right.  Then the Court has no problem

 3    with Agent Nixon attending the closing if he wishes.

 4         Anything else, counsel?

 5         MS. EDELSTEIN:  Nothing, Your Honor.  Thank you.

 6         THE COURT:  All right.  Then we will -- oh, yes.

 7    Yes.  The verdict form.  Let's take a look at that.  Have I

 8    circulated the most recent form version?  I think it's real

 9    straightforward now.

10         Do you have it, Nick?

11         MR. KUNKLE:  Yes, Judge.

12         MS. JENNIS:  We didn't get one today, but yesterday

13    all we wanted taken out of all four counts was the "aiding and

14    abetting."

15         THE COURT:  I thought he did that.  Nick, go print up

16    what we have and circulate to everybody and look at it before

17    we break for lunch.

18         I really don't set limits but, counsel, can you give

19    me just an estimate how long you think for closing argument?

20         MS. JENNIS:  Shorter than Mr. Kunkle's based on my

21    experience.

22         MR. KUNKLE:  She goes two.  Does that mean both or

23    just the first one?

24         THE COURT:  Actually, both.  The reason I ask is I

25    just kind of have planning in mind for thinking about the jury

 1    and what times if we have to take a break.  I never want to

 2    interrupt anybody's closing argument with a break, so.

 3          MR. KUNKLE:  Your Honor, if I'm longer than a

 4    half-hour, throw a shoe at me.  I don't think this case needs

 5    a lot of argument and I'm trying to keep my argument concise.

 6          THE COURT:  Let me say other thing and I'm saying

 7    this in virtually all my trials now and not picking on

 8    anybody.

 9          I have become concerned about the increasingly common

10    practice of the plaintiff -- here it is the government --

11    going light on the opening and then going strong on rebuttal.

12          So I really want the substance of the matter

13    presented in the opening.  And I can deal with that in two

14    ways if I think it's going wrong.  I can set a time limit for

15    the rebuttal -- or I can and I have done this -- I would be

16    open to a motion from the defense to reopen if there is

17    holding back.

18          MR. KUNKLE:  It's supposed to be rebuttal.

19          THE COURT:  It's supposed to be rebuttal.  I'm not

20    saying I think you are planning to do anything nefarious, but

21    again --

22          MS. JENNIS:  I have no problem with that.  I had no

23    intentions of -- I don't know if I have ever had a longer

24    rebuttal than the opening-close.  I don't intend to do that.

25    No more than, you know, for both 45 minutes, Your Honor.

1       THE COURT:  Well, my point is partly the length of

2   rebuttal, but it's mainly the substance of it.

3       When the real meat isn't talked about in the opening

4   and saved for rebuttal, that is abusive and I will cure that

5   on a worst case scenario by letting the defendant reopen his

6   argument.

7       MS. JENNIS:  No, and I understand, Your Honor.  It is

8   to rebut what the defense said in their closing and I fully

9   understand that.

10       THE COURT:  I think I see that more in civil trials,

11   but I have seen it in some criminal trials too.

12       All right.  Thank you all.  Have a good lunch and we

13   will be in recess until one o'clock.

14       Oh, wait.  I'm sorry.  I forgot.  I forgot about the

15   forms of verdict.  Let's hand this out and take a quick look.

16   Actually, well, you know, counsel, I know that I did a mark-up

17   taking out the "aiding and abetting" and I probably forgot to

18   give it to my secretary so it's still there, so we'll take

19   that out.

20       MS. JENNIS:  And that's what we took out yesterday

21   too, Your Honor, was those words.  Otherwise, it's fine.  The

22   United States and defense counsel agree.

23       THE COURT:  All right.  We'll take that out and then

24   we will resolve that.

25       All right.  Good.

1          (Recess taken at 11:52 a.m.; resumed at 1:19 p.m.)

2          (Open court, jury present.)

3               THE COURT:  Please be seated.

4          The record will show the presence of counsel, the

5     defendant, and the jury.  And I'm sorry for being a bit late.

6     We had some technology challenges here that always comes up

7     when you don't want it to, but we have them fix, I think.

8          So have we passed out the jury instructions?

9     **FINAL INSTRUCTIONS TO THE JURY**

10         All right.  Members of the jury, now that you have

11    heard all the evidence, it is my duty to instruct you on the

12    law that applies to this case.  A copy of these instructions

13    will be available in the jury room for you to consult.

14         It is your duty to weigh and to evaluate all the

15    evidence received in the case and, in that process, to decide

16    the facts.  It is also your duty to apply the law as I give it

17    to you to the facts as you find them, whether you agree with

18    the law or not.  You must decide the case solely on the

19    evidence and the law and must not be influenced by any

20    personal likes or dislikes, opinions, prejudices, or sympathy.

21    You will recall that you took an oath promising to do so at

22    the beginning of the case.

23         You must follow all these instructions and not single

24    out some and ignore others; they are all important.  Please do

25    not read into these instructions or into anything I may have

 1    said or done any suggestion as to what verdict you should

 2    return.  That is a matter entirely up to you.

 3         You must decide each count in the Indictment

 4    separately and not allow your verdict on one count to control

 5    your verdict on any other count.

 6         The Indictment is not evidence.  The defendant has

 7    pleaded not guilty to the charges.  The defendant is presumed

 8    to be innocent unless and until the government proves the

 9    defendant guilty beyond a reasonable doubt.  In addition, the

10    defendant does not have to testify or present any evidence to

11    prove innocence.  The government has the burden of proving

12    every element of the charge beyond a reasonable doubt.

13         You must decide each count of the Indictment

14    separately and not allow your verdict on one count to control

15    your verdict on any other count.

16         The defendant is charged in Counts One and Two of the

17    Indictment with Making Fictitious Instrument, in violation of

18    the United States Code.  In order for the defendant to be

19    found guilty of that charge, the government must prove each of

20    the following elements beyond a reasonable doubt:

21         First, the defendant drew, printed, processed,

22    produced or published a false or fictitious instrument,

23    document, or other item identified in the Indictment within

24    the United States, or attempted to do the same;

25         Second, that the instrument, document, or other item

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    identified in the Indictment, appeared, represented, or

2    purported through scheme or artifice, to be an actual security

3    or other financial instrument issued under the authority of

4    the United States or other political subdivision of the United

5    States; and

6            Third, the defendant did so with the intent to

7    defraud.

8            A "fictitious" instrument is a bogus document created

9    to appear to be a financial instrument, although no such

10   genuine financial instrument exists.  Fictitious obligations

11   include bogus obligations that a prudent person might upon

12   consideration be unlikely to accept as genuine, so long as

13   those documents bear a resemblance to actual financial

14   obligations.

15           The government is not required to prove that the

16   false or fictitious instrument, document or other item

17   appeared to be similar to any actual financial instrument in

18   particular.  The item need only credibly appear to be in a

19   class of, or bear a family resemblance to, financial

20   instruments.

21           To act "with intent to defraud" means to act with the

22   intent to deceive other cheat.  It is not necessary, however,

23   to prove that the United States or anyone else was, in fact,

24   defrauded so long as it is established that the defendant

25   acted "with intent to defraud."

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1     The defendant is charged in Counts Three and Four of

2  the indictment with Using Fictitious Instrument, in violation

3  of the United States Code.  In order for the defendant to be

4  found guilty of that charge, the government must prove each of

5  the following elements beyond a reasonable doubt:

6     First, the defendant passed, uttered, presented, or

7  offered a false or fictitious instrument, document, or other

8  item identified in the Indictment within the United States or

9  attempted to do the same;

10     Second, that the instrument, document, or other item

11  identified in the Indictment, appeared, represented, or

12  purported through scheme or artifice, to be an actual security

13  or other financial instrument issued under the authority of

14  the United States or other political subdivision of the United

15  States; and

16     Third, the defendant did so with the intent to

17  defraud.

18     To "pass" or "utter" a false or fictitious

19  instrument, document, or other item includes any attempt to

20  spend the item or otherwise place it in circulation.

21     A "fictitious" instrument is a bogus document created

22  to appear to be a financial instrument, although no such

23  genuine financial instrument exists.  Fictitious obligations

24  include bogus obligations that a prudent person might upon

25  consideration be unlikely to accept as genuine, so long as

1    those documents bear a resemblance to actual financial

2    obligations.

3          The government is not required to prove that the

4    false or fictitious instrument, document, or other item

5    appeared to be similar to any actual financial instrument in

6    particular.  The item need only credibly appear to be in a

7    class of, or bear a family resemblance to, financial

8    instruments.

9          To act "with intent to defraud" means to act with the

10   intent to deceive or cheat.  It is not necessary, however, to

11   prove that the United States or anyone else was, in fact,

12   defrauded so long as it is established that the defendant

13   acted "with intent to defraud."

14         The defendant may be found guilty of Making or Using

15   Fictitious Financial Instruments even if the defendant

16   personally did not commit the act or acts constituting the

17   crime but aided and abetted in its commission.  To prove a

18   defendant guilty of aiding and abetting, the government must

19   prove beyond a reasonable doubt:

20         First, the crime of Making Fictitious Financial

21   Instruments or the crime of Using Fictitious Financial

22   Instruments was committed by someone;

23         Second, the defendant aided, counseled, commanded,

24   induced or procured that person with respect to at least one

25   element of the crime;

1          Third, the defendant acted with the intent to

2    facilitate a violation of the crimes; and

3          Fourth, the defendant acted before the crime was

4    completed.

5          It is not enough that the defendant merely associated

6    with the person committing the crime, or unknowingly or

7    unintentionally did things that were helpful to that person,

8    or was present at the scene of the crime.  The evidence must

9    show beyond a reasonable doubt that the defendant acted with

10   the knowledge and intention of helping that person commit the

11   crime.

12         A defendant acts with the intent to facilitate the

13   crime when the defendant actively participates in a criminal

14   venture with advance knowledge of the crime and having

15   acquired that knowledge when the defendant still had a

16   realistic opportunity to withdraw from the crime.  The

17   government is not required to prove precisely which defendant

18   actually --

19         Actually, we have the word "defendant" there, but I

20   think that's wrong.  I think that should be "person".

21         Counsel, shouldn't that be person?

22         MS. EDELSTEIN:  Yes, Your Honor.  I agree with that.

23         MR. KUNKLE:  Yes, Your Honor.

24         THE COURT:  All right.

25         The government is not required to prove precisely

ER 797

1    which person actually committed the crime --

2           And we should change the second.

3           -- and which person aided and abetted.

4           An act is done knowingly if the defendant is aware of

5    the fact and does not act through ignorance, mistake, or

6    accident.  The government is not required to prove that the

7    defendant knew that his acts or omissions were unlawful.  You

8    may consider evidence of the defendant's words, acts, or

9    omissions along with all the other evidence, in deciding

10   whether the defendant acted knowingly.

11          The indictment charges that the offense alleged was

12   committed "on or about" a certain date.

13          Although it is necessary for the government to prove

14   beyond a reasonable doubt that the offense was committed on a

15   date reasonably near the date alleged in the Indictment, it is

16   not necessary for the government to prove that the offense was

17   committed precisely on the date charged.

18          Proof beyond a reasonable doubt is proof that leaves

19   you firmly convinced the defendant is guilty.  It is not

20   required that the government prove guilt beyond all possible

21   doubt.

22          A reasonable doubt is a doubt based upon reason and

23   common sense and is not based purely on speculation.  It may

24   arise from a careful and impartial consideration of all the

25   evidence, or from lack of evidence.

1          If after a careful and impartial consideration of all

2    the evidence, you are not convinced beyond a reasonable doubt

3    that the defendant is guilty, it is your duty to find the

4    defendant not guilty.  On the other hand, if after a careful

5    and impartial consideration of all the evidence, you are not

6    convinced -- or you are convinced beyond a reasonable doubt

7    that the defendant is guilty, it is your duty to find the

8    defendant guilty.

9          You are here only to determine whether the defendant

10   is guilty or not guilty of the charges in the Indictment.  The

11   defendant is not on trial for any conduct or offense not

12   charged in the Indictment.

13         The evidence you are to consider in deciding what the

14   facts are consists of:

15         One, the sworn testimony of any witness; and

16         Two, the exhibits received in evidence; and

17         Three, any facts to which the parties have agreed.

18         In reaching your verdict you may consider only the

19   testimony and exhibits received in evidence.  The following

20   things are not evidence and you may not consider them in

21   deciding what the facts are:

22         One, questions, statements, objections, and arguments

23   by the lawyers are not evidence.  The lawyers are not

24   witnesses.  Although you must consider a lawyer's questions to

25   understand the answers of a witness, the lawyer's questions

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    are not evidence.  Similarly, what the lawyers have said in

2    their opening statements, will say in their closing arguments

3    and at other times is intended to help you interpret the

4    evidence, but it is not evidence.  If the facts as you

5    remember them differ from the way the lawyers state them, your

6    memory of them controls.

7         Two, any testimony that I have excluded, stricken, or

8    instructed you to disregard is not evidence;

9         Three, anything you may have seen or heard when the

10   court was not in session is not evidence.  You are to decide

11   the case solely on the evidence received at the trial.

12        Evidence may be direct or circumstantial.  Direct

13   evidence is direct proof of a fact, such as testimony by a

14   witness about what that witness personally saw or heard or

15   did.  Circumstantial evidence is indirect evidence, that is,

16   it is proof of one or more facts from which you can find

17   another fact.

18        You are to consider both direct and circumstantial

19   evidence.  Either can being used to prove any fact.  The law

20   makes no distinction between the weight to be given to either

21   direct or circumstantial evidence.  It is for you to decide

22   how much weight to give to any evidence.

23        In deciding the facts in this case, you may have to

24   decide which testimony to believe and which testimony not to

25   believe.  You may believe everything a witness says, or part

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1   of it, or none of it.

2         In considering the testimony of any witness, you may

3   take into account:

4         One, the witness's opportunity and ability to see or

5   hear or know the things testified to;

6         Two, the witness's memory;

7         Three, the witness's manner while testifying;

8         Four, the witness's interest in the outcome of the

9   case, if any;

10         Five, the witness's bias or prejudice, if any;

11         Six, whether other evidence contradicted the

12   witness's testimony;

13         Seven, the reasonableness of the witness's testimony

14   in light of all the evidence; and

15         Eight, any other factors that bear on believability.

16         The weight of the evidence as to a fact does not

17   necessarily depend on the number of witnesses who testify.

18   What is important is how believable the witnesses were, and

19   how much weight you think their testimony deserves.

20         A defendant in a criminal case has a constitutional

21   right not to testify.  You may not draw any inference of any

22   kind from the fact that the defendant did not testimony.

23         You have heard testimony that the defendant made a

24   statement.  It is for you to decide, one, whether the

25   defendant made the statement; and, two, if so, how much weight

1    to give to it.  In making those decisions, you should consider

2    all the evidence about the statement, including the

3    circumstances under which the defendant may have made it.

4         You have heard testimony from persons who, because of

5    education or experience, were permitted to state opinions and

6    the reasons for their opinions.

7         Such opinion testimony should be judged like any

8    other testimony.  You may accept it or reject it, and give it

9    as much weight as you think it deserves, considering the

10   witness's education and experience, the reasons given for the

11   opinion, and all the other evidence in the case.

12        An accomplice is a person who voluntarily and

13   intentionally joins with another person in committing a crime.

14   If a witness admits or was alleged to be an accomplice to the

15   crimes charged or if a witness's testimony was given in

16   exchange for a promise by the government that the witness will

17   not be prosecuted, in evaluating the testimony of such a

18   witness, you should consider the extent to which the testimony

19   may have been influenced by these factors.  In addition, you

20   should examine the testimony of such a witness with greater

21   caution than that of other witnesses.

22        When you begin your deliberations, elect one member

23   of the jury as your foreperson who will preside over the

24   deliberations and speak for you here in court.

25        You will then discuss the case with your fellow

1    jurors to reach agreement if you can do so.  Your verdict,

2    whether guilty or not guilty, must be unanimous.

3          Each of you must decide the case for yourself, but

4    you should do so only after you have considered all the

5    evidence, discussed it fully with the other jurors, and

6    listened to the views of your fellow jurors.

7          Do not be afraid to change your opinion if the

8    discussion persuades you that you should.  But do not come to

9    a decision simply because other jurors think it is right.

10          It is important that you attempt to reach a unanimous

11   verdict but, of course, only if each of you can do so after

12   having made your own conscientious decision.  Do not change an

13   honest belief about the weight and effect of the evidence

14   simply to reach a verdict.

15          Because you must base your verdict only on the

16   evidence received in the case and on these instructions, I

17   remind you that you must not be exposed to any other

18   information about the case or to the issues it involves.

19   Except for discussing the case with your fellow jurors during

20   your deliberations:

21          Do not communicate with anyone in any way and do not

22   let anyone else communicate with you in any way about the

23   merits of the case or anything to do with it.  This includes

24   discussing the case in person, in writing, by phone or

25   electronic means, via e-mail, text messaging, or any Internet

1   chat room, blog, website or other feature.  This applies to

2   communicating with your family members, your employer, the

3   media or press, and the people involved in the trial.  If you

4   are asked or approached in any way about your jury service or

5   anything about this case, you must respond that you have been

6   ordered not to discuss the matter and to report the contact to

7   the court.

8          Do not read, watch, or listen to any news or media

9   accounts or commentary about the case or anything to do with

10  it; do not do any research, such as consulting dictionaries,

11  searching the Internet or using other reference materials; and

12  do not make any investigation or in any other way try to learn

13  about the case on your own.

14         The law requires these restrictions to ensure the

15  parties have a fair trial based on the same evidence that each

16  party has had an opportunity to address.  A juror who violates

17  these restrictions jeopardizes the fairness of these

18  proceedings, and a mistrial could result that would require

19  the entire trial process to start over.  If any juror is

20  exposed to any outside information, please notify the court

21  immediately.

22         Some of you have taken notes during the trial.

23  Whether or not you took notes, you should rely on your own

24  memory of what was said.  Notes are only to assist your

25  memory.  You should not be overly influenced by your notes or

1    those of your fellow jurors.

2         The punishment provided by law for this crime is for

3    the court to decide.  You may not consider punishment in

4    deciding whether the government has proved its case against

5    the defendant beyond a reasonable doubt.

6         A verdict form has been prepared for you.

7         And, Nick, would you put that on the projector?

8         After you have reached unanimous agreement on a

9    verdict, your foreperson should complete the verdict form

10   according to your deliberations, sign and date it, and advise

11   the clerk that you are ready to return to the courtroom.

12        All right.  As you can see, the verdict form as to

13   each of the four counts state that as to that count and the

14   count number, that you find the defendant "not guilty" or

15   "guilty."  And please fill out the verdict in accordance with

16   your unanimous decision.

17        All right.  Thank you, Nick.

18        A JUROR:  Your Honor, it's not on our screen.

19        THE COURT:  All right.  It's not on?

20        There.  Do you have it?

21        A JUROR:  It's white.  There it is.

22        THE COURT:  All right.  All right.  And then it

23   continues on to the second page.

24        If it becomes necessary during your deliberations to

25   communicate with me, you may send a note through the clerk,

1    signed by any one or more of you.  No members of the jury

2    should ever attempt to communicate with me except by a signed

3    writing, and I will respond to the jury concerning the case

4    only in writing or here in open court.  If you send out a

5    question, I will consult with the lawyers before answering it,

6    which may take some time.  You may continue your deliberations

7    while waiting for the answer to any question.  Remember that

8    you are not to tell anyone, including me, how the jury stands,

9    numerically or otherwise, on any question submitted to you,

10   including the question of the guilt of the defendant, until

11   after you have reached a unanimous verdict or have been

12   discharged.

13         All right.  Do counsel have any corrections to the

14   instructions?

