**C.A. No. 15-10322**

D. Ct. No. CR-14-00184-PHX-NVW

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GORDON LEROY HALL,

Defendant-Appellant.

———————

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF ARIZONA

-------------------------------------------------------------

**BRIEF OF APPELLEE**

-------------------------------------------------------------

JOHN S. LEONARDO
United States Attorney
District of Arizona

KRISSA M. LANHAM
Deputy Appellate Chief

MONICA EDELSTEIN
Assistant U.S. Attorney
Two Renaissance Square
40 N. Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone: (602) 514-7500
Attorneys for Appellee

Date Submitted via ECF:  August 4, 2016

# I.  TABLE OF CONTENTS

Page

I.      Table of Contents.................................................................. i

II.     Table of Authorities ............................................................. ii

III.    Statement of Jurisdiction

    A.      District Court Jurisdiction ....................................................1

    B.      Appellate Court Jurisdiction...................................................1

    C.      Timeliness of Appeal............................................................1

    D.      Bail Status........................................................................1

IV.     Issues Presented ....................................................................2

V.      Statement of The Case

    A.      Nature of the Case; Course of Proceedings...........................3

    B.      Statement of Facts ............................................................3

VI.     Summary of Arguments...........................................................13

VII.    Arguments

    A.      The Government Presented Overwhelming Evidence at Trial to Support the Jury's Determination that the Defendant Is Guilty of Violating the Fictitious Financial Instrument Statute ........................14

    B.      The District Court Properly Determined That the Defendant Was Competent to Stand Trial Without the Need for an Evidentiary Hearing .......................................................................23

    C.      The District Court Did Not Plainly Err When It Imposed Standard Conditions 11, 6, and 5 of Supervised Release or A Special Condition Prohibiting Major Financial Purchases ................30

VIII.   Conclusion .........................................................................38

IX.     Statement of Related Cases ....................................................39

X.      Certificate of Compliance ......................................................40

XI.     Certificate of Service ...........................................................41

i

## II. TABLE OF AUTHORITIES

**CASES**

*Mendez v. Knowles*, 556 F.3d 757 (9th Cir. 2009) ......................... 23-24, 26, 29-30

*Robidoux v. O'Brien*, 643 F.3d 334 (1st Cir. 2011) ............................... 26

*United States v. Anzaldi*, 800 F.3d 872 (7th Cir. 2015) ........................ 25

*United States v. Aubrey*, 800 F.3d 1115 (9th Cir. 2015) ....................... 14

*United States v. Bee*, 162 F.3d 1232 (9th Cir. 1998) ........................... 32

*United States v. Bitao*, 266 F. App'x. 536 (9th Cir. 2008) .................... 21

*United States v. Blinkinsop*, 606 F.3d 1110 (9th Cir. 2010) ................. 35

*United States v. Bolinger*, 940 F.2d 478 (9th Cir. 1991) ...................... 34

*United States v. Brown*, 669 F.3d 10 (1st Cir. 2012) ........................... 26

*United States v. Downs*, 123 F.3d 637 (7th Cir. 1997) ......................... 30

*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011) ...................... 23

*United States v. Garza*, 751 F.3d 1130 (9th Cir. 2014) ....................... 25-26, 29-30

*United States v. Howick*, 263 F.3d 1056 (9th Cir. 2001) ...................... 16-17, 20

*United States v. James*, 328 F.3d 953 (7th Cir. 2003) .......................... 25

*United States v. Johnson*, 998 F.2d 696 (9th Cir. 1993) ....................... 36

*United States v. Katakis*, 800 F.3d 1017 (9th Cir. 2015) ...................... 22

*United States v. Landers*, 564 F.3d 1217 (10th Cir. 2009) .................... 25

*United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007) ................. 17-18

*United States v. Murphy*, 2016 WL 3201582, \*5
  (9th Cir. June 9, 2016) ................................................................. 14, 18

*United States v. Napier*, 463 F.3d 1040 (9th Cir. 2006) ....................... 34

*United States v. Neal*, 776 F.3d 645 (9th Cir. 2015) ............................ 24

*United States v. Nickels*, 324 F.3d 1250 (11th Cir. 2003) .................... 30

*United States v. Ross*, 476 F.3d 719 (9th Cir. 2007) ........................... 32

*United States v. Salman*, 531 F.3d 1007 (9th Cir. 2008) ..................... 15-16, 21

*United States v. Santiago*, 466 F.3d 801 (9th Cir. 2006) ...................... 31

*United States v. Siu Kuen Ma*, 290 F.3d 1002 (9th Cir. 2002) ............. 31

*United States v. Stoterau*, 524 F.3d 988 (9th Cir. 2008) ..................... 31

*United States v. T.M.*, 330 F.3d 1235 (9th Cir. 2003) ............................... 32-33, 37

*United States v. Torres-Aguilar*, 352 F.3d 934 (5th Cir. 2003) ............................ 34

*United States v. Turner*, 985 F. Supp. 2d 1311 (M.D. Ala. 2013) ........................ 19

*United States v. Washington*, 584 F. App'x 846 (9th Cir. 2014) .......................... 37

*United States v. Watson*, 582 F.3d 974 (9th Cir. 2009) ................................. 30-33

*United States v. White*, 670 F.3d 1077 (9th Cir. 2012) .......................................... 26

*United States v. Wise*, 391 F.3d 1027 (9th Cir. 2004) .......................................... 33

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012) ........................... 33, 35

*United States v. Zalapa*, 509 F.3d 1060 (9th Cir. 2007) ....................................... 36

## STATUTES

18 U.S.C. § 2 ........................................................................................................ 3

18 U.S.C. § 514 ........................................................................................ 14-19, 21

18 U.S.C. § 514(a)(1) ........................................................................................... 3

18 U.S.C. § 514(a)(2) ........................................................................................... 3

18 U.S.C. § 3231 .................................................................................................. 1

18 U.S.C. § 3553(a) ............................................................................................ 32

18 U.S.C. § 3583(d)(1) ........................................................................................ 32

18 U.S.C. § 4241 .................................................................................................. 9

18 U.S.C. § 921(g)(1) ........................................................................................... 3

18 U.S.C. § 924(a)(2) ........................................................................................... 3

28 U.S.C. § 1291 .................................................................................................. 1

## RULES

Fed. R. App. P. 4(b) ............................................................................................ 1

Ninth Circuit Rule 30-1.10 .................................................................................. 1

## MISCELLANEOUS

U.S. Sentencing Guidelines Manual § 1B1.11 ................................................... 34

U.S. Sentencing Guidelines Manual § 5B1.3 .................................................... 33

U.S. Sentencing Guidelines Manual § 5D1.2  ........................................................ 33

U.S. Sentencing Guidelines Manual § 5D1.3(a) .................................................... 34

U.S. Sentencing Guidelines Manual § 5D1.3(c) .................................................... 34

# III. STATEMENT OF JURISDICTION

## A. District Court Jurisdiction

The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231 because the defendant/appellant, Gordon Leroy Hall ("the defendant"), was charged with a federal crime. (CR 3; ER 7-10.)[1]

## B. Appellate Court Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 based on the entry of the final judgment by the district court on June 17, 2015. (CR 154; ER 1088-91.)

