**15-10322**

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

**UNITED STATES OF AMERICA,**

**Plaintiff-Appellee,**

**v.**

**GORDON LEROY HALL,**

**Defendant-Appellant.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA (CR-14-00184-NVW-1)

**DEFENDANT - APPELLANT'S REPLY BRIEF**

JON M. SANDS
Federal Public Defender
District of Arizona

DANIEL L. KAPLAN
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007-2730
(602) 382-2700

# TABLE OF CONTENTS

**PAGE**

Table of Authorities ............................................................. iii

Introduction ....................................................................... 1

Argument .......................................................................... 2

I.    The government fails to refute Mr. Hall's showing that the evidence was insufficient to prove that he violated the "fictitious instruments" statute. ... 2

    A.    The government fails to explain how a money order can be deemed a "false or fictitious" instrument. ......................................................... 3

        (1)    Whether the money orders could be the object of a counterfeiting charge is immaterial. .......................................... 3

        (2)    The government fails to overcome the fact that a money order is an actual real-world – and not a "fictitious" – financial instrument. .................................................................... 4

    B.    The government fails to explain how Mr. Hall's money orders purported to be "issued under the authority of the United States." ... 8

    C.    The government fails to explain how a reasonable jury could find that Mr. Hall acted with the requisite "intent to defraud." ....................... 11

II.   The government fails to refute Mr. Hall's showing that the district court erred in failing to conduct a hearing into his competency to stand trial. ....... 15

III.  The government fails to vindicate the unlawful supervised release conditions that the district court imposed upon Mr. Hall. ............................ 19

    A.    The government's assertion that standard conditions of supervised release are "presumed suitable" is misguided. ................................... 20

B.   The government's defenses of the challenged conditions are
     unconvincing. ................................................................. 22

     (1)   "[N]ot associate with any person convicted of a felony" ........ 22

     (2)   "Work regularly at a lawful occupation" ................................ 24

     (3)   "Support your dependents" and meet "family
           responsibilities" ...................................................................... 25

     (4)   Major Purchases ...................................................................... 25

C.   The district court's imposition of these unlawful conditions was
     plain error. .......................................................................... 27

Conclusion ....................................................................................... 29

Certificate of Compliance with FRAP 32(a)(7)(B)

Certificate of Filing and Service

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc)................. 23

*Jones v. United States*, 529 U.S. 848 (2000) .............................................................11

*Maxwell v. Roe*, 606 F.3d 561 (9th Cir. 2010)........................................................... 18

*Mendez v. Knowles*, 556 F.3d 757 (9th Cir. 2009).....................................................17

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006)................. 9

*Smith v. City of Fontana*, 818 F.2d 1411 (9th Cir. 1987) .......................................... 23

*Strandberg v. City of Helena*, 791 F.2d 744 (9th Cir. 1986)...................................... 23

*United States v. Abbouchi*, 502 F.3d 850 (9th Cir. 2007).......................................... 29

*United States v. Asuncion-Pimental*, 290 F.3d 91 (2d Cir. 2002) ....................... 20, 21

*United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008)..................................... 28

*United States v. Betts*, 511 F.3d 872 (9th Cir. 2007) ................................................. 21

*United States v. Bitao*, 266 F. App'x 536 (9th Cir. 2008).........................................13

*United States v. Caceres-Olla*, 738 F.3d 1051 (9th Cir. 2013).................................. 25

*United States v. Dreyer*, 705 F.3d 951 (9th Cir. 2013).............................................. 19

*United States v. Duncan*, 643 F.3d 1242 (9th Cir. 2011)...........................................17

*United States v. Guagliardo*, 278 F.3d 868 (9th Cir. 2002) ............................... 19, 28

*United States v. Havelock*, 664 F.3d 1284 (9th Cir. 2012) (en banc) ........................ 14

*United States v. Howick*, 263 F.3d 1056 (9th Cir. 2001) .................................... 4, 5, 6

*United States v. Joseph*, 716 F.3d 1273 (9th Cir. 2013) ............................................ 28

*United States v. Kappes*, 782 F.3d 828 (7th Cir. 2015) ................................. 21, 24, 28

*United States v. Katakis*, 800 F.3d 1017 (9th Cir. 2015) .......................................... 11

*United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016) .......................................... 29

*United States v. McEnry*, 659 F.3d 893 (9th Cir. 2011) ............................................ 25

*United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007) ................................ 5, 6, 7

*United States v. Murphy*, --- F.3d ---, 2016 WL 3201582 (9th Cir. 2016) .............. 8, 9

*United States v. Murphy*, No. 12-cr-2497 (S.D. Cal.) ......................................... 9, 10

*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235 (1989) .................................... 11

*United States v. Stephens*, 424 F.3d 876 (9th Cir. 2005) .......................................... 27

*United States v. T.M.*, 330 F.3d 1235 (9th Cir. 2003) ............................................... 26

*United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015) ........................................ 27

*United States v. Torres-Aguilar*, 352 F.3d 934 (5th Cir. 2003) ........................... 20, 21