15         MS. JENNIS:  No, Your Honor.

16         MR. KUNKLE:  No, Your Honor.

17         THE COURT:  All right.  Very well then.

18         And the government my make its closing argument.

19   **CLOSING ARGUMENT:  GOVERNMENT**

20         MS. JENNIS:  Thank you.

21         Good afternoon, Ladies and Gentlemen of the Jury.

22         You now know that the defendant Gordon Leroy Hall was

23   in the business of defrauding the IRS.  You know that Gordon

24   Hall, along with his son, Benton, and a man named Brandon

25   Adams created money orders and mailed those money orders to

1    the IRS to pay off Gordon Hall's tax debt from 1996 and 1997.

2         You know that no matter how real those money orders

3    appeared to being, their routing numbers printed in magnetic

4    ink on real check stock, they were, in fact, tied to nothing

5    and worth nothing.

6         And that is why the defendant is guilty of all four

7    counts in the Indictment; two counts of making a fictitious

8    instrument and two counts of using it.

9         Now, even though the defendant has been in the debt

10   elimination business since at least 2011, it was January 18,

11   2013, that he calls up the -- he calls up T.W. Lyons at the

12   IRS.  And he calls up Mr. Lyons to get a specific payoff

13   amount for his 1996 and 1997 tax years.  And he also wants the

14   payoff amount as to a specific date, January 23, 2013.

15        And you remember hearing Mr. Lyons on the stand

16   saying that he received that voice mail on a Friday when he

17   wasn't in the office.

18        Now, it was a three-day weekend.  So on January 22nd,

19   2013, Mr. Lyons returned Mr. Hall's call.  He had left a phone

20   number for him.  And when the phone was answered, T.W. Lyons

21   asked to speak with Gordon Hall and that is the person who

22   answered the phone.

23        Now, you know through that conversation that now the

24   defendant wanted the payoff date of January 28th, 2013.  And

25   you heard from T.W. Lyons that he gave him that payoff amount,

1   a specific payoff amount for 1996 and a specific payoff amount

2   for 1997.

3        Now, T.W. Lyons told you he had to look it up on his

4   computer and figure out the exact amounts that would be owed

5   for a payoff date of January 28, 2013.

6        Mr. Lyons wanted to know if the defendant was going

7   to come in and deliver the payment, but the defendant told

8   him, no, he would be mailing it in.

9        Now, on January 24th, 2013, the money orders are

10  printed.

11       Now, you're going to have the exhibits that have been

12  admitted back with you in the jury room and you should look at

13  them and take the money order out of the plastic and you can

14  look at it.

15       And you'll see in the top right-hand corner that the

16  date printed is January 24th, 2013.  And you learned from the

17  evidence that this is the date that it was printed by Brandon

18  Adams when Brandon Adams was in New Mexico.  Brighton

19  testified that she and Benton Hall went out to New Mexico to

20  move Brandon Adams back to Arizona.

21       While Brighton was there, she saw the Dell printer

22  which is over here in the corner and is also one of the

23  exhibits that you can have back in the jury room.

24       And she saw Brandon Adams print money orders.

25       You know that when there was a search warrant done at

1    the rental house here of Brandon Adams was living in and was

2    rented by Benton Hall, that the same Dell printer was found.

3    And also was found listed in Exhibit 14 was a box of check

4    stock.  And you can look at this check stock and see.  It

5    looks just like the ones that the money orders were printed

6    on.

7            Now, on your screen you see that the money order has

8    the defendant's name listed in the top left-hand corner and

9    the exact payoff amount given by T.W. Lyons.  He explained to

10   you that the amount that was written on the money order was

11   the exact amount that he gave the defendant for tax period

12   1996, which is also listed on the bottom.

13           And you can see the defendant's signature in the

14   corner, in the lower right-hand corner.  His daughter Shannon

15   Hall told you that that was the defendant's signature and

16   Brighton Jorgensen actually saw him sign it.

17           And it's the same for both money orders.

18           This is Count Two and Count Four because this is a

19   different year.  So the difference between the counts is we

20   have two counts of Making a Fictitious Instrument; one count

21   is for the 1996 money order and one is for the 1997 money

22   order.  And the same thing for when they are using the

23   fictitious instrument; one count is for 1996 and one count is

24   for 1997.

25           And what happened on January 28th, 2013?  Well, that

1    was the day that the money orders were mailed to the IRS.

2           Now, you heard Shannon say -- tell you that she

3    received money orders from Brandon Adams in the mail.  Shannon

4    was home at her residence where she lived with her dad at the

5    Presidio Circle and she got the money orders in the mail.  And

6    there were just money orders in there, no other paperwork.

7           And you know that Benton Hall was the person who

8    mailed the money orders as he was identified by his sister

9    Shannon Hall and also by Brighton Jorgensen.

10          And here is his picture.  The Postal Inspector

11   explained to you how you can tie a Registered Mail letter back

12   or a package back to its inception where it entered the mail.

13   And he brought -- and he was able to do that with the

14   information with the numbers on the Registered Mail receipt

15   and he got pictures of Benton Hall mailing the packages.

16          And what happened on January 29th?  That's the day

17   that the money orders arrived at the IRS office in Mesa,

18   Arizona.

19          Mr. Lyons testified that he was working home -- from

20   home that day but he was waiting for those money orders.  He

21   thought because the defendant had a nice new house, a house

22   that now had a tax lien on it, that maybe the defendant would

23   be paying off his debt.

24          Jo Colegrove, she's a secretary there at IRS.  She

25   told you the money orders arrived and that Mr. Lyons came in

1    from his day of working at home to process them.

2          Unfortunately, the money orders were fictitious and

3    worthless and that is why you are here today.  Now remember,

4    the IRS need not be fooled by these money orders.  They need

5    not think the money orders are fake.  Rather, it's the

6    defendant's intent that matters.

7          Now, the Judge instructed you on the elements of the

8    crimes charged in the Indictment.  So let's go over the

9    evidence as it relates to the elements.  So in Counts One and

10   Two the defendant is charged with Making a Fictitious

11   Instrument.

12         Now you know the money orders were made by the

13   defendant's company.  Shannon and Brighton explained that the

14   defendant teamed up with Brandon Adams and they explained to

15   you how Brandon Adams trained the staff how to complete the

16   spreadsheet and how the spreadsheet would be sent to Brandon

17   Adams and he's the one that would print the check on his

18   special printer with his special ink and his special paper.

19         You also heard from Shannon that she got the money

20   orders in the mail and you saw the e-mail that she got from

21   Brandon Adams and that's going to be Exhibit No. 12.

22         Exhibit No. 12, the money order spreadsheet, that was

23   from Brandon Adams to Benton and Shannon Hall.  And in that

24   spreadsheet it explained, it had all the information necessary

25   in order for Brandon to print out the checks -- the money

1    orders.

2          Now, you'll note there were three separate money

3    orders listed here.  And two of the money orders comport with

4    Exhibits 1 and 2 and then there's a third money order for a

5    larger amount.  It was some amount over 1.1 million.  In fact,

6    if you look on page 3 of Exhibit No. 12, you'll see it was for

7    3.25 million.  $3,250,000.

8          Now, Shannon testified that she did bring one of the

9    money orders for her dad to sign.  But Brighton testified that

10   she brought the two money orders that are the charge in the

11   Indictment, Exhibits 1 and 2, that she's the one who brought

12   these for Gordon Hall to sign and he signed them.  You see the

13   blue signature there.  But they're also initialed because the

14   date was wrong in the top right-hand corner.  And it said --

15   and so she had him initial it and that's why she could

16   remember it.  And also in the record of payment was another

17   area where he initialed it.

18         Now you know that it's Gordon Hall's social security

19   number on all of these documents because Mr. Lyons verified

20   that it was Gordon Hall's social security number.  And there

21   are no -- there's no way that the amount that T.W. gave to

22   Gordon Hall could get on these money orders unless it was the

23   defendant himself who provided that information so they could

24   get on the money orders.

25         If the defendant didn't provide that information,

1    then the money orders couldn't be made.  And at the end of it

2    he puts the finishing touches on by signing the money orders.

3           The next counts, Counts Three and Four, talk about

4    passing the money orders.  Well, you know they were mailed to

5    the IRS.  First, the IRS got them and you saw Benton Hall mail

6    them.  You know from Shannon and Brighton that Benton mailed

7    them.

8           You know that the defendant's employees mailed stuff

9    all the time and they used Registered Mail.  And you know that

10   Benton Hall is a high-ranking member of the team.

11          And here we have again Benton mailing the money

12   orders and you will have Exhibit 8 back with you in the jury

13   room.

14          Now, Aiding and Abetting.  There are two ways that

15   the defendant can be guilty of the Counts in Counts One

16   through Four of the Indictment.

17          He can be guilty of the crimes if he directly

18   committed the crimes, but he can also be guilty of the crime

19   if he aided and abetted the crime.

20          Now, the Judge just gave you his instructions and I

21   believe that you all have a copy.  And the instructions define

22   "aiding and abetting."  And they require the defendant to

23   actively participate in a criminal venture.

24          Now, how do you know that the defendant did this?

25          Well, the money orders were for the defendant's

1    taxes.  And you know that the only way the amounts got on

2    those money orders was for the defendant to provide that

3    information to one of the members of his team because he's the

4    only one that T.W. gave that information to.

5           The defendant stated that the money orders would be

6    mailed in and they were mailed in.

7           The defendant signed and initialed the money orders

8    when the defendant was the only one who benefitted from these

9    money orders.

10          Now, before we go into what a false or fictitious

11   instrument is, remember Shannon's testimony about the

12   hierarchy of the office.  It was her dad in charge.  He was

13   the entrepreneur.  The scheme could never have taken place if

14   he wasn't involved.

15          He got the ball rolling and he finished it when he

16   signed the check for the first two counts in the Indictment.

17          Now, both counts require that the money orders be

18   false or fictitious but appear to be a real security.

19          You heard from the expert today, the government's

20   expert, William Kerr, who has 30 years with the Comptroller of

21   the Currency.  And he told you that the appearance of these

22   money orders, they appear to be legit.  And why do they appear

23   to be legit?  They say "money order" on the top, list a drawer

24   on here who is going to be Gordon Hall.  They're dated January

25   24th, 2013.  It lists the payment amount, the exact amount

1   provided by T.W. Lyons on both money orders.  Both money

2   orders are signed by Gordon Hall.  Both money orders say "pay

3   to the order of the U.S. Treasury."  Both money orders say

4   "for the benefit of" and they say "for the benefit of Gordon

5   Hall" and list his social security number and each

6   specifically lists a separate tax year and they're on security

7   paper.

8          Again, you're going to have these back with you in

9   the jury room and you can see the perforation.  And you heard

10  about all the numbers listed on the bottom.  You heard that

11  this was MICR encoded fonts.  That means that the machine can

12  read the numbers listed on the bottom.

13         The first number on the left is the routing number

14  and that's where to send the money order.  It tells you what

15  bank to send it to.

16         The second one is the account number.  And normally,

17  that would be a real account.  In this case it's the

18  defendant's social security number.

19         And you heard from T.W. Lyons that the routing number

20  was not to an account where you could withdraw money, but it

21  was only to -- it was an account that could only accept money,

22  an account where money could only be deposited.

23         He also told you, Mr. Kerr, that individuals do not

24  have an account.  There are no individuals accounts at the

25  Treasury.  And so even if this could be processed -- and you

1  know one was processed because Special Agent Neri, she told

2  you about one of the money orders that was found at the house

3  was returned for insufficient funds.

4       So it was processed but you never actually get money

5  for it because there was no account that was tied to that

6  routing number.

7       Now, the third number listed on the bottom, that's

8  going to be the actual check number -- the money order number

9  on top.  And then the last number is the payment amount.

10       And you heard the expert explain all the little dots

11  around it and how that looks just like a typical money order

12  or a typical check.

13       Now, also important is that the money orders have to

14  appear to be issued under the authority of the United States.

15  And Mr. Kerr told you today that the money order appeared to

16  be issued under the authority of the United States because it

17  referenced the Treasury.  It says the drawee is Mr. Geithner,

18  the Secretary of the Treasury.

19       Why are these money orders fictitious?

20       They're fictitious because an entirely new item was

21  created, an item that doesn't -- didn't exist before.  It

22  references an account which you can't draw funds from, the

23  social security number.  The routing number from the Federal

24  Reserve Bank -- remember Mr. Kerr told you is a deposit on the

25  account.  The Treasury doesn't maintain the individual bank

1    accounts.  And even though it could be processed, it's always

2    going to be returned because of the nonexistent account.

3              Again, these money orders were tied to nothing, and

4    therefore, were worthless.

5              Here is a picture of the money order for tax year

6    1996.  You can see on the screen, and again, it's got all

7    the -- all the numbers that we discussed on the bottom and it

8    looks like a money order and even says "money order" on top.

9              And this is the other side of the check.  And

10   Mr. Kerr talked about that.  And he talked about the fact that

11   the money order -- and you will have it back there, but it

12   talks about the security features of this money order and the

13   micro printing and the watermark and the heat sensitive logo

14   and the color background and the fluorescent fibers.  This was

15   the real deal for check stock.

16             You can see here on your screen where Gordon Hall's

17   social security number is matching the second number listed on

18   the bottom of the check.  The check number in the top

19   right-hand corner matches the third area.  And the last one is

20   the amount.

21             Now, what's important for all four counts is that the

22   defendant acted with the intent to defraud.  You know that the

23   defendant intended to defraud.  These money orders, they

24   weren't a joke.  They weren't Monopoly money.  They weren't

25   written on the side of a banana.  They were written on real

1    check stock.

2          It's been established that Gordon Hall owed a tax for

3    tax years 1996 and 1997.  It's been established that the

4    defendant called and got the specific amounts that he owed for

5    each tax year.

6          The defendant spared no expense in creating a

7    business to defraud the IRS.  He made sure his team created

8    the most real money orders that they could.  He had a staff

9    that worked 40 hours a week.  He had over 100 clients,

10   according to Shannon Hall and Brighton, and everybody was

11   working to eliminate debt.

12         You heard from Agent Neri that 140 money orders were

13   located, some from the search warrant of the defendant's

14   residence and some from all over the country from Revenue

15   Officers who sent them in.  And they were all the same and

16   they were all made the same way as the ones in Exhibit 1 and 2

17   by Gordon Hall and his team.

18         I believe it's 120 money orders -- if I misspoke

19   before, the evidence showed it was 120 money orders -- and

20   these money orders were made in a mere three months in 2013.

21   Because remember, the search warrant was on March 14th, 2013.

22   And these 120 money orders, what was the amount that they

23   totaled?  Agent Neri told you they totaled almost $93,000,000.

24         Now, Gordon Hall, his business was paid with real

25   money.  That's how his clients paid.  He paid his staff with

1    real money.  In fact, he paid them with cash.  He didn't use

2    money orders to pay his everyday expenses.  He didn't use

3    money orders to pay his employees.  He didn't use money orders

4    when one of the employees went to the Post Office to mail one

5    of the packages.  He used real money.

6            In fact, he knows that these money orders aren't real

7    because he created them and he intended to pay off his tax

8    debt.  Because not only did he spare no expense in creating

9    these very real-looking money orders, but he sent in the

10   payment voucher.

11           They didn't come alone.  They came with a real

12   payment voucher already filled out to go along with the money

13   order.  And you'll see that the payment vouchers match the

14   amount of the money order.

15           Gordon Hall is an entrepreneur.  Shannon told you

16   that in 1996 she was living with her dad.  And what did he do

17   for a living?  He was an entrepreneur.

18           In 2011 she moved back with her dad.  And what was he

19   doing for a living?  He was an entrepreneur.  And his business

20   was defrauding the United States -- I mean the IRS.  And you

21   know that because of what his company did.

22           Now, Brighton told you that she liked and trusted the

23   Halls but she wouldn't take a money order as payment because

24   it wasn't payment.  She wanted real payment which is cash.

25   And this is from a person who had been out of high school for

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

 1    less than a year.

 2           Basically, the defendant, Brandon, and all the other

 3    employees of the company were printing money.  Over 100 money

 4    orders showed up at the IRS or at his house and they all

 5    looked the same.

 6           Now, ladies and gentlemen, the evidence shows beyond

 7    a reasonable doubt that the defendant committed all four

 8    crimes as listed in the Indictment.

 9           But what is "reasonable doubt"?  It's a simple

10    concept.  It's doubt based upon reason.  It's not guilt beyond

11    all doubt.  Simply put:  What does your common sense tell you

12    happened?

13           The government need only prove these crimes beyond a

14    reasonable doubt.  They only need to prove the elements, not

15    each and every fact.  We elicited testimony about bits and

16    pieces of information that we thought would be helpful to your

17    determination.  But keep in mind that the United States needs

18    only prove the elements of the crime and that is the law.

19           So take your common sense back with you to the jury

20    room.  You decide reasonable inferences from the facts

21    presented to you.

22           Remember, there are two types of evidence.  Direct

23    evidence; for example, I actually saw it.  Or circumstantial

24    evidence; I may not have seen it but I know what happened by a

25    totality of all the things that were going around.  You can

1   consider both types of evidence.

2          Now, Ladies and Gentlemen of the Jury, under the

3   defendant's leadership these money orders were created.  They

4   were created to pay off Mr. Gordon Hall's tax debt for 1996

5   and 1997.  He was the sole person who benefitted.  His team

6   and him created them and they mailed them, thereby using them

7   to the IRS.  The defendant got the ball rolling and he was the

8   one who would benefit.

9          So now that you have heard all of the evidence and

10  seen the instruments and seen the check stock and the printer,

11  you can now find the defendant guilty of all four counts in

12  the Indictment.

13         Thank you.

14         THE COURT:  All right.  Mr. Kunkle, I may make your

15  closing argument.

16  **CLOSING ARGUMENT:  DEFENDANT**

17         MR. KUNKLE:  Good afternoon, ladies and gentlemen.

18         First off, thank you for coming down and attending

19  trial, coming in and doing your duty as jurors.  Without you

20  folks we don't have a trial.  You folks are what stand between

21  the government and Mr. Hall's freedom.

22         And why do we have trials?  We're here for trials

23  because the government brings a case.  They go down and

24  present evidence and they get an indictment, which isn't proof

25  of anything, for you folks to consider whether crimes were

1    committed.

2          And during this week you got to meet your government.

3    You got to meet the FBI, the IRS, the United States Postal

4    Inspection Service.  I mean, Mr. Kerr is a retired government

5    person from the Office of Comptroller Currency.

6          And what you have seen is the awesome power and

7    resources of your government at work when they choose to bring

8    a case against someone.

9          My job is here to defend Mr. Hall as best I can

10   because what's at stake here is Mr. Hall's freedom.

11         THE COURT:  Mr. Kunkle, could you pull the microphone

12   a little closer to you?  It moves.

13         MR. KUNKLE:  I'm sorry.  I hope you folks are hearing

14   me.  I trust that you are.

15         So what's at issue here, Ms. Jennis just laid it out

16   very nicely for you in a PowerPoint presentation that the

17   government puts together and says:

18         Ladies and gentlemen, these are elements of the

19   crime.  Fictitious instruments.  Made.  Uttered.  Passed.  Put

20   into circulation.

21         The Judge just instructed you on those elements of

22   the offense.  With an intent to defraud.

23         What's not at issue here and nothing that you folks

24   need to decide is whether or not Mr. Hall owned the home or

25   did not own the home or how the home was encumbered or whether

1    he had money in the home, equity in the home.

2            You don't have to decide any of that.  That's not

3    before you.  You don't have to decide whether he could pay the

4    taxes or he was refusing to pay the taxes because he had a pot

5    of gold at the end of a rainbow and didn't want to give it to

6    the government.  That's not before you.