## C. Timeliness of Appeal

Following the entry of the final judgment on June 17, 2015, the defendant filed a notice of appeal on June 17, 2015. (CR 156; ER 1099.) The notice was timely pursuant to Fed. R. App. P. 4(b).

## D. Bail Status

The defendant is currently in custody, serving his sentence, and is expected to be released on March 27, 2033, according to the Bureau of Prisons.

---

[1] "CR" refers to the Clerk's Record, followed by the document number(s). "RT" refers to the Reporter's Transcript, followed by a date and page number(s). "ER" refers to the Excerpts of Record, followed by the page number(s). References to the PSR are followed by the appropriate paragraph numbers. Pursuant to Ninth Circuit Rule 30-1.10, the government will file a pdf version Under Seal via the Ninth Circuit Appellate ECF system.

1

## IV.  <u>ISSUES PRESENTED</u>

A.      Whether the district court erred in denying a Motion for Acquittal when there was substantial evidence upon which the jury could find the defendant guilty of violating the fictitious financial instrument statute.

B.      Whether the district court unreasonably declined to conduct a competency hearing despite evidence that the defendant subscribed to sovereign citizen ideology, his behavior was voluntary, and he was previously found to be medically competent.

C.      Whether the district court clearly erred when it imposed, without objection, standard conditions of supervised release and a special condition of supervised release prohibiting major financial purchases.

## V.  <u>STATEMENT OF THE CASE</u>

A.    <u>Nature of the Case; Course of Proceedings</u>

On February 4, 2014, a federal grand jury indicted the defendant on four counts of Making and Using Fictitious Instruments in violation of Title 18, United States Code, Sections 514(a)(1), (a)(2), and Aiding and Abetting the same in violation of Title 18, United States Code, Section 2.[2]  The defendant was tried by a jury and found guilty of counts one through four.  (CR 103.)  On June 16, 2015, the district court sentenced the defendant, as to each count, to concurrent terms of 96 months' incarceration with the sentence to run consecutive to the sentence of incarceration in U.S. District Court, District of South Carolina, case no. 13-CR-00170-JMC.  The district court further ordered that the defendant be placed on supervised release following incarceration for a term of five years.  (CR 154; ER 1088-91.)

B.    <u>Statement of Facts</u>

1.    <u>The Defendant's Participation with The Sovereign Citizen Movement and Criminal History</u>

The defendant, Gordon Hall, is best described as a "financial predator…not just occasionally, but for decades."  (RT 6/16/2015 27-28; ER 1061-1062.)  While

_____

[2] The defendant was also charged with one count of Felon in Possession of a Firearm in violation of Title 18, United States Code, Sections 921(g)(1) and 924(a)(2). (CR 3.)  This count was severed on the first day of trial and the district court later dismissed the count without prejudice on the government's motion.  (CR 94, 105.)

the defendant "politely" declined to participate in the preparation of the PSR, his criminal history and involvement with the sovereign citizen movement and its ideology are well documented. (PSR ¶ 32-34, 40-41, 53.)

The defendant's decades-long immersion with financial crime began in the late 90's when he was convicted of racketeering and related charges in the Southern District of New York for the stock manipulation of Health Tech International stock, a national company owned and operated by the defendant. (PSR ¶ 32.) The defendant was also charged with and ultimately convicted of, investor fraud in New York in the late 90's. (PSR ¶ 33.) The defendant was released from prison for these two crimes in 2009. (PSR ¶ 32-33.) In 2013, the defendant was charged with a wire fraud conspiracy in the District of South Carolina for assisting an individual to hide the proceeds of a Ponzi scheme. (PSR ¶ 34.) The defendant pled no contest to that charge and was incarcerated in that case at the time the indictment was returned in the present case. (RT 1/7/13 7-9; ER 155-57.)

Although it is not clear precisely when the defendant began subscribing to the ideology of the sovereign citizen movement, it is undisputed that following his release from prison in 2009, the defendant returned to Arizona and was self-employed as an "entrepreneur" teaching seminars, making and producing talk shows, and operating a business promoting sovereign citizen teachings and methodologies. (RT 1/21/15 393, 405; ER 405, 494; PSR ¶ 53.)

4

The Sovereign Citizen Movement subscribes to a number of anti-establishment theories with various iterations including the idea that all of society, including the relationship between an individual and the government, is based on contract law or governed by the Uniform Commercial Code. (PSR ¶ 4.) Common ideology includes the "redemption theory," an idea premised on the notion that every citizen has a secret bank account tied to their social security number that is maintained by the government and that the individual has the right to access. (RT 1/21/15 382-83; ER 483-84.) The movement espouses various methods by which an individual can access these secret accounts including through the use of financial instruments such as sight drafts, private set-off bonds, or as is the issue in this case, money orders. (RT 1/21/15 212-13, 412, 486-90; ER 313-14; 513, 587-91.)

2.    The <u>Defendant's Business Enterprise to Make and Submit Fictitious Financial Instruments to the Internal Revenue Service</u>

The defendant's business operated under various names including Commerce Coach or Contracts in Motion. (PSR ¶ 4.) The business was originally operated from the defendant's residence at Presidio Circle in Mesa, Arizona, and then later at an office also located in Mesa. (RT 1/21/15 404-07; ER 505-08.) The purpose of the business was to assist clients, for a fee, with all manner of "debt elimination," including in circumstances when clients owed money to the Internal Revenue Service ("IRS"), through various sovereign citizen proscribed methodologies.

5

(RT 1/21/15 379-81, 498; ER 480-82; 599.) The defendant maintained a staff of at least six employees including his children Shannon Hall and Benton Hall, a co-defendant in the case. (RT 1/21/15 407, 500; ER 508, 601.) Employees were responsible for gathering information from various clients and inputting that information into document templates available on the computer that were later sent out via registered mail on the clients' behalf. (RT 1/21/15 415-17, 512; ER 516-18, 613.) Employees were paid in cash by the defendant or Benton Hall each Friday. (RT 1/21/15 409, 541-42; ER 510, 642-43.)

The original "process" utilized by the defendant's business included sending multiple documents and filings to the IRS including documents called private setoff bonds. (RT 1/21/15 507-08; ER 608-609.) The "process" generally involved multiple steps and procedures that ultimately led to various nonsensical, frivolous documents and papers being sent to IRS offices all over the country. (RT 1/21/15 506-09; ER 607-10.) Clients were charged for the creation and mailing of each document sent on their behalf. (RT 1/21/15 379-80, 520-22; ER 480-81, 621-23.) The defendant and Benton Hall were responsible for discussing fees and amounts due with clients. (RT 1/21/15 522; ER 623.) Clients paid for the services provided by the defendant's business by check or money order. (RT 1/21/15 521; ER 622.)