*United States v. Turner*, 985 F. Supp. 2d 1311 (M.D. Ala. 2013) ........................ 10, 11

*United States v. Washington*, 584 F. App'x 846 (9th Cir. 2014) ................. 25, 26, 28

*United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012) ................. 22, 23, 24, 28

## Statutes

18 U.S.C. § 514 ...................................................................................*passim*

18 U.S.C. § 514(a) ................................................................. 8, 10, 13

18 U.S.C. § 3583(d)(1) ..................................................................... 22

18 U.S.C. § 4241 ................................................................................ 16

18 U.S.C. § 4241(a) ..................................................................... 15, 18

## Rules

Fed. R. Crim. P. 43(a) ...................................................................... 20

Fed. R. Evid. 201(c)(2) ....................................................................... 9

**Introduction**

Mr. Hall demonstrated in his opening brief that his convictions must be overturned because a money order is not a "nonexistent instrument," and thus it is not "false or fictitious" within the meaning of 18 U.S.C. § 514. Unsurprisingly, the government fails to refute this self-evident fact. Instead, the government focuses its energies on arguing that Mr. Hall's money orders were not "counterfeits." But nothing turns on whether they are counterfeits. The government's burden at trial was not to prove that Mr. Hall's money orders were *not* counterfeits; it was to prove that they *were* "false or fictitious." The government did not, and could not, carry that burden, because money orders simply are not "false or fictitious" instruments of which there are "no genuine versions." The government also bore the burden of proving that the money orders purported to be "issued under the authority of the United States," and that Mr. Hall created and delivered them with the "intent to defraud." It failed to prove either of these essential elements as well. The only "authority" under which the money orders purported to operate was that of Mr. Hall, a private citizen, and the evidence cannot support any rational chain of inferences leading to the conclusion that Mr. Hall acted with the intent to defraud. For this and the additional reasons discussed below, Mr. Hall's convictions and sentence cannot stand.

**Argument**

**I.    The government fails to refute Mr. Hall's showing that the evidence was insufficient to prove that he violated the "fictitious instruments" statute.**

The statute that the government chose to charge Mr. Hall with violating was 18 U.S.C. § 514, which applies (as pertinent here) to a person who passes a "false or fictitious instrument" that appears to be "issued under the authority of the United States" "with the intent to defraud." But as Mr. Hall demonstrated in his opening brief, the two money orders that underlie this case do not fall within Section 514 for three independently-sufficient reasons: (1) a money order is not a "false or fictitious" financial instrument; (2) Mr. Hall's money orders did not purport to be "issued under the authority of the United States," and (3) the evidence could not support a reasonable chain of inference culminating in the finding that Mr. Hall sent the money orders with the "intent to defraud."[1] The government fails to refute this showing.

---

[1] Op. Br. at 21-33.

A.   **The government fails to explain how a money order can be deemed a "false or fictitious" instrument.**

(1)   **Whether the money orders could be the object of a counterfeiting charge is immaterial.**

The essential flaw in the government's response is that it attacks a "straw man" argument of its own invention, rather than the argument that Mr. Hall actually raised. According to the government, Mr. Hall's argument is that "the money orders at issue are counterfeit versus fictitious."[2] The government proceeds to attack this invented argument by insisting that the money orders could not be prosecuted as counterfeits.

It is immaterial whether Mr. Hall's money orders could be prosecuted as counterfeits. The government did not choose to prosecute them under the counterfeiting statute; it chose to prosecute them as "false or fictitious," in violation of Section 514.[3] The government thereby assumed the burden of proving beyond a reasonable doubt – not that the money orders are *not* "counterfeit" – but that they *are* "fictitious." The bulk of the government's argument on the lead claim in this appeal is simply beside the point.

---

[2] Gov. Br. at 15.
[3] ER Vol. 2 at 7-8.

**(2)** **The government fails to overcome the fact that a money order is an actual real-world – and not a "fictitious" – financial instrument.**

Mr. Hall observed in his opening brief that, pursuant to this Court's holding in *United States v. Howick*, 263 F.3d 1056 (9th Cir. 2001), Section 514 is understood to extend to "nonexistent instruments" "of which there are no genuine versions." *Id*. at 1067.[4] The *Howick* Court explained that Congress designed the statute to cover items that "bear[] a family resemblance to" – but are not themselves – "genuine financial instruments." *Howick*, 263 F.3d at 1068. But at Mr. Hall's trial the government's experts confirmed that money orders *are* genuine financial instruments, and that Mr. Hall's money orders included all the necessary elements of such instruments.[5] It follows that Mr. Hall's conduct could not have fallen within the scope of the statute. None of the government's arguments cogently explain how a money order could properly be deemed a "nonexistent" financial instrument.