7            This is about a tax debt that goes back almost 20

8    years.  Think that through for a moment.  That's what this is

9    about and the efforts of the government to collect that tax

10   debt, which is why we're here.

11           You don't have to decide -- well, you don't have to

12   agree or disagree with Mr. Hall's beliefs.  You're not here to

13   decide on the validity of those beliefs, whether they're

14   righteous, whether you think they're crazy, whether you think

15   those beliefs are just out of this world, nonsensical,

16   fantasy.

17           What you are to decide really in the end is whether

18   he is guilty of four different crimes.  Those four different

19   crimes are two money orders for '96 -- or, I'm sorry, one

20   money order for '96 being made, passed to the IRS; one money

21   order for 1997, passed or made, and it went to the IRS.

22           So who did this ultimately go to?  The IRS.  Which is

23   why we're here.

24           Now, you also promised us in your voir dire, folks,

25   that you wouldn't take into account Mr. Hall's garb, what he's

1   wearing.  And throughout this trial, I mean it would be

2   natural for you to sit there and go, "What is going on here?"

3            That's his right to appear like that before you.  He

4   had the same right to dress out like this, but he's dressed

5   like that.  That's his decision.  That's part of the belief.

6            You've also learned a little bit about how trials go.

7   When a witness testifies.  What can happen.  How words are

8   used.  How people testify and what they say.  They come down

9   here on they promise to tell you the truth.  But even when

10  somebody says I'm going to tell you the truth, they don't come

11  at that from some vacuum.  They come at it from their

12  background.

13           So someone who is his daughter is going to testify a

14  lot differently than someone who works over at the IRS about

15  what happened in this case.

16           And what's in evidence is free for you folks to take

17  back there and look through it.  And I'm going to ask you,

18  please, to go back there and look through this for a minute

19  because this may seem real simple, and it might be, just to

20  look at some money orders and go, hey, they're fake, what else

21  do we need to know?

22           But those money orders didn't just come out of

23  nowhere.  Again, they have a background to them.  They have a

24  reason behind them.  And that reason is what I'm asking you

25  because you promised to keep an open mind to go back there and

1    examine.

2         And understand that when you are determining whether

3    he is guilty and you're going to have to determine whether

4    he's innocent.  You don't have to determine whether you like

5    him or you might not like him.

6         I will tell you right now, we all stand when you

7    people come in here.  Even the Judge does.  That's out of

8    respect for the fact that you, the citizens who come from the

9    community, the 14 of you who have never met before, come in

10   here with a promise to decide whether someone's freedom can be

11   taken away from them by this government.

12        But that's your government.  Okay.  And I'm going to

13   touch on that a little bit more too because you don't have to

14   agree with them.  You don't have to in your individual

15   capacity as a juror, you don't have to say I'm going to go

16   along today because I want to be out of here by five o'clock.

17        The judge instructed you on that.  But honestly, I'm

18   asking each of you deep down to look at this and ask yourself:

19   Why this would happen.  Why someone would do this.

20        Now, the law before you is somewhat of an odd law.

21   The government has emphasized to you more than once:  No one

22   has to be harmed.   No one actually has to be defrauded.   No

23   one has to be shown they were a part of anything.  No one has

24   to be shown to be cheated out of anything.

25        The Federal Reserve Bank in Atlanta did not have to

1    take money and give it to the IRS.  They don't have to prove

2    that.  But that's the law that we have before us.

3            And Ms. Jennis said to you Mr. Hall benefitted.  I

4    don't know if he really benefitted from this.  She said that

5    twice to you.  And the reason that there's no harm to this is

6    because ultimately, what this is about and why you are here is

7    because Mr. Hall, among other things, cannot stand the IRS.

8            I mean, many of us sitting there, that's why you were

9    asked about it voir dire.  How do you feel about the IRS?

10           No offense to Ms. Neri.  Nobody likes the IRS.  I

11   mean, Mr. Lyons is a perfectly likeable guy.  Ms. Colegrove, a

12   nice lady.  But nobody likes to pay taxes.  We all like to go

13   home with our wallets a little fatter.

14           But we have to.  Some people disagree with that.

15   And, again, that's not the issue before you.  You may go back

16   there in that jury room.  We're not allowed to go back there

17   with you.  You may not like the fact that he doesn't pay his

18   taxes but do not hold that against him.

19           That's not what is at issue here.  This is whether

20   he's guilty of taking these documents with some intent to

21   defraud the IRS with them or to cheat the IRS, one of your

22   government agencies.

23           And, yes, it's your government.  Not theirs.  It's

24   yours.  So we're here why?

25           In the government's opening they said they were going

1    to show you how these were made, where they were made, and

2    Ms. Edelstein said why they were made.  Well, why they were

3    here.

4          Because the IRS does not like people thumbing their

5    nose at the IRS.  The IRS does not like people taking and

6    mailing things to them because they send them around to a

7    Frivolous Filing Unit and you could be fined $5,000.

8          The IRS does not like to have to go out and knock on

9    doors 25 times and try to enforce a Summons and they really

10   can only go so far until they get the money.

11         He's not on trial for tax evasion.  He's not on trial

12   for filing false returns.  He's not on trial for a lot of

13   different things.  He's on trial for this fictitious documents

14   charge, this crime that makes it a crime just to have those

15   with nothing more.  If you intend to cheat who?  The

16   government.  How are you going to cheat the government with

17   this?  It doesn't make sense.

18         Now, the government, as I told you, doesn't have to

19   prove that anyone was defrauded, anyone was cheated, or that

20   the IRS paid this money.  In fact, I told you, one of them

21   actually got processed because somebody at the IRS looked at

22   it and said, hey, that could be real.

23         But I want you to go back there and take a good like

24   at that document.  And it's not real.  We all know that.  I

25   told you that this morning when I was talking to Mr. Kerr.

1    I'm not going to stand up here and tell you this is

2    something that really exists.  So what are we here for?  Why

3    are we here?  Why are you being asked to take away his freedom

4    over these criminal charges?

5    And the government -- Mr. Kerr parroted this -- said

6    this is an attempt to pay his debt.  Really?  Think that

7    through for a minute.  Do you really think this is his attempt

8    to pay the debt?

9    Now, I mentioned before, you don't have to decide if

10   you like Mr. Hall or not; and you may not.  And I apologize to

11   each and every one of you that he didn't stand up out of

12   respect for you and for this Court.

13   We do it.  As a lawyer I stand up because this

14   gentleman is a federal judge.  I respect his authority over

15   the proceedings in this court.  The same way I stand for you

16   folks.  I respect your authority as citizens to come in and

17   make a very momentous and weighty decision.

18   And like I said, you don't have to go back there and

19   have a referendum on whether or not you like Mr. Hall.  That's

20   not the issue.  So why?  Why are we here?  Why would someone

21   not stand?  Why would someone wear orange?

22   You heard some testimony about sovereignty.

23   Sovereignty movement.  This idea that people are without the

24   jurisdiction of the United States.

25   You can learn more about it if you wish.  And I asked

1   you folks earlier, go back there and read Exhibit 6 and 7.

2   Look through it.  Okay?  Just look through it.  You heard

3   things like "sui juris."  Latin.  It means "of one's own

4   right."  It means a free man entitled to have rights.  Natural

5   rights.

6        One of the beliefs of the sovereignty movement is

7   that people are outside the federal government's jurisdiction

8   because why?  They fear that government.  They fear the way

9   they collect taxes.  They fear the power of the IRS.

10        Over the course of many of your lifetimes you have

11   heard about IRS reform.  You have heard about abuses.  You

12   have heard about them collecting money they shouldn't have

13   collected.  Liening the wrong house.  Using an abuse of

14   process.  That's just the IRS.

15        The sovereignty movement isn't just about the IRS.

16   It goes a little deeper.  But in this context it's about

17   taxes.  And why do people believe that they are their own

18   creditor?  That their body is a collateral?  Why do they

19   believe they're outside the jurisdiction of the United States?

20   Why do they put a mailing label on their that says

21   "nondomestic without U.S."

22        Arizona Republic.  Not the newspaper.  But if this is

23   a different republic of a state.  Why do they do that?  Well,

24   we all know there is no secret bank accounts tied to a social

25   security number.  That there is no strawman account.  That

1    there is no fictional "you" and a legal "you."

2         There is no way anyone can tell you that that's

3    legitimate.  I'm not going to try to tell you that.  It isn't.

4         But that's what someone believes.  Rightly or

5    wrongly.  And you're not here to determine whether or not Mr.

6    Hall -- and you heard the word "promoter."  You heard the word

7    "clients."  One hundred twenty of these.  Yes.

8         These ideas run rampant through the Internet where

9    people say this is what you can do to cancel your debt.  This

10   is what you can do.  When you're under water on your mortgage,

11   that bank sold your mortgage to someone else.  They broke the

12   contract that you had.  And in my -- well, their misguided

13   view of the law, that they pick bits and pieces and strands of

14   this and that.

15        Look through Exhibit 6 and 7.  Again, I don't want

16   you to go back there and get your head into a spin over it

17   because, as Ms. Jorgensen told you, you can believe a flower

18   grows in the pot because you talk to it if someone tells you

19   that that's what happens and you observe the flower to grow

20   and it makes sense.

21        Her mother and step-father were believers in this.

22   Many people are.  That's why someone would pay Gordon Hall and

23   people, who are his daughter and son, to print up money orders

24   to mail them in to the IRS because they start believing this.

25   You heard Ms. Jorgensen say he was a believer.  Other people

1    were in it for the money.  He's a believer.

2            Rightly or wrongly, you're not to go back there and

3    decide if that's right or wrong.  It's wrong.  There's no

4    secret bank account.  None of that exists.  You heard Agent

5    Nixon talk about that.

6            I'm not a creditor of myself.  I'm not a separate

7    person as I stand here before you, although sometimes this

8    trial has felt like an out-of-body out-of-mind experience.

9            But this is something very serious.  This isn't about

10   bananas.  This is about whether Mr. Hall has his freedom taken

11   away and is facing significant punishment.

12           Now, back of this sovereignty movement is the idea

13   that people are just tied to a government debt, a giant

14   Leviathan, a giant beast that just exists and churns debt and

15   ties the people to the United States by virtue of the fact

16   that they happen to be born here and they become a citizen,

17   that their children will become tied to that debt.  Debt.

18           That's why they try to eliminate their debt.  Because

19   they don't want their children to have that debt.  They don't

20   believe in many things the government does.

21           And you heard Agent Neri call it a Conspiracy Theory.

22   And one of the best parts about a conspiracy theory and why

23   people believe this and why people continue to do it and why

24   money orders get mailed to different IRS Service Centers and

25   why they try to impede the IRS is because when someone comes

1    along from the government, from the IRS and says, hey, this is

2    all B.S., part of the way that theory sells with people is

3    that they tell the people, the receptive audience, the people

4    who are in debt, the people who have lost their homes, the

5    people who are buried in credit cards, the people who have a

6    mortgage they can't pay, the people who have a car that they

7    can't afford, the people they know who have been put out of

8    their homes, foreclosed upon.

9         They tell you:  When the government comes and tells

10   you this doesn't work, well, they don't want you to know that

11   it does work.  They're going to tell you it doesn't work and

12   that's why it continues to perpetrate.

13        We can all believe in something.  Did we really go to

14   the moon in 1969?  Who would know.  Supposedly people were

15   there.  Who shot Kennedy?  Those are conspiracy theories.

16        The theory that there is a secret bank account at the

17   IRS or the Treasury that will pay your tax debt.

18        Go, Timothy Geithner, take that secret money from me

19   that you have been using to buy debt on the international debt

20   markets and encumbering me and my children, pay my debt.

21   Leave me alone.  I didn't consent to that debt by virtue of

22   the fact I happened to be born in Texas, Arizona, Utah, or

23   somewhere in the United States.  So I'm not part of the United

24   States.

25        It makes absolutely no sense.  I'm not a subscriber

1    to these opinions or beliefs.  I know them well.

2            Now, that comes about from people feeling a huge

3    disconnect and alienation.  It doesn't make it right.  It

4    doesn't make it wrong.  But that's in part why it happens.

5            And part of that, when the fine line is drawn,

6    between where people have that belief and what they see as

7    their ability or their duty, their goal, their mission to not

8    only get out of their debt perhaps, well, but they got to know

9    that it doesn't work at a certain point, but to get back at

10   their government, to protest their government.

11           We all know about protests.  I have often marveled at

12   the fact that somehow people lay down in the street and block

13   a car and get arrested for that.  Where is your car more

14   important than someone's right to protest?

15           But that protest gets directed at one of the first

16   intersections with their government, the government that wants

17   to take their money out of their pocket, the government that

18   they don't believe is fair, it's disconnected from them, that

19   has burdened them and their children with debt.

20           That's what that's about in part.  You can read more

21   about it in Exhibit 6 and 7.

22           How far did the connect go?  Well, one result is that

23   you end up in a United States Federal District Court with a

24   criminal charge that can bring someone a huge punishment, a

25   loss of their freedom.

 1             And the government wants that to happen.  That is why

 2    we have the FBI, IRS, whomever else going to a home with guns

 3    drawn over funny money.  That's why we have two U.S. Attorneys

 4    sitting to my left, an IRS special agent, an FBI agent, a

 5    Postal Inspector, all the power of the IRS saying:  This isn't

 6    going to happen.

 7             We're going to take a guy like Gordon Hall, this

 8    promoter, and we want you to say:  Put him away.  We're not

 9    going to put up with somebody -- now, excuse the use of the

10    term -- screwing with the IRS.

11             We're not going to have that; and especially you,

12    Mr. Promoter, who has been involved with numbers of other

13    people having these seminars and these call-ins where you will

14    prepare these money orders for somebody else.

15             And by the way, whether a money order went into the

16    system in Ohio or Texas or anywhere else, he's not charged

17    with that.  The Judge instructed you don't consider that.  And

18    I'll tell you something.  You might go back there and think,

19    man, this guy is major public enemy number one nuisance.

20    Let's convict him.

21             And, you know, that's what the government,

22    Ms. Jennis, wants you to do.  That's really why we're here.

23    Because if Mr. Hall gets convicted, oh, I can probably

24    guarantee you the government will put out a press release to

25    say Mr. Hall got convicted.  Beware all.

CR14-00184-PHX-NVW  JURY TRIAL - DAY 3  1-22-15

1          Don't follow those.  But that message is just going

2    to keep going out and resonating with more and more people who

3    want to believe it because it falls on fertile ground.

4          And whether we like it or not -- and just so you

5    know, if there's one part of your deliberations where you want

6    to go back there and think, yeah, that's what we need to do

7    because this has to stop, that's not going to stop but his

8    freedom is going to be taken away.

9          Now, why are we here?  Why are we really here?  Okay?

10   And so this comes down to:  Did Mr. Hall really intend to

11   defraud and cheat the IRS?

12          And as I mentioned before, this is an odd law that

13   Congress passes it and you people give consent to the

14   government, your Congress, your congressional representatives

15   to represent you.  We don't all get to go and vote on what the

16   law.  But that's what the consent is about; the people and

17   about the laws and how they work.

18          You don't have to agree with it.  We have elections

19   where half the people don't even show up to vote and then the

20   other half or maybe the other third of the people, it's split

21   about what people agree on.

22          You don't have to sit here and be a collective body

23   that goes back there and does what your government wants you

24   to do.  You can stand up for your individual conscience and

25   say "I'm not going to go along with that."

1          But, again, you're going to go back there and say,

2    well, he did the crime.

3          And really when you ask yourself about these elements

4    in this statute, is this a statute that's really here to let

5    the IRS use it to go after people who, for lack of a better

6    term, mess with the IRS or cause them a lot of hassle or make

7    them come in on their day off -- well, I shouldn't say his day

8    off.  He was working from home -- on his flex day to come in

9    and see if this over one hundred thousand dollar remittance

10   needed to go to the bank just like that.

11         Now, Mr. Lyons would tell you he really expected that

12   this time Mr. Hall was going to pay.  Really?  Really?  Think

13   that through for a minute.

14         In the twenty-year history of not paying a tax, he's

15   been chased now since 2003 when they assessed the tax.

16   There's a long history there.  You heard Ms. Colegrove even

17   say we were familiar with this guy.  We used to get mailings

18   all the time.  He had a box.

19         Mr. Lyons said most files are that thick.  He had a

20   book.  You only got two pieces of it here in 6 and 7 for you

21   to look through.

22         This is a guy who is never going to pay his tax.  And

23   when the government sits here and tells you this was just yet

24   another attempt to pay the tax, that's ludicrous.  Look at

25   those other mailings in 6 and 7.  That's just the tip of the

1    iceberg of what he was sending in.

2          If you believe any of those other ones were an

3    attempt to pay a tax, in reality that's crazy.  That's just

4    absolutely crazy thinking.  Because some of those documents

5    are stamped in there.  Here is your voucher.  I accept it for

6    value and return it for value.  I'm an independent person.

7    There.  Go pay yourself.  I don't owe you.  Do what you're

8    going to do.

9          And, again, there's no result.  The worse thing that

10   was ever going to happen is that the banana would go through

11   the system and go nowhere.  And what would really happen?

12   We're back to maybe another mailing with a privately

13   registered setoff bond.

14         So really what's going on here -- and this is why

15   this came up during this trial -- this is called impeding the

16   IRS.  Obstructing the administration of the Internal Revenue

17   Code laws.  That is a much less serious problem.  But you're

18   not being asked to decide that.

19         You're being asked to decide this much more serious

20   thing where someone would set out to defraud somebody by

21   perhaps passing the million-dollar bill that someone would

22   look at and say:  That looks really like a million-dollar

23   bill.  I'll take it.

24         And if you really think through it for a minute about

25   this idea of an intent to defraud, who's getting this?  The

 1    intended recipient.  I couldn't help but notice.  I think the
 2    instructions call about the "intended recipient."

 3         The intended recipient.  Silly or stupid?  I mean,
 4    IRS.  Intended recipient.  Was this really designed to help
 5    the IRS get somebody?  Or was this designed to protect
 6    somebody who takes that bogus, obviously bogus, document that
 7    they don't really know exists.

 8         You know, I come and say to you:  I'm going to pay
 9    you with a Federal Treasury Warrant.  I'm going to come and
10    pay you with this security in the XYZ Corporation I've signed
11    over to you.  I'm going to give you this money order.

12         But, see, one part of this is that the document has
13    to look credible on its face.  If there had been a dog -- if
14    there had been some kind of Daffy Duck smoking a cigar on the
15    dollar bill you got, you wouldn't take it to the bank.

16         If you get a check at the IRS and it says right on
17    there "put it on my private offset account" -- and, in fact,
18    it even says more than that.  It says:  "Go tell your boss,
19    Timothy Geithner, to go pay himself."

20         Think about that if that makes any sense.  And think
21    about if this is what the statute was set out to do.  If
22    that's what you want to do is go back there and protect the
23    government from its own silliness.

24         And if the government would stand up here and tell
25    you that this is -- and let me pull these out -- a credible

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    document that really is a fictitious instrument -- I'm not

2    going to tell you this is real.  It's not.  Why would somebody

3    go to this effort to do this on behalf of not only himself but

4    other people?  And tell an IRS employee, because that's the

5    intended recipient.  That's who this is going to.  Not

6    Ms. Colegrove.  Not Mr. Lyons.  It's not them.  They use the

7    term the royal "we" more than once but they really speak for

8    the IRS.

9          First off, somebody who gets something like this that

10   just says "money order" with no backing, nothing else on it,

11   you would look at it and go, hum, and you would read it.

12   Private offset accounts.

13         But when you start looking at it, you have to think

14   for a minute.  It doesn't just come out of nowhere.  This

15   wasn't like, hey, Mr. Hall called in one day and said he's

16   going to pay his taxes.