In 2012, the defendant partnered with co-defendant Brandon Adams ("Adams") who was operating similar businesses to the defendant's known as

6

Mastery in Commerce and Creditors in Commerce. (RT 1/21/15 522-25, 551; ER 623-26, 652; PSR ¶ 5.) Along with the defendant, in late 2012, Adams created a new "process" in which money orders were printed and submitted to the IRS rather than the prior documentation commonly used by sovereign citizens. (RT 1/21/15 409-12, 419-20; 523-27; ER 510-13, 520-21, 624-28.)

During at least 2010 through 2013, IRS Collections Officer, T.W. Lyons ("RO Lyons") attempted to collect the defendant's tax debt and received multiple frivolous and nonsensical documents frequently utilized by the defendant's business related to the defendant's own tax liability. (RT 1/20/15 187-89; ER 288-90.) In January 2013, the defendant contacted RO Lyons by telephone to request information related to his tax debt. (RT 1/20/15 172-73, ER 273-74.) This was the first time the defendant had ever directly contacted RO Lyons despite having previously sent RO Lyons many other documents and filings. (RT 1/20/15 286-87, 289-90; ER 387-88, 390-91.) RO Lyons later spoke directly with the defendant by telephone and provided the exact amount of tax due and owing to the IRS by the defendant for tax years 1996 and 1997. (RT 1/20/15 172-74, 179-80; ER 273-75, 280-81.) Sometime after this conversation took place, the defendant signed the money orders contained in Government's Exhibits 1 and 2 and the two money orders were sent via registered mail to the IRS by co-defendant Benton Hall. (RT 1/21/15 430, 528, 533; ER 531, 629, 634.)

7

On January 29, 2013, the two money orders arrived at the IRS office in Mesa, Arizona, each accompanied by a payment voucher known as an IRS Form 1040V. (RT 1/20/15 176, 180, 182; ER 277, 281, 283.) The first money order, in the amount of $868,397.60, purported to satisfy the defendant's tax debt for the 1996 tax year in the exact amount communicated by RO Lyons to the defendant on January 22, 2013. (RT 1/20/15, 173-74, 179-80; ER 274-75, 280-81.) The second money order, in the amount of $635,176.26, also purported to be a payoff of the total owed by the defendant for 1997 in the exact amount communicated to him by RO Lyons. (RT 1/20/15 182; ER 283.)

The money orders were described by government expert William Kerr ("Kerr") as "high-quality item[s] that [are] attempting to represent [themselves] as… legitimate financial instrument[s]." (RT 1/22/15 613; ER 714.) Each money order, in an attempt to make it appear valid, was printed on security paper, had various security features, included routing and account styled numbers on the bottom portion of the money order, and was in the format expected of a standard money order. (RT 1/22/15 601-06; 609-12; ER 702-07, 710-13.) The two money orders associated with the defendant's tax debt were the first two money orders of this kind received by an IRS office in the country and represented the first time the co-defendants utilized money orders as part of their "debt elimination" enterprise. (RT 1/21/15 366, 527; ER 467, ER 628.)

8

In addition to the money orders associated with the defendant's own tax debt, IRS agents determined that the defendant and Adams were responsible for creating approximately 124 additional money orders totaling close to $93,000,000.00. (RT 1/21/15 376-77; ER 477-78.) Of these money orders, 60 totaling approximately $6,000,0000.00 were received by various IRS offices around the United States by Revenue Officers assigned to the cases of the defendant's clients. (RT 1/21/15 376; ER 477; PSR ¶8.) During search warrants conducted at the defendant's home and office, investigators found additional money orders that were printed, but not yet mailed, totaling approximately $38,000,000.00. (RT 1/21/15 377; ER 478; PSR ¶ 8.)

3.    Determination that the Defendant was Competent to Stand Trial

Counsel for the defendant filed a motion to determine competency pursuant to 18 U.S.C. § 4241 on December 18, 2014, roughly one month prior to the scheduled trial date. (CR 68; ER 140.) Counsel cited primarily to a breakdown in communications between himself and the defendant and informed the district court that discussions between the two "have not been fruitful, or even productive, and this counsel feels compelled to raise the issue of the defendant's competency." (CR 68; ER 141.)

The district court conducted a hearing on January 7, 2015, with respect to the competency motion and counsel's motion to withdraw. (CR 77; ER 156.) A portion

9

of the hearing was conducted *ex parte*. During the portion of the hearing that was not *ex parte*, government counsel informed the district court that the defendant had a competency evaluation in the defendant's South Carolina matter and that government counsel was attempting to get that evaluation unsealed for the benefit of the district court and defense counsel. (RT 1/7/15 8; ER 156.) Counsel advised that the district court in South Carolina had determined, based in part on a competency report, that the defendant was competent to stand trial and was determined to be sane during the commission of the offense in that case. (RT 1/7/15 8-9; ER 156-57.) The defendant subsequently entered a guilty plea in late 2013, after he had been indicted in the present case.[3] (RT 1/7/15 8-9; ER 156-57.)

Following the *ex parte* portion of the hearing, the district court stated:

> I find that the defendant's behavior is feigned … it reflects a refusal to acknowledge what he understands about these proceedings and will not be allowed to disrupt the proceedings… I find the defendant is willfully refusing to answer the Court's answers and willfully refusing to communicate with his lawyer, none of which entitles him to a new lawyer or delay in the proceedings, and that he understands sufficiently the nature of this proceeding and how to assist his lawyer because he's done that until recently. (RT 1/7/15 14; ER 162.)

---

[3] During a *Faretta* hearing, the South Carolina district court found that the defendant's insistence on refusing to directly answer the district court's questions and persisting in unresponsive responses was intended to be "disruptive." The district court further stated that "there is a competency finding in the record, so that finding in and of itself can remain because I do believe they [the defendant and Benton Hall] understood me. That they are coherent. That they do understand the questions I am asking of them. They just choose, for whatever reason, to respond in a way that they have here today." (ER 83.)

The district court then clarified that the ruling was based on the finding that the defendant was competent but that his behavior was "along the line of malingering…behavior." (RT 1/7/15 14; ER 162.)

The district court and defense counsel were ultimately provided with the defendant's competency report dated July 9, 2013.[4] The report concluded that "Mr. Hall was not suffering from the symptoms of a mental disorder or defect that impaired his ability to appreciate the nature and quality of the wrongfulness of his acts." (ECF No. 22-2.) The defendant was described as having no difficulty complying with administrative regulations within his institution, denied any prior mental health issues or treatment, and displayed normal intellectual and emotional responses to questions from the examiner. (ECF No. 22-2.) The district court did not directly address the competency issue again on the record before trial began.