The government posits that Mr. Hall's money orders were "previously non-existent" because no money order whereby the drawer transfers money from a Treasury account tied to the drawer's social security number to satisfy the

---

[4] Op. Br. at 22-28.
[5] ER Vol. 4 at 704:25-705:7, 717:15-18.

drawer's debts to the Treasury "exists in circulation."[6] But *no* money orders "exist in circulation." Money orders are not currency. They do not "circulate" as currency does, or as the "fictitious" financial instruments at issue in *Howick* – bogus federal reserve notes in "eye-poppingly large" denominations – purported to do. *Howick*, 263 F.3d at 1061. Money orders are *ad hoc* instruments whereby the drawer orders the drawee to pay the specified amount to the specified recipient.[7] *Every* money order – and every check, for that matter – is "previously non-existent" insofar as it is created to effectuate a particular transaction, and extinguished when that transaction is complete. This characteristic distinguishes money orders and checks from currency, but it does not render them "non-existent" financial instruments.

The government may intend to suggest that what rendered Mr. Hall's money orders "previously non-existent" was the fact they listed bogus account information that rendered them worthless. Indeed, the government's expert expressly analogized Mr. Hall's money orders to a "worthless check."[8] But the Fifth Circuit made plain in *United States v. Morganfield*, 501 F.3d 453 (5th Cir. 2007), that "a check, even if it is worthless, is not, as a matter of law, a 'false or

---

[6] Gov. Br. at 17.
[7] ER Vol. 4 at 725:24-728:14.
[8] *Id*. at 740:15-17.

fictitious instrument.'" *Id*. at 457. Like the money orders in the instant case, the bogus checks in *Morganfield* left their holders disappointed, but they did not expunge checks from the catalogue of "genuine financial instruments." *Howick*, 253 F.3d at 1068.

The government's efforts to distinguish *Morganfield* miss the mark. According to the government, the key fact in *Morganfield* was that the defendants' bogus checks could have been prosecuted as counterfeits. Following this logic, the government reasons that *Morganfield* is inapposite because Mr. Hall's money orders could not have been prosecuted as counterfeits, in light of the fact that they did not "purport to copy or 'knock off' a circulating money order from any institution, bank, or entity."[9]

The government is mistaken. In fact, the *Morganfield* court took no position as to whether the checks at issue were counterfeits – it simply noted in passing that the defendant's actions "*may well* have created 'forged' or 'counterfeit' obligations." *Morganfield*, 501 F.3d at 460-61 (emphasis added). This is unsurprising, because the key question in *Morganfield* – as here – is not whether an instrument that the government chose to prosecute under Section 514 is counterfeit, but whether it is "false or fictitious." And here, as in *Morganfield*, the

---

[9] Gov. Br. at 18.

fact that the account information listed on an otherwise-valid financial instrument renders it worthless does not turn an "otherwise 'real'" financial instrument into a "'nonexistent' type of security." *Id*. at 461.

Finally, the government posits that Mr. Hall's money orders fall within Section 514 because they "were created entirely out of whole cloth by [Brandon] Adams, labeled 'money order' with no further designation, created to look genuine, signed by the defendant, and mailed off to the IRS."[10] But none of these features renders a money order "false or fictitious." The government's own expert confirmed that a legitimate money order – like a legitimate check – can be made "out of whole cloth": Provided that the necessary information is included, a check or money order can be drawn up with a pen on a blank sheet of paper and be perfectly valid.[11] The same expert acknowledged that Mr. Hall's money orders "ha[d] the criteria for a real money order."[12] Thus, the features to which the government points serve to confirm that Mr. Hall's money orders were exemplars of a "real" – rather than a "nonexistent" – type of financial instrument.

In sum, the government fails to overcome this fatal flaw in its case: Money orders simply are not "nonexistent instruments."

---

[10] Gov. Br. at 18.
[11] ER Vol. 4 at 714:10-11, 744:7-16.
[12] *Id*. at 704:25-705:7, 717:15-18.

**B.** **The government fails to explain how Mr. Hall's money orders purported to be "issued under the authority of the United States."**

Mr. Hall showed in his opening brief that a second flaw in the government's case was that his money orders did not purport to be "issued under the authority of the United States," an "organization," or any of the other entities enumerated in Section 514. 18 U.S.C. § 514(a). Unlike the "fictitious" instruments in *Howick*, the money orders neither stated that they were issued under the authority of the United States nor bore any official-looking seal, crest, or logo appearing to be associated with the United States government.[13] The government has never suggested that Mr. Hall's money orders purported to be issued under the authority of any entity other than the United States. The government's failure to prove this element is independently fatal to its case.

The government in response points to this Court's decision in *United States v. Murphy*, --- F.3d ---, 2016 WL 3201582 (9th Cir. 2016), which was issued after Mr. Hall filed his opening brief.[14] The defendant in *Murphy* sent the IRS "bonded promissory notes" along with a cover letter containing "dense legalese." *Murphy*, --- F.3d at ---, 2016 WL 3201582 at *5. The upshot of these documents was that "Murphy, through a convoluted series of accounting devices, ultimately sought to

---

[13] Op. Br. at 28-31.
[14] Gov. Br. at 18-20.

8

pay his taxes from an account created for him, and held on his behalf, by the United States government." *Id*. "Thus construing the evidence," the Court concluded, "a rational jury could find beyond a reasonable doubt that the notes were issued under the authority of the United States." *Id*.