17         Now, Mr. Hall had been sending the IRS document after

18   document for years.  Years.  About how he wasn't going to pay.

19   And so finally, one of these arrives in the mail.  Let's go

20   kick in the doors with some guns, take the printers, find out

21   what else is going on.

22         And why does the government want to do that?

23         Well, there's an old expression:

24         You can kill the snake by cutting off its head.  You

25   can also kill the snake charmer by cutting off his head.  If

UNITED STATES DISTRICT COURT

1    he's really the charmer and not just somebody who's involved

2    in this.  And you don't have to decide whether or not you like

3    Mr. Hall because he was involved with making money orders with

4    other people, with other people paying him money to do it in

5    his grand scheme of people who have misguided beliefs to mess

6    with their IRS obligations.

7            The government could go after them many other

8    different ways, but taking away someone's freedom because they

9    all of a sudden want to have people come in here, paraded

10   before you, going, well, I thought this was real.  You know, I

11   put it in the box and I thought this was really going to go

12   through the system.  This banana.  Look at what could have

13   happened.  Look at what did happen.

14           And so at the end of the day, ladies and gentlemen,

15   and this really isn't a joke.  I'm sorry we all kind of have a

16   little bit of levity about it, but, you know, Mr. Hall is the

17   guy who is going to pay the price over here if you folks go

18   back there and vote guilty.  A big price.

19           This isn't just about impeding the IRS.  Messing with

20   them.  This isn't about like a funny thing.  You know, I asked

21   Mr. Kerr this morning, you know, a nice gentleman.  He's old

22   enough to remember the old "Who's On First" lines from Abbott

23   and Costello.  Who's on first?  You know, when he gets paid,

24   who signs his -- you know, who gets the checks?  Who?

25           But this isn't a joke.  This isn't a joke.

1          And so at the end of the day you come back down to

2     it.  Why are we really here?  And so we have a document.  It's

3     not real.  Is there an intent to defraud?  And you come down

4     to this dilemma, perhaps, or just this question:  Is there an

5     intend to defraud or is there an intent to cheat?

6          One in one hand.  Someone who has these beliefs.  Sui

7     juris.  I'm my own right.  I'm a natural free person.  I'm

8     outside the United States.  Nondomestic.  The Republic of

9     Arizona.  I'm outside this.  I'm my own creditor.  My own

10    underwriter.  There's a secret bank account that I believe

11    exists.  I'm going to do that to send this to the IRS.

12          You would have to realize that somebody who, if they

13    held those beliefs and thought for one minute that that would

14    really attempt to pay their debt, they're crazy.  That's not

15    an intent to defraud.

16          They really believe this in a very misguided, insane,

17    crazy, conspiratorial sole belief that that's going to work,

18    that he's going to benefit from that, that really that's going

19    to happen?  That there is an account in your social security

20    number?  It's right there on the check -- or is that a money

21    order or what is that?  Do you really think that's it?

22          So what's the other side of the coin?

23          The other side of the coin -- and, again, Ms. Jennis

24    said he created his own.  How many of you folks created your

25    own money orders in the last number of years?  Nobody does.

1    But somebody who has these beliefs does.  Or somebody creates

2    them because really deep down they don't want to pay.

3            They're not going to cheat anybody.  They're not

4    going to defraud anybody.  But they are sure going to put the

5    proverbial banana -- maybe a big rotten, black banana -- into

6    the system that the computer can't read and cause the IRS a

7    lot of heartache.

8            Heartache, ladies and gentlemen.  Grief.  Coming in

9    off your flex day.  That's what this is about.  This is about

10   someone saying to the IRS:  Huh-uh.

11           I think the expression is:  Thumb in your eye.

12           I've heard:  In your face.

13           There's others.

14           Go away.  I'm not paying you.  That's it.  Here.

15   And, in fact, I'll take one more step and we'll do this to

16   impede the administration of the IRS.

17           That's really what they're doing.  They're not

18   defrauding them to cheat the IRS.  That's ludicrous.  I mean,

19   it's crazy or it's ludicrous or what they're really doing is

20   something else.

21           You really think he has benefitted from this?  We're

22   all here.  I don't want to be here.  Nice day outside.  You

23   folks don't want to be here.  We're here because these guys,

24   the government, these people, the alphabet soup agencies, want

25   us to be here because they want Mr. Hall.

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1        Now, when you go back there to deliberate, I'm asking

2   you, please, go back there.  Don't take things at face value.

3   Look through those documents.  Pull these checks out of there.

4   Ask yourself that question.

5        Why are we really here?  Why are we here?  Why was I

6   brought down for jury duty?  Why is Mr. Kunkle sitting over

7   there with a guy who's in orange garb not standing up for us?

8   Where are we here.  Because it's a protest.  There's nobody

9   who's going to get defrauded with a bogus check with their

10  social security number with the Treasury account.  This is

11  about screwing with the IRS.

12        And, ladies and gentlemen, I ask you to please go

13  back there and weigh your conscience.  Make a very careful

14  decision because this is his freedom.  And what stands between

15  that is you folks.

16        Thank you.

17        THE COURT:  All right.  The government may give a

18  rebuttal.

19  **REBUTTAL CLOSING ARGUMENT:  GOVERNMENT**

20        MS. JENNIS:  Ladies and gentlemen, this is not about

21  a tax debt.  That's not an element of the offense.  It's not

22  an element of the offense that the money order or any money

23  order was going to the IRS.  It doesn't matter where it was

24  going.

25        Mr. Kunkle said money orders have a background.  They

1    have a reason behind them.

2            The money orders in this case do have a background

3    and their background is they were created to defraud the IRS.

4            There's no evidence that didn't -- that the defendant

5    didn't like the IRS.  The evidence is that his business

6    created the money orders and they created over a 120 other

7    money orders.  And these money orders were for clients all

8    over the United States and they totaled almost $93,000,000.

9            In fact, the defendant's money orders, Exhibits 1 and

10   2, you can see them.  They totaled over $1,500,000.

11           Mr. Kunkle's stories, they aren't evidence.  But ask

12   yourself:  If the defendant didn't recognize the authority of

13   the United States, if he was a true sovereign citizen, then

14   why did he have a driver's license?  Why did he call the IRS

15   to get a payoff amount, an exact amount?  In fact, the message

16   he left at first was that he wanted the payoff amount for

17   January 23rd, but when he spoke with Mr. Lyons on the 22nd of

18   January, he changed the payoff amount until January 28th.

19           Why call the IRS if you didn't believe in the

20   government?  Why would he use the U.S. Postal Service and not

21   just deliver the money orders?  The IRS office was in Mesa.

22   The office and the home of the defendant and the company's

23   office, they were in Mesa.  Yet Benton Hall went to a Post

24   Office in Phoenix so that the money orders could be mailed

25   Registered Mail to the IRS.

1          Why attach a real payment voucher and fill it out

2     correctly if you don't care about the United States or you're

3     thumbing your nose or you don't recognize any authority of the

4     United States?

5          This wasn't a joke.  This wasn't the defendant

6     thumbing his nose.  This was a business.  Half a dozen

7     employees paid in cash.  Fancy home, about 9,000 square feet.

8     Nice office.  Over 100 paying-clients paying with real money.

9          Brandon Adams.  Benton Hall rented a home for him in

10    Mesa, Arizona, so he could bring that printer and print the

11    120-some odd money orders for $93,000,000.

12          We're not here -- you're not here because of the

13    actions of the IRS.  You are here because of the actions of

14    Gordon Leroy Hall, the defendant.

15          Now, the Judge read you the jury instructions and I

16    just want to point out a couple of them to you.

17          Activities Not Charged on page 7 of the jury

18    instructions.

19          You are here only to determine whether the defendant

20    is guilty or not guilty of the charges in the Indictment.  The

21    defendant is not on trial for any conduct or offense not

22    charged in the Indictment.

23          That's on page 7.

24          On page 12.  Jury Consideration of Punishment.

25          The punishment provided by law for this crime is for

1    the court to decide.  You may not consider punishment in

2    deciding whether the government has proved its case against

3    the defendant beyond a reasonable doubt.

4           This is not about an attempt to pay.  This is about

5    an attempt to defraud.  Why would a person go out of their way

6    to make all those money orders?

7           The defendant did it to make money.  Don't ignore the

8    fact that this was a business and that the defendant made real

9    money by printing these fictitious money orders.

10          Thank you.

11          THE COURT:  All right.  At this time we will select

12   the alternates.

13          I told you at the beginning that we will have two

14   alternates.  And let me repeat when I said those were selected

15   alternates are not released yet.  If for some reason any juror

16   becomes unable to continue to deliberate, we will call an

17   alternate back and the jury will begin their deliberations

18   anew.

19          And once the jury is discharged, we will call the

20   alternates and at that time the alternates will be released

21   from all of their instructions.

22          So, Nick, have you shuffled?

23          All right.  We shuffle twice here.

24          All right.  Juror No. 3 and Juror No. 5.

25          So when the jury retires to deliberate, you all can

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    be -- be sure to give us your phone numbers so we know where

2    to reach you.

3              And now the clerk will deal with you to the extent

4    you have any questions or any other needs.  But in case he is

5    unavailable, we will swear the bailiff.  So, Nick, will you

6    please swear Cullen as the bailiff.

7         **(Bailiff duly sworn.)**

8              THE COURT:  All right.  Now, you can deliberate as

9    long as you want.  Sometimes I have had juries stay past 5:00

10   if you feel like you're making progress.

11             I ask you to deliberate at least until 4:30.  And if

12   you have to come back another day, you can come back as

13   early -- actually, you can't get in before eight o'clock

14   because the courthouse is not open before eight o'clock.

15             But I ask you to be here by 9:00 if you have to come

16   another day.  And you can take breaks at whatever time you

17   like.

18             With that the jury will retire to deliberate.

19             All rise for the jury.

20        (Jury retires to deliberate at 2:53 p.m.)

21        (Open court, no jury present.)

22             THE COURT:   All right.  Please be seated.

23             The record will show the absence of the jury.  Do we

24   have -- are you going to stay here, Mr. Kunkle?

25             MR. KUNKLE:  I'm not going anywhere and I will give

1   Mr. Sommers  my phone number.

2           THE COURT:  Ms. Jennis, will you be at the U.S.

3   Attorneys here?

4           MS. JENNIS:  We will provide Mr. Sommers with our

5   phone number.  It's just easier.

6           THE COURT:  All right.  That's fine.

7           I haven't brought this up because I didn't want to

8   distract you from the trial, but has the government been able

9   to talk to your witnesses on the guns, Count Five, as to when

10  they would be available so we could set a firm time for that?

11          MR. KUNKLE:  Your Honor, before the government even

12  answers -- and I don't mean to step out of turn -- if we

13  could, you know my position.

14          And that's something, if I could have the opportunity

15  even to early next week, that may give the government some

16  more time to get their witnesses scheduled and that gives me a

17  time to go back to where I'm going to be and figure out when

18  that would work.

19          And I think because of the late severance and other

20  circumstances, I would rather come back and say these are the

21  two or three days I can devote to that in light of what my new

22  duties or schedule might, be if the Court is amenable to that.

23          And I would even ask maybe for a status conference

24  like sometime next week, early next week to come back and set

25  a trial date.

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1        THE COURT:  Ms. Jennis, have you been able to talk to

2   your people as to when they would be available?

3        MS. JENNIS:  My understanding is they would be

4   available -- I also spoke with your deputy clerk and he said

5   that your availability for February was most likely the week

6   of February 16 and the United States would be available then.

7        THE COURT:  Does that work for you, Mr. Kunkle?

8        MR. KUNKLE:  I'm thinking it might.  I would like to

9   just talk to --

10       THE COURT:  That's fine.  You can check things out

11   and let's tentatively plan on --

12       MS. JENNIS:  Your Honor, as the United States voiced

13   previously when we discussed this, our biggest concern was the

14   week leading up to the Super Bowl and perhaps a little bit

15   after.

16       But it was really not having the trial next week just

17   due to law enforcement resources due to -- and because of the

18   crowdedness of the Super Bowl and law enforcement does have a

19   lot of other duties that week.

20       THE COURT:  Are any of these out-of-town witnesses?

21       MS. JENNIS:  No, but they are assigned.

22       THE COURT:  All right.

23       MS. JENNIS:  I do know that they can't take vacation

24   during a couple-week period because of all the activities that

25   are going on in the area starting this Sunday -- probably

 1    starting this week.

 2          THE COURT:  All right.  Mr. Kunkle, why don't you

 3    check that out.  I don't have trials on Mondays because I have

 4    sentencings on Mondays, so it would be February 17 is when I

 5    could begin.

 6          MR. KUNKLE:  Okay.

 7          THE COURT:  But my sense is that trial is going to

 8    take about two days.

 9          MR. KUNKLE:  That's why I said two or three, Judge.

10          The funny part is I didn't even tell them yet.  I

11    said -- I did tell them I have to do this trial, but I didn't

12    tell them yet that I have to do another one.

13          THE COURT:  Well, tell them that I very much

14    appreciate their flexibility.

15          MR. KUNKLE:  I will let Mr. Peterson know.

16          THE COURT:  All right.  Besides, you can make a

17    little extra money on the side at the princely rate that we

18    pay.

19          So all right.  Then, Nick, I'm going to recess and

20    you all can check what exhibits to send to the jury.  But

21    while you were out, we were talking about a time to set for

22    the trial on Count Five.  And we're tentatively looking at

23    February 17.  But Mr. Kunkle needs to check and make sure that

24    he's available then.

25          And, Mr. Kunkle, if you could just let the deputy

1    clerk know if that's a time you can do.  Just let us know and

2    we will enter an order setting the firm trial date.

3         MR. KUNKLE:  All right.

4         THE COURT:  And I think I would like you all to redo

5    the jury instructions limited to that.  And we have some

6    issues that just came up that we didn't need to resolve on the

7    forfeiture as to whether we're going to submit that to the

8    jury or not.

9         I think as we talked before, that's the defendant's

10   call whether to submit that to the jury.  But let's see.  I

11   think what I'll do is I'm going to require a revised jury

12   instruction for the trial on Count Five, say, the Friday

13   before, assuming we go on February 17, and that would be

14   February 13.

15        But we'll get an order out on that once we know for

16   sure that time is good for everyone.  If that time isn't good,

17   Mr. Kunkle, I'm going to ask you and the government to confer

18   and confer with the deputy clerk about what times you all can

19   do it.

20        I would like to get this nailed down within a day or

21   two.

22        Counsel, anything else before we recess?

23        MS. JENNIS:  No, Your Honor.  Thank you.

24        MR. KUNKLE:  No, sir.

25        THE COURT:  Very well.  Then we will recess and wait

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1    for the jury.

2         (Proceedings adjourned at 2:59 p.m.)

3                         * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CR14-00184-PHX-NVW   JURY TRIAL - DAY 3   1-22-15

1

2                        C E R T I F I C A T E

3

4            I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8            I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 9th day of September,

14   2015.

15

16

17

18

19                        s/Elizabeth A. Lemke
                          ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25

UNITED STATES DISTRICT COURT

ER 853

1              **UNITED STATES DISTRICT COURT**

2              **FOR THE DISTRICT OF ARIZONA**

3               _____

4

5 **United States of America,**   )
                         )   No. **CR 14-0184-1-PHX-NVW**
6           Plaintiff,   )
                         )
7         vs.             )   Phoenix, Arizona
                         )   January 22, 2015
8 **Gordon Leroy Hall,**      )   4:19 p.m.
                         )
9          Defendant.   )
 _____ )

10

11         **BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE**

12

13

14        **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

15             **(JURY TRIAL - DAY 3)**
               **(_Jury Verdict_)**
16        **(Pages 765 through 771, inclusive.)**

17

18

19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, Spc 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

1    **APPEARANCES:**

2

3    For the Plaintiff:

4            U.S. ATTORNEY'S OFFICE
             By:  **Lisa Jennis, Esq.**
             By:  **Monica B. Edelstein, Esq.**
5            40 N. Central Avenue, Suite 1200
             Phoenix, Arizona 85004

6

7    For the Defendant:

             STEPHEN C. KUNKLE PLLC
8            By:  **Stephen C. Kunkle, Esq.**
             5150 N. 16th Street, Suite A222
9            Phoenix, Arizona 85016

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2          THE COURT:  The record will show the presence of

3    counsel, the defendant, and the jury.

4          And members of the jury, have you reached a unanimous

5    verdict?                                                    16:19:25

6          JURY FOREPERSON:  Yes.

7          THE COURT:  All right.  Will you please hand the

8    verdict form to the clerk.

9          And the clerk will please read and record the verdict.

10         THE COURTROOM DEPUTY:  Omitting the formal caption,     16:19:50

11   we, the jury, duly empaneled and sworn in the above-entitled

12   action, upon our oaths, find the defendant, Gordon Leroy Hall,

13   as to making a fictitious instrument as charged in Count 1 of

14   the indictment:  Guilty.

15         As to making a fictitious instrument as charged in      16:20:08

16   Count 2 of the indictment:  Guilty.

17         As to using a fictitious instrument as charged in

18   Count 3 of the indictment:  Guilty.

19         As to using a fictitious instrument as charged in

20   Count 4 of the indictment:  Guilty.                          16:20:22

21         Signed by the jury foreperson dated this 22nd day of

22   January, 2015.

23         THE COURT:  Will the clerk please poll the jury.

24         THE COURTROOM DEPUTY:  Juror Number 1, is this your

25   true verdict?

**January 22, 2015 – Jury Trial – Day 3 – Verdict**

```
 1              JUROR NUMBER 1:  Yes.

 2              THE COURTROOM DEPUTY:  Juror Number 2, is this your

 3   true verdict?

 4              JUROR NUMBER 2:  Yes.

 5              THE COURTROOM DEPUTY:  Juror Number 4, is this your        16:20:40

 6   true verdict?

 7              JUROR NUMBER 4:  Yes.

 8              THE COURTROOM DEPUTY:  Juror Number 6, is this your

 9   true verdict?

10              JUROR NUMBER 6:  Yes.                                      16:20:45

11              THE COURTROOM DEPUTY:  Juror Number 7, is this your

12   true verdict?

13              JUROR NUMBER 7:  Yes.

14              THE COURTROOM DEPUTY:  Juror Number 8, is this your

15   true verdict?

16              JUROR NUMBER 8:  Yes.

17              THE COURTROOM DEPUTY:  Juror Number 9, is this your

18   true verdict?

19              JUROR NUMBER 9:  Yes.

20              THE COURTROOM DEPUTY:  Juror Number 10, is this your       16:20:53

21   true verdict?

22              JUROR NUMBER 10:  Yes.

23              THE COURTROOM DEPUTY:  Juror Number 11, is this your

24   true verdict?

25              JUROR NUMBER 11:  Yes.                                     16:20:57
```

——— January 22, 2015 - Jury Trial - Day 3 - Verdict ———

1           THE COURTROOM DEPUTY:  Juror Number 12, is this your

2    true verdict?

3           JUROR NUMBER 12:  Yes.

4           THE COURTROOM DEPUTY:  Juror Number 13, is this your

5    true verdict?

6           JUROR NUMBER 13:  Yes.

7           THE COURTROOM DEPUTY:  And Juror Number 14, is this

8    your true verdict?

9           JUROR NUMBER 14:  Yes.

10          THE COURT:  All right.  It is ordered that the          16:21:07

11   existing custody orders are affirmed pending sentencing.

12          And Nick, give us a time for entry of judgment and

13   sentencing.

14          THE COURTROOM DEPUTY:  April 20 at 11:00.

15          THE COURT:  It is ordered setting the date for          16:21:18

16   sentencing and entry of judgment for April 20 at 11:00.

17          It is further ordered that the U.S. Probation Office

18   prepare a presentence investigation report.