4.    Sentence

On June 16, 2015, the defendant was sentenced to 96 months' incarceration. (RT 6/16/15 45-46; ER 1079-80.) As part of his sentence, a five-year term of supervised release was imposed. (RT 6/16/15 46-47; ER 1080-81.) The district court included the following standard conditions of supervised release in accordance with General Order 12-13 in the Judgment and Commitment: 1) support all

---

[4] On April 11, 2016, this Court granted the Appellant's stipulated motion to correct the record and file the attachment to the motion under seal. (ECF No. 22, 22-2, 23.)

11

dependents and meet other family obligations; 2) work regularly at a lawful occupation unless excused by the probation officer for other acceptable reasons; and 3) you shall not associate with persons convicted of a felony… unless granted permission by the probation officer. (ER 1089-90; CR 154.) In addition, during the sentencing hearing, the district court added an additional special condition prohibiting the defendant from "making major purchases, incurring new financial obligations, or entering into any financial contracts without the prior approval of the probation officer." (RT 6/16/15 47; ER 5.)

## VI.  <u>SUMMARY OF ARGUMENTS</u>

The defendant's arguments are without merit and should be denied.  Although the defendant may be disenchanted with the result, the jury determination that the defendant is guilty of making and using fictitious financial instruments is based on ample evidence supported by the record. The evidence at trial, viewed in the light most favorable to the prosecution, overwhelmingly supports the jury's conclusion that the money orders sent to the IRS by the defendant are fictitious financial instruments, that the money orders give the appearance of being issued under the authority of the United States, and that the defendant intended to defraud the government by submitting the money orders.

The district court's determination of competency without a hearing was sufficiently grounded in the information available to the district court and was reasonable because unusual ideology, malingering behavior, and an evaluation determining that the defendant is competent are sufficient grounds to deny a competency hearing.

Finally, the terms of supervised release imposed by the district court are standard conditions, or are proper in light of this type of case, justified by the record, and do not jeopardize the defendant's liberty or due process rights.   As such, this Court should affirm.

# VII. <u>ARGUMENTS</u>

**A.** **The Government Presented Overwhelming Evidence at Trial to Support the Jury's Determination that the Defendant Is Guilty of Violating the Fictitious Financial Instrument Statute**

1. <u>Standard of Review</u>

The defendant's motion for judgment of acquittal preserves his sufficiency challenge. *United States v. Murphy*, 2016 WL 3201582, *5 (9th Cir. June 9, 2016). The denial of a motion to enter a judgment of acquittal is reviewed de novo. *United States v. Aubrey*, 800 F.3d 1115, 1124 (9th Cir. 2015). Sufficiency of evidence to support a criminal conviction is reviewed "to determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Murphy*, 2016 WL 3201582 at * 5 (internal citation omitted). Therefore, the question is not whether or not this Court agrees that the evidence presented proves the essential elements of a § 514 violation beyond a reasonable doubt, but whether it would be rational for the jury to find the defendant guilty given the evidence presented at trial.

2. <u>Argument</u>

The defendant argues that there was insufficient evidence to support a conviction for three reasons: 1) the money orders are not fictitious financial instruments implicating § 514; 2) the money orders did not purport to be "issued under the authority of the United States"; and, 3) the evidence does not support a

14

determination that the defendant had the requisite intent to defraud. (Op. Br. at 2-3.) The defendant's arguments lack merit. There is ample evidence in the record, which when taken in the light most favorable to the United States, establishes beyond a reasonable doubt that the defendant is guilty of the crimes of conviction.

        a.    The money orders in this case are precisely the type of fictitious instrument proscribed by Section 514

The defendant first argues that the money orders made and passed by the defendant are not "fictitious" because money orders are "well-established," real-world financial instruments regardless of the fact that the defendant's money orders were "worthless" and "homemade." (Op. Br. at 24, 28.) In essence, the defendant is arguing that the money orders at issue are counterfeit versus fictitious because there are legitimate money orders in circulation. The defendant's argument is a generalization and fails to take into account the precise facts of this case that directly implicate the fictitious financial instrument statute.

Section 514 prohibits a person from presenting or offering with intent to defraud "any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security or other financial instrument issued under the authority of the United States." 18 U.S.C. § 514. This Court has imported to the statutory language a requirement of "verisimilitude" or that "the documents have the quality of appearing to be true or real," though the document could be an entirely fabricated item. *United*

15

*States v. Salman*, 531 F.3d 1007, 1011 (9th Cir. 2008) (citing *United States v. Howick*, 263 F.3d 1056, 1068 (9th Cir. 2001)).

The key factor is the appearance of the fictitious instrument not its actuality. "The very purpose of the statute is to supplement the preexisting counterfeit laws by criminalizing bogus obligations that are not copies of any actual obligation." *Howick*, 263 F.3d at 1067. The credibility of a fraudulent instrument can be supported by a non-exhaustive list including: "official seals; serial numbers; portraits of government buildings, official signatures; dates of issue; and statements to the effect that the document shall serve as legal tender or shall be redeemable for something of value." *Salman,* 531 F.3d at 1014. The statute criminalizes even "bogus obligations that a prudent person might upon consideration be unlikely to accept as genuine, so long as those documents bear a family resemblance to actual financial obligations." *Howick*, 263 F.3d at 1068. The test is not whether the document is similar to any financial obligation in circulation in particular, but whether taken as a whole, the financial instrument at issue is "apparently a member of the family of 'actual...financial instrument[s]' in general." *Id.* at 1068.

The fundamental fact of import pursuant to § 514 is not that the defendant chose to pass worthless, homemade, financial instruments that he labelled "money orders" when in fact, money orders are common and recognizable financial instruments in use and circulation, but rather that he created previously non-existent

money orders that bore a family resemblance to a financial instrument that could be real and in circulation. Here, the money orders list the defendant personally as the drawer, purport to issue from an account at the Treasury tied to the defendant's social security number, and order the Secretary of the Treasury to use a Treasury account to pay the defendant's debts to the Treasury. (RT 1/22/15 601-06; 609-12; ER 702-07, 710-13.) No such "money order" exists in circulation that can be counterfeited. The question *Howick* asks is whether or not the defendant's money orders are *designed* to create the appearance of a legitimate money order. Not only does the existence of common/ordinary money orders in circulation not exonerate the defendant, it further implicates him by demonstrating a close "family resemblance to genuine financial instruments." *Howick*, 263 F.3d at 1068.