Mr. Hall acknowledges that, on its face, this language appears to apply to Mr. Hall's money orders. But there is a substantial distinction between Mr. Hall's money orders and the "bonded promissory notes" in *Murphy*: Whereas Mr. Hall's money orders referenced the United States Treasury only as "Drawee" and payee, and did not contain any matter tending to suggest that the money orders were actually issued under the authority of the Treasury,[15] the "Bonded Promissory Notes" in *Murphy* prominently listed the names, titles, and addresses of the Secretary of the Treasury and an IRS official in the margin at the bottom of the document. *United States v. Murphy*, No. 12-cr-2497 (S.D. Cal.) (Doc. 201-1 at 12). (Mr. Hall hereby requests judicial notice of this judicial record pursuant to Federal Rule of Evidence 201(c)(2). *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).) These elements, unlike any element of Mr. Hall's money orders, tended to support the inference that the notes appeared or purported to be issued under the authority of the United States. In addition, Mr.

---

[15] ER Vol. 4 at 864, 869; Op. Br. at 12.

Hall notes and preserves his disagreement with the pertinent holding in *Murphy*, in view of the possibility that that holding may be overturned by a superior authority.

The government also points to the Middle District of Alabama's opinion in *United States v. Turner*, 985 F. Supp. 2d 1311 (M.D. Ala. 2013).[16] The *Turner* court reasoned that documents similar to Mr. Hall's money orders effectively purported to be issued under the authority of the United States because they "allege[d] that an account exists in the United States Treasury that can legally be used to offset the maker's debt." *Turner*, 985 F. Supp. 2d at 1317. The court reasoned that "[s]uch an account could only exist and could only be drawn from under the exercise of United States authority." *Id*. at 1317-18.

But the district court in *Turner* erred in projecting its own understanding of the *necessary implications* of what a purported financial instrument contemplated with what the instrument *itself* actually appeared or purported to be. The statute does not describe "instruments directing transactions the necessary implication of which is an exercise of federal authority" – it describes instruments that actually "appear[], represent[], purport[], or contriv[e] through scheme or artifice" to be "*issued under the authority of*" the United States or other entities. 18 U.S.C. § 514(a) (emphasis added). These are very different concepts. A farmer's prayer

---

[16] Gov. Br. at 19.

for rain necessarily contemplates an exercise of heavenly power, but it does not follow that the prayer is "issued under the authority" of God. The *Turner* court effectively rewrote the statute to broaden its scope, which violates both the general principle that "[t]he plain meaning of legislation should be conclusive" (*United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242 (1989)), and the doctrine that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Jones v. United States*, 529 U.S. 848, 858 (2000) (internal quotation marks omitted).

In short, because Mr. Hall's money orders did not appear or purport to be issued under the authority of the United States, his conduct cannot have violated Section 514.

### C. The government fails to explain how a reasonable jury could find that Mr. Hall acted with the requisite "intent to defraud."

Evidence is sufficient to support a conviction only where it can enable reasonable jurors, adopting a "logical chain of inference," to find every element of the charged crime beyond a reasonable doubt. *United States v. Katakis*, 800 F.3d 1017, 1025 (9th Cir. 2015). Mr. Hall showed in his opening brief that no such chain of inference is available here. The jurors could accept either the "true believer" scenario, whereby Mr. Hall genuinely believed that a secret bank account lodged in the Treasury could legitimately offset his tax obligations, or the "nose-thumbing"

11

scenario, whereby he understood that no such account existed, and only intended to thumb his nose at the IRS. Neither chain of inference leads to the conclusion that Mr. Hall intended to defraud the federal government.[17]

The government insists that "the chain of inferences necessary for a jury to conclude that the defendant had the requisite intent to defraud is supported by the evidence."[18] But the government never actually articulates a logical chain of inference that would support that conclusion. Instead, the government proffers a jumble of observations, none of which demonstrates that the evidence could support a finding of an intent to defraud.

- The government notes that Mr. Hall's money orders bore "indicia suggesting they [we]re negotiable and authentic."[19] Under the "true believer" scenario, these indicia would be consistent with Mr. Hall's intent to bring about a genuine transfer of funds. Under the "nose-thumbing" scenario, the fact that Mr. Hall listed a patently bogus account from which the funds were to be drawn renders these "indicia" irrelevant, because all the "indicia" in the world could not cause real money to be withdrawn from a fake account.

---

[17] Op. Br. at 31-33.

[18] Gov. Br. at 22.

[19] *Id*. at 20.

- The government observes that Mr. Hall called Revenue Officer Lyons and requested the exact amount of taxes owed, showing that he "intended to convince the IRS that he would make payment."[20] But Section 514 does not criminalize acting with the intent to "convince" the creditor that one will make payment. It criminalizes acting with the "intent to *defraud*." 18 U.S.C. § 514(a) (emphasis added). Under the "true believer" scenario, Mr. Hall genuinely *did* intend to make payment. Under the "nose-thumbing" scenario, his actions tending to convince the IRS that he would make payment could indicate an intent to *mislead*, but not an intent to *defraud*. Section 514 does not cover actions taken with the intent to mislead, inconvenience, or annoy; it reaches only actions taken with the intend to *defraud*.