19          Now, members of the jury, I know my speech is kind of

20   corny and I will try not to give it to you again.  But I      16:21:32

21   believe everything I said.  We do have the best criminal

22   justice system in the world, and it's because of the jury more

23   than any other one thing.  I thank you all for your service.  I

24   thank you for the time you have given us today.  I thank you

25   for the care you took in answering all those questions we asked 16:21:50

1    you and the attention you have given to everything you have

2    heard here today.

3            And with that, the jury will be discharged.  You are

4    released from all the admonitions I gave you.  And let me tell

5    you, you are perfectly free to discuss your jury experience.          16:22:03

6    And some people enjoy talking about their jury experience.

7    Maybe a lot of people do.  But you never have to explain your

8    verdict to anyone.  You never have to justify it to anyone.

9    And if you prefer not to discuss your experience or your

10   verdict, you don't have to.  And if people want to bring it up          16:22:25

11   you can say, well, it's just not something I want to talk

12   about.

13           And you are free to, again, talk about it.  If there's

14   anything about this you want to look up on the internet now you

15   can do that.  All the admonitions are released.  And I thank          16:22:40

16   you all for your service.

17           And with that, the jury is discharged.  We will be

18   adjourned.

19           (Proceeding concluded at 4:22 p.m.)

20

21

22

23

24

25

1

2

3

4

5                        C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 7th day of September,

16   2015.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25

X FILED          LODGED
RECEIVED       COPY

JAN 2 2 2015

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 14-00184-1-PHX-NVW |
|                Plaintiff, | |
|     vs. | **VERDICT FORM** |
| Gordon Leroy Hall, | |
|                Defendant. | |

We, the Jury, duly empaneled and sworn in the above-entitled action, upon our oaths, find the defendant, Gordon Leroy Hall:

As to Making a Fictitious Instrument, as charged in Count 1 of the Indictment:

_____ Not Guilty          \_\_\_✓\_\_\_ Guilty

As to Making a Fictitious Instrument, as charged in Count 2 of the Indictment:

_____ Not Guilty          \_\_\_✓\_\_\_ Guilty

/ / /

As to Using a Fictitious Instrument, as charged in Count 3 of the Indictment:

_____ Not Guilty          ___✓___ Guilty

As to Using a Fictitious Instrument, as charged in Count 4 of the Indictment:

_____ Not Guilty          ___✓___ Guilty

DATED this _22_ day of January, 2015.

_____Juvy 12_____
FOREPERSON

- 2 -

ER 862



Brighton-Nicole Jorgensen, Presenter
10905 Yellowjacket Ridge
Flagstaff, Arizona [86004]
*Non-domestic without the U.S.*

RE 261 089 815 US

UNITED STATES
POSTAL SERVICE

1000        85204

T. W. Lyons
1818 E SOUTHERN AVE, STE 154
MS: 5105 - MES
MESA, AZ 85204

001-001

Exhibit 1          ER 863

FOR SECURITY PURPOSES THE BACK OF THIS DOCUMENT CONTAINS A COLORED BACKGROUND AND MICROPRINTING IN THE BORDERS

| Drawer: | GORDON LEROY HALL<br>3546 E PRESIDIO CIRCLE<br>MESA, AZ 85213-8017 | **MONEY ORDER** | 2013000102 |
|---|---|---|---|

Issue date: 24 JANUARY 2013

Pay to the Order of: **UNITED STATES TREASURY**

$ 868,397.60

Pay the Sum of: Eight-hundred Sixty-eight Thousand Three-hundred Ninety-seven and 60/100 ------- **Dollars**

Drawee: Timothy Franz Geithner, Secretary of the Treasury
℅ U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

This Draft is an unconditional order by the Drawer for the Drawee to pay on demand to the Payee the fixed amount of money indicated herein. The place of payment is indicated as the address for the Drawee. This Draft is transferred for value as payment of the antecedent claim(s) indicated on the "For the Benefit of" line on this Draft. The Drawee is to ledger this Draft as a result of the debit(s), obligation(s), and liabilities(s) of the antecedent source(s) indicated herein by and through this Private Offset Account number 552988459. The Payee, as the party entitled to enforce this Draft, shall make presentment of this Draft to the Drawee at the place of payment indicated herein. Presentment, payment, and dishonor of this Draft shall be made in accordance with Article 3 of the Uniform Commercial Code.

For the Benefit of: GORDON L HALL 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; TAX PERIOD 12/31/1996

Signature of maker and accommodation party for the drawee

SECURITY LOCKS WILL DISAPPEAR WHEN COPIED OR WITH NORMAL BODY HEAT

⑈061000146⑈ 552988459⑈ 2013000102 ⑈0086839760⑈

---

## RECORD OF PAYMENT     MONEY ORDER: 2013000102

| DATE | PAYEE | AMOUNT |
|---|---|---|
| 24 JANUARY 2013 | UNITED STATES TREASURY | $ 868,397.60 |

For: GORDON L HALL 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; TAX PERIOD 12/31/1996

Exhibit 1                    ER 864  001-002

ENDORSE CHECK HERE

X

001-003

↓ MP
**DO NOT WRITE / SIGN / STAMP BELOW THIS LINE**
**DEPOSITORY BANK ENDORSEMENT**   MP ↓



*Listed below are the security features provided on this document which meet and/or exceed industry guidelines.*

**Security Features:** | **Results of check alteration:**

• Micro-Printing · Small type in border of check and endorsement area appears blurred if copied or scanned.

• Watermark · Hold at an angle to view. White watermark will turn yellow under ultraviolet light.

• Heat Sensitive Logo · Looks will disappear when copied or with normal body heat.

• Colored Background · Void without background.

• Fluorescent Fibers · Visible only under ultraviolet light. Cannot be photocopied or scanned.

**Exhibit 1**



**ER 865**

# 19**96** **Form 1040-V**  Department of the Treasury Internal Revenue Service

## Paperwork Reduction Act Notice

We ask for the information on Form 1040-V to help us carry out U.S. Internal Revenue laws. If you use Form 1040-V, you must provide the requested information. Your cooperation will help us ensure that we are collecting the right amount of tax.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Internal Revenue Code section 6103.

The time needed to complete and mail Form 1040-V will vary depending on individual circumstances. The estimated average time is 13 minutes. If you have comments about the accuracy of this time estimate or suggestions for making Form 1040-V simpler, we would be happy to hear from you. You can write or call the IRS. See the Instructions for Form 1040.

## What Is Form 1040-V and Do I Need To Use It?

It is a statement you send with your payment of any balance due on line 62 of your **1996 Form 1040.** Using Form 1040-V allows us to process your payment more accurately and efficiently. We strongly encourage you to use Form 1040-V, but there is no penalty if you do not do so.

## How Do I Fill In Form 1040-V?

**Box 1.** Enter the amount of your payment.

**Box 2.** Enter the first four letters of your last name. See examples below.

| Name | Enter | Name | Enter |
|---|---|---|---|
| John Brown | BROW | Jean McCarthy | MCCA |
| Juan DeJesus | DEJE | Helen O'Neill | ONEI |
| Joan A. Lee | LEE | Pedro Torres-Lopez | TORR |

**Boxes 3 and 4.** Enter your social security number (SSN) in box 3. If you are filing a joint return, enter in box 3 the SSN shown first on your return and the second SSN in box 4.

**Box 5.** Enter your name(s) and address.

## How Do I Make My Payment?

● Make your check or money order payable to the "Internal Revenue Service" (not "IRS"). Do not send cash.

● Make sure your name and address appear on your check or money order.

● Write "1996 Form 1040," your daytime phone number, and SSN on your check or money order. If you are filing a joint return, enter the SSN shown **first** on Form 1040.

● Detach Form 1040-V along the dotted line.

● **DO NOT** attach your payment or Form 1040-V to your return or to each other. Instead, just put them loose in the envelope.

● Please use the envelope that came with your tax package to mail your 1996 tax return, payment, and Form 1040-V. If you do not have that envelope or you moved, used a paid preparer, or filed electronically, mail the items to the Internal Revenue Service at the address shown on the back that applies to you.

Cat. No. 20975C

Form **1040-V** (1996)

---

▼ DETACH HERE AND MAIL WITH YOUR PAYMENT ▼

---

| Form **1040-V** Department of the Treasury Internal Revenue Service (98) | **Payment Voucher** ► Do not staple or attach this voucher to your payment. | OMB No. 1545-0074 19**96** |
|---|---|---|

| 1 Enter the amount of the payment you are making<br>► $ 868,397.60 | 2 Enter the first four letters of your last name<br>H A L L | 3 Enter your social security number<br>552 : 98 : 8459 |
|---|---|---|

| 4 If a joint return, enter your spouse's social security number | 5 Enter your name(s)<br>GORDON L HALL<br>Enter your address<br>3546 EAST PRESIDIO CIRCLE<br>Enter your city, state, and ZIP code<br>MESA, ARIZONA, 85213 |
|---|---|

Cat. No. 20975C

Exhibit 1     ER 866

001-004



# AFFIDAVIT OF SERVICE

Maricopa county      )
Arizona state        ) affirmed and subscribed:
United States of America )

It is hereby affirm and certify, that on the date noted below, the undersigned mailed to:

    **T.W. LYONS**
    **1818 E SOUTHERN AVE, STE 15A**
    **MS: 5105 - MES**
    **MESA, AZ 85204**
    **(Registered Mail No. _____)**

hereinafter, "Recipient(s)," the documents and sundry papers regarding <u>**PAYMENT FOR TAX PERIOD 1996**</u>     as follows:

1. **MONEY ORDER, Number 2013000102**, for $868,397.60, dated 24 January 2013 [1 page];

2. **IRS FORM 1040-V, PAYMENT VOUCHER**, for tax year 1996 [1 page],

a total of _____ **Two (2)** _____ pages,

copies of which are affixed hereto, by Registered Mail, under the Registered Mail number(s) given above Return Receipt attached, by placing same in a postpaid envelope properly addressed to Recipient(s) at the said addresses and depositing same at an official depository under the exclusive face and custody of the United States Post Office.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____.

                                            _____

                                        AFFIANT

                                        **Brighton-Nicole Jorgensen**
                                        **℅ 10905 Yellowjacket Road, Flagstaff, Arizona**

## JURAT

State of Arizona       )
                       ) affirmed and subscribed
County of Maricopa    )

Subscribed and sworn to (or affirmed) before me on this _2 8th_ day of _____ **January** _____ , __ **2013** __ , by
___ **Brighton Nicole Jorgensen** ___ , proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

                                              _____
                                              (Signature of notarial officer)

                                        Title/Rank: **Notary Public**_____

                                        Printed Name: _____

                                          Commission expires: _____

**Exhibit 1**                              **ER 867**
                                                            001-005



002-001

Exhibit 2                    ER 868

| Drawer: | GORDON LEROY HALL<br>3546 E PRESIDIO CIRCLE<br>MESA, AZ 85213-9017 | **MONEY ORDER** | 2013000103 |
| | | Issue date: | **24 JANUARY 2013** |

**MONEY ORDER**

2013000103

Issue date: **24 JANUARY 2013**

Pay to the Order of: **UNITED STATES TREASURY**   $ **635,176.26**

Pay the Sum of: **Six-hundred Thirty-five Thousand One-hundred Seventy-six and 26/100 ------------ Dollars**

Drawee: Timothy Franz Geithner, Secretary of the Treasury
℅ U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

This Draft is an unconditional order by the Drawer for the Drawee to pay on demand to the Payee the fixed amount of money indicated herein. The place of payment is indicated as the address for the Drawee. This Draft is transferred for value as payment of the antecedent claim(s) indicated on the "For the Benefit of" line on this Draft. The Drawee is to ledger this Draft as a setoff of the debt(s), obligation(s), and liability(ies) of the antecedent claim(s) indicated herein by and through the Private Offset Account number 552988459. The Payee, as the party entitled to enforce this Draft, shall make presentment of this Draft to the Drawee at the place of payment indicated herein. Presentment, payment, and dishonor of this Draft shall be made in accordance with Article 3 of the Uniform Commercial Code.

For the Benefit of: GORDON L HALL 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; TAX PERIOD 12/31/1997

Signature of maker and accommodation party for the drawer

SECURITY LOCKS WILL DISAPPEAR WHEN COPIED OR WITH NORMAL BODY HEAT

⑆061000146⑆ 552988459⑈ 2013000103 ⑈0063517626⑈

## RECORD OF PAYMENT     MONEY ORDER: 2013000103

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 24 JANUARY 2013 | UNITED STATES TREASURY | $ 635,176.26 |

For: GORDON L HALL 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; TAX PERIOD 12/31/1997

Exhibit 2     ER 869


# 1997 Form 1040-V



**Department of the Treasury
Internal Revenue Service**

## What Is Form 1040-V and Do You Need To Use It?

It is a statement you send with your payment of any balance due on line 64 of your **1997 Form 1040.** Using Form 1040-V allows us to process your payment more accurately and efficiently. We strongly encourage you to use Form 1040-V, but there is no penalty if you do not do so.

## How To Fill In Form 1040-V

**Box 1.** Enter the amount of your payment.

**Box 2.** Enter the first four letters of your last name. See examples below.

| Name | Enter | Name | Enter |
|------|-------|------|-------|
| John Brown | BROW | Jean McCarthy | MCCA |
| Juan DeJesus | DEJE | Helen O'Neill | ONEI |
| Joan A. Lee | LEE | Pedro Torres-Lopez | TORR |

**Boxes 3 and 4.** Enter your social security number (SSN) in box 3. If you are filing a joint return, enter in box 3 the SSN shown first on your return and in box 4 the SSN shown second.

**Box 5.** Enter your name(s) and address as shown on your return.

## How To Prepare Your Payment

● Make your check or money order payable to the "Internal Revenue Service" (not "IRS"). **Do not** send cash.

● Make sure your name and address appear on your check or money order.

● Write "1997 Form 1040," your daytime phone number, and SSN on your check or money order. If you are filing a joint return, enter the SSN shown **first** on your return.

## How To Send In Your Return, Payment, and Form 1040-V

● Detach Form 1040-V along the dotted line.

● **DO NOT** attach your payment or Form 1040-V to your return or to each other. Instead, just put them loose in the envelope.

● If an envelope came with your tax package, please use it to mail your 1997 tax return, payment, and Form 1040-V.

● If you do not have that envelope or you moved or used a paid preparer, mail your tax return, payment, and Form 1040-V to the Internal Revenue Service at the address shown on the back that applies to you.

**Note:** *If you filed electronically, send your payment and Form 1040-V to the applicable address shown on the back.*

**Paperwork Reduction Act Notice.** We ask for the information on Form 1040-V to help us carry out the Internal Revenue laws of the United States. If you use Form 1040-V, you must provide the requested information. Your cooperation will help us ensure that we are collecting the right amount of tax.

You are not required to provide the information requested on a form that is subject to the Paperwork Reduction Act unless the form displays a valid OMB control number. Books or records relating to a form or its instructions must be retained as long as their contents may become material in the administration of any Internal Revenue law. Generally, tax returns and return information are confidential, as required by Internal Revenue Code section 6103.

The time needed to complete and mail Form 1040-V will vary depending on individual circumstances. The estimated average time is 13 minutes. If you have comments about the accuracy of this time estimate or suggestions for making Form 1040-V simpler, we would be happy to hear from you. See the Instructions for Form 1040.

Cat. No. 20975C

**▼ DETACH HERE AND MAIL WITH YOUR PAYMENT ▼**

Form **1040-V** (1997)

---

Form **1040-V**
Department of the Treasury
Internal Revenue Service (99)

## Payment Voucher

► Do not staple or attach this voucher to your payment.

OMB No. 1545-0074

**1997**

| 1 Enter the amount of the payment you are making | 2 Enter the first four letters of your last name | 3 Enter your social security number |
|---|---|---|
| ► $ 635,176.60 | H A L L | 552 : 98 : 8459 |

| 4 If a joint return, enter the SSN shown second on that return | 5 Enter your name(s) |
|---|---|
| | GORDON L HALL |
| | Enter your address |
| | 3546 EAST PRESIDIO CIRCLE |
| | Enter your city, state, and ZIP code |
| | MESA, ARIZONA, 85213 |

Cat. No. 20975C

**Exhibit 2**          **ER 871**
002-004



# AFFIDAVIT OF SERVICE

Maricopa county       )
Arizona state          ) affirmed and subscribed:
United States of America  )

It is hereby affirm and certify, that on the date noted below, the undersigned mailed to:

```
T.W. LYONS
1818 E SOUTHERN AVE, STE 15A
MS: 5105 - MES
MESA, AZ 85204
(Registered Mail No. _____)
```

hereinafter, "Recipient(s)," the documents and sundry papers regarding <u>PAYMENT FOR TAX PERIOD 1997</u> as follows:

1. **MONEY ORDER, Number 2013000103**, for $635,176.26, dated 24 January 2013 [1 page];

2. **IRS FORM 1040-V, PAYMENT VOUCHER**, for tax year 1997 [1 page],

a total of _____ **Two (2)** _____ pages,

copies of which are affixed hereto, by Registered Mail, under the Registered Mail number(s) given above Return Receipt attached, by placing same in a postpaid envelope properly addressed to Recipient(s) at the said addresses and depositing same at an official depository under the exclusive face and custody of the United States Post Office.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____.