The *Morganfield* case cited in support of the defendant's position does not help the defendant, and in fact, disproves his misprinted check analogy. *United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007). In that case, the court addressed whether or not checks issued by commercial banks to worthless shell companies could be prosecuted under § 514. *Id.* at 456-57. Addressing the distinction between a forgery and a fictitious document, the court determined that the "checks were actual negotiable instruments that were issued by legitimate banks where actual checking accounts existed" and the defendants' subsequent actions may well have created "forged" or "counterfeit" obligations but their actions did not make

17

otherwise "real" checks "nonexistent." *Id.* at 460. The court elaborated stating "[t]he statute [§514], then, prohibits the use of a not real or imaginary type of instrument that purports to be an existing type of security." *Id.*

The facts of that case are entirely distinguishable, and do not contravene this Court's guidance in *Howick* and *Salman*. The money orders here were not drawn on any institution nor did they purport to copy or "knock off" a circulating money order from any institution, bank, or entity. They were created entirely out of whole cloth by Adams, labeled "money order" with no further designation, created to look genuine, signed by the defendant, and mailed off to the IRS, thereby falling into the precise conduct contemplated by the fictitious financial instrument statute. (RT 1/21/15 409-12, 419-20, 430, 528, 533.) There was ample evidence on the record from which the jury could conclude that the money orders were in fact fictitious rather than counterfeit instruments, and the consistent verdict therein should not be disturbed.

b. The evidence supports the jury's conclusion that the money orders were issued under the authority of the United States

The defendant next argues that the money orders he presented to the IRS do not "purport to be issued under the authority of the United States." (Op. Br. at 28.) This argument also fails. This Court, in a published opinion, recently addressed the question of sufficiency of the evidence related to the phrase "issued under the authority of the United States." *Murphy*, 2016 WL 3201582. In that case, the

18

defendant was convicted of four counts of violating § 514 related to "bonded promissory notes" purporting to satisfy the defendant's tax liability that showed on the face of the notes that:

> [defendant] was the "maker" of the notes, each of which was payable "to the order of" the Secretary of the Treasury and the IRS examiner "for credit to" the Department of Treasury and the IRS. Each note was "secured" by a "private discharging and indemnity bond" in the possession of "[Secretary of the Treasury] Mr. Henry M. Paulson, Jr., holder in due course.

*Id.* at *2. The Court construed the evidence to "suggest that [defendant], through a convoluted series of accounting devices, ultimately sought to pay his taxes from an account created for him, and held on his behalf, by the United States" and that the evidence was sufficient for a rational jury to find that the notes were issued under the authority of the United States. *Id.* at *5; *see also United States v. Turner*, 985 F. Supp. 2d 1311, 1314-1317 (M.D. Ala. 2013) (in case of bonds addressed to Secretary of Treasury printed on thick paper with ornate border and written in legalese, neither text nor legislative history of § 514 supports limiting application to documents appearing to be issued "by" the United States when false document claims a "power or entitlement that is grounded in the authority of the United States.").

The money orders created by the defendant and his partners bore striking similarity to the instruments sustained in these cases, including that they purport to be payable to the Treasury, list the Secretary of the Treasury as the drawee, and

19

purport to access an account in the defendant's name held by the United States to pay outstanding tax debts. As such, construing the evidence in the light most favorable to the government, there is ample evidence to support the determination that the fictitious money orders give the appearance of being issued under the authority of the United States.

      c.    The evidence supports the jury's conclusion that the defendant acted with the required intent to defraud

Finally, the defendant argues that regardless of whether the jury found that he truly believed that a secret account could pay his tax debts or whether, in the alternative, that he knew the money orders were bogus and could not resolve his debt, no rational jury could have found he had the requisite intent to defraud. (Op. Br. at 31.) To the contrary, the government presented overwhelming evidence that the defendant intended to defraud the IRS.

Bogus financial instruments that bear indicia suggesting they are negotiable and authentic support a finding of an intent to defraud. *See Howick*, 263 F.3d at 1069. At trial, Kerr testified at length about the characteristics of the defendant's money orders that made them "high-quality item[s] that [are] attempting to represent [themselves] as… legitimate financial instrument[s]," including that they had the symbols and markings necessary for a financial institution to attempt to process them, were printed on security paper with watermarks, and included all the common items expected to be included on a money order. (RT 1/22/15 601-06, 609-13;

20

ER 702-07, 710-14.) The degree of specificity and care put into the creation of these particular instruments, therefore, suggests an intent to defraud.

This Court has also held that the context in which a fictitious financial instrument is presented is relevant. *See Salman*, 531 F.3d at 1015. Here, the defendant actually called RO Lyons and requested the exact amount of his outstanding tax debt and submitted money orders in these precise amounts. (RT 1/20/15 172-74, 179-80; ER 273-75, 280-81.) Despite having sent countless bogus documents to the same IRS office for years, this was the first time the defendant had ever contacted the IRS office directly and advised that they should expect payment of his tax debt. (RT 1/20/15 286-87, 289-90; ER 387-88, 390-91.) The money orders were also submitted along with payment vouchers referencing the tax debts the defendant owed for 1996 and 1997. (RT 1/20/15 176, 180, 182; ER 277, 281, 283.) There was ample evidence from which the jury could infer that the defendant intended to convince the IRS that he would make payment.

Knowledge of the instrument's falsity is not an element of § 514 and evidence of intent to actually use the documents was sufficient for a rational jury to infer intent to defraud. *United States v. Bitao*, 266 F. App'x. 536 (9th Cir. 2008). The defendant's two money orders were the first of hundreds that flooded the IRS from the defendant's business and represented the first time the defendant utilized money orders as part of his debt elimination scheme. (RT 1/21/16, 366, 527; ER 467, 628.)

21

The evidence at trial established that over 140 money orders just like those passed by the defendant were mailed to IRS personnel all over the country on behalf of the defendant's clients totaling more than $93,000,000.00. (RT 1/21/15 376-77; ER 477-78.) The defendant did not provide this service for free. (RT 1/21/15 379-80, 520-22; ER 480-81, 621-23.) To the contrary, the defendant made considerable amounts of real money by perpetuating this fraud all over the country and by promoting and marketing the scheme as well. (RT 1/21/15 393, 405; ER 405, 494.)

The likelihood that the defendant's scheme would ultimately discharge any tax debts is irrelevant to the determination of whether or not the defendant intended to defraud the IRS. Because the chain of inferences necessary for a jury to conclude that the defendant had the requisite intent to defraud is supported by the evidence, a rational jury could find the defendant guilty beyond a reasonable doubt. *See United States v. Katakis*, 800 F.3d 1017, 1023 (9th Cir. 2015) ("evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case, or where there is a total failure of proof of a requisite element.) (internal quotation and citation omitted). The denial of the motion to enter a judgement of acquittal was proper.

22

**B.     The District Court Properly Determined That the Defendant Was Competent to Stand Trial Without the Need for an Evidentiary Hearing**

1.     Standard of Review

When reviewing the denial of a motion to hold a competency hearing, this Court employs a "practical standard of review" involving a "comprehensive review of the evidence." *United States v. Duncan*, 643 F.3d 1242, 1247 (9th Cir. 2011). "The question to be asked by the reviewing court is whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." *Mendez v. Knowles*, 556 F.3d 757, 771 (9th Cir. 2009) (*citing de Kaplany v. Enomoto*, 540 F.2d 975, 983 (9th Cir. 1976) (*en banc*)).  This Court defers to the district court's findings of fact that the evidence did not require a competency hearing unless they are "unreasonable." *Id.* (internal citation omitted).