- The government cites *United States v. Bitao*, 266 F. App'x 536 (9th Cir. 2008), for the proposition that the required *mens rea* for a Section 514 offense is "intent to defraud," rather than "[k]nowledge of the instruments' falsity." *Id*. at 537-38.[21] This is a red herring. Mr. Hall does not argue that

---

[20] *Id*. at 21.
[21] Gov. Br. at 21.

13

the government failed to prove his "knowledge of the instruments' falsity"; he argues that the government failed to prove his "intent to defraud."[22]

- The government points to evidence showing that Mr. Hall had a hand in a large number of similar money orders being mailed to IRS personnel, and that Mr. Hall "made considerable amounts of real money by perpetuating this fraud all over the country."[23] But the government did not choose to charge Mr. Hall with defrauding his company's clients; it chose to charge him with sending two money orders to the IRS with the intent to defraud the United States government.[24] The "real money" that Mr. Hall received from his clients is thus immaterial to the charges that the government bore the burden of proving.

In short, the government fails to identify any logical chain of inference, based on the evidence at trial, that would support a rational conclusion that Mr. Hall sent the money orders to the IRS with the "intent to defraud." For that reason, and the additional reasons set forth above, this Court should vacate his convictions and remand the case for the entry of a judgment of acquittal. *United States v. Havelock*, 664 F.3d 1284, 1296 (9th Cir. 2012) (en banc).

---

[22] Op. Br. at 31-33.
[23] Gov. Br. at 21-22.
[24] ER Vol. 2 at 7-8.

**II.      The government fails to refute Mr. Hall's showing that the district court erred in failing to conduct a hearing into his competency to stand trial.**

Before, during, and after his trial, Mr. Hall engaged in a broad array of bizarre, irrational, and self-defeating behaviors. He repeatedly expressed the belief that the proceedings had nothing to do with him, refused to assist his counsel in preparing for trial or sentencing, alienated the jurors by choosing to appear in court in prison garb and sitting through the proceedings with his eyes closed, gave incoherent and non-responsive answers to the court's questions, filed incoherent papers, caused his lawyer to repeatedly express concern about his competency, and failed to accept a generous plea offer that would have resulted in his receiving no additional prison time, as a result of which he eventually received *eight years* of additional prison time for the charges underlying this case.

Despite all this evidence, despite the fact that his counsel filed a pretrial motion for a competency hearing, and despite the fact that the governing statute mandates such a hearing wherever there is "reasonable cause to believe" that the defendant may be unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense (18 U.S.C. § 4241(a)),

15

the district court refused to conduct such a hearing. Mr. Hall showed in his opening brief that this was error.[25] The government fails to explain how it was not.

The government first asserts that "[c]ourts reviewing the question of competency of adherents to the sovereign citizen ideology have universally held that these defendants are competent to stand trial irrespective of their sovereign citizen beliefs."[26] The government's evident premise is that, because courts have found *other* defendants exhibiting similar behavior competent, there was no need for the district court to conduct a hearing on that question with respect to Mr. Hall. But there is nothing in Section 4241 exempting cases in which a defendant espouses "sovereign citizen" beliefs from its mandates. Indeed, any such blanket exemption would be inconsistent with the fact that Mr. Hall, like any citizen of the United States, has an *individual* right to due process. In any case, it would be foolhardy to draw conclusions from the dearth of caselaw regarding defendants who were found *in*competent to stand trial: Such cases presumably did not proceed to trial, conviction, or appeal, and thus did not culminate in the issuance of opinions that would find their way into legal research databases.

The government further posits that Mr. Hall's refusal to assist his counsel or to engage in the proceedings, his counsel's expressions of concern about his

---

[25] Op. Br. at 33-42.
[26] Gov. Br. at 24.

competence, and his self-defeating rejection of the government's generous plea offer do not – considered individually – "rise to the level of doubt necessary to compel an evidentiary hearing."[27] But this "divide-and-conquer" approach to the pertinent factors is improper. The governing standard requires courts to "engage in a '*comprehensive*' review of the evidence," rather than assessing individual factors *in vacuo*. *United States v. Duncan*, 643 F.3d 1242, 1247 (9th Cir. 2011) (emphasis added).

The government's suggestion that *Mendez v. Knowles*, 556 F.3d 757 (9th Cir. 2009), precludes Mr. Hall's reliance on his rejection of the government's plea offer as evidence of his incompetency[28] is equally misguided. The *Mendez* panel held that the defendant's conduct leading to the withdrawal of a plea agreement that would have recommended "a prison term of *twenty-five years to life*" did not constitute substantial evidence of his incompetence. *Mendez*, 556 F.3d at 761 (emphasis added). In the instant case, by contrast, Mr. Hall's conduct led to the withdrawal of a plea agreement that would have provided for *no* additional prison time.[29] The failure to accept the plea offer was a great deal more self-defeating, and thus more probative of incompetence, in this case than in *Mendez*.

---

[27] *Id*. at 25.
[28] Gov. Br. at 29.
[29] Op. Br. at 8-9.