 

AFFIANT

**Brighton-Nicole Jorgensen**
**℅ 10905 Yellowjacket Road, Flagstaff, Arizona**

# JURAT

State of Arizona       )
                   ) affirmed and subscribed
County of Maricopa  )

Subscribed and sworn to (or affirmed) before me on this _28th_ day of _____ **January** _____, ____ **2013** ____, by
_____ **Brighton Nicole Jorgensen** _____, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

 

_____
(Signature of notarial officer)

Title/Rank: **Notary Public** _____

Printed Name: _____

Commission expires: _____

---

**AFFIDAVIT OF SERVICE**                      **Page 1 of 1**

**Exhibit 2**           **ER 872**


# Internal Revenue Service
### United States Department of the Treasury

| This Product Contains Sensitive Taxpayer Data |
|---|

## Account Transcript

|  |  |
|---|---|
| Request Date: | 01-12-2015 |
| Response Date: | 01-12-2015 |
| Tracking Number: | 100224397406 |

FORM NUMBER:      1040A

TAX PERIOD:      Dec. 31, 1996

TAXPAYER IDENTIFICATION NUMBER:          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
SPOUSE TAXPAYER IDENTIFICATION NUMBER:   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

GORDON L HALL
2545 E LYNWOOD ST
MESA, AZ 85213-2380-459

--- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

| | | |
|---|---|---|
| ACCOUNT BALANCE: | 534,882.46 | |
| ACCRUED INTEREST: | 386,529.74 | AS OF: Jan. 19, 2015 |
| ACCRUED PENALTY: | 0.00 | AS OF: Jan. 19, 2015 |

ACCOUNT BALANCE PLUS ACCRUALS
(this is not a payoff amount):          921,412.20

** INFORMATION FROM THE RETURN OR AS ADJUSTED **

| | |
|---|---|
| EXEMPTIONS: | 01 |
| FILING STATUS: | Married Filing Separate |
| ADJUSTED GROSS INCOME: | 663,776.00 |
| TAXABLE INCOME: | 660,426.00 |
| TAX PER RETURN: | 0.00 |
| SE TAXABLE INCOME TAXPAYER: | 0.00 |
| SE TAXABLE INCOME SPOUSE: | 0.00 |
| TOTAL SELF EMPLOYMENT TAX: | 0.00 |

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)          Apr. 24, 2003
PROCESSING DATE                                                        Jun. 02, 2003

Account Transcript 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 1040A Dec. 31, 1996 HALL                    Page 2 of 3

| | TRANSACTIONS | | | |
|---|---|---|---|---|

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|---|---|---|---|---|
| 150 | Substitute tax return prepared by IRS | | 06-02-2003 | $0.00 |
| n/a | 29210-123-25441-3 | | | |
| 140 | Inquiry for non-filing of tax return | | 02-05-1998 | $0.00 |
| 596 | Tax return referred for review | | 11-19-1998 | $0.00 |
| 570 | Additional account action pending | | 06-02-2003 | $0.00 |
| 420 | Examination of tax return | | 05-22-2003 | $0.00 |
| 170 | Penalty for not pre-paying tax | 20041808 | 05-17-2004 | $13,254.66 |
| 160 | Penalty for filing tax return after the due date | 20041808 | 05-17-2004 | $56,031.52 |
| 300 | Additional tax assessed by examination | 20041808 | 05-17-2004 | $249,029.00 |
| n/a | 29247-514-00086-4 | | | |
| 421 | Closed examination of tax return | | 05-17-2004 | $0.00 |
| 336 | Interest charged for late payment | 20041808 | 05-17-2004 | $204,398.99 |
| 276 | Penalty for late payment of tax | 20041808 | 05-17-2004 | $62,257.25 |
| 971 | Collection due process Notice of Intent to Levy -- issued | | 07-28-2005 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 08-05-2005 | $0.00 |
| 971 | Collection due process Notice of Intent to Levy -- undeliverable | | 08-10-2005 | $0.00 |
| 530 | Balance due account currently not collectable | | 11-21-2005 | $0.00 |
| 583 | Lien released | | 08-30-2006 | $0.00 |
| 537 | Account currently considered collectable | | 10-16-2006 | $0.00 |
| 530 | Balance due account currently not collectable | | 01-24-2007 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 08-05-2005 | $0.00 |
| 971 | Notice issued CP 071A | | 11-03-2008 | $0.00 |
| 971 | Notice issued CP 071D | | 12-01-2008 | $0.00 |
| 537 | Account currently considered collectable | | 10-19-2009 | $0.00 |
| 971 | Notice issued CP 071D | | 12-06-2010 | $0.00 |
| 670 | Payment Levy | | 09-19-2011 | -$50,002.44 |
| 670 | Payment Levy | | 11-08-2011 | -$1.26 |
| 971 | Notice issued CP 071D | | 12-05-2011 | $0.00 |
| 670 | Payment Levy | | 12-02-2011 | -$85.26 |
| 971 | Notice issued CP 071D | | 12-03-2012 | $0.00 |

Exhibit 3                    ER 874          003-002

Account Transcript 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 1040A Dec. 31, 1996 HALL          Page 3 of 3

| 582 | Lien placed on assets due to balance owed | 12-21-2012 | $0.00 |
| 520 | Bankruptcy or other legal action filed | 09-12-2013 | $0.00 |
| 582 | Lien placed on assets due to balance owed | 09-20-2013 | $0.00 |
| 582 | Lien placed on assets due to balance owed | 09-20-2013 | $0.00 |
| 520 | Bankruptcy or other legal action filed | 11-13-2013 | $0.00 |
| 582 | Lien placed on assets due to balance owed | 12-27-2013 | $0.00 |

This Product Contains Sensitive Taxpayer Data

Account Transcript 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 1040A Dec. 31, 1997 HALL                    Page 1 of 3



# Internal Revenue Service
United States Department of the Treasury

```
┌────────────────────────────────────────────────────────────────┐
│        This Product Contains Sensitive Taxpayer Data            │
└────────────────────────────────────────────────────────────────┘
```

## Account Transcript

                                        Request Date:        01-12-2015
                                       Response Date:        01-12-2015
                                      Tracking Number:    100224397406

FORM NUMBER:      1040A

TAX PERIOD:       Dec. 31, 1997


TAXPAYER IDENTIFICATION NUMBER:          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
SPOUSE TAXPAYER IDENTIFICATION NUMBER:   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


GORDON L HALL
2545 E LYNWOOD ST
MESA, AZ 85213-2380-459


            --- ANY MINUS SIGN SHOWN BELOW SIGNIFIES A CREDIT AMOUNT ---

ACCOUNT BALANCE:                         388,664.48
ACCRUED INTEREST:                        285,321.07    AS OF: Jan. 19, 2015
ACCRUED PENALTY:                              0.00     AS OF: Jan. 19, 2015


ACCOUNT BALANCE PLUS ACCRUALS
(this is not a payoff amount):           673,985.55


            ** INFORMATION FROM THE RETURN OR AS ADJUSTED **


EXEMPTIONS:                                  01
FILING STATUS:                      Married Filing Separate
ADJUSTED GROSS INCOME:                   532,941.00
TAXABLE INCOME:                          529,491.00
TAX PER RETURN:                               0.00
SE TAXABLE INCOME TAXPAYER:                   0.00
SE TAXABLE INCOME SPOUSE:                     0.00
TOTAL SELF EMPLOYMENT TAX:                    0.00

RETURN DUE DATE OR RETURN RECEIVED DATE (WHICHEVER IS LATER)    Apr. 24, 2003
PROCESSING DATE                                                 Jun. 02, 2003

```

Account Transcript 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 1040A Dec. 31, 1997 HALL                    Page 2 of 3