2.     Argument

Primarily, the defendant argues that the defendant's exhibited behavior regarding his beliefs and adherence to the sovereign citizen ideology and trial counsel's perceived inability to productively engage the defendant's participation in trial are sufficient grounds upon which the district court should have conducted a competency hearing.  (Op. Br. at 36-39.)  This position is unsupported by law.

Due process compels an evidentiary hearing only when "there is substantial evidence" that the defendant is mentally incompetent. *Mendez*, 556 F.3d at 771

23

(*citing Moore v. United States*, 464 F.2d 663,666 (9th Cir. 1972) (internal citations omitted)). Factors that the district court should consider in making a competency determination without an evidentiary hearing include evidence of the defendant's irrational behavior, demeanor, and any prior medical opinion on competency. *Id.* (*citing Drope v. Missouri*, 420 U.S. 162, 180 (1975)).

Ideological leanings-even ones that produce odd or unusual behavior-are not a bar to competency. Courts reviewing the question of competency of adherents to the sovereign citizen ideology have universally held that these defendants are competent to stand trial irrespective of their sovereign citizen beliefs. In *United States v. Neal*, this Court upheld the competency determination of a defendant, who like the defendant here, strictly adhered to the sovereign citizen belief system, finding that the defendant's comments and conduct were indicative of his beliefs and not a lack of competence. 776 F.3d 645 (9th Cir. 2015). Specifically, this Court held that the defendant's "nonsensical" filings containing "rambling statements" and "irrational arguments" did not render the defendant incompetent, and that "competency will not be questioned when a defendant merely displays rude, uncooperative and sometimes wacky behavior." *Id.* at 657, *citing United States v. Johnson*, 610 F.3d 1138, 1144-1146 (9th Cir. 2010).

Like the defendant in *Neal*, all of the behavior cited as establishing lack of competence such as incoherent filings, lack of engagement with the proceedings,

24

non-responsive answers, and "self-defeating behavior" (Op. Br. at 36-38) are explained by the defendant's belief system rather than evidence of mental deficiency that a reasonable judge should have credited. As such, the district court correctly reached the conclusion that adherence to a sovereign ideology, and the expression of such, was voluntary "feigned" behavior that did not reflect on the defendant's ability to understand the proceeding or nature of the situation he faced. (ER 162.)

Other courts considering similar factual records involving sovereign defendants have reached the same conclusion. *See United States v. Anzaldi*, 800 F.3d 872, 877-78 (7th Cir. 2015) (deeply held belief did not rise to mental defect because "adherence to a discredited legal theory does not create reasonable cause to believe [] suffers from a mental defect.") (citation omitted); *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003) ("Sometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect so deficient that trial is impossible."); *see also United States v. Landers*, 564 F.3d 1217, 1221-22 (10th Cir. 2009).

Similarly, the refusal to assist counsel or to engage in the proceedings does not rise to the level of doubt necessary to compel an evidentiary hearing. *See United States v. Garza*, 751 F.3d 1130, 1136 (9th Cir. 2014) ("A defendant who refuses to work with this lawyer out of spite alone is not incompetent even if that defendant

25

has a serious mental disease or defect.") (*citing Davis v. Woodford*, 384 F.3d 628, 645-46); *see also United States v. White*, 670 F.3d 1077, 1085 (9th Cir. 2012) (refusal to cooperate with defense counsel not *prima facie* indicator of mental incompetence where reasonable to infer defendant had ability to cooperate but did not to cause problems); *United States v. Brown*, 669 F.3d 10, 17 (1st Cir. 2012) (recognizing difference between inability to understand legal proceeding and communication with counsel and willingness to do so); *Robidoux v. O'Brien*, 643 F.3d 334, 339 (1st Cir. 2011) (sovereign ideology does not prevent defendant from knowing he faces trial, recognizing procedures to be used, or appreciating advice that desired defenses will not constitute effective defense). Nor is counsel's express concerns about the defendant's competence sufficient to compel the district court to hold a hearing. *See Mendez*, 556 F.3d at 773 (court should consider a lawyer's representations concerning competence of his client but court need not accept them without question) (*citing Drope*, 420 U.S. at 177 n. 13).

The record is clear that the defendant was aware of the proceedings and the gravity of the situation based on his statements and actions, including his pro se filings, and again at his arraignment, hearing to appointment counsel, and other pre-trial interactions with the district court. (ER 15, 35, 22, 88-91, 125-27.) There are several instances prior to the commencement of trial during which the defendant clearly demonstrated an awareness of the situation he faced and acknowledgment

26

that he understood precisely what was happening around him. During the defendant's initial appearance and arraignment on May 19, 2014, when asked by the district court whether the defendant was voluntarily waiving the appointment of counsel, the defendant definitively responded that he was waiving his right to court-appointed counsel and later acknowledged that he would not be represented by court-appointed counsel in other preliminary hearings. (RT 5/19/14 5, 25; ER 15, 35.) In response to questions regarding the scheduling of the detention hearing, the defendant answered the district court's questions precisely and was appropriately responsive including acknowledging the pending issue of detention by stating, "I appreciate that fact." (RT 5/19/14 12; ER 22.) The defendant further apologized to the district court for speaking over the district court's inquiry. (RT 5/19/14 12; ER 22.)

In the *Faretta* hearing held on June 11, 2014, the defendant initially persisted with unresponsive answers to the district court's questions leading the district court to make the finding that "Mr. Hall has refused to cooperate with the Court, refused to answer questions; that he has proceeded for purposes of obstruction and delay…Also, the Court finds that Mr. Hall's comments are nonsensical and in bad faith." (RT 6/11/14 32; ER 123.) In response, the defendant was immediately responsive and directly addressed the district court's point stating:

> In light of your comments that, you know, my concern is that I'm perceived as acting in bad faith, which it is not my intention to, Your

Honor, and nor do I wish to offend your august office, because I understand the importance of not—certainly not dishonoring this office nor yourself nor wasting your time nor Mrs. Jennis's when much like my son, I don't intent to waste the Court's time with a trial and only merely wish to resolve the matter. (RT 6/11/14 34; ER 125.)

The defendant went on to withdraw his motion to proceed pro se indicating "I clearly understand that. And to consider going forward within this courtroom without competent counsel…is not a good idea and would be foolish." (RT 6/11/14 35-36; ER 126-27.)

The record demonstrates that the defendant assisted court-appointed counsel to execute a financial affidavit (ER 131), and conferred with counsel on the issue of detention (ER 133.) During jury selection, when an issue arose concerning the defendant's behavior, defense counsel stated "I have had a conversation with Mr. Hall. He is seated in his chair, unrestrained, legs crossed. I think we are going to be okay." (RT 1/20/15 3; ER 220.) Thereinafter, when the district court inquired whether the defendant would follow the district court's instructions, defense counsel again stated "[defendant] has assured me he will. And again, he knows. He's listening to me. If I say yes, he will obey, he understands, I believe, that if he misbehaves, we have had a discussion." (RT 1/20/15 4; ER 221.) In addition, defense counsel's own papers and statements suggest that the defendant was engaging with him at some time during the representation and assisting in his defense. (ER 131, 133, 137, 215-16, 220-21.) Counsel acknowledges the

defendant's competency on several occasions stating "I know he's an intelligent man" and went on to describe conversations regarding the government's plea offer by stating "I have communicated along those same lines if not further and more profoundly to Mr. Hall the plea offers." (RT 1/15/1542-43; ER 215-16.) According to counsel's pleadings in November 2014, the defendant "has been in consistent communications with this counsel." (CR 63; ER 137.) Any breakdown of that communication was not indicated until counsel's subsequent competency pleading in December 2014, just one month before trial began.