The government also points to evidence indicating that Mr. Hall "was aware of the proceedings and the gravity of the situation."[30] But this, too, misperceives the applicable standard, which calls for an inquiry into whether the defendant is able to "understand the nature and consequences of the proceedings against him" and to "assist properly in his defense." 18 U.S.C. § 4241(a). A person can be "aware" of proceedings and their "gravity" without understanding their "nature" or "consequences," and without being able to "assist properly" in his own defense. And the record suggests that this, at best, was Mr. Hall's situation.

The government references selected portions of the record in which Mr. Hall appears to have behaved rationally, and points to the competency assessment that had been conducted in South Carolina two years before his trial in the instant case.[31] But the government fails to address the fact that this Court "ha[s] repeatedly acknowledged that a defendant's competency can change within a short period of time." *Maxwell v. Roe*, 606 F.3d 561, 575 (9th Cir. 2010). Nor does the government acknowledge this Court's observation that an assessment carries little weight where, as here, it is not contemporaneous with the defendant's trial and is a mere "short form letter[]." *Id*. at 575, 577.[32]

---

[30] Gov. Br. at 26.
[31] Gov. Br. at 27-29.
[32] Op. Br. at 41.

In short, the government's arguments fail to acknowledge the governing standards, the statutory mandate, or the totality of the evidence. Because on the whole of the evidence "a reasonable judge would be expected to experience a genuine doubt respecting [Mr. Hall's] competence," the district court erred in refusing to conduct such a hearing here. *United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013) (internal quotation marks omitted). This Court should accordingly vacate Mr. Hall's convictions and remand the case with instructions that the district court hold an evidentiary hearing regarding Mr. Hall's competency and, if it determines that the matter cannot be reliably resolved, grant him a new trial. *Id.* at 965.

## III. The government fails to vindicate the unlawful supervised release conditions that the district court imposed upon Mr. Hall.

In his opening brief, Mr. Hall noted that discretionary conditions of supervised release are permissible only if they are reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender, involve no greater deprivation of liberty than is reasonably necessary to achieve those goals, and are "sufficiently clear to inform him of what conduct will result in his being returned to prison." *United States v. Guagliardo*, 278 F.3d 868, 872 (9th Cir. 2002). Mr. Hall demonstrated that four of the conditions that the district court imposed

on him breach these mandates.[33] The government's attempts to refute this showing are unconvincing.

### A. The government's assertion that standard conditions of supervised release are "presumed suitable" is misguided.

Citing decisions of the Second and Fifth Circuits (*United States v. Torres-Aguilar*, 352 F.3d 934 (5th Cir. 2003); *United States v. Asuncion-Pimental*, 290 F.3d 91 (2d Cir. 2002) (per curiam)), the government asserts that supervised release conditions labeled "standard" are "presumed suitable."[34] This assertion is misguided in two respects.

First, the cases on which the government relies have nothing to do with the *merits* of supervised release conditions labeled "standard." The question addressed in these cases was whether the conditions in question could be presumed to have been imposed automatically, regardless of the district courts' failure to articulate them orally at sentencing, such that their inclusion in the judgment did not violate the rule that a defendant must be present at the imposition of his sentence. *Asuncion-Pimental*, 290 F.3d at 93 (citing Fed. R. Crim. P. 43(a)); *Torres-Aguilar*, 352 F.3d at 935 (referring to defendant's constitutional right to be present at sentencing). The defendants in these cases challenged the conditions solely on the

---

[33] Op. Br. at 42-47.
[34] Gov. Br. at 33-34.

ground that they were not part of the oral pronouncement of sentence, and the circuit courts rejected these challenges on the rationale that the conditions, like conditions labeled "standard" by the Guidelines, are presumed to be included in the judgment when specified circumstances are present. *Asuncion-Pimental*, 290 F.3d at 93; *Torres-Aguilar*, 352 F.3d at 935. Thus, contrary to the government's suggestion, these opinions' descriptions of "standard" conditions as "presumed suitable in an all cases" pertain only to the presumption that they are *included in the judgment*, not to any assumption about their merits.

Second, any suggestion that supervised release conditions labeled "standard" must be presumed "suitable" on their merits on a blanket basis would overlook the fact that the statute governing supervised release conditions "leaves no room for blanket policies applicable without individualized consideration regarding discretionary conditions." *United States v. Betts*, 511 F.3d 872, 878 (9th Cir. 2007). It follows that "the fact that certain non-administrative conditions are labeled 'standard' does not render them immune from the requirements that they be adequately supported and not vague or overbroad." *United States v. Kappes*, 782 F.3d 828, 848 (7th Cir. 2015).

For these reasons, the government's insistence that supervised release conditions labeled "standard" must be "presumed suitable" on their merits is mistaken.

**B.     The government's defenses of the challenged conditions are unconvincing.**

The government also mounts particularized defenses of the challenged conditions. These defenses are unconvincing.