```
┌──────────────────────────────────────────────────────────────────┐
│                          TRANSACTIONS                              │
└──────────────────────────────────────────────────────────────────┘
```

| CODE | EXPLANATION OF TRANSACTION | CYCLE | DATE | AMOUNT |
|------|----------------------------|-------|------|--------|
| 150 | Substitute tax return prepared by IRS | | 06-02-2003 | $0.00 |
| n/a | 29210-123-25501-3 | | | |
| 570 | Additional account action pending | | 06-02-2003 | $0.00 |
| 420 | Examination of tax return | | 05-22-2003 | $0.00 |
| 170 | Penalty for not pre-paying tax | 20041008 | 03-22-2004 | $10,530.74 |
| 160 | Penalty for filing tax return after the due date | 20041008 | 03-22-2004 | $44,287.65 |
| 300 | Additional tax assessed by examination | 20041008 | 03-22-2004 | $196,834.00 |
| n/a | 29247-461-00058-4 | | | |
| 421 | Closed examination of tax return | | 03-22-2004 | $0.00 |
| 336 | Interest charged for late payment | 20041008 | 03-22-2004 | $124,339.45 |
| 276 | Penalty for late payment of tax | 20041008 | 03-22-2004 | $49,208.50 |
| 971 | Collection due process Notice of Intent to Levy -- issued | | 07-28-2005 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 08-05-2005 | $0.00 |
| 971 | Collection due process Notice of Intent to Levy -- undeliverable | | 08-10-2005 | $0.00 |
| 530 | Balance due account currently not collectable | | 11-21-2005 | $0.00 |
| 583 | Lien released | | 08-30-2006 | $0.00 |
| 537 | Account currently considered collectable | | 10-16-2006 | $0.00 |
| 530 | Balance due account currently not collectable | | 01-24-2007 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 08-05-2005 | $0.00 |
| 971 | Notice issued CP 071A | | 11-03-2008 | $0.00 |
| 971 | Notice issued CP 071D | | 12-01-2008 | $0.00 |
| 537 | Account currently considered collectable | | 10-19-2009 | $0.00 |
| 971 | Notice issued CP 071D | | 12-06-2010 | $0.00 |
| 670 | Payment Levy | | 02-22-2011 | -$8,111.53 |
| 670 | Payment Levy | | 02-22-2011 | -$28,488.33 |
| 971 | Notice issued CP 071D | | 12-05-2011 | $0.00 |
| 971 | Notice issued CP 071D | | 12-03-2012 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 12-21-2012 | $0.00 |
| 360 | Fees and other expenses for collection | | 03-04-2013 | $16.00 |
| 520 | Bankruptcy or other legal action filed | | 09-12-2013 | $0.00 |
| 582 | Lien placed on assets due to balance owed | | 09-20-2013 | $0.00 |

Account Transcript 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 1040A Dec. 31, 1997 HALL                                    Page 3 of 3

| 582 | Lien placed on assets due to balance owed | 09-20-2013 | $0.00 |
| 360 | Fees and other expenses for collection | 10-21-2013 | $32.00 |
| 520 | Bankruptcy or other legal action filed | 11-13-2013 | $0.00 |
| 582 | Lien placed on assets due to balance owed | 12-27-2013 | $0.00 |
| 360 | Fees and other expenses for collection | 02-24-2014 | $16.00 |

This Product Contains Sensitive Taxpayer Data

Exhibit 4                                    ER 878

004-003



**Department of the Treasury**
**Internal Revenue Service**

IRS

**CERTIFIED MAIL**

Date:

Taxpayer Identification Number:

Form:

Person to Contact:

Contact Telephone Number:

Contact Fax Number:

Employee Identification Number:

Last Day to File a Petition With the
United States Tax Court:

Tax Year Ended:

Deficiency:
Increase in tax

Dear

**Why We Are Sending You This Letter**
We determined that you owe additional tax or other amounts, or both, for the tax year or years identified above. This letter is your NOTICE OF DEFICIENCY, as required by law. The enclosed Form 4549-A, *Income Tax Discrepancy Adjustments* or Form 5278, *Statement - Income Tax Changes,* shows how we figured the deficiency.

**If You Wish to Challenge This Determination**
If you want to challenge this determination in court before making any payment, you have 90 days from the date of this letter (150 days if this letter is addressed to you outside of the United States) to file a petition with the United States Tax Court to reconsider the deficiency.

**Information You Will Need**
If you have recently sought bankruptcy relief by filing a petition in bankruptcy court, see enclosed Notice 1421, *How Bankruptcy Affects Your Right to File a Petition in Tax Court in Response to a Notice of Deficiency.*

**Letter 531 (Rev. 8-2012)**
Catalog Number 40223L

**Exhibit 5**

**ER 879**005-001

You can get a copy of the rules for filing a petition and a petition form by writing to the following address:

United States Tax Court
400 Second Street, NW
Washington, DC 20217

- The Tax Court has a simplified procedure for small tax cases when the dispute for each tax year is $50,000 or less.

- If you use this simplified procedure, you cannot challenge the Tax Court's decision. You can get information on the simplified procedure for small cases from the Tax Court by writing to the court at the address above or from the court's internet site at www.ustaxcourt.gov.

- If you file a petition for multiple tax years and the dispute for any one or more of the tax years exceeds $50,000, this simplified procedure is not available to you.

**The Law Regarding Married Couples**
The law requires separate notices for husbands and wives. Both must sign and file the petition or each must file a separate, signed petition if this letter is addressed to both husband and wife, and both want to petition the Tax Court.

If only one spouse is in bankruptcy at the time this letter was issued or files a bankruptcy petition after the date of this letter, the bankruptcy automatic stay does not prohibit the spouse who is not in bankruptcy from filing a petition with Tax Court. The bankruptcy automatic stay of the spouse seeking bankruptcy relief does not extend the time for filing a petition in Tax Court for the spouse who is not in bankruptcy.

**How to File Your Petition Form**
Send the completed petition form, a copy of this letter, and copies of all statements and/or schedules you received with this letter to the Tax Court at the address above. If more than one tax year is shown above, you may file one petition form showing all of the years you are challenging.

You may represent yourself before the Tax Court, or you may be represented by anyone admitted to practice before the Tax Court.

**Time Limits on Filing a Petition**
The time you have to file a petition in the Tax Court is set by law.

1. The petition is considered timely filed if the postmark date falls within the prescribed 90 or 150 day period and the envelope containing the petition is properly addressed with the correct postage.

2. The Tax Court cannot consider your case if your Tax Court petition is filed late. IRS cannot grant an extension or allow a suspension of the prescribed deadline, even for reasonable cause. Thus, contacting the Internal Revenue Service (IRS) for more information, or receiving other correspondence from the IRS won't change the allowable period for filing a petition with the Tax Court.

**If You Agree with the Notice of Deficiency**
If you decide not to file a petition with the Tax Court, please sign the enclosed Form 4089-B, *Notice of Deficiency - Waiver,* and return it to us at the IRS address on the top of the first page of this letter. This will permit us to assess the deficiency quickly and can help limit the accumulation of interest.

**Letter 531 (Rev. 8-2012)**
Catalog Number 40223L

**Exhibit 5**          **ER 880** 005-002

**If We Don't Hear from You**
If you decide not to sign and return Form 4089-B, and you do not file a petition with the Tax Court within the time limit, the law requires us to assess and bill you for the deficiency after 90 days from the date of this letter (150 days if this letter is addressed to you outside the United States).

NOTE: If you are a C-corporation, section 6621(c) of the Internal Revenue Code requires that we charge an interest rate two percent higher than the normal rate on corporate underpayments in excess of $100,000.

**Information About the IRS Taxpayer Advocate Office**
The IRS office whose phone number appears at the top of the notice can best address and access your tax information and help get you answers. You may be eligible for help from the Taxpayer Advocate Service (TAS) if you have tried to resolve your tax problem through normal IRS channels and have gotten nowhere, or you believe an IRS procedure just isn't working as it should. TAS is your voice at the IRS. TAS helps taxpayers whose problems are causing financial difficulty or significant cost, including the cost of professional representation (this includes businesses as well as individuals). You can reach TAS by calling the TAS toll-free number at 1-877-777-4778 or by contacting the local Taxpayer Advocate office at:

To learn more about TAS and your basic tax responsibilities, visit www.TaxpayerAdvocate.irs.gov.

**How to Contact Us**
You may write or call the contact person whose name, telephone number, and IRS address are shown in the heading of this letter if you need further assistance. If you write, please include your telephone number, the best times if we need to call you and a copy of this letter to help us identify your account.

If you prefer to call and the telephone number is outside your local calling area, there may be a long distance charge to you.

Keep the original letter for your records.

Sincerely,

Commissioner
By

Enclosures:
Form 4549-A or Form 5278
Form 4089-B

**Letter 531 (Rev. 8-2012)**
Catalog Number 40223L

Exhibit 5                    ER 881 005-003



006-001

Exhibit 6        ER 882



006-002

Exhibit 6                    ER 883

| Form 668-A(ICS) (Rev. July 2002) | Department of the Treasury – Internal Revenue Service **Notice of Levy** |
|---|---|

DATE: **04/18/2011**

REPLY TO: **Internal Revenue Service**
**JENNIFER PARDUE**
**1818 E SOUTHERN AVE STE 15**
**MS: 5117 PARDUE**
**MESA, AZ 85204**

TO: **UNITED STATES DISTRICT COURT**
**DISTRICT COURT CLERKS OFFICE ARIZONA**
**SANDRA DAY O'CONNER U.S. COURTHOUSE**
**401 W. WASHINGTON ST. SUITE 130**
**PHOENIX, AZ 85003**

TELEPHONE NUMBER
OF IRS OFFICE: **(480)503-7285**

NAME AND ADDRESS OF TAXPAYER:
**GORDON L HALL**
**1408 W HEATHER AVE**
**GILBERT, AZ 85233-4125**

IDENTIFYING NUMBER(S):  ▮▮▮-8459

**Comments:** This levy attaches to the $50,000 cash bond. We expect disbursement of the bond to the IRS only when the court determines the bond is to be released.

| Kind of Tax | Tax Period Ended | Unpaid Balance of Assessment | Statutory Additions | Total |
|---|---|---|---|---|
| 1040 | 12/31/1996 | $584,971.42 | $286,649.96 | $871,621.38 |
| 1040 | 12/31/1997 | $388,600.48 | $212,761.40 | $601,361.88 |

| THIS LEVY WON'T ATTACH FUNDS IN IRAs, SELF-EMPLOYED INDIVIDUALS' RETIREMENT PLANS, OR ANY OTHER RETIREMENT PLANS IN YOUR POSSESSION OR CONTROL, UNLESS IT IS SIGNED IN THE BLOCK TO THE RIGHT. ===========================⇒ | Total Amount Due | $1,472,983.26 |
|---|---|---|

We figured the interest and late payment penalty to **05/18/2011**

Although we have told you to pay the amount you owe, it is still not paid. This is your copy of a notice of levy we have sent to collect this unpaid amount. We will send other levies if we don't get enough with this one.

**Banks, credit unions, savings and loans, and similar institutions described in section 408(n) of the Internal Revenue Code must hold your money for 21 calendar days** before sending it to us. They must include the interest you earn during that time. Anyone else we send a levy to must turn over your money, property, credits, etc. that they have *(or are already obligated for)* when they would have paid you.

If you decide to pay the amount you owe now, please **bring** a guaranteed payment *(cash, cashier's check, certified check, or money order)* to the nearest IRS office with this form, so we can tell the person who received this levy not to send us your money. Make checks and money orders payable to **United States Treasury.** If you mail your payment instead of bringing it to us, we may not have time to stop the person who received this levy from sending us your money.

If we have erroneously levied your bank account, we may reimburse you for the fees your bank charged you for handling the levy. You must file a claim with the IRS on Form 8546 within one year after the fees are charged.

If you have any questions, or want to arrange payment before other levies are issued, please call or write us. If you write to us, please include your telephone number and the best time to call.

| Signature of Service Representative **/S/ JENNIFER PARDUE** | Title **REVENUE OFFICER** |
|---|---|

**Part 4 –** For Taxpayer

Form **668-A(ICS)** (7-2002)

Exhibit 6 ER 884

**Excerpts from the Internal Revenue Code**
\* \* \* \* \* \* \* \* \* \* \* \*

**Sec. 6331. LEVY AND DISTRAINT.**

(b) Seizure and Sale of Property.—The term "levy" as used in this title includes the power of distraint and seizure by any means. Except as otherwise provided in subsection (e), a levy shall extend only to property possessed and obligations existing at the time thereof. In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible).

(c) Successive Seizures.—Whenever any property or right to property upon which levy has been made by virtue of subsection (a) is not sufficient to satisfy the claim of the United States for which levy is made, the Secretary may, thereafter, and as often as may be necessary, proceed to levy in like manner upon any other property liable to levy of the person against whom such claim exists, until the amount due from him, together with all expenses, is fully paid.

**Sec. 6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.**

(a) Requirement.—Except as otherwise provided in this section, any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights to property or discharge such obligation to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process.

(b) Special rule for Life Insurance and Endowment Contracts.

(1) In general.—A levy on an organization with respect to a life insurance or endowment contract issued by such organization shall, without necessity for the surrender of the contract document, constitute a demand by the Secretary for payment of the amount described in paragraph (2) and the exercise of the right of the person against whom the tax is assessed to the advance of such amount. Such organization shall pay over such amount 90 days after service of notice of levy. Such notice shall include a certification by the Secretary that a copy of such notice has been mailed to the person against whom the tax is assessed at his last known address.

(2) Satisfaction of levy.—Such levy shall be deemed to be satisfied if such organization pays over to the Secretary the amount which the person against whom the tax is assessed could have had advanced by such organization on the date prescribed in paragraph (1) for the satisfaction of such levy, increased by the amount of any advance (including contractual interest thereon) made to such person on or after the date such organization had actual notice or knowledge (within the meaning of section 6323(i)(1)) of the existence of the lien with respect to which such levy is made, other than an advance (including contractual interest thereon) made automatically to maintain such contract in force under an agreement entered into before such organization had such notice or knowledge.

(3) Enforcement proceedings.—The satisfaction of a levy under paragraph (2) shall be without prejudice to any civil action for the enforcement of any lien imposed by this title with respect to such contract.

(c) Special Rule for Banks.—Any bank (as defined in section 408(n)) shall surrender (subject to an attachment or execution under judicial process) any deposits (including interest thereon) in such bank only after 21 days after service of levy.

(d) Enforcement of Levy.

(1) Extent of personal liability.—Any person who fails or refuses to surrender any property or rights to property, subject to levy, upon demand by the Secretary, shall be liable in his own person and estate to the United States in a sum equal to the value of the property or rights not so surrendered, but not exceeding the amount of taxes for the collection of which such levy has been made, together with costs and interest on such sum at the underpayment rate established under section 6621 from the date of such levy (or, in the case of a levy described in section 6331 (d)(3), from the date such person would otherwise have been obligated to pay over such amounts to the taxpayer). Any amount (other than costs) recovered under this paragraph shall be credited against the tax liability for the collection of which such levy was made.

(2) Penalty for violation.—In addition to the personal liability imposed by paragraph (1), if any person required to surrender property or rights to property fails or refuses to surrender such property or rights to property without reasonable cause, such person shall be liable for a penalty equal to 50 percent of the amount recoverable under paragraph (1). No part of such penalty shall be credited against the tax liability for the collection of which such levy was made.

(e) Effect of honoring levy.—Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made who, upon demand by the Secretary, surrenders such property or rights to property (or discharges such obligation) to the Secretary (or who pays a liability under subsection (d)(1)), shall be discharged from any obligation or liability to the delinquent taxpayer and any other person with respect to such property or rights to property arising from such surrender or payment.

**Sec. 6333. PRODUCTION OF BOOKS.**

If a levy has been made or is about to be made on any property, or right to property, any person having custody or control of any books or records, containing evidence or statements relating to the property or right to property subject to levy, shall, upon demand of the Secretary, exhibit such books or records to the Secretary.

**Sec 6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY.**

(a) Release of Levy and Notice of Release.–

(1) In general.—Under regulations prescribed by the Secretary, the Secretary shall release the levy upon all, or part of, the property or rights to property levied upon and shall promptly notify the person upon whom such levy was made (if any) that such levy has been released if—

(A) the liability for which such levy was made is satisfied or becomes unenforceable by reason of lapse of time,

(B) release of such levy will facilitate the collection of such liability,

(C) the taxpayer has entered into an agreement under section 6159 to satisfy such liability by means of installment payments, unless such agreement provides otherwise,

(D) the Secretary has determined that such levy is creating an economic hardship due to the financial condition of the taxpayer, or

(E) the fair market value of the property exceeds such liability and release of the levy on a part of such property could be made without hindering the collection of such liability.

For purposes of subparagraph (C), the Secretary is not required to release such levy if such release would jeopardize the secured creditor status of the Secretary.

(2) Expedited determination on certain business property.—In the case of any tangible personal property essential in carrying on the trade or business of the taxpayer, the Secretary shall provide for an expedited determination under paragraph (1) if levy on such tangible personal property would prevent the taxpayer from carrying on such trade or business.

(3) Subsequent levy.—The release of levy on any property under paragraph (1) shall not prevent any subsequent levy on such property.

(b) Return of Property.—If the Secretary determines that property has been wrongfully levied upon, it shall be lawful for the Secretary to return—

(1) the specific property levied upon,

(2) an amount of money equal to the amount of money levied upon, or

(3) an amount of money equal to the amount of money received by the United States from a sale of such property.

Property may be returned at any time. An amount equal to the amount of money levied upon or received from such sale may be returned at any time before the expiration of 9 months from the date of such levy. For purposes of paragraph (3), if property is declared purchased by the United States at a sale pursuant to section 6335(e) (relating to manner and conditions of sale), the United States shall be treated as having received an amount of money equal to the minimum price determined pursuant to such section or (if larger) the amount received by the United States from the resale of such property.

(d) Return of Property in Certain Cases.—

If—

(1) any property has been levied upon, and

(2) the Secretary determines that—

(A) the levy on such property was premature or otherwise not in accordance with administrative procedures of the Secretary,

(B) the taxpayer has entered into an agreement under section 6159 to satisfy the tax liability for which the levy was imposed by means of installment payments, unless such agreement provides otherwise,

(C) the return of such property will facilitate the collection of the tax liability, or

(D) with the consent of the taxpayer or the National Taxpayer Advocate, the return of such property would be in the best interests of the taxpayer (as determined by the National Taxpayer Advocate) and the United States,

the provisions of subsection (b) shall apply in the same manner as if such property had been wrongfully levied upon, except that no interest shall be allowed under subsection (c).

\* \* \* \* \* \* \* \* \* \* \*

**Applicable Sections of Internal Revenue Code**

6321. LIEN FOR TAXES.
6322. PERIOD OF LIEN.
6325. RELEASE OF LIEN OR DISCHARGE OF PROPERTY.
6331. LEVY AND DISTRAINT.
6332. SURRENDER OF PROPERTY SUBJECT TO LEVY.
6333. PRODUCTION OF BOOKS.
6334. PROPERTY EXEMPT FROM LEVY.
6343. AUTHORITY TO RELEASE LEVY AND RETURN PROPERTY.
7426. CIVIL ACTIONS BY PERSONS OTHER THAN TAXPAYERS.
7429. REVIEW OF JEOPARDY LEVY OR ASSESSMENT PROCEDURES.

**For more information about this notice, please call the phone number on the front of this form.**

Form **668-A(ICS)** (1-2003)

Exhibit 6   ER 885

006-004



Internal Revenue Service
1818 E. Southern Avenue, Suite 15A
Mesa, AZ 85204-5230

Official Business
Penalty for Private Use, $300

5117 Pardue

85233⁵4125

neopost
$0.440
04/25/2011
Mailed From 85204

US OFFICIAL MAIL
$300 Penalty
For Private Use

US POSTAGE

Exhibit 6                    ER 886

006-005

Private Registered Security Interest No. PR11-002

## CERTIFICATE OF ADMINISTRATIVE JUDGMENT

Arizona Republic )
Maricopa county ) affirmed and subscribed:
Without the United States )

**PRESENTMENT**   Be it known, that, the person signing below, a duly empowered Notary, at the request

of ___Gordon LeRoy Hall___   In care of ___3546 East Presidio Circle, Mesa, Arizona, Non-domestic without the United States___ ;
          Claimant                                    Address

did duly present on ___July 26, 2011___ the attached ___CONSENT TO JUDGMENT___ dated ___July 25, 2011___ ;
                                            **NOTICE OF DEFAULT IN DISHONOR**

regarding ___Form 668-A(ICS) issued by Department of the Treasury – Internal Revenue Service regarding TAXPAYER: GORDON L HALL for "Notice of Levy"___ ;

to ___Internal Revenue Service, c/o Chief Financial Officer, 1111 Constitution Avenue NW, Washington, D.C. 20244-0002___
___
      Respondent___

signed by ___Gordon LeRoy Hall___ noticing ___NOTICE OF DEFAULT IN DISHONOR – CONSENT TO JUDGMENT___ ,
the time limit having elapsed for any timely response thereto.

**JUDGMENT:**   Whereupon, the Notary signing below, for the reason **default and dishonor by non-response/non-performance**, does publicly and solemnly certify the default and dishonor as against all parties it may concern by reason of non-response/non-performance thereof and **stipulations therein**.

**NOTICE:**   The undersigned Notary Public, certifies that on ___July 26, 2011___ Notice(s) of Administrative Judgment were sent to the parties noted below by depositing in an official depository under the exclusive face and custody of the United States Post Office a sealed envelope containing said Notices(s) directed to the respective person or entity at the last known corresponding address noted below:

| NAME | ADDRESS |
|---|---|
| Internal Revenue Service c/o Chief Financial Officer | 1111 Constitution Avenue NW, Washington, D.C. 20244-0002 |

**TESTIMONY**   I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Benton Hall_
Notary

Executed on: ___July 26, 2011___

Benton Hall
3546 East Presidio Circle
Mesa, Arizona
*Non-Domestic without the United States*

---

## CERTIFICATION OF DUE PRESENTMENT OF NOTICE UNDER NOTARY SEAL

Date of Presentment:         July 26, 2011

Notice Presented Under Seal:    **NOTICE OF DEFAULT IN DISHONOR – CONSENT TO JUDGMENT**

Notary's Certification:      The above-noted parties were presented notice under notary seal that certification of non-response/non-performance within ten (10) days of postmark would comprise their acceptance of the terms and conditions contained therein, the time having elapsed for response or performance thereof, which was dishonored.

**Exhibit 6**                              **ER 887**

# State of California

## Secretary of State

I, **Debra Bowen** , Secretary of State of the State of California, hereby certify:

That the attached transcript of 2  page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of

August 02, 2011

_Debra Bowen_

Secretary of State

FILE #        117279405723

**Exhibit 6**            **ER 888**

006-007

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

480-286-3340

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

GORDON L. HALL
3546 EAST PRESIDIO CIRCLE
MESA, AZ 85213
USA

DOCUMENT NUMBER: 29862680002
FILING NUMBER: 11-7279405723
FILING DATE: 08/02/2011 14:41
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| **1a. ORGANIZATION'S NAME** GORDON L. HALL | | | |
| **1b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **1c. MAILING ADDRESS** 3546 EAST PRESIDIO CIRCLE | **CITY** MESA | **STATE** AZ  **POSTAL CODE** 85213 | **COUNTRY** USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION LEGAL ENTITY | 1f. JURISDICTION OF ORGANIZATION USA | 1g. ORGANIZATIONAL ID#, if any ***-**-8459 ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | |
|---|---|---|---|
| **2a. ORGANIZATION'S NAME** | | | |
| **2b. INDIVIDUAL'S LAST NAME** | **FIRST NAME** | **MIDDLE NAME** | **SUFFIX** |
| **2c. MAILING ADDRESS** | **CITY** | **STATE**  **POSTAL CODE** | **COUNTRY** |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | |
|---|---|---|---|
| **3a. ORGANIZATION'S NAME** | | | |
| **3b. INDIVIDUAL'S LAST NAME** Hall | **FIRST NAME** Gordon | **MIDDLE NAME** LeRoy | **SUFFIX** |
| **3c. MAILING ADDRESS** c/o 3546 East Presidio Circle, Mesa, Arizona | **CITY** | **STATE**  **POSTAL CODE** | **COUNTRY** ZZZ |

4. This FINANCING STATEMENT covers the following collateral:

1. Certificate of Administrative Judgment dated July 26, 2011 between the above named BOX 1 Entity, GORDON L. HALL, "Accommodation
Creditor", pursuant to this Judgment and Chief Financial Officer, hereinafter "Respondent", of the Internal Revenue Service, Administrative Judgment Debtor in THE DEPARTMENT OF THE TREASURY, Internal Revenue Service, 1111 Constitution Avenue NW, Washington
D.C. 20244-002, instrument No. PR11-002;
2. Notice of lien hold interest in Private Administrative Case No. PR11-002 with the Chief Financial Officer of the Internal
Revenue Service, hereinafter "Respondent", and Gordon LeRoy Hall, hereinafter "Administrative Judgment Creditor";
3. Security agreement grants and conveys Specific Power of Attorney to the above named BOX 1 Entity, GORDON L. HALL, to go into
UNITED STATES DISTRICT COURT and enter a confession of Judgment for dismissal of the Tax Assessment for the years 12/31/1996 and
12/31/1998 issued for the TAXPAYER: GORDON L. HALL with prejudice on behalf of the Internal Revenue Service, Chief Financial Officer,

5. ALT DESIGNATION: ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]  [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA

FILING OFFICE COPY

Exhibit 6  ER 889  006-008

# UCC FINANCING STATEMENT ADDENDUM

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT**

| 9a. ORGANIZATION'S NAME | | |
|---|---|---|
| GORDON L. HALL | | |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|
| | | |

**10. MISCELLANEOUS:**

DOCUMENT NUMBER: 29862680002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 11d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any □ NONE |
|---|---|---|---|---|
| | | | | |

**12. □ ADDITIONAL SECURED PARTY'S or □ ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

**13.** This FINANCING STATEMENT covers □ timber to be cut or □ as-extracted collateral, or is filed as a □ fixture filing.

**14.** Description of real estate:

**16. Additional collateral description:**

Judgment Debtor of the Private Administrative Case No. PR11-002.

**15. Name and address of RECORD OWNER of above-described real estate (If Debtor does not have a record interest):**

**17. Check only if applicable and check only one box.**
Debtor is a ☑ Trust or □ Trustee acting with respect to property held in trust or □ Decedent's Estate

**18. Check only if applicable and check only one box.**
□ Debtor is a TRANSMITTING UTILITY
□ Filed in connection with a Manufactured-Home Transaction - effective 30 years
□ Filed in connection with a Public-Finance Transaction - effective 30 years

**FILING OFFICE COPY**

**Exhibit 6**

**ER 890**

## "EXHIBIT A"
## <u>RECORD OF PRESENTMENT</u>

**For: Completed Administrative Process between
Gordon LeRoy Hall, hereinafter "Undersigned",
and the
Chief Financial Officer, hereinafter "Respondent", of the
Internal Revenue Service
(1111 Constitution Avenue, NW, Washington, D.C. 20244-0002)**

**CONSISTING OF FORTY-TWO (42) LEAVES**

**Exhibit 6**        **ER 891**

006-010



**UNITED STATES POSTAL SERVICE®**

**Certificate Of Mailing**

This Certificate of Mailing provides evidence that mail was presented to USPS® for mailing. This form may be used for domestic and international mail.

From: Gordon LeRoy Hall
C/o Benton Hall, Notary Public
3546 East Presidio Circle
Mesa, Arizona

To: JENNIFER PARDUE REVENUE OFFICE
Internal Revenue Service
1818 E Southern Avenue, Suite
Mesa, AZ 85204-5230

PS Form **3817**, April 2007 PSN 7530-02-000-9065



**UNITED STATES POSTAL SERVICE®**

**Certificate Of Mailing**

This Certificate of Mailing provides evidence that mail was presented to USPS® for mailing. This form may be used for domestic and international mail.

From: Gordon LeRoy Hall
C/o Benton Hall, Notary Public
3546 East Presidio Circle
Mesa, Arizona

To: Internal Revenue Service
C/o Chief Financial Officer
1111 Constitution Avenue NorthWest
Washington D.C. 20244-0002

PS Form **3817**, April 2007 PSN 7530-02-000-9065

**Exhibit 6**                    **ER 892**

006-011

Case #PR11-002

Claimant:
> Gordon LeRoy Hall
> c/o Benton Hall, Notary Public
> 3546 East Presidio Circle
> Mesa, Arizona
> *Non-Domestic without U.S.*

### THIS IS A PRIVATE COMMUNICATION BETWEEN THE PARTIES
NOTICE TO AGENT IS NOTICE TO PRINCIPAL --- NOTICE TO PRINCIPAL IS NOTICE TO AGENT

# *NOTICE*

## NOTICE OF DEFAULT IN DISHONOR
## CONSENT TO JUDGMENT

July 25, 2011

Respondent:

> Internal Revenue Service
> c/o Chief Financial Officer
> 1111 Constitution Avenue NW
> Washington D.C. 20244-0002
> USPS "Certificate of Mailing" (PS Form 3817)

Re:  Form **668-A(ICS)** issued by Department of the Treasury – Internal Revenue Service regarding
TAXPAYER: **GORDON L HALL** for **"Notice of Levy"**.

**STATEMENT OF FACTS:**

1. On June 11, 2011, Gordon LeRoy Hall, hereinafter "Trustor", made presentment of a NOTICE TO
SETOFF ACCOUNTS, COUPON in the amount of FOUR MILLION FIVE HUNDRED THOUSAND AND
00/100 DOLLARS, **"Notice of Levy"** Form 668-A(ICS) issued by Department of the Treasury –
Internal Revenue Service regarding TAXPAYER: **GORDON L HALL** with bankers acceptance
indorsement, I.R.S.FORM 1040-V payment voucher, and a Private Registered Setoff Bond, hereinafter
"Tender", a record of which is available upon request, to IRS Technical Support Division, hereinafter
"Tender Agent", for the settlement of "Form 668-A(ICS)" issued by Department of the Treasury –
Internal Revenue Service, hereinafter **"Notice of Levy"**, sent via USPS Registered Mail, Article No. RE
261 087 054 US, by Julie K. Fields, Notary Public, hereinafter "Notary", as evidenced by the
"NOTARY'S CERTIFICATE OF SERVICE" dated June 11, 2011, a record of which is available upon
request.

2. On June 16, 2011, United States Postal Service, hereinafter "Carrier", delivered the Tender to the
Tender Agent.

3. On June 22, 2011 the Tender Agent accepted the Tender for the settlement of the **"Notice of Levy"**, as
evidenced by the "CERTIFICATE OF NON-RESPONSE" dated June 22, 2011, a record of which is
available upon request.

**Page 1 of 4**

Exhibit 6          ER 893

006-012

4. On June 29, 2011, Gordon LeRoy hall, hereinafter "Claimant", made presentment of a NOTICE OF TENDER FOR SETOFF and a REQUEST REGARDING A STATEMENT OF ACCOUNT, hereinafter "Presentment", to the Chief Financial Officer of Internal Revenue Service, hereinafter "Respondent", sent via USPS "Certificate of Mailing" (PS Form 3817), by the Notary, as evidenced by the "NOTARY'S CERTIFICATE OF SERVICE" dated June 29, 2011, a record of which is available upon request.

5. On June 29, 2011, the NOTICE OF TENDER FOR SETOFF and REQUEST REGARDING A STATEMENT OF ACCOUNT are deemed received pursuant to the *"Mailbox" Rule*.

6. As of July 14, 2011, Respondent has not sufficiently responded to the Presentment.

7. Respondent's failure to sufficiently respond or timely honor the Presentment, by the terms of the Presentment, constitutes Respondent's acceptance and approval of the REQUEST REGARDING A STATEMENT OF ACCOUNT contained therein.

8. Respondent's acceptance and approval of the REQUEST REGARDING A STATEMENT OF ACCOUNT constitutes Respondent's agreement to the stipulated aggregate amount of unpaid obligations being Zero ($0.00) and 00/100 dollars.

9. As of July 14, 2011 neither the Claimant nor the Notary, have received sufficient response to the Presentment, thereby placing the Respondent at fault, as evidenced by the "CERTIFICATE OF NON-RESPONSE" dated July 14, 2011, a record of which is available upon request.

10. On July 14, 2011 Claimant made presentment of a "NOTICE OF FAULT — OPPORTUNITY TO CURE" to the Respondent, dated July 14, 2011, hereinafter "Fault Notice", a record of which is available upon request, sent via USPS "Certificate of Mailing" (PS Form 3817), by the Notary, as evidenced by the "NOTARY'S CERTIFICATE OF SERVICE" dated July 14, 2011, a record of which is available upon request.

11. As of July 25, 2011 neither the Claimant nor the Notary, received sufficient response to the Presentment or the Fault Notice, from the Respondent, as evidenced by the "CERTIFICATE OF NON-RESPONSE" dated July 25, 2011, a record of which is attached hereto.

12. Respondent's failure to perform by the terms of the Presentment, constitutes Respondent's acceptance and approval of the granting and conveying of a Specific Power of Attorney to the Claimant to perform the duties of the Respondent stipulated therein.

13. Respondent's failure to perform by the terms of the Fault Notice, constitutes Respondent's acceptance and approval of the granting and conveying of a Specific Power of Attorney to the Claimant to perform the duties of the Respondent stipulated therein.

14. Respondent has defaulted.

15. As an operation of law, Respondent by dishonor of the Presentment and the Fault Notice has created a default.

**DEFAULT:**

For the Respondent's failure to honor the Presentment and Fault Notice places the Respondents in **default**. For the course of dealing, set forth herein, with the Respondent's failure, refusal, or neglect in the presentment of a verified response to the Presentment and Fault Notice, constitutes the Respondent's failure to perform in good faith and the Respondent's acquiescence and tacit agreement with all terms, conditions and stipulations set forth within this Notice of Default in Dishonor (Consent to Judgment), Presentment, and Fault Notice. Therefore this matter is deemed *res judicata* and *stare decisis*.

Of this presentment take due **Notice** and heed, and govern yourself accordingly. This **FINAL EXPRESSION IN A RECORD** is intended as a complete and exclusive statement of the terms of the agreement between the parties.

Exhibit 6                    ER 894

006-013

## Commercial Affidavit Oath and Verification

Arizona republic        )
                        ) sworn and subscribed:
Maricopa county    )

I, Gordon LeRoy Hall, Secured Party Creditor, under my unlimited liability and Commercial Oath, proceeding in good faith, being of sound mind, having first-hand knowledge, affirm, state, and declare that the facts contained herein are true, correct, complete and not misleading, under penalty of International Commercial Law, so help me, God, this twenty-sixth day of the Seventh month, in the year of our Lord, Two-thousand Eleven. In Witness Whereof, I have hereunto set my hand and seal.

Gordon LeRoy Hall, Authorized Representative
For the Accommodation Party & Secured Party
Creditor
ALL RIGHTS RESERVED

### JURAT

State of Arizona        )
                        ) sworn and subscribed:
Maricopa County    )

ON THIS 26th Day of July 2011, before me, the undersigned Notary Public, personally appeared Gordon LeRoy Hall and provided satisfactory evidence that he was that individual. In my presence he executed the foregoing instrument for the purposes stated therein and acknowledged that said execution was by his free act and deed.

Witness my hand and official seal I have set hereunto.

Benton Hall, Notary Public
3546 East Presidio Circle
Mesa, Arizona 85213

Cc:

JENNIFER PARDUE, REVENUE OFFICER
Internal Revenue Service
1818 E. Southern Avenue, Suite 15A
Mesa, Arizona 85204-5230
(480) 917-4025
USPS "Certificate of Mailing" (PS Form 3817)

Enclosure(s):

Page 3 of 4

**Exhibit 6**                    **ER 895**

006-014

(1) **NOTICE OF ADMINISTRATIVE JUDGMENT** dated July 26, 2011 (1 leaf);

(2) **CERTIFICATE OF NON–RESPONSE/NON-PERFORMANCE** dated July 25, 2011 (1 leaf);

(3) **USPS "Certificate of Mailing" (PS Form 3817)** (Original's on file) (1 leaf); and

(4) **NOTARY'S CERTIFICATE OF SERVICE** dated July 26, 2011 (Signed original on file) (2 leaves).

Case #PR11-002

## NOTICE OF ADMINISTRATIVE JUDGMENT

Arizona Republic            )
Maricopa county            ) affirmed and subscribed:
Without the United States )

**PRESENTMENT**   Be it known, that, the person signing below, a duly empowered Notary, at the request

of _____ Gordon LeRoy Hall _____ In care of _____ 3546 East Presidio Circle, Mesa, Arizona, *Non-domestic without the United States* _____ ;
            Claimant                                    Address

did duly present on _____ July 26, 2011 _____ the attached **NOTICE OF DEFAULT IN DISHONOR** _____ dated _____ July 25, 2011 _____ ;
                                            **CONSENT TO JUDGMENT**

regarding _____ Form 668-A(ICS) issued by Department of the Treasury – Internal Revenue Service regarding TAXPAYER: GORDON L HALL for "Notice of Levy" _____ ;

to _____ Internal Revenue Service, c/o Chief Financial Officer, 1111 Constitution Avenue NW, Washington, D.C. 20244-0002 _____
                                            Respondent

signed by _____ Gordon LeRoy Hall _____ noticing _____ **NOTICE OF DEFAULT IN DISHONOR – CONSENT TO JUDGMENT** _____ ,
the time limit having elapsed for any timely response thereto.

**JUDGMENT:**   Whereupon, the Notary signing below, for the reason default and dishonor by non-response/non-performance, does publicly and solemnly certify the default and dishonor as against all parties it may concern by reason of non-response/non-performance thereof and stipulations therein.

**NOTICE:**   The undersigned Notary Public, certifies that on _____ July 26, 2011 _____ Notices(s) of Administrative Judgment were sent to the parties noted below by depositing in an official depository under the exclusive face and custody of the United States Post Office a sealed envelope containing said Notices(s) directed to the respective person or entity at the last known corresponding address noted below:

| NAME | ADDRESS |
|------|---------|
| Internal Revenue Service c/o Chief Financial Officer | 1111 Constitution Avenue NW, Washington, D.C. 20244-0002 |

**TESTIMONY**   I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_Benton Hall_
Notary

Executed on: _____ July 26, 2011 _____

Benton Hall
3546 East Presidio Circle
Mesa, Arizona
*Non-Domestic without the United States*

---

### CERTIFICATION OF DUE PRESENTMENT OF NOTICE UNDER NOTARY SEAL

Date of Presentment:           July 26, 2011

Notice Presented Under Seal:   **NOTICE OF DEFAULT IN DISHONOR – CONSENT TO JUDGMENT**

Notary's Certification:        The above-noted parties were presented notice under notary seal that certification of non-response/non-performance within ten (10) days of postmark would comprise their acceptance of the terms and conditions contained therein, the time having elapsed for response or performance thereof, which was dishonored.

**Exhibit 6**                                        **ER 897**

006-016

Case #PR11-002

## CERTIFICATE OF NON-RESPONSE/NON-PERFORMANCE

Arizona Republic )
Maricopa county ) affirm and subscribed:
Without the United States )

PRESENTMENT Be it known, that, the person signing below, a duly empowered Notary Public, at the request

of Gordon LeRoy Hall In care of 3546 East Presidio Circle, Mesa, Arizona, Non-domestic without the United States ;
 Claimant Address

did duly present on July 14, 2011 the NOTICE OF FAULT -- OPPORTUNITY TO CURE dated July 14, 2011

to Internal Revenue Service, c/o Chief Financial Officer
 1111 Constitution Avenue North West, Washington D.C. 20244-0002
 Respondent

signed by Gordon LeRoy Hall, requesting recipient approve or correct a statement what the debtor believes to be the aggregate amount of unpaid obligations belonging to GORDON LEROY HALL, the time limit having elapsed for a timely response thereto.

DEFAULT: Whereupon, the Notary signing below, for the reason dishonor by non-response/non-performance, does publicly and solemnly certify the dishonor as against all parties it may concern by reason of non-response/non-performance thereof and stipulations therein.

NOTICE: The undersigned Notary, certifies that as of July 14, 2011 NOTICE OF FAULT -- OPPORTUNITY TO CURE were sent to the parties noted below by depositing in an official depository under the exclusive face and custody of the United States Post Office a sealed envelope containing said Notices(s) directed to the respective person or entity at the last known corresponding address noted below:

| NAME | ADDRESS |
|---|---|
| Internal Revenue Service c/o Chief Financial Officer | 1111 Constitution Avenue North West, Washington D.C. 20244-0002 |

TESTIMONY I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

 _Benton Hall_
 Notary

 Executed on: July 25, 2011

 **Benton Hall**
 **3546 East Presidio Circle**
 **Mesa, Arizona**
 *Non-domestic without the United States*

---

### CERTIFICATION OF DUE PRESENTMENT OF NOTICE UNDER NOTARY SEAL

| | |
|---|---|
| Date of Presentment: | June 29, 2011 |
| Notice Presented Under Seal: | NOTICE OF FAULT -- OPPORTUNITY TO CURE |
| Notary's Certification: | The above-noted parties were presented notice under notary seal that certification of non-response/non-performance within ten (10) days of postmark would comprise their acceptance of the terms and conditions contained therein, the time having elapsed for response or performance thereof, which was dishonored. |

Exhibit 6 ER 898

006-017





**U.S. POSTAL SERVICE — CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT PROVIDE FOR INSURANCE—POSTMASTER

Received From:
Gordon LeRoy Hall
c/o Julie K Fields
P.O. Box 1025
Gilbert, Arizona 85299

One piece of ordinary mail addressed to:
INTERNAL REVENUE SERVICE
C/o Chief Financial Officer
1111 Constitution Avenue NW
Washington, D.C. 20244-0002

PS Form 3817, January 2001

$1.15



**U.S. POSTAL SERVICE — CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT PROVIDE FOR INSURANCE—POSTMASTER

Received From:
Gordon LeRoy Hall
c/o Julie K Fields
P.O. Box 1025
Gilbert, Arizona 85299

One piece of ordinary mail addressed to:
Internal Revenue Service
1818 E. Southern Avenue, Suite 1
MS: 5117 Pardue
Mesa, Arizona 85204-5230

PS Form 3817, January 2001

$1.15



**U.S. POSTAL SERVICE — CERTIFICATE OF MAILING**

MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL, DOES NOT PROVIDE FOR INSURANCE—POSTMASTER

Received From:
Julie k. Fields, Notary Public
P.O. Box 1025
Gilbert, Arizona

One piece of ordinary mail addressed to:
JENNIFER PARDUE, REVENUE OF
Internal Revenue Service
1818 E. Southern Ave., Suite 1
Mesa, Arizona 85204-5230

PS Form 3817, January 2001

$1.15

Exhibit 6          ER 899          006-018

Case #PR11-002

# NOTARY'S CERTIFICATE OF SERVICE

It is hereby certified that on the date noted below, the undersigned Notary Public mailed to:

Internal Revenue Service
c/o Chief Financial Officer
1111 Constitution Avenue NW
Washington D.C. 20244-0002
**USPS "Certificate of Mailing" (PS Form 3817)**

Cc:

JENNIFER PARDUE, REVENUE OFFICER
Internal Revenue Service
1818 E. Southern Avenue, Suite 15A
Mesa, Arizona 85204-5230
(480) 917-4025
**USPS "Certificate of Mailing" (PS Form 3817)**

hereinafter, "Recipients," the documents and sundry papers pertaining to Form **668-A(ICS)** issued by Department of the Treasury – Internal Revenue Service regarding TAXPAYER: **GORDON L HALL** for **"Notice of Levy"** as follows.

(1) *NOTICE*: **NOTICE OF DEFAULT IN DISHONOR – CONSENT TO JUDGMENT** (4 leaves);

(2) **NOTICE OF ADMINISTRATIVE JUDGMENT** dated July 26, 2011 (1 leaf);

(3) **CERTIFICATE OF NON-RESPONSE/NON-PERFORMANCE** dated July 25, 2011 (1 leaf);

(4) USPS **"Certificate of Mailing" (PS Form 3817)** (Original's on file) (1 leaf); and

(5) Reference copy of this **NOTARY'S CERTIFICATE OF SERVICE** dated July 26, 2011 (signed original on file) (2 leaves).

These mailings contained a total of nine (9) leaves each. They were sent via the United States Postal Service under the control, direction, and instruction of the USPS "Certificate of Mailing" (PS Form 3817) referenced above. The aforesaid mailings were placed in postpaid envelopes properly addressed to the Recipients. They were deposited at an official depository under the exclusive face and custody of the United States Postal Service within the State of Arizona.

July 26, 2011

DATE

*Gordon Hall*

NOTARY PUBLIC

NOTARY'S CERTIFICATE OF SERVICE

Page 1 of 2

Exhibit 6 ——————— ER 900

006-019

Benton Hall, Notary Public

3546 East Presidio Circle

Mesa, Arizona 85213

**LEGAL NOTICE** The Certifying Notary is an independent contractor and not a party to this claim. In fact the Certifying Notary is a Federal Witness Pursuant to TITLE 18, PART I, CHAPTER 73, SEC. 1512. *Tampering with a witness, victim, or an informant.* The Certifying Notary also performs the functions of a quasi-Postal Inspector under the Homeland Security Act by being compelled to report any violations of the U.S. Postal regulations as an Officer of the Executive Department. Intimidating a Notary Public under Color of Law is a violation of Title 18, U.S. Code, Section 242, titled "Deprivation of Rights Under Color of Law," which primarily governs police misconduct investigations. This Statute makes it a crime for any person acting under the Color of Law to willfully deprive any individual residing in the United States and/or United States of America those rights protected by the Constitution and U.S. laws.

**NOTARY'S CERTIFICATE OF SERVICE**

Page 2 of 2

Exhibit 6      ER 901

006-020

# PRIVATELY REGISTERED SETOFF BOND

**BOND NUMBER**
GH20110602

## $4,500,000.00

**REGISTERED**
CALIFORNIA SECRETARY OF STATE
UCC DOCUMENT NO.: 2915220002
UCC FILING NO.: 11-7271659605

Pay to the Order of: **UNITED STATES TREASURY ("PAYEE")**
1500 Pennsylvania Avenue N.W.
Washington, D.C. 20220

Issue Date: **June 2, 2011**

Maturity Date: **June 2, 2041**

For Further Credit to: Department of the Treasury — Internal Revenue Service on behalf of TAXPAYER, GORDON L. HALL
By/On/Through: Gordon LeRoy Hall, Surety ("Creditor")
Private Offset Account No. 552988459

**WHEREAS** only fiat money exists in circulation for the discharge of debts, and

**WHEREAS** this instrument is intended to constitute a Privately Registered Setoff Bond,

**BE IT KNOWN THAT:**

This Privately Registered Setoff Bond is tendered in good faith as full satisfaction of any and all claims and/or demands;

The undersigned Creditor, being of sound mind and having only honorable intentions, issues this Privately Registered Setoff Bond for the purposes of protecting secured interests, reserving rights of recourse, remedy, and subrogation, and to maintain the honor of the above-named account holders and accounts;

The undersigned Creditor, in his rightful *Sui Juris* status, does hereby knowingly and with full disclosure hold, bind, and obligate the collateral of the Creditor;

This instrument is intended to insure, underwrite, indemnify, and discharge the above-noted account holders and accounts against any and all pre-existing current and future losses, costs, debts, taxes, encumbrances, deficits, deficiencies, liens, judgments, true bills, obligations of contract and/or performance, defaults, charges, and any and all other obligations as may exist or come to exist during the term of this bond;

By this instrument the undersigned Creditor is voluntarily acting as surety for all of the above-noted account holders and accounts, each severally and jointly, for any amount up to and including Four Million Five Hundred Thousand United States Dollars ($4,500,000.00) thereby honorably discharging and vacating dollar-for-dollar all obligations listed above until the sum or the term of this Privately Registered Setoff Bond is exhausted.

SATISFACTION OF LIABILITIES. The PAYEE may demand payment of all or any portion hereof at its discretion by posting the payment to the Private Offset Account above-indicated dollar-for-dollar and transferring the obligation by TT&L or presentment to:

Timothy F. Geithner ("Secretary")
Secretary of the Treasury
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

PRIVATE OFFSET ACCOUNT. The PAYEE shall by the end of business on the day of presentment, but in no case later than one business day thereafter, post the full or partial value of this bond to satisfy, set-off, pay, terminate, and discharge dollar-for-dollar in accord with generally accepted accounting principles any and all past, present, and/or future debts, liabilities, encumbrances, deficiencies, deficits, liens, charges, fees, interest, bills, true bills, taxes, obligations of contract and/or performance, instruments of debt, and all other obligations (jointly and severally) attributed to the account holders and accounts above-noted.

AMOUNT DUE.                    PAYEE enter the amount due below

$ ☐☐☐☐☐☐☐☐☐.☐☐

MATURITY. Upon demand, the Secretary shall release the obligation dollar-for-dollar to the extent so paid, with the balance of the bond remaining in full force and effect. Upon satisfaction of this obligation in full, the Secretary shall mark this bond cancelled and return it bearing the marks of cancellation to the Principal or the Principal's heirs by registered mail. All profits and proceeds accruing since presentment to remain with the Secretary for the benefit and use of the United States Department of the Treasury.

*IN WITNESS WHEREOF, the Signatory to this bond does hereby affix his respective hand and seal on this Second day of the Sixth month in the year of our Lord Two Thousand and Eleven.*

By: _____ (seal)
Gordon LeRoy Hall, Surety/Underwriter
Exemption ID # 552988459
Non-domestic mail
in care of: 3546 East Presidio Circle
Mesa, Arizona

**Exhibit 6**          **ER 902**
006-021

# State of California

## Secretary of State

I, **Debra Bowen** , Secretary of State of the State of California, hereby certify:

That the attached transcript of 2  page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF**, I execute this certificate and affix the Great Seal of the State of California this day of

June 02, 2011

*Debra Bowen*

Secretary of State

FILE #      117271659605

Exhibit 6                    ER 903
006-022

# UCC FINANCING STATEMENT

**FOLLOW INSTRUCTIONS (front and back) CAREFULLY**

**A. NAME & PHONE OF CONTACT AT FILER [optional]**

480-286-3340

**B. SEND ACKNOWLEDGMENT TO: (Name and Address)**

GORDON L. HALL
3546 EAST PRESIDIO CIRCLE
MESA, AZ 85213
USA

DOCUMENT NUMBER: 29152200002
FILING NUMBER: 11-7271659605
FILING DATE: 06/02/2011 08:54
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

**1a. ORGANIZATION'S NAME**
GORDON L. HALL

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3546 EAST PRESIDIO CIRCLE | MESA | AZ | 85213 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | LEGAL ENTITY | USA | ***-**-8459 ☐ NONE |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names**

**2a. ORGANIZATION'S NAME**

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L DEBTOR INFO | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID#, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

**3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)**

**3a. ORGANIZATION'S NAME**

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| Hall | Gordon | LeRoy | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| c/o 3546 East Presidio Circle, Mesa, Arizona | | | | ZZZ |

**4. This FINANCING STATEMENT covers the following collateral:**

PRIVATE REGISTERED SETOFF BOND No. GH20110602

Value of Collateral: Four-Million Five-Hundred Thousand and 00/100 Dollars — USD $4,500,000.00

**5. ALT DESIGNATION:** ☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR ☐ SELLER/BUYER ☐ AG. LIEN ☐ NON-UCC FILING

| ☐ 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] ☐ All Debtors ☐ Debtor 1 ☐ Debtor 2 |
|---|---|

**8. OPTIONAL FILER REFERENCE DATA**

PRIVATE REGISTERED SETOFF BOND No. GH20110602

FILING OFFICE COPY

**Exhibit 6**

**ER 904**

006-023

UC FINANCING STATEMENT ADDENDUM

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

**9a. ORGANIZATION'S NAME**

GORDON L. HALL

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME, SUFFIX |
|---|---|---|
| | | |

MISCELLANEOUS:

DOCUMENT NUMBER: 29152200002
IMAGE GENERATED ELECTRONICALLY FOR WEB FILING
THE ABOVE SPACE IS FOR CA FILING OFFICE USE ONLY

**11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names**

| 11a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE / COUNTRY |
| 11d. SEE INSTRUCTIONS / ADD'L DEBTOR INFO | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID#, if any / NONE |

**12. ADDITIONAL SECURED PARTY'S or ASSIGNOR S/P'S NAME - insert only one name (12a or 12b)**

| 12a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE / COUNTRY |

**13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral, or is filed as a ☐ fixture filing.**

**14. Description of real estate:**

**16. Additional collateral description:**

**15. Name and address of RECORD OWNER of above-described real estate**
(if Debtor does not have a record interest):

**17. Check only if applicable and check only one box.**
Debtor is a ☒ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

**18. Check only if applicable and check only one box.**
☐ Debtor is a TRANSMITTING UTILITY
☐ Filed in connection with a Manufactured-Home Transaction - effective 30 years
☐ Filed in connection with a Public-Finance Transaction - effective 30 years

FILING OFFICE COPY

Exhibit 6

ER 905

# State of California

## Secretary of State

I, **Debra Bowen** , Secretary of State of the State of California, hereby certify:

That the attached transcript of 2  page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



**IN WITNESS WHEREOF,** I execute this certificate and affix the Great Seal of the State of California this day of

June 02, 2011

_Debra Bowen_

Secretary of State

FILE #          1172716646

Exhibit 6

ER 906