The defendant cites to "self-defeating" behavior, including the rejection of the government's generous plea offer as evidence of incompetence. (Op. Br. at 38.) This argument has been expressly rejected. *Mendez*, 556 F.3d at 772 (no precedent that "defendant's rejection of a plea agreement, even if unwise, constitutes substantial evidence that he may have been incompetent.") (*citing Davis v. Woodford*, 384 F.3d 628, 645 (9th Cir. 2004)).

Additionally, the fact that the defendant was deemed competent in the South Carolina case that preceded this case in close proximity further supports the district court's determination that a hearing was unnecessary. The defendant professed the same sovereign ideology and behavior in that case and was deemed competent. This Court sets a high burden of medical evidence that must be shown to prove incompetence. *Garza*, 750 F.3d at 1135 (even cases with detailed medical history

29

evidence fail to establish that reasonable judge would have genuine doubt regarding competency where the defendant's mental problems have no discernable impact on proceedings). It is not reversible error for the district court to determine, on the basis of a psychiatric report and observations of the defendant, that a competency hearing is not warranted. *Mendez*, 556 F.3d at 773; *see also, United States v. Nickels*, 324 F.3d 1250, 1251-52 (11th Cir. 2003); *United States v. Downs*, 123 F.3d 637, 641 (7th Cir. 1997).

Why the defendant voluntarily chose to change his behavior and disengage is not the relevant inquiry, but in no way could that personal choice require or compel a reasonable district court to question the defendant's competency to proceed. Based on the totality of the evidence including that the defendant's unusual ideology does not equate to incompetence, the defendant's voluntary choice not to cooperate, and the expert finding that defendant was competent, the district court's ruling that a competency hearing was unnecessary was reasonable.

**C.    The District Court Did Not Plainly Err When It Imposed Standard Conditions 11, 6, and 5 of Supervised Release or A Special Condition Prohibiting Major Financial Purchases**

1.    <u>Standard of Review</u>

This Court reviews for abuse of discretion a district court's imposition of supervised release conditions. *United States v. Watson*, 582 F.3d 974, 981 (9th Cir. 2009). In applying this standard, this Court gives considerable deference to a district

court's determination of the appropriate supervised release conditions because "a district court has at its disposal all of the evidence, its own impressions of a defendant, and wide latitude." *Id.* (internal quotation marks omitted); *accord United States v. Stoterau*, 524 F.3d 988, 1002 (9th Cir. 2008). "Whether a supervised release condition violated the Constitution is reviewed de novo." *Watson*, 582 F.3d at 981. However, when a party does not lodge a specific objection, yet asserts error on appeal, this Court reviews for plain error. *United States v. Santiago*, 466 F.3d 801, 803 (9th Cir. 2006).

> Before an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Id.* (*quoting United States v. Maciel-Vasquez*, 458 F.3d 944, 996 n.3 (9th Cir. 2006)) (internal quotation marked omitted). This is because "[a] specific objection provides the district court with an opportunity to address the error in the first instance and allows this court to engage in more meaningful review." *Id.* (internal quotation marks and citations omitted). Error is "plain" only when it is "clear, or equivalently, obvious." *United States v. Siu Kuen Ma*, 290 F.3d 1002, 1005 (9th Cir. 2002), *citing United States v. Olano*, 507 U.S. 725, 734 (1993).

The defendant failed to object to the imposition of the supervised release conditions during sentencing and challenges these release conditions for the first time on appeal. As such, this Court should review for plain error.

2.  Argument

The defendant challenges the imposition of conditions 11, 6, and 5, respectively of the "standard" conditions of supervised release and the special condition restricting his ability to make major purchases or incur debts without prior approval of his Probation Officer as unduly burdensome of his liberty and due process rights. (Op. Br. at 43-44.) The defendant is mistaken.

A district court has broad discretion in imposing conditions of supervised release. *United States v. T.M.*, 330 F.3d 1235, 1239-40 (9th Cir. 2003); *United States v. Bee*, 162 F.3d 1232, 1234 (9th Cir. 1998). A district court may impose conditions of supervised release as long as they are "reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, taking into account the offender's history and personal characteristics, and involve no greater deprivation of liberty than is reasonably necessary for the purposes of supervised release." *Watson*, 582 F.3d at 982; *see* 18 U.S.C. §§ 3553(a); 3583(d)(1); *United States v. Ross*, 476 F.3d 719, 721 (9th Cir. 2007); *T.M.,* 330 F.3d at 1240.

The conditions of supervised release do not have to be related to the underlying offense of conviction as long as they satisfy these goals. *Watson*, 582

F.3d at 983; *United States v. Wise*, 391 F.3d 1027, 1031 (9th Cir. 2004); *T.M.*, 330 F.3d at 1240. In determining the appropriate supervised release conditions, the district court can also take into account the need to protect the public from the defendant's future crimes. *Wise*, 391 F.3d at 1031. District courts are ordinarily not required to explain on the record the reasons for imposing each condition of supervised release "if the reason is apparent from the record." *United States v. Wolf Child*, 699 F.3d 1082, 1099 (9th Cir. 2012) (internal quotation marks and end citations omitted).

> a. Standard Conditions 11, 6, and 5 were proper given the nature and circumstances of the defendant's crime, history, and personal characteristics, and were not an impermissible deprivation of the defendant's liberty

The conditions of supervised release listed in General Order 12-13 of the United States District Court for the District of Arizona incorporate the requirements of United States Sentencing Guidelines ("USSG") §§ 5B1.3 and 5D1.2. (ER 1088-1091). The defendant specifically challenges the following three conditions: (11) "You shall not associate with any person engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer"; (6) "You shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons"; and (5) "You shall support your dependents and meet other family responsibilities." (ER 1088-1091; CR 154.) These conditions are listed in Chapter

33

Five of the Sentencing Guidelines. *See* USSG §§ 5D1.3(a) & 5D1.3(c). As such, they are presumed suitable.[5] *See United States v. Torres-Aguilar*, 352 F.3d 934, 937 (5th Cir. 2003) ("the 'standard' conditions provided in § 5D1.3(c) are presumed suitable in all cases") (quoting *United States v. Asuncion-Pimental*, 290 F.3d 91, 94 (2d Cir. 2002) (per curiam)); *see also United States v. Napier*, 463 F.3d 1040, 1042-43 (9th Cir. 2006) (noting that "imposition of . . . mandatory and standard conditions is deemed to be implicit in an oral sentence imposing supervised release").