### (1)     "[N]ot associate with any person convicted of a felony"

Mr. Hall demonstrated that the condition barring him from associating with felons improperly infringes upon his fundamental liberty interest in having contact with his children Benton and Shannon. In *United States v. Wolf Child*, 699 F.3d 1082 (9th Cir. 2012), this Court held that a condition infringing upon a releasee's liberty interest in having contact with his own children is proper only if it is supported by a contemporaneous, on-the-record finding that the condition is supported by record evidence, was necessary to accomplish one or more of the factors listed in 18 U.S.C. § 3583(d)(1), and involves no greater deprivation of liberty than reasonably necessary. *Wolf Child*, 699 F.3d at 1091-94.[35]

The government urges this Court to overlook the lack of findings by making its own, *de novo* finding that this condition is "appropriate because Benton Hall was

---

[35] Op. Br. at 44-46.

a co-conspirator in the case and Shannon Hall testified at length that she worked for her father in the fictitious money order business."[36] But *Wolf Child* makes plain that "[i]t is not enough that reviewing court may be able to piece together [evidence satisfying the necessary findings] from its *own* review of the record." *Wolf Child*, 699 F.3d at 1092 (emphasis added). "Rather," the Court explained, "the sentencing court, at the time it imposes the restrictive condition on the exercise of a particularly significant liberty interest, must *itself* point to the evidence in the record on which it relies and explain how on the basis of that evidence the particular restriction is justified." *Id.* (emphasis added). The *de novo* finding suggested by the government is thus precluded by this Court's caselaw.

The government also seeks to distinguish *Wolf Child* on the ground that Shannon and Benton "are not minor dependents."[37] Contrary to the government's premise, however, a parent's fundamental liberty interest in the companionship and society of his child extends to adult, as well as minor children. *Smith v. City of Fontana*, 818 F.2d 1411, 1417-19 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. De La Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc); *Strandberg v. City of Helena*, 791 F.2d 744, 748 & n.1 (9th Cir. 1986). It follows that the mandates set forth in *Wolf Child*, which are designed to protect a supervisee's

---

[36] Gov. Br. at 34-35.
[37] Gov. Br. at 35.

fundamental liberty interest in having contact with his own children, apply fully to cases involving adult children such as Shannon and Benton.

Finally, the government posits that the fact that the condition "specifically permits the [p]robation officer to sanction contact at the request of the defendant" vindicates the condition.[38] But this Court rejected this precise argument in *Wolf Child*, holding that "[i]f the record does not justify imposing a supervised release condition that infringes on a defendant's liberty interests, the limiting condition may not be imposed simply because a probation officer has the authority to mitigate the severity of the improper deprivation of liberty." *Wolf Child*, 699 F.3d at 1095-96.

In short, the government fails to justify leaving the overbroad no-contact-with-felons condition in place.

### (2)   "Work regularly at a lawful occupation"

Mr. Hall showed in his opening brief that the condition requiring him to "work regularly at a lawful occupation" is impermissibly vague because it fails to define "regularly." *Kappes*, 782 F.3d at 849.[39] The government makes no attempt to argue that this condition is not impermissibly vague, effectively conceding the

---

[38] Gov. Br. at 35.

[39] Op. Br. at 46.

point. *See United States v. Caceres-Olla*, 738 F.3d 1051, 1054 n.1 (9th Cir. 2013);

*United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011).

### (3) "Support your dependents" and meet "family responsibilities"

Mr. Hall showed in his opening brief that the condition requiring him to

"support [his] dependents" and meet other "family responsibilities" is

inappropriate both because he has no "dependents," and because its meaning is

impermissibly vague.[40] The government makes no attempt to dispute either of

these points, effectively conceding their validity. *Caceres-Olla*, 738 F.3d at 1054 n.1;

*McEnry*, 659 F.3d at 902.

### (4) Major Purchases

Finally, Mr. Hall showed that the condition barring him from making "major

purchases" is impermissibly vague, as this Court found in *United States v.

Washington*, 584 F. App'x 846 (9th Cir. 2014).[41] The government proffers several

defenses of this condition, but none holds water.

The government asserts that, in light of Mr. Hall's offense, "the district

court had sufficient justification" for imposing this condition.[42] But Mr. Hall's

argument is not that the condition is *unjustified*, it is that the condition is *vague*.

---

[40] Op. Br. at 46-47.
[41] Op. Br. at 47.
[42] Gov. Br. at 37.

The government's attempt to distinguish *Washington* is unavailing for the same reason: The government posits that *Washington* is distinguishable because "[h]ere, the nexus between the crime of conviction and the supervised release condition is not nebulous."[43] But the *Washington* panel did not strike the condition because its connection to the crime of conviction was nebulous; it struck the condition because it is "impermissibly vague." *Washington*, 584 F. App'x at 847. And the government identifies no flaw in the *Washington* panel's holding or reasoning.