The defendant takes issue with the first condition as impermissibly restricting contact with two of his adult children who have prior felonies without an explicit finding on the record by the district court that the condition was necessary in light of one of the permissible considerations. (Op. Br. At 45.) Prohibiting a defendant from associating with those involved in the crime of conviction is permissible as a means to prevent further criminal activity. Even otherwise legal contact—such as contact between parents and children—may nonetheless be restricted during the term of supervised release in furtherance of public protection and adequate deterrence. *See United States v. Bolinger*, 940 F.2d 478, 480 (9th Cir. 1991) (conditions may prevent reversion into former lifestyle and contacts even though activity may be legal). Here, the imposition of condition 11 was appropriate because Benton Hall

---

[5] Although there are proposed amendments to some of the standard conditions pending, the district court must use the guidelines in effect at the time of sentencing. U.S.S.G. § 1B1.11.

was a co-conspirator in the case and Shannon Hall testified at length that she worked for her father in the fictitious money order business.

The defendant's reliance on the *Wolf Child* case makes no difference to the inquiry. (Op. Br. at 45). In that case, involving an attempted sexual assault on an unrelated girl, this Court faulted the district court for failing to state on the record the reason for the imposition of the particular supervised release condition. *Wolf Child*, 699 F.3d at 1093. That case is distinguishable for two reasons. First, Shannon and Benton Hall are not minor dependents. *See Wolf Child*, 699 F.3d at 1082. Second, the involvement of both Shannon and Benton Hall in the crimes of conviction and their actions to support and assist their father's enterprise were explicit on the record before the district court. (RT 1/21/15 407, 409, 430, 522, 528, 533.) Therefore, no additional justification was necessary given the apparent criminal enterprise the defendant engaged in with his adult children.

In any event, the supervised release condition specifically permits the Probation officer to sanction contact at the request of the defendant. *See United States v. Blinkinsop*, 606 F.3d 1110, 1121 (9th Cir. 2010) (where defendant restricted from going to locations where children under 18 are present, written permission of probation officer sufficiently protects defendant's liberty interest in attending own children's events). This accommodation balances the need to ensure deterrence and

35

other important considerations with the defendant's interest in having contact with his adult children.

As to the remaining two conditions, the defendant argues that the use of the word "regularly" prior to the work condition and the fact that the defendant does not have any dependents renders these conditions vague. (Op. Br. at 46-47.) The defendant, however, has utterly failed to state how these conditions impermissibly jeopardize the defendant's liberty and due process interests. Any error must be plain and in light of the lack of precedent questioning the application or imposition of such standard conditions, the defendant has failed to show that the district court, in light of its familiarity with the circumstances of the case, plainly erred in imposing these standard conditions. *See United States v. Zalapa*, 509 F.3d 1060, 1064 (9th Cir. 2007) ("Plain error is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection."). Standard conditions 11, 6, and 5 are therefore proper.

      b.    The special condition to prohibit major purchases or incur new financial obligations without pre-approval of the probation officer is entirely reasonable given the nature of the defendant's crime

Special conditions of supervised release can be unrelated to the facts enumerated by the Sentencing Guidelines so long as there is a reasonable relationship to the history and characteristics of the defendant. *United States v. Johnson*, 998 F.2d 696, 698 (9th Cir. 1993). The defendant was convicted for

36

making and offering false and fictitious financial instruments with the "intent to defraud." At the time the defendant created and passed the money orders at issue, his tax debt exceeded $1.4 million dollars. (RT 1/20/15 174; ER 275.) At sentencing, the district court further stated, "Mr. Hall clearly has a history of defrauding other people, including using this movement to get money out of other people." (RT 6/15/15 32; ER 1066.) As such, the district court had sufficient justification for the imposition of this condition to promote deterrence and protect the public based on the record before the district court.

This Court has held that the major purchases provision is not impermissibly vague. *See T.M.*, 330 F.3d at 1242 (remanded on other grounds). The defendant's citation to the *Washington* case is misplaced. That case was a drug case in which the district court imposed the major purchases condition based on a recommendation by the Probation Department. *See United States v. Washington*, 584 F. App'x 846, 847 (9th Cir. 2014). Here, the nexus between the crime of conviction and the supervised release condition is not nebulous. In light of the totality of the record, this special condition is a reasonable imposition on the defendant and protects the public from any further malfeasance by the defendant. Similar, to the contact condition, the special condition further authorizes the defendant to seek guidance from the Probation officer, thereby, further mitigating any prejudice to the defendant. The special condition is proper in light of the record in this case.

## VIII.  **<u>CONCLUSION</u>**

For the foregoing reasons, the judgment of conviction and sentence should be affirmed.

JOHN S. LEONARDO
United States Attorney
District of Arizona

KRISSA M. LANHAM
Deputy Appellate Chief


*<u>s/ Monica Edelstein</u>*
MONICA EDELSTEIN
Assistant U.S. Attorney

38

## IX.  <u>STATEMENT OF RELATED CASES</u>

To the knowledge of counsel, there are no related cases pending.

## X.  CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1 FOR CASE NO. 15-10322

I certify that: (check appropriate option(s))

☒　1.　Pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule 32-1, the attached opening/answering/reply/cross-appeal brief is

　　　☒　Proportionately spaced, has a typeface of 14 points or more and contains <u>8,816</u> words (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words; reply briefs must not exceed 7,000 words), or is

　　　☐　Monospaced, has 10.5 or fewer characters per inch and contains _____ words or ___ lines of text (opening, answering, and the second and third briefs filed in cross-appeals must not exceed 14,000 words or 1,300 lines of text; reply briefs must not exceed 7,000 words or 650 lines of text).

☐　2.　The attached brief is **not** subject to the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because

　　　☐　This brief complies with Fed. R. App. P. 32(a)(1)-(7) and is a principal brief of no more than 30 pages or a reply brief of no more than 15 pages;

　　　☐　This brief complies with a page or size-volume limitation established by separate court order dated __ and is

　　　☐　Proportionately spaced, has a typeface of 14 points or more and contains ___ words, or is

　　　☐　Monospaced, has 10.5 or fewer characters per inch and contains pages or ___ words or __ lines of text.

<u>August 4, 2016</u>　　　　　*s/ Monica Edelstein*
Date　　　　　　　　　　　MONICA EDELSTEIN
　　　　　　　　　　　　　Assistant U.S. Attorney

## XI.  **CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of August, 2016, I electronically filed the

Brief of Appellee with the Clerk of the Court for the United States Court of Appeals

for the Ninth Circuit by using the appellate CM/ECF system.  Participants in the case

who are registered CM/ECF users will be served by the appellate CM/ECF system.


*s/ Monica Edelstein*
MONICA EDELSTEIN
Assistant U.S. Attorney

41