The government also represents that this Court "held that the major purchases provision is not impermissibly vague" in *United States v. T.M.*, 330 F.3d 1235 (9th Cir. 2003).[44] This is untrue. There was no vagueness challenge to the "major purchases" condition in *T.M.* The defendant's argument was that the condition "must be vacated and remanded because he was not given notice that the district court was considering imposing [it]." *T.M.*, 330 F.3d at 1242. This Court agreed, holding that the condition "must reconsidered because T.M. did not have proper notice that the court was considering such a condition." *Id.* at 1243. The vagueness issue that Mr. Hall raises here was not raised or ruled upon in *T.M.*

---

[43] *Id.*
[44] Gov. Br. at 37.

26

Finally, the government posits that the language permitting major purchases with the approval of the probation officer "mitigat[es] any prejudice" to Mr. Hall.[45] But a probation officer's discretion to construe an impermissibly vague condition does not *mitigate* the condition's unlawfulness; it *exacerbates* it. The role of sentencing defendants is assigned to Article III judges alone, and may not constitutionally be delegated to nonjudicial actors such as probation officers, any more than it could be delegated to law clerks or secretaries. *United States v. Stephens*, 424 F.3d 876, 880-82 (9th Cir. 2005); *United States v. Thompson*, 777 F.3d 368, 382 (7th Cir. 2015). The clause authorizing the probation officer to sign off on major purchases cannot cure the condition's unlawful vagueness.

The government thus fails to vindicate the "major purchases" condition's unlawful vagueness.

### C. The district court's imposition of these unlawful conditions was plain error.

Mr. Hall showed in his opening brief that the district court's imposition of these unlawful conditions was plain error. The government asserts that it was not, because Mr. Hall has not shown "how these conditions impermissibly jeopardize [his] liberty and due process interests."[46] But this Court firmly rejected this

---

[45] Gov. Br. at 37.
[46] Gov. Br. at 36.

27

argument in *United States v. Barsumyan*, 517 F.3d 1154 (9th Cir. 2008), holding that "[t]he probability that the defendant will actually be subject to the condition is irrelevant to the determination of 'substantial rights' in the plain error context, which equates 'substantial rights' with legal prejudice." *Id.* at 1162. Here, as in *Barsumyan*, "[s]ince the condition would not have been imposed had the error not occurred, it necessarily affected substantial rights." *Id.* This Court has also observed that a releasee has a right not to be placed "in the untenable position of discover[ing] the meaning of his supervised release condition only under continual threat of reimprisonment, in sequential hearings before the court." *Guagliardo*, 278 F.3d at 872 (internal quotation marks omitted).

The government further argues that these errors could not be plain in light of the "lack of precedent questioning the application or imposition of such standard conditions."[47] In fact, all of the caselaw on which Mr. Hall relies was on the books by the time of Mr. Hall's June 2016 sentencing, including *Wolf Child* (October 2012), *Kappes* (April 2015), *Guagliardo* (January 2002), and *Washington* (September 2014). But the government's theory would be invalid even if it had not been, because the lack of "appellate case law answering th[e] precise question" does not preclude a plain error finding. *United States v. Joseph*, 716 F.3d 1273, 1280

---

[47] Gov. Br. at 36.

(9th Cir. 2013). Indeed, this Court has found plain error with respect to supervised release conditions even where no binding precedent had previously invalidated the same condition. In *United States v. Abbouchi*, 502 F.3d 850 (9th Cir. 2007), for example, the Court found plain error, not because binding precedent had invalidated the condition in question, but because the evidence on which the district court relied was "insufficient to support" it. *Id.* at 858. And more recently in *United States v. LaCoste*, 821 F.3d 1187 (9th Cir. 2016), the Court found plain error in the imposition of a condition, not because any binding precedent had invalidated that condition, but because "[t]he facts of th[e] case" did not justify it. *Id.* at 1192. The government's assertion that the lack of precedent invalidating the identical condition bars a plain error finding is thus mistaken.

In sum, the government fails to refute Mr. Hall's showing that this Court should find plain error with respect to these unlawful supervised release conditions.

## Conclusion

For the reasons set forth above and in Mr. Hall's opening brief, this Court should reverse his convictions on the ground of insufficiency of the evidence and remand the case with instructions that a judgment of acquittal be entered, reverse his convictions on the ground that the district court erred in failing to conduct a competency hearing and remand the case with instructions that the district court

either conduct a hearing on his competency at the time of trial of grant him a new

trial, or vacate his sentence in light of the district court's imposition of unlawful

supervised release conditions and remand the case for resentencing.

Respectfully submitted on August 22, 2016.

s/*Daniel L. Kaplan*
DANIEL L. KAPLAN
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007-2730
(602) 382-2700

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B)</u>

I hereby certify that, pursuant to FRAP 32(a)(7)(B), the foregoing

**Defendant-Appellant's Reply Brief** is proportionately spaced, has a typeface of

14 points, and contains 6,235 words.


<u>s/*Daniel L. Kaplan*</u>
DANIEL L. KAPLAN
Assistant Federal Public Defender
*Attorney for Defendant - Appellant*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that I caused the foregoing **Defendant-Appellant's Reply Brief** to be submitted to the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit on August 22, 2016, using the appellate CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/*Daniel L. Kaplan*
DANIEL L. KAPLAN
Assistant Federal Public Defender
*Attorney for Defendant - Appellant*